UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

VIRGINIA L. GIUFFRE,

                        Plaintiff,

   -against-

ALAN DERSHOWITZ

                        Defendant,

-----------------------------------------------------------------------x

1:19-CV-03377

ECF CASE

**DECLARATION OF
ALAN DERSHOWITZ**

     I, **ALAN DERSHOWITZ**, declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746, as follows:

     1.    I am the Defendant in this case, and I am familiar with the facts and circumstances in this matter based upon my own personal knowledge and observations, review of documents within my possession, and those matters not based thereon are upon information and belief.

     2.    I respectfully submit this Declaration in support of my Motion to Disqualify and respectfully request that the Court enter an order disqualifying the law firm of Boies Schiller Flexner LLP (hereinafter the "Boies Schiller Firm") as counsel for the Plaintiff, pursuant to, (a) Rules 3.7(b)(1) and (2) of the New York Rules of Professional Conduct, and individual attorneys within the Boies Schiller Firm pursuant to Rule 3.7(a) of the New York Rules of Professional Conduct; (b) due to inherent and nonwaivable conflicts of interest by the Boies Schiller Firm as described herein as it relates to this litigation pursuant to Rules 1.6, 1.7, 1.9, 1.10 and/or 1.18 of the New York Rules of Professional Conduct; (c) pursuant to the discretionary power of this Respected Court to order disqualification; and (d) for such other and further relief as to the Court may seem just and proper. The basis for

firm wide disqualification are the multiple related incidents of unethical conduct by the Boies Schiller Firm that mandate firm wide disqualification.

3.     I further respectfully submit this Declaration in support of my Motion to Disqualify, seeking the disqualification of the Boies Schiller Firm based on this Honorable Court's discretionary power to grant such equitable, fair and just relief based on the pervasive personal animus, bad faith, malicious, defamatory, and unlawful conduct as exemplified by David Boies and the Boies Schiller Firm against me that has caused me irreparable harm. For this, and the incidents detailed herein, David Boies and attorneys in the Boies Schiller Firm have become necessary, material, and relevant fact witnesses who, if testifying truthfully, will offer testimony adverse and prejudicial to their client, and I fully intend to call these witnesses to testify at depositions and at the trial of this matter.

4.     Furthermore, I intend to address, rebut, defend and counterclaim against the wanton misrepresentation of fact and misleading defamatory accusations made by the Plaintiff Virginia L. Giuffre, nee Roberts, (hereinafter "Giuffre") in her Complaint. The Complaint and this litigation is fueled by the inappropriate and pervasive involvement of the Boies Schiller Firm, and in order to preserve the integrity of the judicial process, the Boies Schiller Firm must be disqualified in this action. A copy of the Complaint filed in this matter, and undersigned by Sigrid McCawley and Joshua Schiller, is annexed hereto as **EXHIBIT A**.

5.     The instant motion is timely, and filed now, because the Boies Schiller Firm has written a letter in an attempt to intimidate me -stating that I am attempting to avoid my "reckoning"- in response to a letter written by my attorneys which put them on notice of their conflicts and grounds for disqualification, and in which they demand I file this motion

now (while also threatening to seek sanctions if I do so) or they will claim, albeit erroneously under the law, that it is too late. A copy of the May 6, 2019 letter drafted by my attorneys and sent to the Boies Schiller Firm is annexed hereto as **EXHIBIT B**. A copy of the May 9, 2019 email response from Boies Schiller Firm attorney Joshua Schiller is annexed hereto as **EXHIBIT C.**

## RELEVANT FACTS

6.      I am currently *Professor Emeritus* at Harvard Law School and employed in writing and legal work on a consulting basis.

7.      Attorneys David Boies (hereinafter "Boies") and Sigrid McCawley (hereinafter "McCawley"), Carlos Sires (hereinafter "Sires") are partners of the Boies Schiller Firm. Boies is a name partner of the Boies Schiller Firm, which maintains offices in New York, Florida and other locations in the United States. McCawley and Sires are partners at the Boies Schiller Firm's Fort Lauderdale office.

**I.      Jeffrey Epstein**

8.      I met Jeffrey Epstein (hereinafter "Epstein"), a wealthy money manager, in the late summer of 1996 through an eminent mutual acquaintance, Lady Lynn Forester de Rothschild, and we maintained a cordial academic relationship, along with many other academics, especially from Harvard, where Epstein maintained an office and conducted seminars attended by distinguished professors in connection with a program he funded.

9.      However, in a highly publicized case, Epstein was accused of sexual crimes involving underage females, and in 2005, I was retained by Epstein to be part of a legal team to represent him in regard to the charges he was facing.

10.     Together with Roy Black, Kenneth Starr, Jay Lefkowitz, Gerald Lefcourt, and several other prominent lawyers, I helped arrange a plea bargain under which Epstein pled guilty to a single charge of soliciting prostitution under Florida state law. Epstein was sentenced to 18 months of imprisonment and upon release, he had to register as a sex offender. Epstein also agreed to settle all future civil suits with his alleged victims.

11.     Although I participated in negotiating Epstein's criminal plea bargain, I was not involved in drafting the non-prosecution agreement. Moreover, contrary to the allegations made by Giuffre's lawyers, I never negotiated any provision that would have protected me from future prosecution, since I did absolutely nothing that would warrant prosecution.

12.     Had I been accused, or suspected, at that time of anything even remotely questionable, I would have been disqualified by the prosecution from any involvement in the case. At no time was this contemplated as there existed no grounds for it. I have been advised by the main prosecutor involved in the negotiations that there were no allegations or suspicions of misconduct against me at the time. In January 2009, Epstein was released after serving thirteen months of his original sentence, some of it on work release.

## II.        The CVRA Litigation

13.     In 2008, shortly after it became public that Epstein had reached an agreement with prosecutors, several of his alleged victims brought a lawsuit against the government under Crime Victims' Rights Act ("the CVRA lawsuit"), alleging that prosecutors had failed to inform them of the Epstein plea deal, see *Doe v. United States, Case 9:08-cv-80736-KAM*. Giuffre was not one of these alleged victims.

14.     On December 30, 2014, Giuffre's attorneys Bradley Edwards and Paul

Cassell filed a Motion Pursuant to Fed. Civ. P. Rule 21 for Joinder in Action (hereinafter

"the Motion for Joinder") through which they sought to include two alleged victims of

Epstein as plaintiffs in the CVRA lawsuit. One of those anonymous individuals - identified

in the Motion for Joinder only as "Jane Doe #3", was later named by various media sources

as the Plaintiff Giuffre. Giuffre alleged that she had been sexually abused by several of

Epstein's acquaintances, including Prince Andrew of England, and myself. It is my belief

that the false allegations against me were deliberately filed in a public document, and

deliberately leaked to the media, although other pleadings and documents throughout the

litigation were filed under seal. I further believe that one of the reasons why I was accused

in public filings while others were accused only in sealed filings was because this was

essential to an extortion plot by Giuffre and her attorneys against billionaire Leslie "Les"

H. Wexner, as discussed more fully *infra*.

15.     Specifically, The Motion for Joinder alleged that

*Epstein required [Roberts] to have sexual relations with Dershowitz on
numerous occasions while she was a minor, not only in Florida but also on private
planes, in New York, New Mexico, and the U.S. Virgin Islands. In addition to being a
participant in the abuse of Jane Doe #3 and other minors, Deshowitz [sic] was an eye-
witness to the sexual abuse of many other minors by Epstein and several of Epstein's
co-conspirators.* [1]

It further stated that:

*Dershowitz helped negotiate an agreement with a provision that provided
protection for himself against criminal prosecution in Florida for sexually abusing
Jane Doe #3. Because this broad immunity would have been controversial if disclosed,
Dershowitz (along with other members of Epstein's defense team) and the Government*

---

[1] Jane Doe #3 and Jane Doe #4's Motion Pursuant to Rule 21 for Joinder in Action", *Jane Doe #1
and Jane Doe #2 v. U.S.*, Case  No. 08-80736-Civ-Marra/Johnson, December 30, 2014, p.4

*tried to keep the immunity provision secret from all of Epstein's victims and the general public, even though such secrecy violated the Crime Victims' Rights Act.* [2]

16.    The Motion for Joinder also stated that:

*Epstein also trafficked Jane Doe #3 for sexual purposes to many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders. Epstein required Jane Doe #3 to describe the events that she had with these men so that he could potentially blackmail them.*

17.    To date, neither Giuffre nor her representatives have publicly disclosed the names of any other "powerful men" to whom Giuffre was trafficked (we are aware of the names of these individuals). They have also failed to identify any of the "other minors" who they claim were forced to have sex with me. Indeed, one of Giuffre's lawyers admitted during his deposition that he did not have the names of any "other minors" or any evidence to support this outrageous and false allegation.

18.    Giuffre's allegations contained the in the Motion for Joinder and in subsequent court filings in the CVRA case were eventually stricken from the record by the judge. The judge found that Giuffre's allegations were improper, insofar as they contained "redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f)"[3], cautioned that "that all counsel are subject to Rule 11's mandate that all submissions be presented for a proper purpose and factual contentions have evidentiary support,"[4] and described the decision to strike Giuffre allegations as a "sanction" against her attorneys.

---

[2] Jane Doe #3 and Jane Doe #4's Motion Pursuant to Rule 21 for Joinder in Action", *Jane Doe #1 and Jane Doe #2 v. U.S.*, Case No. 08-80736-Civ-Marra/Johnson, December 30, 2014, p.4
[3] "Order Denying Petitioners' Motion to Join Under Rule 21 and Motion to Amend Under Rule 15," *Jane Doe #1 and Jane Doe #2 v. U.S.*, Case No. 08-80736-Civ-Marra/Johnson, April 7, 2015, p.4
[4] *Ibid*

### III.          Virginia Giuffre's False Allegations

19.     On December 30 2014, Giuffre falsely alleged in the CVRA pleading that I had engaged in sexual activity with her when she was a minor. She claimed to have had sexual contact with me on at least six occasions at the behest of Epstein.

20.     I have previously sworn under oath and subject to perjury -and repeat this sworn statement now- that this accusation is totally and categorically false, that I did not know Giuffre at the time she alleges these incidents to have occurred, I had never met her at the time she alleges these incidents to have occurred, and I never had any sexual or other contact with Giuffre. I do so again emphatically herein. In fact, I have met her only once, and that was when she was deposed in 2016. Her sworn statements to the contrary are perjurious.

21.     Indisputable documentary evidence proves that 1) I could not have been and was not at locations during the times Giuffre claimed to have had sex with me; and 2) she was not a minor during that time period, as revealed by her subsequent testimony and documentary evidence available to her lawyers at the time, and that 3) she has made false statements and committed perjury about other individuals including former Vice President Al Gore, Tipper Gore and former President Bill Clinton.

22.     This information was known to the Boies Schiller Firm, yet they persist to aid, abet, and encourage Giuffre, and others, to make false allegations against me.

23.     Giuffre has made numerous provably false factual allegations that demonstrate that she is not a credible witness. Giuffre gave an interview to the Daily Mail in 2011, in which she used her own name, and for which she was paid $160,000. A copy of the 2011 Daily Mail article is annexed hereto as **EXHIBIT D**. In that interview, Giuffre

described several incidents that were demonstrably false on their face. Giuffre also recalled

having met Al Gore and his then-wife Tipper on Epstein's island:

> *"I had no clue that anything was up. The Gores seemed like a beautiful couple*
> *when I met them. All I knew was that Mr. Gore was a friend of Jeffrey's and*
> *Ghislaine's. Jeffrey didn't ask me to give him a massage. There might have been a*
> *couple of other girls there on that trip but I could never have imagined this guy would*
> *do anything wrong. I was planning to vote for him when I turned 18. I thought he was*
> *awesome."*

24.     The evidence will prove that Al Gore does not personally know Jeffrey

Epstein and has never been to Epstein's private island in the Caribbean, and that

McCawley, Boies, and the Boies Schiller Firm knew this when they filed her false affidavit

and McCawley saw her perjure herself at her deposition. Boies was Al Gore's lawyer in

*Bush v. Gore* and could easily have confirmed this by calling his former client. When I

asked Boies why he had not checked with his former client, he responded that he was not

vouching for Giuffre's "general credibility", but he was convinced that she was "wrong"

in accusing me.

25.     Giuffre also claimed to have met Bill Clinton twice. Giuffre described her

interactions with Clinton as follows:

> *"Ghislaine Maxwell [Epstein's associate] went to pick up Bill in a huge black*
> *helicopter that Jeffrey had bought her. She'd always wanted to fly and Jeffrey paid for*
> *her to take lessons, and I remember she was very excited because she got her license*
> *around the first year we met. I used to get frightened flying with her but Bill had the*
> *Secret Service with him and I remember him talking about what a good job she did."[5]*

26.     Giuffre also described, in detail, a dinner with President Clinton, Jeffrey

Epstein and others on Little St. James, a private Caribbean island, which Mr. Epstein owns:

> *"We all dined together that night. Jeffrey was at the head of the table. Bill was at*
> *his left. I sat across from him. Emmy Tayler, Ghislaine's blonde British assistant sat at*
> *my right. Ghislaine was at Bill's left and at the left of Ghislaine there were two olive-*
> *skinned brunettes who'd flown in with us from New York.... Maybe Jeffrey thought they*

---

[5] *Id.*

8

*would entertain Bill, but I saw no evidence that he was interested in them. He and Jeffrey and Ghislaine seemed to have a very good relationship. Bill was very funny."*

27.     Giuffre's account regarding Clinton was patently absurd -the Secret Service would never have allowed Clinton to fly with a novice helicopter pilot -and was later disproved by an investigation headed by the former FBI Director Louis Freeh, which found that according to Secret Service records, "former President Clinton did not in fact travel to, nor was he present on, Little St. James Island between January 1, 2001 and January 1, 2003"- the time period during which Giuffre was associated with Epstein. Freeh concluded as follows: ***"Over the past several months, an independent investigation was conducted, under my supervision, by former senior federal law enforcement officials. We interviewed many witnesses and reviewed thousands of pages of documentary evidence. Our investigation found no evidence to support the accusations of sexual misconduct against Professor Dershowitz. In fact, in several instances, the evidence directly contradicted the accusations made against him. In my opinion, the totality of the evidence found during the investigation refutes the allegations made against Professor Dershowitz."*** Louis Freeh's reports, collectively with a statement by Freeh Group International Solutions, LLC President and CEO James R. Bucknam, are annexed hereto as **EXHIBIT E**.

28.     Moreover, in the 2011 interview Giuffre did not name me publicly as one of her abusers. There are sealed documents in the case of *Giuffre v. Maxwell* 15-cv-7433 - emails and a book manuscript- which bear directly on this issue. I am seeking to unseal these documents because they conclusively prove that Giuffre has acknowledged that she never had sex with me and that I am innocent. They discredit the bold allegations made by Giuffre and her lawyers. They also prove that Giuffre' lawyers were well aware that she

was deliberately trying to frame me for a crime she and they knew I did not commit. The need to have these documents unsealed is all the more relevant and necessary now due the filing of the instant action by Giuffre against me.

29.     Since Giuffre's false accusations against me were made in a publicly filed court pleading, media outlets around the world began reporting that I had been accused of sexually abusing a minor -the most serious crime a law professor has ever, to my knowledge, been accused of- I had no choice but to defend myself publicly by telling the truth and providing evidence of my innocence.

30.     I began my public defense in the media against Giuffre's baseless allegations and accused Giuffre' lawyers, Cassell and Edwards, of professional misconduct.  As a result, Giuffre's attorneys and I filed defamation claims against each other. (see *Edwards v. Dershowitz*, Case no. CACE 15-000072). The case was settled and the lawyers who filed the accusation withdrew it and acknowledged it was "a mistake" to have included it. Moreover, the federal judge before whom the allegation was made struck the allegation as a "sanction" against the lawyers who filed it. A copy of the Cassell and Edwards statement in which the accusation is acknowledged as a mistake is annexed hereto as **EXHIBIT F**. The decision of the Honorable Kenneth A. Marra, United States District Court for the Southern District of Florida, striking allegations made against me, is annexed hereto as **EXHIBIT G**.

31.     It was after I had completed an interview defending myself on the *Today Show* on January 22nd 2015, that Carlos Sires, a partner at the Fort Lauderdale office of the Boies Schiller Firm sent me an unsolicited e-mail and offered me his assistance. I was not aware at the time that this very law firm was secretly representing Giuffre against me. The

series of emails between Carlos Sires and myself, as discussed further *infra*, are annexed hereto as **EXHIBIT H**.

### IV.   Conflicts of Interest Involving Attorneys of the Boies Schiller Firm

32.     I had known Carlos Sires (hereinafter "Sires") for several years, having worked with him and his partner Sigrid McCawley (hereinafter "McCawley") from the Boies Schiller Firm in Fort Lauderdale on an unrelated federal case.

33.     On the morning of January 22, 2015 shortly after I had concluded the *Today Show* interview regarding Giuffre's allegations, Sires sent me the following email:

*Hi Alan,*

*Very strong appearance on the Today show this morning. I am very sorry you are having to go through this and wanted to send my note of support. If there is anything I can do for you, please let me know.*

*Carlos*

I responded almost immediately, as follows:

*Thank you for your kind words. I would love your help. Can we talk. [xxx-xxx-xxxx]*

34.     We spoke by phone that evening. We discussed Giuffre's allegations against me, which Sires said he knew were false. I asked Sires whether he would be willing to join my legal team, as local counsel in Fort Lauderdale where the case had been filed. I had no lawyer from Broward County at the time. He told me that he needed to check with the managing partner of the Boies Schiller Firm's Fort Lauderdale office, Stuart Singer, to make sure he would not face a conflict of interest in representing me. I offered to call David Boies, who I had known for years, and ask him but Sires told me that wouldn't be necessary.

35.     Shortly after our conversation that evening, Sires wrote me that:

*Alan,*

*I just exchanged emails with Stuart and voiced my desire to do what we can to help you out. He shares that desire. I will speak with him tomorrow in more detail after I get out of federal court in WPB. I'll be in touch, perhaps together with Stuart, tomorrow or over the weekend. In the meantime, don't hesitate to call me. My number is below.*

*Carlos*

The following day, January 23rd, Sires wrote me again as follows:

*Alan,*

*Stuart and I think we can provide help. We think a meeting would be a good idea. I know you're out of the country next week. Are you available to meet the afternoon of either the following Monday or Tuesday (February 2 or 3)?*

*Carlos*

I responded later that day:

*Dear Carlos*

*Thank you so much. My schedule is uncertain. I have a speech in Prague early next week and another in Paris days later. We aren't sure whether we will be coming back in between. Any chance we can talk on the phone today? If not, when I'm in Prague if you give me a time. Then I can come up to see you when I get back. My cell is xxx xxx xxxx.*

*Thanks again*
*Alan*

Sires wrote me back that evening:

*Alan,*

*Looks like we should speak by phone next week. Why don't you email me once you're overseas and let me know what times would work for you. In the meantime, can you send me the complaint and any other submissions? Stuart and I look forward to working with you on this.*

*Carlos*

36.     At that point, I reasonably believed that a lawyer-client relationship had formed between Sires, the Boies Schiller Firm, and myself. Sires did not say that any

conflict check was still pending or that there was any other impediment to the Boies

Schiller Firm representing me. Sires' statement, "Stuart and I look forward to working with

you on this" indicated that Sires and his law firm had agreed to represent me in my dispute

involving Giuffre, Cassell, and Edwards. Moreover, Sires had solicited information from

me regarding the case, which I had provided, including a highly confidential legal strategy

memorandum that I had drafted for my lawyers.

37.   Consequently, I instructed my attorney Ken Sweder to send Sires various

documents relevant to the dispute. He did so on January 28.

*Carlos,*

*Alan Dershowitz asked that I send you pleadings with respect to the "Jane Doe#3" situation.*

*I am attaching:*

> *(1)The Motion to Intervene in the Crime Victims Rights Act case which references Alan.*
> *(2)The Motion to Intervene and Declaration filed by Alan in the action.*
> *(3)Jane Doe #3's Opposition to Alan's Motion to Intervene and her Declaration in support of her Opposition.*
> *(4)The complaint for defamation filed against Alan in Florida.*

*I understand that you will be speaking directly with Alan some time this week.*

*If there is anything else at all that you would like to see, please let me know.*

*Best,*
*Ken Sweder*

38.   Sires was also sent a detailed memorandum marked "confidential l/c

privilege" describing how I intended to disprove Giuffre's allegations in my regard, and

my legal strategy for the defamation lawsuit involving Cassell and Edwards.

39.   This was a highly confidential memorandum intended for my legal team

only. It detailed strategy as to my defense and comment on the allegations. If disclosed to

the opposing parties it would be highly prejudicial to my case. I had no reason to know that

Sires and the Boies Schiller Firm were adverse to me in any way, and disclosed the material

in confidence to those in the law firm that I was led to believe was representing me.

40.     Sires received and read this confidential memorandum and on January 29,

Sires sent the following email, which clearly showed that he had studied my confidential

strategy memo:

*Alan and Ken,*

*I'm sure you have already looked at this issue, but the attached opinion and
Restatement section relate to Alan's recently circulated notes concerning his acting in
"self-defense" to the charges leveled against him. Stuart and will [sic] wait to hear from
Alan during his travels.*

*Carlos*

The following day, January 30th, however, Sires wrote me as follows:

*Alan,*

*To Stuart and my disappointment, we have learned that we are precluded from
assisting you in this matter due to a conflict, the nature of which we are not at liberty to
discuss.*
*Although we hoped to assist you, we know that you have very competent counsel on
board. We're sorry about this circumstances [sic]and wish you the best.*

*Carlos*

41.     The nature of the conflict that precluded Sires and Singer from representing

me was not disclosed to me. At first, it was claimed by a lawyer at the Boies Schiller Firm

that the Boies Schiller Firm could not represent me because Jonathan Schiller, one of the

firm's name partners, was on the board of Columbia University, and the firm consequently

would not represent academics. This was clearly a pretext. Only later did I learn that this

was a false cover story and that the real reason was that McCawley and Bois had been

representing Giuffre - the woman who falsely accused me - in matters directly adverse to me, including her false accusation against me.

42.     On February 10, 2015, I received a letter from Nicholas Gravante, the general counsel for the Boies Schiller Firm acknowledging that I "had communications involving Mr. Sires and Mr. Singer regarding potential representation in connection with *Edwards v. Dershowitz,* pending in the Circuit of the Seventeenth Judicial Circuit in and for Broward County, Florida," informing me that the Boies Schiller Firm was involved in "a representation that is adverse to you... the nature of which we are unable to disclose," and stating that:

> *"In an excess of caution, we have taken the following steps to screen Mr. Sires and Mr. Singer from the Screened Matter.*
>
> *We have notified all Firm personnel in writing that Mr. Sires and Mr. Singer may not participate in any way in the Screened Matter. Furthermore, all Firm personnel have been instructed in writing that no one may discuss with Mr. Sires or Mr. Singer any aspect of the Screened Matter or any information in any way relating to that matter; that no one may discuss the Screened Matter in the presence of or near Mr. Sires or Mr. Singer; and that no one may show Mr. Sires or Mr. Singer any documents relating to the Screened Matter. Mr. Sires and Mr. Singer have been instructed, orally and in writing, not to discuss or share any data, information or documents regarding the any [sic.] aspect of the allegations against you or your responses to those allegations."*

A copy of the letter sent to me by Nicholas Gravante is annexed hereto as

**EXHIBIT I**.

43.     The screening of Sires that Gravante describes even if perfectly executed, does not save the Boies Schiller Firm from being disqualified from further representation of Giuffre. Rule 1.18 provides that lawyers in a firm can continue representing a client when a different lawyer in the firm who received confidential information from a prospective client is timely screened, but only if the screened lawyer initially "took reasonable measures to avoid exposure to more disqualifying information than was

reasonably necessary to determine whether to represent the prospective client." As demonstrated above, Sires did not.

44.     Mr. Gravante did not describe the nature of the conflict that precluded Sires and Singer from representing me. However, I learned that Sigrid McCawley, a Boies Schiller partner in Fort Lauderdale and a close personal friend of Sires, was representing Giuffre, as was Boies, one of the name partners of the Boies Schiller Firm. In fact, McCawley and Boies had long been representing Giuffre and McCawley continued to represent her throughout the proceedings of the defamation lawsuit. I was also told that the Boies Schiller Firm had a common interest agreement with Cassell and Edwards, my direct opponents in a defamation lawsuit that was ongoing at the time.

45.     It is inconceivable that it would take eight full days to reveal such an obvious conflict. Moreover, the Gravante letter does not disclose whether Sires or Singer had already discussed any aspect of my case with McCawley, Boies, or anyone else in the Boies Schiller Firm. I could not then raise the conflict issue in court because the Boies Schiller Firm did not represent a party to the lawsuit against me.

46.     Furthermore, despite Gravante's assurances, I have reason to doubt the integrity of the measures described in his letter. This doubt is grounded on my knowledge of prior unethical behavior of Boies and his firm. For example, I became aware that the Honorable Colleen McMahon, of the United States District Court for the Southern District of New York, had previously raised serious questions regarding the lack of sensitivity of the Boies Schiller Firm to obvious conflicts of interest. In *Madison 92nd Street Associates, LLC v. Marriott International Inc., et al*, (SDNY Case No. 1:13-cv-00219) Judge McMahon stated:

*"A clearer conflict of interest cannot be imagined. A first year law student on day one of an ethics course should be able to spot it. BSF, which holds itself out as one of the country's preeminent law firms, did not. Not when it undertook a representation that would inevitably attack its own work for Host. Not when its former client raised the issue – which occurred as soon as Host learned that Plaintiff had retained BSF and read a copy of the draft complaint that its former lawyers had prepared. Not when Host's counsel in this lawsuit, the Proskauer Rose firm, formally notified BSF in writing that its prior representation of Host created a conflict. Not when the firm, after being warned about the conflict, filed a lawsuit containing allegations as to which its own attorneys (including quite possibly name partner David Boies, who billed time to both representations) were important – indeed virtually necessary – rebuttal witnesses."*

A copy of Judge McMahon's decision is annexed hereto as **EXHIBIT J**.

More incidents of unethical conduct by the Boies Schiller Firm are discussed in the accompanying Memorandum of Law.

V.      **Communications with David Boies and the Boies Schiller Firm**

47.     On May 19th 2015, Boies and I met in person at the Sherry Netherlands Hotel in New York City. A mutual acquaintance who had been a member of the Boies Schiller Firm, also attended the meeting.

48.     At that meeting, I told Boies that my records, that I provided Boies and the Boies Schiller Firm, demonstrated that Giuffre's allegations could not be true. He told me that he was very upset that my name had been included in the federal pleading. He described the decision to name me by Giuffre's lawyers - by whom he meant Cassell and Edwards - as a self-inflicted wound. He said that had any of Giuffre's representatives asked his opinion, he would have opposed the inclusion of my name in the federal filing. He also told me he was not speaking on behalf of those lawyers and was not authorized to negotiate any settlement on their behalf. This was just a meeting between old friends to discuss the accusations against me, which he repeatedly told me he did not believe was true.

49.     Boies further stated that he was convinced that Giuffre was mistaken in naming me as someone with whom she had sex. He said that it was his obligation to try to persuade her to acknowledge that I could not have been among the people with whom she had sex. He said that if he failed to persuade her of that fact, he would leave her representation to Edwards and Cassell and no longer represent her. He said that although he is always reluctant to drop a client, especially in a *pro bono* case, he would feel comfortable doing that in this case because she is adequately represented by her two other lawyers.[6] He said that it would be a win-win both for me and for Giuffre, were she to acknowledge that she had made a mistake in naming me. He said that he was convinced that I did not and could not have had sex with her.

50.     He also repeatedly stated that he had absolutely no authority to settle the pending case between myself and Cassell and Edwards. He described our conversations as an opportunity for me to provide documentary evidence that Giuffre's allegations in my regard were untrue, so that he might convince Giuffre that she was mistaken in naming me in the CVRA lawsuit.

51.     Minutes after that meeting concluded, I dictated the following memo to my secretary:

*Less than 5 minutes ago I completed nearly an hour long meeting with the above and I am recording my contemporary recollection of what was said. DB told me that he was very much upset at the fact that my name was included in the federal pleading. He said it was wrong and a self-inflicted wound by Roberts and her lawyers to name names, including mine. He said that had he been asked in advance he would have strongly opposed the inclusion of names. He said he was now convinced that Roberts was mistaken in naming me as someone with whom she had sex. He said that it was his obligation to try to persuade her to acknowledge that I could not have been among the people with whom she*

---

[6] Unbeknownst to me at the time, Boies and the Boies Schiller Firm had a contingency fee agreement with Giuffre and upon information and belief collected a substantial fee when Ghislaine Maxwell settled her case with Giuffre.

*had sex. He said that if he failed to persuade her of that, he would leave her representation to Edwards and Scarolo and no longer represent her.*

*He said that although he is always reluctant to drop a client, especially in a pro bono case, he would feel comfortable doing that in this case because she is adequately represented by her two other lawyers. He told me that he would have never taken this case if he knew that she would name me and that he regrets having taken the case. He said that it would be a win-win both for me, for Roberts and for "truth and justice" were she to now acknowledge that she made a mistake in including me. He said he is convinced that I did not and could not have had sex with her.*

*He also told me that Roberts told him she had sex with another prominent individual who he did not name. He said he had spoken to the individual and was now convinced that he too did not have sex with her. He thinks that as a young impressionable girl, she was totally confused about who it was she was having sex with. He persuaded her not to publicly identify this man, and so far she has accepted his advice. He said he wished he had had the opportunity to talk to me as well in advance of my being named and that he is confident that he could have persuaded her not to name me.*

*He proposed the following way of going forward. He would like me to bring my timeline evidence to him, Sigrid McCauley [sic] and to Virginia Roberts in an effort to persuade Roberts that I could not have been at the places where she claims to have had sex with me. He hopes that when she sees my evidence she will acknowledge that she made a mistake. He said it won't be easy for her to do that, but that it would be the best thing for her and her case to acknowledge her mistake. Again he repeated that if she refuses to do that, he could not ethically continue to represent her and would leave the matter to the other two lawyers. I gave him my schedule of available dates over the next month.*

*He agreed to try to put off the hearing that is scheduled for this Friday in Broward County court and to try to arrange a meeting with him, Sigrid and Roberts sometime between May 29 and June 2.*

*The meeting was entirely amicable and I came away convinced that DB firmly believed that I have been falsely accused and wanted to make it right by getting me out of the case and by having her withdraw her false accusation. I said that if he did so, I would be happy to apologize to the lawyers for my statements, delivered in anger, after I learned about the false accusation. I have completed dictating this memo at 9:51AM and it based on my contemporaneous best recollection of what transpired at the meeting.*

52.     Over the next several weeks, I worked to put together a comprehensive

timeline of my whereabouts between September 1999 and September 2002 - the time

period during which Giuffre claimed to have been associated with Epstein - based on credit

card records, medical records, phone records, contemporaneous journal entries, and other

documentary evidence. I then presented that information to Boies and McCawley at a meeting at the Boies Schiller Firm's offices in New York on June 1, 2015.

53.     I told Boies and McCawley that the records were quite thorough but that because the events in question had happened over a decade ago, I was still working on collecting documentation. Boies said that the more complete the records were, the better he would be able to persuade Roberts that it was impossible that I could be the person with whom she had six sexual encounters.

54.     At the end of the meeting, Boies stated that he found the evidence extremely compelling but that before he met with Giuffre to try to convince her of my innocence, he wanted the record to be as complete as possible. He told me that: "the lawyers who put your name in the federal pleading not only did a stupid thing that hurt their clients, they also did the wrong thing. They never should have accused you of so heinous a crime without checking and double checking, the way I did with the person I called." He said that we should meet again after I had assembled all of the relevant records. I agreed, and told him I would be in touch as soon as possible. After the meeting, I wrote an email to my secretary, Sarah Neely, documenting my recollection of events:

> *Meeting with David Boies on June 1 between 10 am and 1 pm.*
>
> *I have just left a meeting with David Boies which ended with a private conversation in which he said "the lawyers who put your name in the federal pleading, not only did a stupid think [sic] that hurt their clients, they also did the wrong thing. They never should have accused you of so heinous a crime without checking and double checking, the way I did with the person I called."*
>
> *At the meeting itself, Sigrid McCauley, [sic.] David Stone, Nicholas Maisel and another woman from the Boies firm were present. Boies said his goal was to persuade Virginia Roberts that she was mistaken in identifying me as a person with whom she had sex. He said he thinks that she actually believes that, but she is mistaken. I challenged his view that she actually believes she had sex with me, pointing to the fact that she has also said that she had dinner with Bill Clinton and Al Gore and his wife on the island. David*

*responded by saying "I have never challenged Virginia with regard to her statements about Al and Tipper Gore and I am not vouching for her general credibility, but I think she has come to believe the story about you."*

*Boies reviewed our documents, focusing on several months during two years. He asked Nick numerous questions and requested that he be shown the original records, especially cell phone records. He said that the records were very persuasive, very complete and very compelling. I told him that we could provide even more documentation, and that what he had seen was merely a work in progress. He said that the more complete the records the better he would be able to persuade VR and her other lawyers that it was impossible that I could be the person with whom she had six sexual encounters on the island, New Mexico, the airplane and Epstein's home in Palm Beach and New York. He seemed particularly shocked when I told him that Virginia had sworn that she gave Epstein oral sex while I stood next to him talking to him. He asked Sigrid to show him the affidavit in which she made that claim and he seemed to be shocked by it.*

*Boies said that the best course of conduct would be to put off all legal proceedings until after the summer so as to give us time to come to a global resolution, and also to give me time to supplement the current records with additional data. I agreed to that proposal and he said that he would talk to Brad Edwards in an effort to get him to agree as well to put everything off to give us time to resolve this.*

*The meeting was entirely amicable.*

55.    Boies, McCawley, and I agreed to meet again once I had assembled further documentary evidence. By the end of June, I had collected records that established my location on every single day of the time period in which Giuffre was associated with Epstein. I arranged another meeting with Boies and McCawley for July 6th, where my research assistant, Nicholas Maisel, would present the documentary evidence, and I would call in via Skype.

56.    Over the course of the meeting, Boies conducted a detailed examination of the timeline that Maisel had put together, and repeatedly asked to look at phone records, and financial documentation. The timeline disproved the crucial elements of Giuffre's allegations about me. During the period in which Giuffre was in contact with Epstein, I did not visit Epstein's private island in the Caribbean; I did not visit his ranch in New Mexico,

I did not stay at his home in Palm Beach; and I did not fly on his private jet. These were among the locations where Giuffre falsely claimed to have had sex with me.

57.     At the conclusion of the meeting, Boies told me that he and McCawley would meet with Giuffre in the near future and try to convince her that she had made a mistake in identifying me as someone she had sex with. He asked Maisel to send him a memo detailing my trips to South Florida during the relevant time period, together with the relevant documentation. I agreed, on condition that the memo would be kept confidential, and that in particular, Boies would not share its contents with Edwards and Cassell.

58.     After that meeting, Maisel wrote the following memo:

*Memo regarding meetings with David Boies*

*On 6 July 2015, I met with David Boies, David Stone, and Sigrid McCawley in Mr. Boies' office at BSF in New York. Alan called in via skype. The stated purpose of the meeting was to provide David Boies with enough information that he might convince his client, Virginia Roberts, that she could not possibly have had sex with Alan as described in her statements in the CVRA case. At the previous meeting, Mr. Boies described himself as convinced that Alan could not possibly have had sex with her, but stated that the more information we could provide him, the easier it would be for him to convince Virginia that she was mistaken.*

*I walked Mr. Boies through the summary documents I had prepared describing Alan's location for the years 1999, 2000, 2001, and 2002. He repeatedly asked to see the phone records, credit card transactions, and other evidence that I had used, especially for the year 2000. Thereafter, he seemed generally convinced as to the accuracy of the summary documents, and relied on them to note down Alan's location for the remaining three years. He stated that 1999 probably wasn't relevant anyway.*

*Alan and he spoke at length throughout the meeting. The tone and substance was very similar to the previous meeting, which Alan attended in person. Ms. McCawley and Mr. Stone said virtually nothing. At the conclusion of the meeting in the late afternoon, David Boies asked me to send him a memo regarding Alan's trips to South Florida during the relevant time period. With Alan's permission, and with the caveat that he not share the content of the memo, I agreed to do so by the end of the week.*

59.     After the meetings described above, I spoke with Boies by telephone about this case on several occasions. I recorded a telephone conversation with Boies in which he

said it would have been "impossible" for me to have been at these locations and that his

client is "wrong, simply wrong". I asked him what his next step would be in light of his

conclusion that it was impossible for me to have been at the locations where Giuffre

claimed to have had sex with me. He responded that:

> *"The next step would be for me and Sigrid to meet with VR [Giuffre] and tell her the following: We know you believe you had relations with Professor Dershowitz. However we have now reviewed the documentary evidence and we are convinced that your belief is wrong and we would like to explore with you how you could have come to that false conclusion. You could have, at your age and under the circumstances, misidentified somebody or perhaps somebody intentionally misidentify him for you. One thing is clear – your conclusion is simply wrong."*

60.     Boies continued to reaffirm his belief that Giuffre' allegations about me are

untrue until recently, when he reversed course. Despite his pronouncements that he did not

believe Giuffre' allegations in my regard, and that he did not find her account of meeting

various celebrities credible, Boies and his firm continued to represent Giuffre. As now they

are so entrenched in this litigation so as to become fact witnesses, with information and

testimony relevant to this action that is adverse to their own client, it mandates firm wide

disqualification.

61.     I have since come to understand that although Boies believed that Giuffre

was wrong, he never had any intention of trying to convince Giuffre that she was wrong in

identifying me. The meetings were orchestrated to ascertain whether I had information that

might prove damaging to Giuffre's credibility, so that her lawyers could be prepared to

defend her against attacks on her credibility, and to fit future false accusations against me

in the time frame and locations provided in my records.

62.     Boies reportedly told one of Giuffre's other attorneys that I was a fool for

giving him so much information. Despite our explicit agreement not to show the

information I provided him with Giuffre' other lawyers, Boies did so, pursuant to his common interest agreement with them, which he hid from me.

### VI.        Giuffre's Prior Testimony and the Boies Schiller Firm

63.    McCawley and Boies made statements that based on the documentation I had provided, Giuffre' allegations against me could not possibly be true.

64.    I believe this raises the serious issue as to if McCawley, Boies and their firm prepared and/or permitted Giuffre to testify perjuriously that the abuse accounts were _true_, despite their knowledge that they were untrue, and if they violated Rule 3.4(b) of the Rules of Professional Conduct, which prohibits lawyer from counseling or assisting a witness to testify falsely. Also, if Giuffre testified falsely and McCawley did not correct Giuffre's false deposition testimony in _Edwards v. Dershowitz_, then she violated that same rule. The evidence that answers these questions is currently under seal. As stated previously, I will be moving the court to unseal all the relevant records. With the filing of this action, it is even more critical that these documents be unsealed so that I may present a defense -and offense- and in the interest of justice.

65.    Furthermore, at the same time that Giuffre publicly accused me of having sex with her, upon information and belief, Boies and McCawley were secretly meeting with lawyers representing the billionaire Leslie Wexner (hereinafter "Wexner"), the Chairman and CEO of L Brands, Inc., the parent company of Victoria's Secret. Giuffre has accused him of engaging in precisely the same conduct that she alleged against me.

66.    Upon information and belief, the decision to name me publicly was calculated to send the following message to Wexner: If you don't want to have happen to you what happened to Alan Dershowitz, you should settle the complaint against you, even

though the statute of limitations has long expired. Wexner's wife and lawyer both described the action of Boies and McCawley as a "shakedown".

67.    In fact, Giuffre's close friend told me, in a consensually recorded conversation, that Giuffre had not made allegations against me initially, and that she did not want to accuse me, but had "felt pressured" by her lawyers to include my name in the filing, and that they were going to secure a substantial sum of money from Wexner.

68.    Boies and McCawley claim that their meetings with Wexner were simply an effort to engage in due diligence before deciding to file a lawsuit against him. This cannot be the truth, since the statute of limitations had long expired on conduct that had allegedly taken place 15 years earlier, and Giuffre was 31 years old at the time Boies and McCawley accused Wexner. Boies also told me and others that as a result of this due diligence, they decided that their client did not, in fact, have sex with Wexner. Accordingly they did not bring a lawsuit.

69.    I will present evidence that Boies, McCawley, and the Boies Schiller Firm knew that their client was wrong in accusing Wexner, yet months after reaching this conclusion, they proffered and/or permitted their client to testify falsely. The evidence of this conduct was sealed by the court. However, I will be moving the court to unseal these documents, which are vital for me to formulate my defense and any counterclaims in this action. I intend to present evidence that Giuffre did not want to accuse me but felt pressure to do so from her lawyers at the Boise Schiller Firm. I further intend to present testimony by Boies, McCawley, Wexner, his wife and lawyer regarding this shakedown and whether Wexner paid or produced anything to keep the accusations against him private.

VII.        **The Current Action**

70.     The Complaint filed in the instant action by the Boies Schiller Firm evidences the deep rooted, personal animus to me by the Boies Schiller Firm that fuels this litigation and is another issue relevant to disqualification.

71.     The Boies Schiller Firm and its attorneys' intricate involvement in the underlying facts rendering them material, necessary, and relevant fact witnesses in this action, are evidenced by the factual allegations made in the Complaint itself.

72.     For example, paragraphs 14, 19, 62, 68, 69, 70, 71, 73, 74, 75, 76, 77, 78, 79 contained allegations, albeit false, that are directly pertaining to the actions of Boies, McCawley, and the Boies Schiller Firm attorneys. These allegations render the aforementioned attorneys material, relevant, and necessary witnesses, for depositions, and ultimately at trial.

73.     Among my defenses would be the legal impossibility of defaming Giuffre by essentially publically repeating what Boies told me numerous times and on tape: namely that his client was "wrong...simply wrong" in accusing me of having sex with her. This in itself is a strong ground for firm disqualification, in that I used Boies' own comments to me to defend myself publically against the false accusations made by his client, who now sues me for making those same public statements in my defense.

74.     I intend to call the abovementioned Boies Schiller Firm attorneys as witnesses to testify as to the allegations made in the Complaint, directly pertaining to their actions and observations, as alleged in the Complaint, and on significant issues material, necessary and relevant to the defense of my case and in support of the prosecution of any counterclaims filed against Giuffre. If testifying truthfully, the testimonial evidence offered

by Boies, McCawley, and other Boies Schiller Firm attorneys will be adverse and prejudicial to Giuffre.

75.     A key to my defense will be to explore the relationship between, Boies, McCawley, and other members of the Boies Schiller Firm with the women, including Giuffre (who previously waived the attorney client privilege as to this subject matter), Sarah Ransome, and Maria Farmer, who have made false allegations and submitted sworn affidavits making serious defamatory statements against me, and any financial motivation to do so. I will therefore be seeking to question these individuals and attorneys within the Boies Schiller Firm, including Boies, and McCawley, about these relationships at depositions and at trial. Although David Boies did not sign the complaint in the instant action he is the moving force behind it, and I intend to question him at length regarding his involvement in this action, and the prior events and discussed herein.

### VIII.     **Grounds for Disqualification**

76.     On January 22, 2015, shortly after the defamation lawsuit was filed, Sires, a partner at the Boies Schiller Firm, sent me an unsolicited e-mail and offered to represent me in connection with the defamation claims. I told Sires that I was interested in having him represent me, and Sires said that he would check with his firm's managing partner, Stuart Singer, to see if he could proceed with the representation. The following day, Sires sent me multiple emails in which he sought to schedule a client meeting. His last communication that date concluded, "Stuart and I look forward to working with you on this matter." At this point, I considered myself in a lawyer-client relationship with the Boies Schiller Firm.

77.     Over the next several days, Sires requested, and I provided, pleadings in the case and other information including a confidential memorandum setting out my legal strategy in the matter.  In addition, Sires sent me the results of legal research he conducted that supported the legal strategy I had set forth in my confidential memorandum.

78.     On January 30, 2015, eight days after our initial contact and seven days after Sires wrote that he and his partner looked forward to working with me, Sires informed me that he could not continue his representation of me "due to a conflict, the nature of which I am not at liberty to discuss."

79.     I later learned that this conflict resulted from the fact that the Boies Schiller Firm was actively representing Giuffre, the very person who was falsely accusing me of engaging in sexual activity with her. Moreover, the subject matter of the Boies Schiller Firm's representation of Giuffre included the defamation suit to which I was a party. Indeed, a Florida partner of the Boies Schiller Firm, McCawley, who upon information and belief is in the very office next to Sires, later actively participated in the depositions in the case in a manner clearly adverse to me, including the filing of a motion for sanctions against me for submitting an affidavit stating that Boies acknowledged that Giuffre was "simply wrong" when she claimed I had sex with her.

80.     McCawley, Boies, and the other attorneys at the Boies Schiller Firm have violated Rules 1.7 and 1.9 of the Rules of Professional Conduct by filing this law suit against me, and by continuing to represent Giuffre, whose interests are materially adverse to mine in the same matter, after receiving confidential information from me that could be used to my disadvantage.

81.    I considered myself a client when I sent confidential disqualifying information to Sires. I would have never exposed this privileged and confidential material regarding the facts and strategy to utilize for my defense to anyone but a lawyer and firm I considered to be representing me. Even if the Boies Schiller Firm claim I was a prospective client, it makes no difference. Boies and McCawley violated Rule 1.18 by continuing to represent Giuffre in a matter adverse to me because Sires solicited, accepted, and reviewed the confidential information I sent him. Under the Rule, in order to avoid Boies and McCawley being disqualified from representing Giuffre, Sires would have had to "take reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary" to conduct a routine conflicts check. Clearly he did not.  Rather, Sires and the Boies Schiller Firm readily accepted the confidential material I sent, while I was under the reasonable belief that no conflict existed. The Boies Schiller Firm's claim that it subsequently screened Sires from any involvement in Giuffre' representation is of no consequence.  Screening Sires after he solicited, received, and reviewed disqualifying information did not revive Boies' and McCawley's and the Boies Schiller Firm's ability to represent Giuffre.

82.    The Boies Schiller Firm took eight full days to alert me to an obvious conflict, and in the interim collected confidential information from me that could be and may have been used to my disadvantage.  By continuing to represent Giuffre in this action, the Boies Schiller Firm is in direct violation of Rule 1.7, 1.9 and/or 1.18, and are rendered lawyer-witnesses pursuant to Rule 3.7. This stark and obvious conflict of interest is part of a long pattern of such conflicts by the Boies Schiller Firm and especially by Boies himself as discussed in the accompanying Memorandum of Law.

83.     By nature of the above, I will need to call Boies Schiller Firm attorneys as witnesses during depositions and/or at trial in this matter. Based on the above, I expect that if testifying truthfully, attorneys at the Boies Schiller Firm, including but not limited to Boies and McCawley, will offer testimony adverse and prejudicial to their own client Giuffre. I intend to call the abovementioned Boies Schiller Firm attorneys as witnesses on a significant issues material, necessary and relevant to the defense of my case and in support of the prosecution of any counterclaims against Giuffre, and it is apparent that the testimony offered by the Boies Schiller Firm attorneys as detailed above may be prejudicial to Giuffre. This mandates firm wide disqualification.

84.     During the course of representing Giuffre, both Boies and McCawley reviewed my travel, cell phone, and credit card records for the entire period during which Giuffre was associated with Jeffrey Epstein.  Those records proved that I could not have been in locations where Giuffre claimed to have sex with me.  Immediately after reviewing the records, Boies and McCawley said in front of witnesses that Giuffre was mistaken when she alleged that she had sexual contact with me.

85.     I recorded a telephone conversation with Boies in which he said it would have been "impossible" for me to have been at these locations and that his client is "wrong, simply wrong". I asked him what his next step would be in light of his conclusion that it was impossible for me to have been at the locations where Giuffre claimed to have had sex with me. He responded that: *"The next step would be for me and Sigrid to meet with VR and tell her the following: We know you believe you had relations with Professor Dershowitz. However we have now reviewed the documentary evidence and we are convinced that your belief is wrong and we would like to explore with you how you could*

*have come to that false conclusion. You could have, at your age and under the circumstances, misidentified somebody or perhaps somebody intentionally misidentify him for you. One thing is clear – your conclusion is simply wrong."*

86.   I will be calling McCawley as a witness at a deposition and at trial in this matter, and it is apparent that the testimony offered by McCawley about the events detailed above, if she testifies truthfully, may -and will- be adverse and prejudicial to Giuffre. This mandates firm wide disqualification.

87.   I will be calling Boies as a witness at a deposition and at trial in this matter and confronting him with the recorded tape of his statements above if he denies making any such statement. It is apparent that the testimony offered by Boies about the events detailed above, if he testifies truthfully, may -and will- be adverse and prejudicial to Giuffre. This mandates firm wide disqualification.

88.   Furthermore, months after concluding that their client's account contained numerous inconsistencies and acknowledging the allegations were false, the evidence will show that McCawley prepared and/or permitted Giuffre to repeat her allegations of abuse against Dershowitz under oath. The details of Giuffre's testimony remain sealed, but I have moved to have these material, relevant, and necessary documents unsealed. The filing of this action against me, and the necessity of the sealed documents to present my defense is a further compelling reason to unseal these documents posthaste. She also prepared this lawsuit and submitted a perjured affidavit by Giuffre that the evidence will show she knew or should have known to be false.

89.   McCawley thus violated Rule 3.3 of the Rules of Professional Conduct by failing to correct the record in Giuffre's depositions both in *Edwards v. Dershowitz* and

*Giuffre v. Maxwell*. Specifically, the evidence will show, that McCawley failed to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client and by counseling and assisting a witness to testify falsely. Instead, we will prove that she took affirmative steps to conceal these adverse facts. I will be calling McCawley as a witness at a deposition and at trial in this matter, and it is apparent that the testimony offered by McCawley about the events detailed above, if she testifies truthfully, may -and will- be adverse and prejudicial to Giuffre. This mandates firm wide disqualification.

90.     As stated above, there are multiple allegations in the Complaint to which attorneys in the Boies Schiller Firm are fact witnesses. I intend to call the abovementioned Boies Schiller Firm attorneys as witnesses to testify as to the allegations made in the Complaint, directly pertaining to their actions and observations, as alleged in the Complaint, and on significant issues material, necessary and relevant to the defense of my case and in support of the prosecution of the any counterclaims against Giuffre. I also intend to question Boies Schiller Firm attorneys about the relationship and communications with Giuffre, Ransome, and Farmer, and their motivation, financial and otherwise, behind their false allegations against me. It is apparent that the testimony offered by the Boies Schiller Firm attorneys as detailed above, if testifying truthfully, may -and will- be prejudicial to Giuffre. This mandates firm wide disqualification.

91.     This motion is not the first time I have raised my concern and grievances about Boies, McCawley and the Boies Schiller Firms' conflicts of interest related to matters pertaining to Giuffre and myself. I sounded the bell early on, in not one, but *three* bar complaints made in 2017, one in Florida, one in Washington D.C., and one in New York.

However, none of these were made at time and in circumstances as critical as this, in which the Boies Schiller Firm represent Giuffre in an action as Plaintiff with claims *directly* against me as Defendant.

92.     Now, more than ever, the Court must address these prejudicial and blatant conflicts of interest, in that the Boies Schiller Firm, after leading me to believe I was a client, took confidential and privileged material from me relating to my strategy to defend against allegations made by their client -the same client is the Plaintiff in this action and is making the same allegations against me-, and that attorneys in the Boies Schiller Firm are in violation of the lawyer as witness rule, as they are necessary, material and relevant witnesses to events underlying the factual allegations in the Complaint, with testimony that will be adverse to their own client.

93.     The actions of the Boies Schiller Firm, taken as a whole, has the potential to make for a very messy, personal, and disruptive litigation that will undermine the integrity of the judicial process. Therefore, disqualification is mandated. It can easily and should be addressed now at this early stage.

## CONCLUSION

94.     For the foregoing reasons, I respectfully request that the Court enter an order granting my Motion to Disqualify the law firm of Boies Schiller Flexner LLP as counsel for the Plaintiff, pursuant to, (a) Rules 3.7(b)(1) and (2) of the New York Rules of Professional Conduct, and individual attorneys within the Boies Schiller Firm pursuant to Rule 3.7(a) of the New York Rules of Professional Conduct; (b) due to inherent and nonwaivable conflicts of interest by the Boies Schiller Firm as described herein as it relates to this litigation pursuant to Rules 1.6, 1.7, 1.9, 1.10 and/or 1.18 of the New York Rules of

Professional Conduct; (c) pursuant to the discretionary power of this Respected Court to order disqualification; and (d) for such other and further relief as to the Court may seem just and proper.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in Charleston, South Carolina on the 3rd day of June, 2019.

Alan Dershowitz