# EXHIBIT J

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

2013 WL 5913382
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

MADISON 92ND STREET
ASSOCIATES, LLC, Plaintiff,
v.
MARRIOTT INTERNATIONAL, INC.,
Host Hotels & Resorts, Inc., Diamondrock
Hospitality Co., and the New York Hotel &
Motel Trades Counsel, AFL–CIO, Defendants.

No. 13 Civ. 291(CM).
|
Oct. 31, 2013.

DECISION AND ORDER GRANTING
DEFENDANT HOST HOTELS & RESORTS,
INC.'S MOTION FOR SANCTIONS
AGAINST BOIES, SCHILLER & FLEXNER

McMAHON, District Judge.

*1 A decade and more ago, the law firm of Boies, Schiller and Flexner (BSF) represented Host Hotels & Resorts ("Host") in a long running dispute with Marriot International Inc. ("Marriott"). The two companies resolved their dispute with a settlement that was approved in the late spring of 2002 ("the 2002 Settlement"). Among the other tasks the firm performed in connection with that representation, BSF was asked to, and did, advise a Special Committee of Host's Board that certain agreements contemplated by the proposed settlement were [Redacted]

In early 2013, BSF—now representing a once-bankrupt limited liability corporation that owned an Upper East Side "Courtyard Marriott" hotel—commenced the instant action against, *inter alia,* Marriott and Host, the parties to the 2002 Settlement. The complaint alleges that, at the very moment when the 2002 Settlement was consummated, Host and Marriott entered into a conspiracy to ensure that certain hotels owned or operated by Marriot would not be union hotels, while others (including the hotel in which plaintiff here invested) would be. The pleading alleges that Host's behavior in the years following—including behavior that was presumably dictated by the terms of the 2002 Settlement—was not in the company's best interest and was "inexplicable" except by reference to this purported conspiracy.

A clearer conflict of interest cannot be imagined. A first year law student on day one of an ethics course should be able to spot it.

BSF, which holds itself out as one of the country's preeminent law firms, did not.

Not when it undertook a representation that would inevitably attack its own work for Host.

Not when its former client raised the issue—which occurred as soon as Host learned that Plaintiff had retained BSF and read a copy of the draft complaint that its former lawyers had prepared.

Not when Host's counsel in this lawsuit, the Proskauer Rose firm, formally notified BSF in writing that its prior representation of Host created a conflict.

Not when the firm, after being warned about the conflict, filed a lawsuit containing allegations as to which its own attorneys (including quite possibly name partner David Boies, who billed time to both representations) were important—indeed virtually necessary—*rebuttal* witnesses.

Not even when a BSF partner reviewed key documents, including a 23 page memorandum addressed to Host's general counsel, in which BSF opined that Host's Board [Redacted]

Eventually, after Proskauer prepared a motion to disqualify that spelled out the situation in words of one syllable, BSF capitulated and withdrew. Host now moves for sanctions in the amount of attorneys' fees it incurred in getting BSF off this case.

The motion is granted.

Case 1:19-cv-03377-LAP   Document 10-10   Filed 06/07/19   Page 3 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

STATEMENT OF FACTS

The relevant facts are as follows:

*The 2002 Settlement*

Host is a self-managed and self-administered public real estate investment trust. Host conducts its operations through an operating partnership, Host Hotels & Resorts, L.P., a Delaware Limited Partnership, of which it is the sole general partner. Host currently owns 103 hotels in the U.S. and 15 properties internationally.

**\*2** Host enters into management agreements with independent third parties to manage the hotels. The hotel management companies manage under their brands, which are commonly known as Marriott, Ritz–Carlton, Westin, Sheraton, W, St. Regis, The Luxury Collection, Hyatt, Fairmont, Four Seasons, Hilton, and Swissotel. Marriott operates dozens of hotels for Host, including the New York Marriott Marquis and the New York Marriott Downtown. (Abdoo Decl. ¶ 3.)

Beginning in 2000 and continuing through at least 2004, BSF actively served as one of Host's outside counsel, working on numerous matters. (*See* Abdoo Decl. ¶ 4.) Among them an investigation into whether Marriott had violated various obligations to Host in connection with its management of Host's properties.

The BSF team on this particular engagement included numerous attorneys from BSF's New York City and Armonk, New York offices, all of whom worked significant numbers of hours for Host on the matters discussed herein.[1] BSF attorneys spent almost two years undertaking with others an all-encompassing review of the relationship between Marriott and Host. (Abdoo Decl. ¶¶ 7–10; Leader Decl. Ex. 1.) They were given access to substantial information, including confidential and privileged information, concerning the details of Host's management and other agreements with Marriott, Host's views and goals with respect to its future relationship with Marriott, and what aspects of the relationship with Marriott Host was willing to modify. BSF's attorneys worked directly with Host's General Counsel and its executives, senior management, and other in-house lawyers in developing strategies to resolve the issues in Host's best interests. (Abdoo Decl. ¶¶ 7–8.) BSF even drafted a detailed, proposed complaint against Marriott.

Settlement discussions between Host and Marriott began toward the end of 2001. In the spring of 2002, Host—with the assistance of BSF and its outside corporate counsel, Hogan & Hartson (now Hogan Lovells)—negotiated and executed a global settlement with Marriott. The settlement included a number of new written agreements governing the relationship between Marriott and Host going forward, as well as amended and restated management agreements that provided Host with additional benefits, including benefits relating to Host's New York City hotels. (Abdoo Decl. ¶ 10.) Hogan & Hartson was the principal drafter of term sheets and modified agreements with Marriott, but BSF attorneys participated extensively behind the scenes in Host's efforts to settle the dispute between Host and Marriott. (Abdoo Decl. ¶ 9.)

BSF was also retained specifically to give advice on [Redacted] A Special Committee of the Host Board engaged, "Boies, Schiller & Flexner LLP to advise the Special Committee regarding the issues raised by its investigation [of potential claims against Marriott], to engage [Marriott] regarding those issues *and to reach an appropriate resolution of those issues that would be in the best interests of Host.*" (*Id.* ¶¶ 5, 12; Ex. 1.) (Emphasis added) In carrying out the assignments, BSF drafted a 23 page confidential memorandum dated May 6, 2002, a copy of which is attached to the Declaration of Elizabeth A. Abdoo ("Abdoo Decl.") as Ex. 1. In this memorandum, BSF opined as follows:

**\*3** [Redacted]

BSF echoed that [Redacted] in the conclusion of its memorandum:

[Redacted]

BSF recognized that its work for Host was sensitive and important; it also recognized and asserted, vigorously, that the information to which it had access during that period included highly sensitive business information. In 2003, after the settlement had been consummated,

Case 1:19-cv-03377-LAP Document 10-10 Filed 06/07/19 Page 4 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

Host asked BSF to provide advice and to respond on its behalf to a subpoena issued by plaintiffs in a California state court action against Marriott. The plaintiffs, owners of other hotels operated by Marriott, sought documents relating to the settlement between Host and Marriott and the amended management and other agreements. (Leader Decl. Ex. 2.) BSF, principally through attorney Roseanne Baxter (who had been fully involved in BSF's examination of issues relating to Marriott), spent several months reviewing and producing Host's documents in response to the subpoena and negotiating with the plaintiffs' firm concerning its scope. (Leader Decl. Ex. 1.) Ultimately, BSF filed a non-party opposition in the California court on Host's behalf, opposing plaintiffs' motion to compel production of "settlement-related correspondence between Host and Marriott." (Leader Decl. Ex. 2 at 2.) BSF argued, among other things, that the party serving the subpoena was "seeking to invade the confidentiality of Host's *most sensitive business deliberations* and discover *competitively sensitive information*." (*Id.* at 3. (Emph.supp.).)

In all, BSF represented Host for four years concerning Host's relationship with Marriott. BSF devoted over 3700 hours to the representation and billed Host approximately $1,250,000 for its services. (Leader Decl. Ex. 1.)

*BSF Represents Madison Adverse to Host*

On December 4, 2012, Marriott forwarded to Host a draft complaint that BSF had threatened to file against Host, Marriott, and others on behalf of Madison. (Abdoo Decl. ¶ 14.) Madison is the former owner of a Courtyard by Marriott hotel located on East 92nd Street and First Avenue in Manhattan (the "92nd Street Hotel"). (Compl.¶ 10.) According to the complaint, in 2002, Madison entered into a management agreement with Courtyard Management Corporation ("Courtyard"), a Marriott affiliate, pursuant to which Madison would build and Courtyard would manage and operate the 92nd Street Hotel. (*Id.*) Seven years later Madison, represented by Katten Muchin Rosenman LLP, filed suit in New York state court against Courtyard (and only against Courtyard) (the "State Court Action"). The complaint in that action asserted, in pertinent part, that Courtyard had induced Madison to contract with Courtyard to managed Host's hotel located on First Avenue and 92nd Street in Manhattan by, among other things, misrepresenting the extent to which the hotel's work force had become unionized and the adverse financial impact that being subject to a union contract would have on Madison's investment.

*4 On information and belief, the State Court Action was stayed pending Madison's bankruptcy proceedings. When it became active again, BSF replaced Katten Muchin Rosenman as Madison's lawyers in the case, and BSF drafted the pleading that was circulated to Marriott and Host in early December 2012.

Before undertaking its representation of plaintiff, BSF's General Counsel, Nicholas Gravante, performed a "conflict check," which revealed that Host had been a client of the firm some years earlier. The record does not include much information about exactly what Gravante did next. It is clear enough what he did *not* do: he did not ask to review either the file or the billing records related to the earlier representation. He nonetheless concluded that the new matter was not the same or substantially related to the former representation. [2]

BSF proceeded to draft a complaint, naming Host as a party defendant. That pleading is before the court as Jimenez Train Ex. 6. In its moving papers, counsel for Host represents that it was "essentially identical" to the complaint that was ultimately filed in this court on January 13, 2013. Host is correct. In fact, the critical paragraphs of the pleading—the ones that encapsulate the conflict—are identical in the draft complaint that Host received on December 4, 2012 and the pleading filed with this court six weeks later. They read as follows:

**Host and Marriott Strike a Deal to Cooperate**

60. To help boost its balance sheets, Host needed to ensure that the workers at the Marriott Marquis and the Marriott Financial Center would not be unionized. Host, however, recognized that it did not have sufficient power to make a deal directly with the Union.... But Host did have the ability to extend its management agreements with Marriott for the Marriott Marquis and the Marriott Financial Center, and Host could also provide additional hotels for Marriott to manage under new management agreements.

Case 1:19-cv-03377-LAP Document 10-10 Filed 06/07/19 Page 5 of 13

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

61. Unlike Host, Marriott had the power to swell the Union's ranks and add millions of dollars in additional dues.... But Marriott did not stand to gain very much—and had much to lose—from sacrificing its substantial employee roster to the Union merely for the sake of its close relationship with Host.... Marriott could not afford to sacrifice that competitive advantage in a deal with the Union.

62. Recognizing that they each had something the other wanted, *Host and Marriott conducted secret meetings and negotiations in mid–2002 in their shared office building in Bethesda to come to a mutually-beneficial solution to their problems.* The representatives at these meetings discussed, negotiated, and agreed upon a specific strategy to harm and eliminate their non-union competitors, including Madison, for the benefit of the conspiracy.

63. Specifically, Host agreed that in exchange for Marriott's assistance in convincing the Union to protect the Marriott Marquis and Marriott Financial Center from unionization, Host would retain Marriott as the manager of both properties, and would sign additional long term management agreements with Marriott for the management of other hotels acquired in and around that time period.

**\*5** 64. Naturally, when conspirators enter into a conspiracy, they take steps to conceal the existence of the conspiracy and its goals, strategies, and targets. Such conspiracies operate in secret, and the conspiracy between Host and Marriott—horizontal competitors—is no different. *That Marriott and Host entered into such an agreement is confirmed by their subsequent conduct—which is otherwise inexplicable.* (Emphasis added)

It takes but a moment to recognize that these paragraphs accuse Host and Marriott of entering into an agreement in mid–2002—the very time when Host, advised by BSF, entered into multiple agreements with Marriott that restructured and extended their relationship—which agreement committed it to "otherwise inexplicable" conduct as part and parcel of a conspiracy to eliminate their non-unionized competitors. The coincidence in timing means that the purported conspiracy would at a minimum have been entered into in the context of the 2002 Settlement, and might well have been part of it, since the "additional long term management agreements" (¶ 63) that were signed in the spring of 2002 were part and parcel of that settlement. It takes but another moment to understand that the lawyers who advised Host [Redacted] and who helped draft the documents here under attack as dictating behavior "inexplicable" except by reference to a RICO conspiracy, would be critical witnesses about the very matters asserted in these paragraphs. This is not ethical rocket science.

The very day she received a copy of the draft complaint, Elizabeth Abdoo, Host's General Counsel, spoke with BSF counsel Roseanne Baxter, who had worked extensively on the Host–Marriott settlement back in 2001–02. (Abdoo Decl. ¶ 16.) Abdoo expressed her concerns about BSF's representation of Madison in the threatened litigation. Abdoo followed up their conversation with an email that afternoon. (*Id.*)

Baxter did not respond to Abdoo. Instead, on December 6, 2012, Abdoo heard from Magda Jimenez Train, deputy general counsel of BSF. Jimenez Train asserted that BSF had investigated Abdoo's allegation of a conflict but the firm did "not have any reason to believe that the potential lawsuit by Madison 92nd Associates referenced in your email is the same or substantially related to any matter in which we previously represented Host, and therefore, there is no actual or potential conflict." (Abdoo Decl. Ex. 3.)

BSF reached this conclusion after consulting with Michael S. Ross, an attorney who specializes in ethics matters and whose work is well known to the court. In a conference call among Ross, Gravante, Jimenez Train and Helen Maher (a BSF partner who was working on the representation of Madison 92nd), which was convened after receipt of Abdoo's email, Ross was told that the new representation concerned a conspiracy among Marriott, Host, DiamondRock and the New York Hotel & Motel Trades Council, AFL–CIO (the "Union") to eliminate nonunion participants from the New York City hotel market. Ross was also told that BSF had previously advised Host "in connection with matters relating to Marriott's financial misconduct toward Host." (BSF Brief in Opposition at 9) Obviously, if that is all Ross was told

about the 2002 representation, he was wildly misinformed about its scope—and quite possibly its timing as well.

**\*6** BSF is careful in its papers to characterize Ross' December 5 conclusion as "tentative" (*Id* ). However, it was not so "tentative" as to prevent Jimenez Train from telling Abdoo on December 6 that no conflict existed—and not so "tentative" as to cause the BSF attorneys to stop work on their new representation until the scope of the old one could be ascertained.

*Further Investigation*

On December 6, Ross and his associate, James D. Liss, together with Jimenez Train, conducted their first interview with a lawyer who had actually worked on the Host matter—Roseanne Baxter. Whether this interview occurred before or after Jimenez Train responded to Abdoo is not clear. According to BSF's opposition papers (which do not include any declaration from Baxter herself), Baxter told her questioners that the prior engagement related to Marriott's unfair financial treatment of Host in the context of their franchisor/franchisee relationship, and that it is not involve "BSF's addressing labor or union issues." (Brief in Opposition at 10) I do not know how pointed the question were that were put to Baxter; I do not know whether she was asked how the dispute on which she worked was resolved, or when it was resolved, or whether the resolution of that dispute was reflected in any agreements that were entered into in mid–2002, or whether anyone else working on the matter (other law firms were involved) was tasked with "addressing labor or union issues."

After interviewing Baxter, Ross opined that he still held to his "tentative" conclusion. But even accepting at face value the opposition brief's description of what Baxter said during the December 6 interview, it does not appear that her statements were subjected to anything but the most superficial analysis. For example, it does not seem to have occurred to Ross, Liss or Jimenez Train that the *absence* of any discussion of "labor or union issues" in connection with the mid–2002 resolution of a long-running and multi-faceted dispute between Marriott and Host might actually undermine, or even give the lie to, the very serious allegation of an anti-union conspiracy that BSF was preparing to make on behalf of its new client.

Nor does it seem that they considered whether, if Host and Marriott did indeed reach some sort of conspiratorial agreement in mid–2002, it was likely reached in the context of settling the ongoing "financial dispute" between the two companies-a settlement that was effected *at exactly the same time* and that involved the consummation of numerous new agreements.

Of course, any such analysis was rendered more difficult by the fact that Ross and Liss *did not even read the draft complaint until after they had interviewed Baxter and delivered their "tentative" conclusion.* (Brief in Opposition at 11). I confess that I do not see how anyone could have asked Baxter an intelligent question about the scope of the prior representation without reading Maher's draft complaint.

**\*7** Ross did suggest that BSF retrieve its billing records from the prior representation and search the firm's electronic case files to identify documents containing certain key terms that he, Liss, and Jimenez Train decided might demonstrate a "substantial relationship" between the former and current matters. Neither of those elementary tasks was undertaken prior to reaching a conclusion that no conflict existed and communicating that conclusion to the firm's former client—not once, but twice. On December 8—before either the billing records or the document search had been concluded—Jimenez Train sent a second email to Abdoo that said:

> Based on our investigation thus far, we do not have any reason to believe that the potential lawsuit by Madison 92nd Associates referenced in your email is the same or substantially related to any matter in which we previously represented Host. If you have any basis to believe otherwise, please let us know as soon as possible.

Over the next few days, Abdoo and Jimenez Train missed several opportunities to connect and discuss the matter by telephone. I intuit that it was during this period that Host retained Proskauer Rose to represent it in connection with the conflict issue.

Case 1:19-cv-03377-LAP   Document 10-10   Filed 06/07/19   Page 7 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

On December, 12, Jimenez Train told Mr. Ross that the search of the firm's electronic billing records and files did not turn up any references to a "labor conspiracy" in connection with the prior Host representation.[3] This confirmed Mr. Ross in his "tentative" conclusion, which he enshrined in a memorandum of even date. Of course, the key word search was doomed before it began, since the terms chosen—"union," "labor," "collective," "bargaining" and "employees"—carved out a very small universe that was reflective of an unduly narrow view of the scope of the prior representation (the result would have been rather different, I suspect, if "management agreement" had been among the key words). Furthermore, no one seems to have comprehended that the absence of those labor-related terms from BSF's documents might have some bearing on the conflicts question.

*Proskauer Enters the Lists*

Also on December 12, Proskauer made its entrance. J. Charles Mokriski, Proskauer's professional responsibility counsel, sent a letter to Ms. Jimenez Train of BSF (Jimenez Train Ex. 10), which said the following:

(1) BSF had represented Host in connection with a dispute with Marriott for an extended period of years encompassing the time frame of the conspiracy alleged in the draft complaint—for which it was paid handsomely.

(2) The resolution of that dispute culminated in an agreement about which BSF would have a substantial amount of information.

(3) The firm would also necessarily have obtained a substantial amount of non-public information about Host, which it was ethically prohibited from disclosing to any third party.

Mokriski demanded, on Host's behalf, that BSF turn over to Host all its records in connection with the 2002 Settlement and the attendant representation, and immediately stop work on the Host matter.

*8 Now, it is absolutely true that Mokriski's letter does not spell out the conflict in words of one syllable. It does not say, "Look, the fair import of your draft complaint is that, in settling their dispute in the middle of 2002, Marriott and Host entered into some sort of illicit conspiracy. You know that's not true, because you helped to negotiate their settlement and advised the Board that [Redacted] And if it were true, you as our lawyers would have been a participant in or aider and abettor of the conspiracy. Either way, you have confidential information from Host that will touch on the allegation that our 2002 Settlement with Marriott was tainted with conspiracy; and some of your lawyers, including David Boies, might well be critical witnesses whose testimony could clear us of these charges. So it is obvious that you can't represent Host in this proposed lawsuit." It is not clear from the record that Mokriski knew enough to be so specific. But he was specific enough for a prudent law firm to have stopped work until it could dig deeper than BSF already had.

On December 18, Jimenez Train responded to Mokriski's letter via email. She continued to deny that any conflict existed. How she could have made such an assertion is puzzling, since it is clear from her email that BSF had not yet reviewed most (if any) of BSF's files relating to its representation of Host: "In the meantime, *we will be gathering* Host's records to deliver to Host. Since we have not represented Host in many years, *all or most of these records have been archived and need to be retrieved and reviewed* so that we can comply with your request." (Mokriski Decl. ¶ 7, Ex. 2.) (Emph.supp.). I doubt that BSF had any intention of retrieving and reviewing the files until Host demanded that they be produced.

On December 28, 2012, the two sides held a conference call to discuss the issue. Jimenez Train explained that BSF's keyword searches of its electronic documents relating to its representation of Host had yielded nothing responsive, so BSF believed that its prior representation of Host had nothing to do with the issues raised in the (then) draft complaint. (*Id.* ¶ 10.) Ross added that he personally had looked at over 1,000 of BSF's documents (presumably retrieved from electronic files) and at every BSF billing entry associated with its engagement, but had found nothing to indicate a conflict. (*Id.* ¶ 11.) I do not know which 1,000 documents Ross reviewed; the record does not indicate whether he looked at, for example, BSF's 23–page letter opining that the 2002 Settlement was [Redacted]

Case 1:19-cv-03377-LAP   Document 10-10   Filed 06/07/19   Page 8 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

Jimenez Train and Ross also represented that they had interviewed BSF attorneys David Boies, Roseanne Baxter, and William Marsillo, and former BSF partner Andrew Hayes, but uncovered no conflict. (*Id.*)[4]

BSF obviously felt that it had done enough conflict checking. On New Year's Eve, BSF filed an amended complaint in the State Court Action. This amended complaint repeated many of the same allegations as in the draft complaint in this action. Host was not, however, named as a defendant in the state court pleading.

### *BSF Turns Over Its Host Documents*

**\*9** During the December 28 telephone call, Proskauer asked when Host would be receiving BSF's documents. (*Id.*) Jimenez Train advised that she would not turn over files before reviewing them. Six days later, on January 4, 2013, BSF produced five boxes of documents from BSF —all of which, BSF represented, were from the electronic files that had been searched using keywords. (*Id.* ¶ 13.) Jimenez Train revealed that this was the beginning of a rolling production; BSF had another 20 to 30 boxes of documents, which she did not intend to produce until she could review them. (*Id.* ¶ 12.) From this it is clear that BSF had not reviewed the vast majority of its files before concluding that it had no conflict.

Jimenez Train avers, in her declaration to this court, that she reviewed those documents with "enhanced care" before turning them over. (*Id.* ¶ 47.) Either her definition of "enhanced care" differs from mine or her statement is patently false. For one thing, the first five boxes of documents contain drafts of the revised Host/Marriott management agreements, which (not surprisingly) include both a provision concerning "Hotel Employees" and an entire section titled "Collective Bargaining Agreements." Somehow these drafts were not picked up in the key word search, even though words like "unions" and "collective bargaining" were among the key words—a fact that should have been apparent to a careful reviewer. Far more significant, the first production also included the 23–page memorandum detailing BSF's analysis of the revised management agreements and concluding that [Redacted] —a memorandum that was not only [Redacted] but was proof that BSF had a serious conflict. (Abdoo Decl. Ex. 1.) Assuming Jimenez Train read that document at all, let alone with "enhanced care," she missed its obvious import.

It had taken BSF almost a month to provide the first five of the "25 to 35" boxes of documents relating to the former representation that BSF possessed. (Mokriski Decl. ¶ 14, Ex.4.) (There were, in the end, 39 boxes of documents) On January 9, 2013, Proskauer complained about the delays in turning over the remainder of Host's files and insisted on a date by when all the files would be produced. Jimenez Train did not, however, agree to provide the documents immediately, or provide a date when BSF's "rolling production" would be complete. She offered a number of excuses for the delay—including her vacation schedule—but insisted that BSF was taking Host's "allegations" of a conflict "very seriously" and that the firm's "top priority" since December 12 had been "to determine whether there was any merit to the allegations in [the Proskauer] letter, and whether there was any legal basis to withdraw ." (Mokriski Decl. Ex. 4.) Jimenez Train insisted "assembly of the file and our substantive review of the file......[was] that much more important and *a task that requires enhanced care and attention by me personally and our outside ethics counsel.*" (*Id.*) (Emphasis added). It is obvious that she had not completed this important work on the day she wrote the note—January 12, 2013.

**\*10** Nonetheless, on the very next day, January 13, 2013 —without any prior notice to Host, and while discussions concerning the conflict were ongoing—BSF filed its complaint against Host in this Court. The complaint is essentially identical to the draft complaint that BSF had threatened to file several weeks earlier. The firm filed the lawsuit even though BSF knew full well that Host (and Proskauer) were reviewing the first files that BSF had produced and were awaiting the rest of the production. (*Id.* ¶ 16.) Only after filing the complaint did BSF deliver the other 30 or so boxes of documents to Proskauer. (Mokriski Dec.)

### *Host Prepares a Motion to Disqualify*

Once the complaint in this action was filed, substantive contact between BSF and Proskauer seems to have ceased. BSF argues that this added unnecessarily to Host's costs. Frankly, I find it perfectly understandable. For over a

Case 1:19-cv-03377-LAP Document 10-10 Filed 06/07/19 Page 9 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

month, BSF had refused to acknowledge any conflict. It had repeatedly represented to its former client that it had reached that conclusion after diligent investigation. It had gone ahead and filed suit against its former client. Host's conclusion that it would have to move to disqualify BSF was anything but unreasonable.

And so Proskauer prepared the motion to disqualify, in connection with which it did what BSF obviously did not—carefully and exactingly reviewed all 39 boxes of BSF documents pertaining to its representation of Host in various Marriott related disputes. (Mokriski Decl. ¶¶ 13, 17.)

After completing its motion papers, Proskauer proposed a final meeting with BSF and its outside ethics counsel in a last ditch effort to avoid the need to file that motion. (Mokriski Decl. ¶ 18.) At this meeting, which was held on Friday, February 22, 2013 (a week after Proskauer had requested it), Proskauer outlined its disqualification motion for BSF, supporting its position that BSF had a serious conflict of interest with documents, all but one of which had been obtained from BSF's own files. At the end of the meeting, Proskauer gave BSF until the close of business on the following Monday to withdraw. (*Id.*)

BSF offered no response to Proskauer's presentation —*except to ask for copies of the documents on which Proskauer had relied,* all but one of which came from BSF's own files. (*Id.*)

*Oh, THAT Conflict!*

The next day, Saturday, February 23, 2013, Mr. Ross contacted Proskauer by phone and stated that BSF had decided it was conflicted from representing Madison and would immediately take steps to withdraw from that representation—both in this case and in the related State Court Action, to which Host was not a party. (Mokriski Decl. ¶ 19.)

What changed BSF's and Ross' minds was seeing—and finally understanding the import of—two documents. The first was the May 6, 2002 Memorandum, in which BSF opined that [Redacted] The second was a November 26, 2002 letter from Abdoo to a lawyer representing the plaintiff in a class action/derivative suit. In that letter, which was drafted in whole or in part by BSF, Abdoo stated that the renegotiated contracts between Host and Marriott were beneficial to Host. [Redacted] utterly inconsistent with Paragraphs 60–66 of the Complaint that was drafted before November 28, 2012 and filed with this court on January 13, 2013. Furthermore, the May 6 Memorandum was turned over by BSF on January 4, which means that it had been reviewed with "enhanced care" prior to that date. Sadly, a lawyer from a firm that had no connection with BSF's earlier representation had to point out the obvious before anyone from or representing BSF would acknowledge the multi-faceted conflict.

*11 On March 1, 2013, BSF filed a "Notice of Joint Motion to Stay All Proceedings and to Adjourn All Current Scheduled Dates" in which it formally acknowledged the conflict of interest and stated it would immediately withdraw from the representation of Madison. Additionally, BSF requested a two-week stay in all proceedings in order to allow Madison the opportunity to find substitute counsel.

*Demand for Fee Reimbursement*

Needless to say, all of this cost Host a pretty penny. So on February 27, 2013, Proskauer informed Mr. Ross that Host expected BSF to reimburse it for the fees and expenses it incurred in having to prepare the motion to disqualify. (Mokriski Decl. ¶ 20.) Mr. Ross did not respond to Host's demand until March 12, when he informed Proskauer that BSF was unwilling to reimburse Host for any portion of those fees. (*Id.*) He asserted that because BSF had taken steps to withdraw immediately after Host showed it the documents at the February 22 meeting—documents that had ostensibly been reviewed first by BSF lawyers—BSF bore no responsibility for costs or expenses Host had incurred in connection with the conflicts issue. (*Id.*)

**ARGUMENT**

**1. BSF Was Clearly Disqualified from Undertaking this Matter Adverse to Host**

Case 1:19-cv-03377-LAP   Document 10-10   Filed 06/07/19   Page 10 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

There is no dispute that BSF had a conflict which should have prevented it from ever undertaking to represent Madison in this action. BSF has admitted as much.

In a case of successive representation such as this, a party seeking disqualification must show (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) counsel whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. *See Lott v. Morgan Stanley Dean Witter & Co. Long–Term Disability Plan,* No. 03 Civ. 9235 HB, 2004 WL 2980193, at *1 (S.D.N.Y. Dec.23, 2004). Successive representation on substantially related matters is the "paradigmatic" case for disqualification, because "the attorney is in a position to use the confidences gained through prior conferences with a former client." *Papanicolaou v. Chase Manhattan Bank, N.A.,* 720 F.Supp. 1080, 1083–84 (S.D.N.Y.1989).

In turn, "Matters are 'substantially related' ... if they involve the same transaction or legal dispute or if, under the circumstances, a reasonable lawyer would conclude that there is otherwise a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Comment [3] to N.Y. RULE OF PROF. CONDUCT 1.9.

BSF's involvement in negotiating, papering and blessing a settlement that it has now painted as an unlawful racketeering and antitrust conspiracy clearly shows that its recent representation of Madison was substantially related to the firm's prior engagement with Host. The complaint before this court questions the motives behind Host's renewal of the Marriott management agreement and calls it "contrary to Host's self-interest" (Compl.¶ 65), yet BSF had previously opined that the renewal "provided a meaningful positive benefit to Host." (Abdoo Decl. Ex. 2.) In such circumstances, a law firm must withdraw. *See e.g., Cablevision Lightpath, Inc. v. Verizon New York Inc.,* 11–cv–2457, 2011 U.S. Dist. LEXIS 125587 (E .D.N.Y. Oct. 28, 2011); *Ullrich v. Hearst Corp.,* 809 F.Supp. 229, 238 (S.D.N.Y.1992).

### 2. Host Is Entitled to Attorneys' Fees Incurred to Force BSF's Mandated Withdrawal

*12 A party seeking to recover attorneys' fees incurred in filing a motion to disqualify may do so under 28 U.S.C. § 1927, which states that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*Id.* The purpose of § 1927 is " 'to ensure that those who create unnecessary costs also bear them.' " *O'Rear v. Am. Fam. Life Ass. Co.,* 144 F.R.D. 410, 413 (M.D.Fla.1992) (citation omitted). In addition, fees may also be recovered under the court's "inherent power to impose attorney's fees 'when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons ... [or] if a court finds that a fraud has been practiced upon it.' " *THOIP v. Walt Disney Co.,* No. 08 Civ. 6823(SAS), 2009 WL 125074, at *4 (S.D.N.Y. Jan.20, 2009) (citations omitted). "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citation omitted.) In truth, they "serv[e] the dual purpose of 'vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.' " *Id.* at 46 (citation omitted.)

In the Second Circuit " 'the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.' " *Enmon*

Case 1:19-cv-03377-LAP   Document 10-10   Filed 06/07/19   Page 11 of 13

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

v. *Prospect Capital Corp.,* 675 F.3d 138, 143–144 (2d Cir.2012) (citation omitted.) *See also THOIP,* 2009 WL 125074, at *4 n. 51 ("The standard for awarding fees under section 1927 and the Court's inherent power is the same.") (citation omitted).

Under the circumstances presented here, *Life Fitness, Inc. v. Sears, Roebuck and Co.,* No. 88 C263, 1988 WL 37835 (N.D.Ill. Apr.21, 1988), is particularly instructive. In that case, the District Court held plaintiff's law firm liable for defendant's attorney's fees pursuant to 28 U.S.C. § 1927 where the firm disregarded several withdrawal demands from the defendant's attorney, insisting that it had fully considered and rejected any conflict, and then voluntarily withdrew from the case after a motion to disqualify was filed. *Id.* at *1. According to the Court, once plaintiff's counsel was informed of the potential conflict, it had "an obligation to investigate the facts and the law." *Id.* at *2. Had the attorneys done so, they could have "saved everyone substantial time and money" by withdrawing without the necessity of a motion. *Id.* Instead, plaintiff's counsel had "unnecessarily required [defendants] to expend time and effort [of preparing and] filing a motion." *Id.*

*13 The court in *THOIP v. Walt Disney Co.,* also awarded attorney's fees after defense counsel's voluntary withdrawal. 2009 WL 125074, at *4. In *THOIP,* defense counsel had determined that a conflict of interest warranted its withdrawal from the case, but then failed to notify plaintiff of the impending withdrawal until several hours before plaintiff filed its motion to disqualify. *Id.* Since the motion was "substantially finished" by the time of the withdrawal, the court held that plaintiff was entitled to fees under § 1927 and the court's inherent power. *Id.* at *3–4 n. 39 & n. 51 (citation omitted).

Frankly, BSF's conduct in the instant matter is infinitely more egregious than that of the conflicted counsel in *Life Fitness* and *THOI.*

— BSF adamantly rejected Host's complaint about the conflict before it had even reviewed its own files relating to the work it had done for Host, files that contained the key documents revealing the conflict.

— BSF and its outside ethics counsel initially claimed there was no conflict because they had done a search of BSF's electronic files for words and phrases like "collective bargaining" and "union" and nothing turned up, yet among BSF's electronic files were multiple documents that should have been turned up in a keyword search using those terms.

— After retrieving its Host files (which it did only belatedly and in response to Host's demand for them, not because it thought it had any obligation to review the scope of its prior representation), BSF refused to turn them over until its deputy general counsel and outside ethics counsel could personally review them with "enhanced care." Yet these two experienced lawyers managed to miss the obvious conflict.

— BSF filed the instant complaint while discussions about the possible conflict were in progress, and before the vast majority of its files were turned over to Host.

— BSF continually represented that it was turning over its files promptly after reviewing them. But as 34 of the 39 boxes that were eventually produced were not turned over until after the complaint was filed, it is incontrovertible that BSF started this lawsuit before anyone at the firm actually bothered to review the vast majority of its relevant files.

Once Host voiced its concern about the conflict, BSF was under an "obligation to investigate the facts and the law." *Life Fitness, Inc.,* 1988 WL 37835, at *2. Indeed, BSF acknowledged this duty. It told Abdoo on December 8, 2012 that it was "analyzing the issue" and undertaking an "investigation." (Abdoo Decl. Ex. 3.) It told Proskauer a month later, on January 10, 2012 (three days before it filed the complaint) that it "had taken, and continue[d] to take Host's "allegations" of a conflict "very seriously" and had given them "top priority." (Mokriski Decl. Ex. 4.) Yet, BSF continued to reject any notion that there was a relationship between the two representations: one advising Host's Board [Redacted] the other attacking those very agreements as "inexplicable" and not in Host's best interest.

*14 It was left to Proskauer to put the complaint and [Redacted] side by side and point out the obvious:

For Educational Use Only

**Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...**

BSF could not help Madison mount an attack on the *bona fides* of the very settlement that the firm had helped to engineer. BSF's conduct resulted in nothing if not needless and vexatious litigation, to the detriment of its former client. And its failure to examine its own files fully before concluding that there was no conflict—a conclusion from which it refused to back down—was, in the circumstances, unreasonable.

BSF argues that it need not reimburse Host for its fees and costs associated with investigating the conflict and preparing the motion to disqualify because it withdrew immediately once Proskauer spelled out exactly what the conflict was. But BSF stands its ethical obligations on their head when it tries to hold its client responsible in these circumstances. BSF had in its possession every piece of information—every document, every datum—needed to ascertain whether a conflict existed. I have outlined above, in great detail, what BSF did and did not do with that information. Proskauer and Host should not have had to physically place the relevant documents under the noses of the lawyers who had purportedly reviewed them with "enhanced care" weeks earlier. The evidence establishes that BSF either failed to undertake an appropriate investigation despite its representations to the contrary, or did so in the most cavalier manner, stringing Host along for weeks, and causing its former client to incur significant expense in trying to secure BSF's acknowledgement of what should have been obvious.

BSF also argues that it should not be charged with discovering the conflict earlier than it did because it was not obvious, but "subtle." I am constrained to disagree; there was nothing subtle about it. Certainly there was nothing subtle about the uncanny coincidence in timing between Host's settlement of what had been a long-running dispute with Marriott and the purported hatching of a conspiracy between the two contending parties. The simultaneity of these two events, without more, should have caused BSF to review its prior work before taking on a new representation adverse to its former client. Once Host cried foul, serious and detailed scrutiny of the prior representation should have been undertaken before filing the complaint that called Host's conduct (including its entry into long-term management agreements that BSF reviewed on behalf of Host's Board) "inexplicable." Serious and detailed scrutiny meant doing more than (1) conducting what can only have been perfunctory interviews with lawyers about a matter about which they had not thought for ten years, and (2) rummaging among electronic documents using "keywords" that appear designed to uncover nothing at all. At a minimum BSF had an obligation, before taking a position that there was no conflict, to retrieve and read the critical documents relating to its prior representation—including specifically any and every document describing the scope of the representation and any and every attorney-client memorandum or opinion letter! As for the document review that did take place: to describe is as incompetent is no overstatement.

**\*15** BSF was also obligated to think about whether the work it performed on a global settlement of disputes between Host and Marriott might make its lawyers witnesses in a case that challenged the *bona fides* of the two companies' relationship from and after the time that settlement was consummated. There is absolutely no evidence that anyone—even Mr. Ross the ethics expert—ever approached the conflicts issue from that angle.

Figuring out the precise contours of BSF's former representation, and its relationship to a conspiracy that was supposedly being hatched at exactly the same moment, did indeed require some connecting of the dots. But BSF purports to employ some of the finest and most sophisticated lawyers in the country. Frankly, the conflict was "subtle" only if one did not particularly want to see it; and from the first day of its "investigation," when Mr. Ross was given a ridiculously unduly narrow description of the scope of the firm's work for Host, until the very end, when BSF had to ask Proskauer for copies of its own damning documents, the evidence suggests to this court that BSF did not want to see it.

BSF suggests that, because Proskauer did not spell out the precise contours of the conflict until February 22, 2013, the basis for the conflict was "speculative." It cites cases from this court which hold that much more than speculation and conclusory allegations are required to disqualify a party's chosen attorney. (BSF Brief in Opposition at 16, n. 5) But there is nothing either speculative or conclusory about the facts that Abdoo and Mokriski brought to BSF's attention—and there is

Case 1:19-cv-03377-LAP   Document 10-10   Filed 06/07/19   Page 13 of 13

For Educational Use Only

Madison 92nd Street Associates, LLC v. Marriott Intern., Inc., Not Reported in...

nothing speculative in the evidence drawn from BSF's own files. So the cases it cites are entirely beside the point.

The only inference I can draw from the record before me—and it is a compelling inference—is that BSF would not agree to withdraw until it was faced with the fact that Host was about to file a motion to disqualify on the public record. Because of BSF's adamant denials of a conflict, Host's attorneys were forced to leave no stone unturned in analyzing how a sophisticated law firm with outside ethics counsel could possibly have concluded, after an exhaustive investigation, that no conflict existed. Host was thus forced to incur significant expenses in preparing the motion to disqualify. Host should not be forced to bear this expense simply because BSF ultimately, and belatedly, conceded that it could not avoid the ethical constraint under which it labored.

### Conclusion

Host's motion for sanctions is granted. Host will be awarded full attorneys' fees for all expenses incurred from and after December 18, 2012. That is the date when BSF, for the third time, denied that there was a conflict and refused to stop work on this matter, even though it had neither reviewed its own files nor conducted an investigation into Host's allegations thorough enough to comport with its obligation to its former client.

Host should submit its time records within ten days of this decision.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5913382

### Footnotes

1   BSF billing records show the following lawyers worked on the matter: current firm partners David Boies (133.4 hours), William Marsillo (244.75 hours), and Marilyn Kunstler (89.9 hours), and associate (now Counsel) Roseanne Baxter (614.9 hours), as well as former partners Andrew Hayes (700.8 hours) and Paul Verkuil (447.6 hours), and associates, Diana Clarke (351.6 hours), Ann Nacinovich (317.2 hours), David Feuerstein (269.6 hours), Kate Ruggieri (246.1 hours), Edward Swaine (100.75 hours), Barbara Clay (47.2 hours), Melissa Kho (43.1 hours), Thomas McMahon (33 hours), Rudolph Baron (28 hours), Emeye Gugsa (25.5 hours), Christina Lewicky (23.7 hours), and Michael Herz (9.1 hours). (*See* Leader Decl. Ex. 1.)
2   We know that he did not retrieve the files or the billing records because they had to be retrieved and reviewed months later.
3   Of all the assertions in the brief in opposition, this is by far the most absurd. Of course the billing records did not contain any references to a "labor conspiracy." I would be shocked to learn that an attorney employed by BSF would have written a diary entry indicating that he or she was advising a client about entering into a "labor conspiracy."
4   Only the Baxter interview appears to have taken place in the few days immediately following Abdoo's original December 4 complaint. None of the interviews took place before Ross first reached his "tentative" conclusion on December 5. The record does not reveal when the other lawyers were interviewed. Significantly, none of the lawyers involved in the original representation has submitted a sworn statement in connection with BSF's opposition to the sanctions motion.

End of Document                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.