## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

VIRGINIA L. GIUFFRE,

     Plaintiff,

v.

ALAN DERSHOWITZ,

     Defendant.

Civil Action No. 19-cv-03377-LAP

**LEAVE TO FILE GRANTED
JUNE 25, 2019**

## PROFESSOR ALAN DERSHOWITZ'S MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS COMPLAINT

Howard M. Cooper (MA BBO# 543842)
(*pro hac vice pending*)
Christian G. Kiely (MA BBO# 684308)
(*pro hac vice pending*)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
ckiely@toddweld.com

Arthur L. Aidala (S.D.N.Y. Bar No. ALA-0059)
Imran H. Ansari (S.D.N.Y. Bar No. IHA-1978)
AIDALA, BERTUNA & KAMINS, P.C.
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011
iansari@aidalalaw.com
aidalaesq@aidalalaw.com

Dated: June 25, 2019

**Table of Contents**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .................................................................................................. 1

FACTUAL ALLEGATIONS .................................................................................. 2

ARGUMENT ......................................................................................................... 8

I.   GIUFFRE'S CLAIMS ARE TIME-BARRED UNDER THE APPLICABLE ONE YEAR
     STATUTE OF LIMITATIONS BECAUSE THEY ARE IDENTICAL IN SUBSTANCE
     TO STATEMENTS WHICH PROF. DERSHOWITZ FIRST PUBLISHED TO A
     GLOBAL AUDIENCE MORE THAN FOUR YEARS AGO ............................................... 8

        a.   Under the "Single Publication Rule," the Statute of Limitations for
             Defamation Actions Begin to Run from the Date of First Publication ...................... 9

        b.   As the Complaint Alleges, Prof. Dershowitz First Published the Allegedly
             Defamatory Statements in 2015, More Than Four Years Prior to the Filing
             of the Complaint ................................................................................. 10

        c.   Prof. Dershowitz's Recent Statements Do Not Constitute a "Republication"
             Triggering a New Limitations Period Because They Reached the Same Global
             Audience as His Original 2015 Statements ................................................. 12

II.  PROF. DERSHOWITZ'S STATEMENTS DEFENDING HIMSELF AGAINST
     SCURRILOUS ALLEGATIONS OF CHILD SEX ABUSE ARE PROTECTED BY
     THE FIRST AMENDMENT AND THE SELF-DEFENSE PRIVILEGE .......................... 16

III. CONCLUSION ............................................................................................. 22

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. 11

*Clark v. Viacom Intern. Inc.*, 617 Fed. Appx. 495 (6th Cir. 2015).................................. 13, 14, 15

*Collier v Postum Cereal Co.*, 150 A.D. 169, 134 N.Y.S. 847 (App. Div. 1912)......................... 18

*D'Amico v. Correctional Medical Care*, 120 A.D.3d 956, 991 N.Y.S.2d 687 (App. Div. 2014)  19

*Doe v. United States*, 9:08-cv-80736 (S.D. Fla.) ....................................................... 2, 3

*Field v. Trump*, 850 F.2d 938 (2d Cir. 1988).............................................................. 11

*Firth v. State of New York*, 98 N.Y.2d 365 (2002) ........................................................ 9, 12, 14

*Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167 (Tex. 2003) ..................................... 9

*Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th Cir. 1994)................................ 17, 18, 20

*Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012 (1st Cir. 1988).................................... 11

*Gelbard v. Bodary*, 270 A.D.2d 866, 706 N.Y.S.2d 801 (App. Div. 2000) .................... 12, 13, 15

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ....................................................... 17

*Giuffre v. Maxwell*, 165 F. Supp. 3d 147 (S.D.N.Y. 2016) ........................................... 21

*Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 81 N.E.2d 45 (1948) ........................................ 9

*Herbert v. Lando*, 441 U.S. 153 (1979) .................................................................. 20

*Hoesten v. Best*, 34 A.D.3d 143, 21 N.Y.S.2d 40 (App. Div. 2006) ................................. 9, 12, 15

*Ieradi v. Mylan Laboratories, Inc.,* 230 F.3d 594 (3d Cir. 2000)................................. 11

*Israel v. Portland News Publishing Co.*, 53 P.2d 529 (Or. 1936) ................................. 16

*Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ................................... 11

*Lehman v. Discovery Communications, Inc.*, 332 F. Supp. 2d 534 (E.D.N.Y. 2004) ................. 12

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ........................................ 7

*Long v. Walt Disney Co.*, 10 Cal. Rptr. 3d 836 (Cal. App. 2 Dist. 2004)...................... 9

*Mencher v. Chesley*, 85 N.Y.S. 2d 431 (Sup. Ct. 1948) ....................................... 16, 18

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................... 17, 18, 21

*Northwest Bypass Grp. v. U.S. Army Corps of Engineers,* 488 F. Supp. 2d 22 (D.N.H. 2007) ... 11

*O'Brien v. Alexander*, 898 F. Supp. 162 (S.D.N.Y. 1995) ........................................................ 18

*Orenstein v. Figel*, 677 F. Supp. 2d 706 (S.D.N.Y. 2009) ......................................................... 19

*Rinaldi v. Viking Penguin*, 52 N.Y.2d 422 (1981) .................................................................. 9, 12

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105 (1991) 16

*State v. Eighth Judicial Dist. Court ex rel. County of Clark*, 42 P.3d 233 (Nev. 2002)……..18, 19

*United States v. Isaacs,* 2008 WL 4346780 (C.D. Cal. Sept. 19, 2008) ...................................... 11

*U.S. ex rel. Lam v. Tenet Healthcare Corp.,* 481 F. Supp. 2d 673 (W.D. Tex. 2006).................. 11

*United States v. W.R. Grace,* 504 F.3d 745 (9th Cir. 2007) ......................................................... 11

*Van Buskirk v. The New York Times Co.*, 325 F.3d 87 (2d Cir. 2003) .......................................... 9

## Statutes and Rules

Crime Victims' Rights Act, 18 U.S.C. § 3771 ............................................................. 2, 3, 5, 7

Fed. R. Civ. P. 12(f) ........................................................................................................ 7, 8

Fed. R. Evid. 201 ................................................................................................................ 11

N.Y. C.P.L.R. § 215(3) ......................................................................................................... 9

## Secondary Sources

J. A. Bryant, Libel & Slander, 41 A.L.R. 2d 1083 (1972).......................................................... 16

Prosser & Keeton on the Law of Torts, at 825 (5th ed. 1984) ...................................... 16

Restatement (Second) of Torts § 577.......................................................................................... 14

Restatement (Second) of Torts § 593, cmt. K.............................................................................. 16

Robert D. Sack, Sack on Defamation at § 9.2.1 (3d ed. 2015) .................................................... 20

Bruce W. Sanford, Libel and Privacy § 4.1 (2d ed. Supp. 1997)………………….………….16

## i. **Introduction**

Since 2014, Professor Alan Dershowitz ("Prof. Dershowitz") has made every lawful effort available to him to defend himself and his reputation against the outrageous, knowingly false and defamatory allegation publicly and maliciously leveled against him by the Plaintiff, Virginia Roberts Giuffre,[1] and her lawyers, accusing him of sexually abusing her when she was a minor[2] while he was a guest at properties owned by billionaire financier Jeffrey Epstein.  Giuffre originally made her false accusation in a public pleading filed in a court action in which Prof. Dershowitz was not a party.  The Court ordered her statements stricken from record of that case as a sanction because they were "immaterial and impertinent."  Prof. Dershowitz thereafter disproved Giuffre's falsities by producing records to her counsel which demonstrate, among other things, that he could not have been where Giuffre said he was when the supposed abuse occurred, via an investigation conducted by a former FBI director, and by pointing out the patent absurdity of numerous other claims Giuffre has made about other public figures including former world leaders, royalty, and high profile businessmen.  Her own lawyer admitted that she was "wrong," "simply wrong" in accusing Prof. Dershowitz because indisputable documentary evidence proved that it would have been "impossible" for him to have been in the locations where she falsely claimed to have had sex with him.  Her best friend confirmed that she never accused Dershowitz before she felt "pressured" by her lawyers to do so.  The falsity of Giuffre's allegations, her malicious intent in asserting them, and misuse of the legal system here are demonstrable.  However, these facts are not the basis of this motion.  Rather, as discussed below,

---

[1] Although the Plaintiff filed her complaint under her married name, Virginia L. Giuffre, the Complaint refers to her by her maiden name, Roberts.  This memorandum refers to her as "Giuffre," consistent with the case caption.

[2] Documentary evidence subsequently proved that Giuffre was well above the age of consent when she claims, falsely, that she had sex with Prof. Dershowitz and others.

1

this Court can and should dismiss Giuffre's Complaint for failure to state a claim because under any reading of the Complaint Giuffre's claims are time-barred and Prof. Dershowitz's allegedly defamatory statements issued in response to Giuffre's vicious lies about him are protected speech pursuant to the First Amendment and the self-defense privilege.

## ii.   Factual Allegations

On December 30, 2014, Giuffre first made her scurrilous allegations that she had been sexually abused by Prof. Dershowitz in a public pleading in which she sought to intervene as a plaintiff in an ongoing Crime Victims' Rights Act ("CVRA") lawsuit brought against the government by victims of sexual abuse committed by Jeffrey Epstein.  *See* Compl. ¶ 10.[3]  The motion for joinder alleged that in addition to sexually abusing her himself, Epstein had "required [Giuffre] to have sexual relations with Dershowitz on numerous occasions while she was a minor, not only in Florida but also on private planes, in New York, New Mexico and the U.S. Virgin Islands[,]" and that, "in addition to being a participant in the abuse of [Giuffre] and other minors, Dershowitz was an eye-witness to the sexual abuse of many other minors by Epstein and several of Epstein's co-conspirators."  *See* Declaration of Michelle Proctus ("Proctus Decl.") Ex. A, at 4.  The filing also alleged that Giuffre had been sexually abused by British Royal Prince Andrew, and "many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders," none of whom were identified (other than Dershowitz, Prince Andrew, and a French modeling agency executive, Jean Luc Brunel).  *Id.*

---

[3] The Plaintiffs in that lawsuit, who had previously been identified by the government as victims of sexual abuse by Jeffrey Epstein, alleged that the United States Attorneys' Office for the Southern District of Florida had violated their rights under the CVRA, 18 U.S.C. § 3771, by failing to timely inform them that it had entered into a non-prosecution agreement with Epstein as part of a deal that required Epstein to plead guilty to state charges and register as a sex offender.  *See* Compl. ¶¶ 8-9; *Doe v. United States*, 9:08-cv-80736, Dkt. No. 435 at pp. 22-23 (S.D. Fla. Feb. 21, 2019).

Prof. Dershowitz responded days later by filing his own motion to intervene in the CVRA action in order to fight the false, salacious and defamatory charges leveled against him.  Proctus Decl. Ex. B.  Prof. Dershowitz attached to his motion a sworn declaration in which he averred that: (i) he had never met or had any sexual or physical contact with Giuffre; (ii) Giuffre was a serial liar and Giuffre's allegations that she had sex with him were deliberate lies; and (iii) the particular allegations of sexual encounters on Epstein's private island, at Epstein's New Mexico ranch, and onboard his private plane were provably false.  *Id.* at 11-15.  Giuffre responded by repeating and expanding upon her accusations against Prof. Dershowitz in a sworn declaration filed in the same action on January 21, 2015.  Proctus Decl. Ex. C.  Giuffre swore that she had sex with Dershowitz on at least six occasions, and provided alleged details of those encounters, including the location of each.  *Id.* at 7.  Ultimately, the court ordered Giuffre's allegations against Dershowitz to be stricken from the record and sanctioned her attorneys for filing them. *See* Proctus Decl. Ex D, *Doe v. United States*, 9:08-cv-80736, Dkt. No. 324 at pp. 6-7, 10 (S.D. Fla. Apr. 7, 2015).  By that time, however, the media had already reported extensively on the allegations and the damage to Prof. Dershowitz' reputation had already been done.

In the immediate wake of the initial publication and leaking of Giuffre's accusations against him, and the massive publicity generated by it, Prof. Dershowitz made numerous television appearances and was quoted in an equal number of print and online articles published the world over by news organizations with world-wide reach including CNN, NBC News, ABC World News, the BBC, the New York Times, the Wall Street Journal, and Reuters, vigorously denying the allegations and accusing Giuffre of fabricating them.  *See* Compl. ¶ 11 (describing how Professor Dershowitz defended himself "in nationally televised news interviews" in early 2015).  These statements were "broadcast around the world" and reached a global audience.

Compl. ¶ 51.  As alleged in the Complaint, *both* in 2015 and in his more recent statements, Prof. Dershowitz's "central assertion is that Giuffre has committed perjury, and that in December 2014, [Giuffre] and her attorneys hatched a scheme to falsely accuse Dershowitz of sex trafficking as part of a criminal attempt to extort a settlement from another party[.]"  Compl. ¶ 14.  *Then* and *now*, Dershowitz truthfully asserted that "he had not had sex with [Giuffre], that [Giuffre] was intentionally lying about having sex with Dershowitz, that [Giuffre] committed the crime of perjury, that [Giuffre] had committed the crime of extortion, and that [Giuffre] had intentionally fabricated her assertions about Dershowitz to extort money from others."  Compl. ¶ 51.

Examples of Prof. Dershowitz's 2015 statements to the media in defense of Giuffre's accusations include:

(a) a January 2, 2015 statement to the *Wall Street Journal* that Giuffre's story was "completely, totally fabricated, made-up," that he "never had sex with an underage woman," and that he was the "innocent victim of an extortion conspiracy."  Proctus Decl. Ex. E.

(b) a January 3, 2015 statement to the *New York Times* that he "categorically and unequivocally" denied all the allegations, and that Giuffre and her attorneys were "lying deliberately[.]"  Proctus Decl. Ex. F.

(c) a January 3, 2015 interview with the BBC in which Dershowitz asserted: "The story is totally made up.  Completely out of whole cloth.  I don't know this woman.  I was not at the places at the times.  It's part of a pattern of made up stories against prominent people and world leaders. . . .  What does she expect me to do, simply not to respond?  She has made a deliberate, wilful, criminal false charge. . . . I will defend myself against those charges."  Proctus   Decl.   Ex.   G   at   1-2, *available at* https://www.bbc.co.uk/sounds/play/p02g7qbc.

(d) a January 5, 2015, interview with CNN in which Dershowitz asserted: that Giuffre "made it up out of whole cloth" in an effort to sell a book; that travel records will prove he wasn't at the locations where she claimed she had sex with him; and that Giuffre was a "serial perjurer," "serial liar," and "serial prostitute." Proctus Decl. Ex. G at 8-9, *available at* https://www.cnn.com/videos/tv/2015/01/05/newday-alan-dershowitz-sexual-abuse-scandal.cnn

(e) a January 5, 2015 appearance on the Today Show in which Dershowitz asserted that he had never met Giuffre, didn't know who she was, and that her allegations were "totally false and made up." Proctus Decl. Ex. G at 8-9, *available at* https://www.today.com/video/today/56723136.

(f) a January 6, 2015 statement to Reuters "categorically denying" Giuffre's allegations and asserting that he could prove "by records and other travel documents that [he] could not have been the places that [Giuffre] says she had sex with [him]." Proctus Ex. Decl. Ex. H.

(g) a January 22, 2015 interview with the Today Show (after Giuffre had repeated her accusations in a sworn declaration filed in the CVRA case) in which Dershowitz stated: "She has filed a perjured affidavit and I can prove categorically, by documentary and other evidence that I couldn't have been in the places that she said I was at the time. . . . She is categorically lying and making the whole thing up." Proctus Decl. Ex. G at 53-55, *available at* https://www.today.com/video/today/56841769.

(h) an April 8, 2015 interview with the Today Show in which Dershowitz categorically denied Giuffre's allegations, stating "I never had any contact. I don't know who she is. I never met her. She made the whole story up out of whole cloth. I can prove that. I will prove it categorically when given an opportunity to do so in court[.]" Proctus Decl. Ex. G at 61-63, *available at* https://www.today.com/video/today/57216046.

Recently, in November 2018, the *Miami Herald* published an interview with Giuffre as part of lengthy article discussing the preferential treatment Epstein allegedly received from the criminal justice system. Compl. ¶ 13 and Ex. 1. In a videotaped interview that the *Herald* posted to its website, "Giuffre described how Epstein and [Ghislaine] Maxwell began grooming her – not just to perform massages, but to sexually pleasure them and others[,]" including "politicians and academics and royalty." Compl. Ex. 1 at p. 6. When she mentioned "academics," the video showed a picture of Dershowitz. The article quoted at length from Giuffre's sworn declaration in the CVRA action, including in particular the details of her accusations against Prof. Dershowitz. Dershowitz, who was asked to comment for the *Miami Herald* article, denied the accusations against him and just as he had in 2015, asserted that they had been fabricated in order to extract money from other wealthy people. Compl. Ex. 1 at p. 8.

5

As to be expected, the *Miami Herald* article sparked renewed interest in Giuffre's accusations against Dershowitz, and he was compelled to reprise his media tour from 2015 denying those accusations.  It is Dershowitz's recent statements to the media in the aftermath of the *Miami Herald* article that form the basis for Giuffre's Complaint in this action.  Specifically, the Complaint identifies six occasions on which Giuffre alleges Dershowitz defamed her. Compl. ¶ 17.  They are:

(a) Dershowitz's comment for the November 28, 2018 *Miami Herald* article, in which he responded to her allegations by asserting that her "story was 100% flatly categorically made up" and "Giuffre and her attorneys fabricated the assertion in order to get money from other powerful, wealthy people."  Compl. Ex. 1, p. 8

(b) Dershowitz's December 1, 2018 letter to the editor of *Raw Story* in response to an article published by that outlet entitled "Trump Defender Alan Dershowitz is deeply involved in the sordid Jeffrey Epstein scandal," in which he asserted: "I never met Giuffre; I never had sex with her; she simply made up the entire story for money."  Compl. Ex. 2

(c) Dershowitz's December 2, 2018 letter to editor of the *Miami Herald*, in response to its November 28, 2018 article, in which he wrote that he: was "deliberately framed for financial reasons . . . in order to obtain money from a wealthy businessman"; that prior to the 2014 CVRA filing Giuffre "had never previously included [Dershowitz] among the people with whom she claimed to have had sex"; that "one of Giuffre's own lawyers has acknowledged in front of witnesses that Giuffre's claims against [Dershowitz] are 'wrong' 'simply wrong'"; and that he never met Giuffre and never had sex with her. Compl Ex. 3.

(d) Dershowitz's December 4, 2018 appearance on the Law & Crime Network, in which he told host Brian Ross that Giuffre is a "certified, complete, total liar," that he can "prove conclusively that she made the whole thing up," and that an investigation by the former head of the FBI concluded the evidence showed "he was not where she said he was." Compl. Ex. 4.

(e) Dershowitz's December 5, 2018 letter to the editor of the *Harvard Crimson*, in which he wrote that "Giuffre made up the accusations out of whole cloth to obtain millions of dollars from Leslie Wexner" and "there is evidence that directly proves [Dershowitz] was framed . . . [including] emails between Giuffre and a journalist, a book manuscript by Giuffre and a legal brief that are smoking guns showing that [he] was deliberately framed for financial reasons."  Compl. Ex. 5.

(f) Dershowitz's March 2, 2019 tweet stating: "My perjuring accusers are Virginia Giuffre and Sarah Ransomme.  Both have long records of lying.  Giuffre sold a story claiming

that she met Al Gore on Epstein's island.  Secret Service records prove he was never on the island.  Ransomme claims she has sex tapes of Hillary C and DJT."  Compl. Ex. 6.

Critically, a comparison of these recent statements and the statements excerpted above at pp. 4-5, as will be discussed below, make clear that *all* of the allegedly defamatory statements within the year preceding the filing of this lawsuit are *identical* in substance to the statements Prof. Dershowitz made during media interviews in 2015, after Giuffre first made the same accusations against him in the CVRA filing.  As well, the Complaint is devoid of any allegation, because there can be none, that the statements were published to different audiences given the fact the 2015 statements were published via the world-wide media and were available on the internet for over four years prior to Giuffre filing this lawsuit.

Finally, although not material to the instant motion, Prof. Dershowitz asks the Court to note that the Complaint filed here is designed more for the media than for the Court.  Dershowitz is aware, for example, that Giuffre's counsel provided the Complaint to the media before it was even filed in court.  The Complaint itself includes numerous irrelevant, impertinent and scandalous accusations that Giuffre and her counsel already know she cannot prove at trial, because they are demonstrably false.[4]  The obvious purpose of including such allegations is to defame Prof. Dershowitz under the assumed protection of the litigation privilege.  Indeed, this

---

[4] These include allegations made by Sarah Ransome, who claims that she too was "lent" out to Prof. Dershowitz for sex, and that he lied in denying that accusation.  Compl. ¶¶ 80-81 and Ex. 14.  They are the very definition of immaterial, impertinent and scandalous.  Fed. R. Civ. P. 12(f).  These false allegations "can have no possible bearing on the issues of the trial" and would not be admissible at a trial of Giuffre's claims.  *See, e.g., Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976).  If they were, Dershowitz would produce hundreds of pages of currently sealed emails from Ransome to a *New York Post* reporter in which Ransome claims to have "sex tapes" of Hillary Clinton, Donald Trump, Bill Clinton and others.  Dershowitz was told about these hallucinatory emails by the reporter who refused to publish them.  The irrelevant, impertinent and scandalous allegations also include a false claim by Maria Farmer that she saw Dershowitz at Epstein's house with underage females.  But her employment records conclusively prove that she and Dershowitz could not have been in Epstein's house at the same time, since she stopped working for Epstein before Dershowitz ever met him.

tactic is part of a pattern that has already been condemned by one federal judge (Marra, J.) in entering a sanction and striking similarly scandalous and impertinent accusations made by Giuffre and her then lawyers.  Should the Court decline to dismiss the Complaint in its entirety, Prof. Dershowitz will move to strike every irrelevant, impertinent and scandalous allegation contained in it pursuant to Federal Rule of Civil Procedure 12(f).

### iii. <u>Argument</u>

I.   **GIUFFRE'S CLAIMS ARE TIME-BARRED UNDER THE APPLICABLE ONE YEAR STATUTE OF LIMITATIONS BECAUSE THEY ARE IDENTICAL IN SUBSTANCE TO STATEMENTS WHICH PROF. DERSHOWITZ FIRST PUBLISHED TO A GLOBAL AUDIENCE MORE THAN FOUR YEARS AGO.**

Giuffre's claims must be dismissed because they are stale and time-barred under the applicable one year statute of limitations for defamation claims.  The statements which Giuffre alleges defamed her – all variations on Dershowitz's "central assertion" that "[Giuffre] has committed perjury, and that in December 2014, [Giuffre] and her attorneys hatched a scheme to falsely accuse Dershowitz of sex trafficking as part of a criminal attempt to extort a settlement from another party" (Compl. ¶ 14) – were originally published by Dershowitz in early 2015 after Giuffre first leveled her accusations against Dershowitz in the filing made in the CVRA case on December 30, 2014.  While Dershowitz has repeated his denials more recently in response to the November 2018 *Miami Herald* article (which on information and belief was generated by Giuffre and her lawyers) and the resulting renewed interest in the story by the media, these statements do not give rise to a new cause of action for defamation because the statements are substantively identical to the 2015 statements and did not reach a new audience.

### a. Under the "Single Publication Rule," the Statute of Limitations for Defamation Actions Begins to Run from the Date of First Publication.

New York law applies a one year statute of limitation to defamation claims, N.Y. C.P.L.R. § 215(3), with the cause of action "generally accru[ing] on the date of the first publication." *Hoesten v. Best*, 34 A.D.3d 143, 150, 821 N.Y.S.2d 40, 45 (App. Div. 2006). In determining when the statute of limitations begins to run on a defamation claim, New York applies the "single publication" rule. *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 125, 81 N.E.2d 45 (1948). Under the traditional application of this rule to print media, any edition of a book or article, regardless of the number of copies sold, is considered a "single publication" which gives rise to only one cause of action. *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003) (citing *Gregoire*, 298 N.Y. at 126, 81 N.E.2d 45). The limitations period begins to accrue at the time of the first publication, which is defined as "the earliest date on which the work was placed on sale or became generally available to the public." *Van Buskirk*, 325 F.3d at 89 (internal quotations and citation omitted). Stated differently, "neither the time nor the circumstance in which a copy of a book or other publication finds its way to a particular consumer is, in and of itself, to militate against the operation of the unitary, integrated publication concept." *Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 433 (1981). The rule applies with equal force to internet publications. *Firth v. State of New York*, 98 N.Y.2d 365, 369–70 (2002). The New York Court of Appeals has explained that the rationale underlying this rule is the prevention of "endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants." *Id.* at 370. It is also designed to protect the First Amendment rights of citizens who are continuously defamed to respond to repeated false accusations. *See Long v. Walt Disney Co.*, 10 Cal. Rptr. 3d 836, 839 (Cal. App. 2 Dist. 2004); *Forbes Inc. v. Granada*

*Biosciences, Inc.*, 124 S.W.3d 167, 174 (Tex. 2003).  As such, it should be interpreted in tandem with the self-defense privilege, whose roots are in the First Amendment.  *See infra* section II.

> **b. As the Complaint Alleges, Prof. Dershowitz First Published the Allegedly Defamatory Statements in 2015, More Than Four Years Prior to the Filing of the Complaint.**

As set forth above, although Giuffre waited until April 2019 to file this suit, her accusations against Prof. Dershowitz and Dershowitz's allegedly defamatory denials of those accusations are not new.  In a recent filing in response to Prof. Dershowitz's Motion to Disqualify, Giuffre's counsel at Boies Schiller Flexner LLP conceded that Prof. Dershowitz has been making the statements at issue in this litigation "[e]ver since" 2014, and that Boies Schiller has been representing Giuffre for five years in connection with her dispute with Dershowitz over Dershowitz's denials of her accusations against him.  *See* ECF No. 15 at 1.  What the Complaint casts as Dershowitz' "central assertion" – that "Giuffre has committed perjury, and that in December 2014, Giuffre and her attorneys hatched a scheme to falsely accuse Dershowitz of sex trafficking as part of a criminal attempt to extort a settlement from another party" (Compl. ¶ 14) – is precisely the same message that Dershowitz advanced in countless media outlets the world over after Giuffre originally made her accusations in the CVRA filing in December 2014.  *See, e.g.*, Compl. ¶ 21 ("More recently, Dershowitz . . . has *again* taken to claiming publically that he demands a trial on the question of whether [Giuffre] committed perjury and made up her statements about him for money." [emphasis added]).  A comparison of the more recent statements quoted in the Complaint with Dershowitz's statements from early 2015 demonstrates on their face and without the need for evidence that they are substantively identical.  Then and now, Dershowitz asserted that "he had not had sex with [Giuffre], that [Giuffre] was intentionally lying about having sex with Dershowitz, that [Giuffre] committed the crime of

perjury, that [Giuffre] had committed the crime of extortion, and that [Giuffre] had intentionally fabricated her assertions about Dershowitz to extort money from others."  Compl. ¶ 51.

Though it avoids attaching or directly quoting from most of them, the Complaint expressly references Dershowitz's earlier denials of Giuffre's accusations, which the Complaint alleges are all part of a sustained campaign to discredit Giuffre.  Compl. ¶ 53.[5]  This Court can and should consider these earlier allegedly defamatory statements in deciding this motion to dismiss, both because they are central to the allegations of the complaint, *see Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988), and because they are susceptible to judicial notice under Fed. R. Evid. 201.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).[6]

---

[5] Although the Complaint strategically attempts to focus on Prof. Dershowitz's more recent media appearances in an attempt to avoid the statute of limitations problem here, it cannot avoid reference to Dershowitz's 2015 media campaign, and indeed expressly references several of Dershowitz's 2015 interviews in which he allegedly defamed Giuffre:  A January 5, 2015 appearance on *CNN Live* (Compl. ¶ 65); a January 15, 2015 interview published in *The American Lawyer* (attached to the Complaint as Exhibit 11); a January 21, 2015 interview with the *New York Daily News* (Compl. ¶ 66); and a January 22, 2015 interview with the *Florida Local 10 News* (Compl. ¶ 66).  Also attached to the Complaint is a December 19, 2018 *Miami Herald* article which explicitly refers to Dershowitz's 2015 "media blitz on TV asserting that [Giuffre] made up the story."  *See* Compl. Ex. 16 at p. 5.

[6] It is well-established that a court may take judicial notice of the existence and content of published articles, even if they are not in the record before it, particularly where, as here, they are not being considered for the truth of the matters reported.  *See* Fed. R. Evid. 201; *United States v. W.R. Grace,* 504 F.3d 745, 766 (9th Cir.2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 569 n. 13 (2007)) (observing that, on appeal, courts have the discretion to expand the existing record to take judicial notice under Rule 201 of the existence and content of published articles); *Ieradi v. Mylan Laboratories, Inc.,* 230 F.3d 594, 598 n. 2 (3d Cir. 2000) (taking judicial notice of an article published in the New York Times that was not in the record); *United States v. Isaacs,* 2008 WL 4346780, at *2 n. 4 (C.D. Cal. Sept. 19, 2008) (taking judicial notice of articles published in the Los Angeles Times and rejecting argument that those articles were not actually "spread on the record in this case"); *Northwest Bypass Grp. v. U.S. Army Corps of Engineers,* 488 F. Supp. 2d 22, 25–26 (D.N.H. 2007) (taking judicial notice of newspaper article, though limiting consideration of facts contained in article to those that appeared undisputed);

      **c.  Prof. Dershowitz's Recent Statements Do Not Constitute a "Republication" Triggering a New Limitations Period Because They Reached the Same Global Audience as His Original 2015 Statements.**

A corollary to the single publication rule is the concept of "republication." "Republication, retriggering the period of limitations, occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely 'a delayed circulation of the original edition.'" *Firth*, 98 N.Y.2d at 371 (quoting *Rinaldi*, 52 N.Y.2d at 435; Restatement (Second) of Torts: Defamation § 577A, comment d).  As the Restatement explains, "[t]he justification . . . usually offered [for the republication rule] is that in these cases the second publication is intended to and does reach *a new group*."  *Id.* (emphasis added).  *See Lehman v. Discovery Communications, Inc.*, 332 F. Supp. 2d 534, 538–39 (E.D.N.Y. 2004) ("Like a publication of the same defamatory statement in both a morning and evening editions of a newspaper, a rebroadcast of a television show is intended to reach a new audience and is therefore an additional communication.").  Consequently, New York courts have recognized an important exception to the republication rule, holding that it does not apply to trigger a new limitations period in situations where a statement made "on a different occasion" from the original publication does *not* reach a new audience.  *See, e.g., Hoesten v. Best*, 34 A.D.3d 143, 150, 821 N.Y.S.2d 40, 45 (App. Div. 2006); *Gelbard v. Bodary*, 270 A.D.2d 866, 706 N.Y.S.2d 801 (App. Div. 2000).

The plaintiff in *Hoesten v. Best* sued the defendant union representative for making allegedly defamatory statements to the plaintiff's employer about his unprofessional behavior, resulting in his firing.  34 A.D.3d at 146.  The defendant had submitted several written

---

*U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F.Supp.2d 673, 680 (W.D. Tex. 2006) ("Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles.").

complaints to the plaintiff's employer, and then subsequently attended a meeting with several representatives of the employer at which she repeated the substance of those statements accusing the plaintiff of unprofessional behavior. *Id.* at 147-48. The action was filed within one year of the meeting, but more than one year since the submission of the written complaints, meaning that the action was time-barred unless the repetition of the statements at the meeting constituted a republication. *Id.* at 149. The court held that no republication occurred, because although the defendant's "statements at the meeting certainly were made on a new occasion, *they nonetheless were made to the same audience and involved the identical subject matter*." *Id.* at 151 (emphasis added). "Accordingly," the court reasoned, "they were more akin to a delayed release of previously published matter as opposed to a distinct republication." *Id.*

Likewise, the court in *Gelbard v. Bodary* held that no republication occurred on an occasion where the defendant hospital employee appeared before a hospital's peer review committee and "merely restated the contents" of an allegedly defamatory letter he had earlier sent to the committee. 270 A.D.2d at 867. Because the original publication occurred outside the one year limitations period, the action was dismissed as time-barred. *Id.* at 866.

In *Clark v. Viacom Intern. Inc.*, 617 Fed. Appx. 495 (6th Cir. 2015), the Sixth Circuit considered application of the single publication and republication doctrines in the context of internet publications. There, two former American Idol contestants sued Viacom, the publisher of MTVNews.com, over allegedly defamatory claims about their criminal history which were originally published in series of online articles following their departures from the show in 2002, and then repeated in new articles on the same website in 2011 and 2012, within the limitations period. *Id.* at 497-99. In affirming the dismissal of the plaintiffs' claims on statute of limitations grounds, the court rejected the plaintiffs' argument that Viacom had republished the allegedly

13

defamatory statement concerning the plaintiffs by including those statements in newly-published retrospective articles about the American Idol franchise. *See id.* at 499 (describing recent articles which made passing reference to prior allegations against plaintiffs and other American Idol contestants).

Notably, the court in *Clark* held that no republication occurred even though the allegedly defamatory statements had been affirmatively repeated in new articles posted to the same website within the limitations period. The court explained:

> Statements that are posted to a forum that is prominently accessible to the online public have a presumptively global audience, and subsequent alterations of format—such as shifting the statement between URLs or moving it from one portion of a webpage or server to another—are not likely to have a measurable effect on the statements' ability to be accessed by a new band of viewers. *Because the initial posting has already been directed at most of the universe of probable interlocutors, there is not likely to be any need for a digital equivalent of a rebroadcast or a second print run.*

*Id.* at 506 (emphasis added). The court observed that its holding adhered to "the traditional touchstone of the republication doctrine: that the test of whether a statement has been republished is if the speaker has affirmatively reiterated *it in an attempt to reach a new audience that the statement's prior dissemination did not encompass.*" *Id.* at 505 (citing *Firth*, 747 N.Y.S.2d 69, 775 N.E.2d at 466; Restatement (Second) of Torts § 577A, cmt. d) (emphasis added). "After all," the court reasoned, "a reiterated statement generates new reputational harm only if the statement is repeated with an intent and ability to expand its dissemination beyond its previous limits[.]" *Id.* at 505-506. Statements previously published to a "presumptively global audience," such as those posted to a "prominent, publicly accessible news website" cannot be presumed to have reached a new audience, and thus do not constitute a republication even if they are "affirmatively reiterated." *Id.* at 506.

14

As Giuffre's Complaint repeatedly alleges, Prof. Dershowitz's denials of Giuffre's accusations were broadcast to a global audience in 2015 and again in 2018.  *See* Compl. ¶ 51 ("Dershowitz's false statements were . . . broadcast around the world[.]" ); Compl. ¶ 98 ("Dershowitz and Epstein intended Dershowitz's false statements to be widely published and disseminated on television, through newspapers, by word of mouth, and on the internet.  As intended by Dershowitz and Epstein, Dershowitz's statements were published and disseminated around the world."); Compl. ¶ 102 (referring to "Dershowitz's and Epstein's campaign to spread his false statements nationally and internationally. . . .").  The Complaint fails to allege that Dershowitz reached a new audience with his 2018 denials because it cannot plausibly do so.  Following the publication of the *Miami Herald* article in November 2018, Dershowitz went on the *same* shows and spoke to the *same* print and online outlets, making the *same* denials that he originally made in 2015 in the aftermath of the CVRA filing, and continued to make between 2015 and 2018 *every time* he was falsely accused.  *See supra* pp. 4-7.   As in *Clark*, Dershowitz's 2015 denials had already reached a "presumptively global audience" and therefore their repetition in 2018 could not have reached a wider audience, and did not as a matter of law constitute a "republication" triggering a new limitations period.  It would have had the same impact had the media simply rebroadcast his previously recorded denials to the same global audience, as it sometimes did.  This conclusion is consistent with New York law which recognizes that a repetition which does not reach a new audience is not a republication.  *See Hoesten v. Best*, 34 A.D.3d at 150; *Gelbard v. Bodary*, 270 A.D.2d 866.  Applying the single publication rule to this Complaint is consistent both with the policies underlying the rule, and with the First Amendment, which requires resolving doubts in favor of robust dialogue and

debate, especially when the alleged defamatory statements were made to defend against scandalous and career-ending accusations.

## II.    PROF. DERSHOWITZ'S STATEMENTS DEFENDING HIMSELF AGAINST SCURRILOUS ALLEGATIONS OF CHILD SEX ABUSE ARE PROTECTED BY THE FIRST AMENDMENT AND THE SELF-DEFENSE PRIVILEGE.

The First Amendment in the area of speech values above all else a free and open marketplace of ideas and public discourse, *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 377 (1984), including the ability to respond to offensive speech with more speech. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991).  Consistent with this, First Amendment jurisprudence in the area of defamation law has long recognized a qualified privilege in the defamed even to defame in response, in order to protect one's own reputational interests.[7]  Such a privilege rests on considerations similar to the tort privilege of self-defense or defense of property.  *See* Bruce W. Sanford, Libel and Privacy § 4.1 (2d ed. Supp. 1997) (citing Keeton, et al., Prosser & Keeton on the Law of Torts, at 825 (5th ed. 1984)).  Under this so-called "right of reply," an individual may respond to one who has defamed him by calling the initial defamer "*an unmitigated liar*," for example, if such name-calling reasonably appears necessary for the protection of reputation.  Restatement (Second) of Torts § 593, cmt. k (emphasis added); *see generally* J.A. Bryant, Annotation, Libel & Slander: Qualified Privilege of Reply to Defamatory Publication, 41 A.L.R. 3d 1083 (1972) (collecting cases on qualified privilege of reply to defamatory publication).  Similarly, a defendant in exercising his right of reply may impugn the plaintiff's motives in making the initial defamatory

---

[7] New York law recognizes this privilege.  *See Reynolds v. Pegler*, 223 F.2d 429, 432 (2d Cir. 1955) (recognizing "privilege of reply" under New York law); *Kane v. Orange Cty. Publications*, 232 A.D.2d 526, 527, 649 N.Y.S.2d 23 (1996) ("response to unfavorable publicity against [the defendant is] covered by a qualified privilege").

charges.  *Mencher v. Chesley*, 85 N.Y.S. 2d 431, 434 (Sup. Ct. 1948); *Israel v. Portland News Publishing Co.*, 53 P.2d 529 (Or. 1936).

This principle has particular meaning in the public versus private figure defamation context.  Following *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), courts have imposed a far more substantial burden of proof on those who enjoy access to the media by virtue of their public profile.  Writing for the majority in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), Justice Powell stated that "self-help…is the first remedy of any victim of defamation… [,]" and noted that "[p]ublic … figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."  *Id.* at 344.   Here, Professor Dershowitz is by any definition a public figure and would face the substantial burden of proving actual malice by clear and convincing evidence should he bring a defamation claim against his defamer.  As such, in Justice Powell's words, his first remedy as a victim of defamatory allegations was and has remained simply to defend himself.  All through American history – beginning with Jefferson's attacks on Adams and Burr and continuing to the current time – enemies have accused each other of being liars and of making up false accusations.  The First Amendment must protect the right of every American who is accused of heinous criminal conduct – whether the accusation is made in the media or in court documents – to defend himself or herself in the court of public opinion.  *See Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1564 (4th Cir. 1994) ("By freely permitting the Foretiches to respond to Dr. Morgan's charges against them— charges that have never been proved in any court of law—we foster both the individual interest in self-expression and the social interest in the discovery and dissemination of truth—the very goals that animate our First Amendment jurisprudence.").   An out of court response in the court

of public opinion is all the more necessary here where the initial defamation was deliberately made in court papers, thus insulating it from a defamation lawsuit. *See O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) (discussing litigation privilege).

Because it is a qualified privilege, the self-defense privilege may be forfeited if abused. "The privilege may be lost . . . if the reply: (1) includes substantial defamatory matter that is irrelevant or non-responsive to the initial statement; (2) includes substantial defamatory material that is disproportionate to the initial statement; (3) is excessively publicized; or (4) is made with malice in the sense of actual spite or ill will." *State v. Eighth Judicial Dist. Court ex rel. County of Clark*, 42 P.3d 233, 239 (Nev. 2002); *see also Foretich*, 37 F.3d at 1559. The Fourth Circuit has observed, however, based on its "reading of the extensive case law on abuse of the privilege of reply," that "a public response to a public attack may be 'uninhibited, robust, and wide-open,' without stepping over the line into abuse." *Id.* at 1560 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Thus, as the Restatement recognizes, the protection afforded by the self-defense privilege goes beyond a mere denial of accusations and extends to statements aimed at impugning the motives of one's accuser:

> [A] reply's contents must clearly relate to its supposed objective—blunting the initial attack and restoring one's good name. Statements that simply deny the accusations, or directly respond to them, or express one's impressions upon first hearing them are certainly responsive. *So, too, are statements impugning the motives of the accuser: "One in self-defense is not confined to parrying the thrusts of his assailant."*

*Foretich*, 37 F.3d at 1560–61 (quoting *Collier v Postum Cereal Co.*, 150 A.D. 169, 178, 134 N.Y.S. 847, 853 (App. Div. 1912)) (emphasis added). *See also Mencher*, 85 N.Y.S.2d at 434 ("The pertinent authorities hold that a person subjects his own motives to discussion when he makes a public attack upon another. Legitimate self-defense is not limited to a mere denial of the charge, but it may include a proper counterattack in the forum selected by the plaintiff.").

Giuffre's Complaint must be dismissed because Prof. Dershowitz's denials of Giuffre's accusations are protected by the self-defense privilege, and the Complaint does not allege facts sufficient to defeat that privilege.  Under New York law, "[t]he elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se."  *D'Amico v. Correctional Medical Care*, 120 A.D.3d 956, 962, 991 N.Y.S.2d 687, 694 (App. Div. 2014).  "[I]n light of the incorporation of a lack of privilege into the elements of a defamation claim[,]" a court may properly dismiss a defamation complaint for failure to state a claim on which relief can be granted where the alleged defamatory statements are protected by a qualified privilege.  *Orenstein v. Figel*, 677 F. Supp. 2d 706, 711 (S.D.N.Y. 2009).

There can be no serious question that Prof. Dershowitz's statements fit comfortably, as a matter of law, within the protection of the self-defense privilege.  Each of the statements identified in the Complaint as having defamed Giuffre – Dershowitz's claims that he "had not had sex with [Giuffre], that [Giuffre] was intentionally lying about having sex with Dershowitz, that [Giuffre] committed the crime of perjury, that [Giuffre] had committed the crime of extortion, and that [Giuffre] had intentionally fabricated her assertions about Dershowitz to extort money from others" (Compl. ¶ 51) – directly responds to the accusations Giuffre leveled against Dershowitz.

The only question is whether the Complaint sufficiently alleges that Dershowitz abused the privilege.  But the Complaint does not and cannot plausibly allege that anything about Prof. Dershowitz's response to Giuffre's accusations was so disproportionate as to amount to an abuse of the privilege.  Giuffre publicly accused Dershowitz, with no advance notice and no legitimate

19

purpose (as found by Judge Marra), of one of the most heinous crimes imaginable.  Giuffre's accusations were, not surprisingly, seized on by the media and disseminated to a global audience, and had an immediate and severe impact on Dershowitz's previously unblemished reputation. Prof. Dershowitz had no choice but to respond to the allegations in precisely the manner he did—not simply by denying them, but by publicly branding Giuffre a liar and questioning her motives in accusing him.  Nor can Giuffre complain that Prof. Dershowitz somehow excessively published his denials, when he issued his responses through the very same mass media outlets that published Giuffre's accusations against him, generally in response to requests from those outlets to reply to Giuffre's accusations.  Indeed, the public record shows that Giuffre's false accusations received far more prominent and extensive coverage than Prof. Dershowitz's truthful responses.

Giuffre's conclusory allegations in the Complaint that Prof. Dershowitz acted with knowing falsity or reckless disregard for the truth in denying her accusations cannot defeat Dershowitz's invocation of the self-defense privilege.  Although there is some suggestion in the case law that the self-defense privilege may be defeated by a showing of malice, it is not constitutional malice in the sense of knowledge of falsity or reckless disregard for the truth, but rather common law "malice in the sense of actual spite or ill will."[8]  *State v. Eighth Judicial Dist. Court ex rel. County of Clark*, 42 P.3d 233, 239 (Nev. 2002); *see also* Robert D. Sack, *Sack on Defamation*, at § 9.2.1 (3d ed. 2015).  *But see Foretich*, 37 F.3d at 1559 (suggesting that only relevant consideration in assessing forfeiture of privilege is proportionality of response). Obviously, if the self-defense privilege could be defeated merely by alleging malice of the

---

[8] For a discussion of the confusion courts sometimes encounter with regard to the distinction between the common law and constitutional forms of malice*, see Herbert v. Lando*, 441 U.S. 153, 199 (1979) (Stewart, J., dissenting).

constitutional variety, i.e., knowledge of falsity or reckless disregard for the truth, the privilege would be a dead letter. If the privilege only protected a denial where the denial could be shown to be true, it would not be a privilege at all since truthful statements are not defamatory. Thus, at a minimum, to defeat the privilege, Giuffre must plausibly have alleged that Dershowitz acted out of "ill will and spite," as opposed to self-preservation, in making his statements. She has not done so. "Ill will and spite" cannot be alleged merely on the basis of the truism that a person falsely accused of a heinous crime will understandably be furious at the false accuser. Something more is required, and has not been alleged here.[9]

Were the courts to encourage defamation suits by everyone accused of lying against their enemies, there would be no end to litigation and First Amendment protected advocacy would be chilled to the point of freezing important debate. In recent years alone, the word liar has been bandied about by numerous politicians, including those in the highest positions of authority. Certainly an ordinary citizen should have the same right to call his false accuser a liar as prominent public officials have had throughout history. In this case, had Prof. Dershowitz not accused his false accuser of lying, making up the story and committing perjury, the false

---

[9] Giuffre will undoubtedly direct the Court to *Giuffre v. Maxwell*, 165 F. Supp. 3d 147 (S.D.N.Y. 2016), in which Judge Sweet rejected Ghislaine Maxwell's invocation of the self-defense privilege in moving to dismiss a similar complaint for defamation which Giuffre brought against Maxwell based on her denials of Giuffre's accusations against Maxwell. That decision, of course, is not binding on this Court, and it is distinguishable on its facts. Maxwell was not a public figure. Dershowitz is, and as a result, Giuffre's allegations against him generated far more intense publicity. He faced immediate ruination of his reputation worldwide. He was therefore compelled to respond in a way that Maxwell was not. Moreover, as a public figure, Dershowitz faces a far high burden under *New York Times v. Sullivan* and its progeny in vindicating his reputation through a defamation lawsuit. He must therefore be afforded more latitude to defend himself publicly under the self-defense privilege. But most importantly, the *Maxwell* decision misapplies the standard for defeating the self-defense privilege, holding that the privilege can be defeated by a mere allegation of constitutional malice in the sense of knowing falsity. *Id.* at 156. As explained above, the self-defense privilege can only be properly defeated by the type of common law "malice in the sense of actual spite or ill will" – beyond ill will stemming from the false accusation – which Giuffre has not alleged here.

accusation would have been accepted as true.  Surely, Prof. Dershowitz has at least as much right to call his accuser a liar as the accuser had to call him a pedophile and rapist.  Either the law must protect *both* the accuser and accused in such a cases, or it must not protect *either*.[10]  Equal justice under the First Amendment demands that the law must not protect the false accusations made against Prof. Dershowitz – deliberately made in court papers and leaked to the media – while denying Prof. Dershowitz the opportunity to defend against those false accusations in the court of public opinion.

### iv.  <u>Conclusion</u>

When a private citizen who is a public figure for constitutional purposes is repeatedly defamed in court papers that are then leaked to the media, he has the right to repeatedly defend his reputation in the court of public opinion.  This right is protected by three independent legal doctrines: the right to republish earlier responses under the principle of first publication; the right to defend himself in public under the self-defense privilege; and the right under the First Amendment to participate in the open marketplace of ideas by offering in-kind responses to a serious accusation that has made its way around the world.  When these doctrines intersect, as they do in this case, these legal issues must be resolved in favor of the principles underlying the constitutional protection of free speech.  For the foregoing reasons, Prof. Dershowitz respectfully requests that this Court dismiss the complaint for failure to state a claim upon which relief can be granted.

---

[10] Insulting one's false accusers is as old as civilization.  As Sigmund Freud once quipped: "The first human who hurled an insult instead of a stone was the founder of civilization."

Respectfully submitted,

ALAN DERSHOWITZ,

By his attorneys,


/s/ Howard M. Cooper
Howard M. Cooper (MA BBO# 543842)
(*pro hac vice pending*)
Christian G. Kiely (MA BBO# 684308)
(*pro hac vice pending*)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
ckiely@toddweld.com


Arthur L. Aidala (S.D.N.Y. Bar No. ALA-0059)
Imran H. Ansari (S.D.N.Y. Bar No. IHA-1978)
AIDALA, BERTUNA & KAMINS, P.C.
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011
iansari@aidalalaw.com
aidalaesq@aidalalaw.com

Dated:  June 25, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on June 25, 2019.


<u>/s/ Howard M. Cooper</u>
Howard M. Cooper