UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X

VIRGINIA L. GIUFFRE                                      1:19-CV-03377

                         Plaintiff,                       ECF CASE

        -against-                              **DECLARATION OF**
                                              **PROF. ROY D. SIMON, JR.**

ALAN DERSHOWITZ,

                          Defendant.

--------------------------------------------------------------- X

       Roy D. Simon, Jr., a Distinguished Professor of Legal Ethics Emeritus at Hofstra University School of Law and an attorney admitted to practice law and in good standing in New York, declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

## **Introduction**

1. On behalf of its client Virginia L. Giuffre ("Plaintiff"), the law firm of Boies, Schiller & Flexner LLP ("Boies Schiller" or the "Firm") has retained me as an expert in the field of professional responsibility for lawyers.

2. Boies Schiller has asked for my objective evaluation, analysis, and expert opinion regarding whether Boies Schiller representation of Ms. Giuffre against defendant Dershowitz in this matter violates the New York Rules of Professional Conduct.  This declaration expresses my opinions and my analysis.

## **Brief Summary of Opinions**

3. In my opinion, to a reasonable degree of professional certainty, Boies Schiller's representation of Ms. Giuffre against defendant Dershowitz in this matter does not violate the New York Rules of Professional Conduct.

4. The disciplinary complaints that Mr. Dershowitz filed against attorneys from Boies Schiller (David Boies and Sigrid McCawley), which raised many of the same issues raised in his motion to disqualify, have all been dismissed.  The complaints submitted by Mr. Dershowitz in these three

jurisdictions were more than 100 pages long (including multiple exhibits) and fully set forth his evidence against the Boies Schiller attorneys. The submissions include much of the *identical language* he has put before this Court in his declaration. Whether or not the dismissals have collateral estoppel effect under New York law (a question of law on which I am not an expert and do not opine), the dismissals by disciplinary authorities in New York, the District of Columbia, and Florida are significant, highly relevant, and should be dispositive here. Out of respect for the diligence and expertise of the disciplinary authorities in New York, D.C., and Florida, this Court should give substantial weight to the fact that each jurisdiction, after investigating the facts and applying the Rules of Professional Conduct, dismissed Mr. Dershowitz's charges. In particular:

a. In New York, the Grievance Committee for New York's Ninth Judicial District conducted an investigation into the complaint Mr. Dershowitz filed against David Boies. After that investigation concluded, the Chairperson of the Grievance Committee wrote a letter to Mr. Boies dated December 31, 2018 stating: "After deliberation, the Committee determined that ***there was no breach of the Rules of Professional Conduct on your part.***" (Emphasis added.)

b. In Florida, after an investigation, Bar Counsel sent Mr. Dershowitz a "Letter Report of No Probable Cause Finding by the Grievance Committee" dated June 14, 2019. The letter informed Mr. Dershowitz that "the committee determined that there is no probable cause for further disciplinary proceedings in this matter" and expressly stated that "the documentation provided in this case ***does not show that you were a client*** of Ms. McCawley's law firm." (Emphasis added.)

c. In the District of Columbia, where Mr. Dershowitz filed the same complaint against Sigrid McCawley that he filed against her in Florida, the D.C. Office of Disciplinary Counsel wrote a letter to Mr. Dershowitz dated September 10, 2018 notifying him that it had "completed its investigation" and that ***"we do not find clear and convincing evidence that Ms. McCawley or any other member of Boies Schiller Flexner, LLP (the firm) represented you."*** (Emphasis added.) The letter added that the Office of Disciplinary Counsel did "not find sufficient evidence to suggest that Mr. Sires and others were not properly screened consistent with the requirements of Rule 1.18."

5.  I agree with the conclusion of the Florida, New York and District of Columbia bar authorities that Mr. Dershowitz was never a client of Boies Schiller and that the Firm's lawyers are not violating the Rules of Professional Conduct by representing Ms. Giuffre in her suit against Mr. Dershowitz.  I have reached these conclusions for the following reasons:

    a.  Boies Schiller never represented Mr. Dershowitz.  Mr. Dershowitz's supposed belief that Boies Schiller represented him has no ethical consequence because it is not a reasonable belief and is not accompanied by any of the usual indicia of an attorney-client relationship, such as a retainer agreement, a fee payment, the provision of legal advice, or an appearance in a proceeding.

    b.  Because Boies Schiller has never represented Mr. Dershowitz, he is not a "former client" of Boies Schiller and cannot invoke Rule 1.9(a) of the New York Rules of Professional Conduct as the basis for his motion to disqualify.

    c.  Mr. Dershowitz was (for about eight days) a "prospective client" of Boies Schiller, but the Firm rejected Mr. Dershowitz as a client before it had commenced representing him because the Firm learned that it had a conflict of interest.  The Firm's duties to a former prospective client such as Mr. Dershowitz are governed by Rule 1.18 of the New York Rules of Professional Conduct.

    d.  Boies Schiller has taken all steps required under Rule 1.18 to avoid disqualification. Specifically:

        i.  Boies Schiller did not receive any information from Mr. Dershowitz that could be "significantly harmful" to him in the present matter within the meaning of Rule 1.18(c). All of the information Mr. Dershowitz provided to Boies Schiller was readily available from the public court file and/or had been broadly and deliberately publicized by Mr. Dershowitz during an appearance on the "Today" show (and other television shows) as well as in op-ed pieces that he published in widely circulated newspapers. The information was thus "generally known" and fell outside the scope of "confidential information" as defined in New York Rule 1.6(a).

        ii.  The Firm took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether Boies

Schiller could (and should) agree to represent Mr. Dershowitz. In particular, Mr. Sires asked Mr. Dershowitz only for the "complaint and other submissions." Mr. Sires did not ask Mr. Dershowitz for any other information, much less privileged or confidential information. Mr. Dershowitz sent an unsolicited memorandum that Mr. Dershowitz simultaneously copied to multiple "friends," but Mr. Sires read it only to help him determine whether to recommend that Boies Schiller accept Mr. Dershowitz's request for representation.

iii.   As soon as the Firm learned that it had to reject Mr. Dershowitz's request for representation due to a conflict of interest, the Firm communicated its rejection to Mr. Dershowitz.

iv.   The Firm complied with Rule 1.18(d)(2)(i) by promptly and reasonably notifying lawyers and non-lawyers within the Firm that Mr. Sires and Mr. Singer were prohibited from participating in the representation of Ms. Giuffre in any manner.

v.   The Firm promptly and reasonably complied with Rule 1.18(d)(2)(ii) by implementing effective screening procedures to prevent the flow of information about Mr. Dershowitz's matter to the Boies Schiller lawyers handling Ms. Giuffre's matter, and that screen remains in effect today.

vi.   The Firm complied with Rule 1.18(d)(2)(iii) by apportioning no part of the fee from representing Ms. Giuffre to the personally disqualified lawyers (Mr. Sires and Mr. Singer) – and since Boies Schiller is representing Ms. Giuffre *pro bono*, no one at Boies Schiller will receive a fee for representing her.

vii.   The Firm promptly complied with Rule 1.18(d)(2)(iv) by giving written notice to Mr. Dershowitz, both via a first class letter and via email, that Boies Schiller had screened Mr. Sires and Mr. Singer from a matter that was adverse to Professor Dershowitz. (This written notice also satisfied the Firm's pursuant to Florida Rule 4-1.18(d)(2)(B), which is identical to New York Rule 1.18(d)(2)(iv).)

**Declaration of Professor Roy D. Simon, Jr.**         5

6. Boies Schiller and individual Boies Schiller lawyers are not disqualified under the advocate-witness rule, Rule 3.7 of the New York Rules of Professional Conduct.  At this stage of the proceedings, Mr. Dershowitz's reasons for calling David Boies or Sigrid McCawley are purely speculative.  His pleadings do not satisfy the Rule 3.7(a) standard that either Mr. Boies or Ms. McCawley is "likely to be a witness on a significant issue of fact", and they do not satisfy the Rule 3.7(b) standard that the testimony of Mr. Boies or Ms. McCawley (or the testimony of any other lawyer in the Firm) "may be prejudicial to the client" (Ms. Giuffre).  Mr. Dershowitz has advanced no concrete evidence of his conspiracy theory.  The Second Circuit has established a high bar for disqualifying a law firm under Rule 3.7, and  Mr. Dershowitz does not come close to surmounting that bar.

7. An independent ground for denial of Mr. Dershowitz's motion to disqualify is laches.  He has waited too long to bring the motion.  He has known about the supposed conflict for more than four years and has expressly threatened several times during that period to file a motion to disqualify.  Ms. Giuffre has now been represented by Boies Schiller for over four years.  She would suffer severe prejudice to her case if the Court were to disqualify the Firm, and she would have substantial trouble finding replacement counsel because Boies Schiller is representing her *pro bono*.

## My Qualifications as an Expert

8. This section summarizes my qualifications as an expert in the field of legal ethics and professional responsibility.  (My full *curriculum vitae* is attached to this report as Exhibit A.)

9. I was the Howard Lichtenstein Distinguished Professor of Legal Ethics at Hofstra University School of Law from 2003 until I voluntarily resigned from my position at Hofstra effective September 1, 2011.  Since that time, I have held the position of Distinguished Professor of Legal Ethics Emeritus at Hofstra University School of Law.  Although I am no longer teaching in the classroom, I continue to publish books on professional conduct for lawyers, and I continue to participate actively in bar committees relating to professional responsibility and the Rules of Professional Conduct.

10. I am admitted to practice law and am an active member in good standing of the Bar in New York. I frequently advise lawyers in New York and elsewhere regarding issues of professional conduct, conflicts of interest, legal malpractice, fiduciary duties, and related issues.  I sometimes serve as an expert consultant and expert witness regarding those issues.

**Declaration of Professor Roy D. Simon, Jr.**                                          6

11. I received my Bachelor of Arts degree *cum laude* in 1973 from Williams College in Williamstown, Massachusetts.  I received my J.D. in 1977 from New York University School of Law, where I served as Editor-in-Chief of the *New York University Law Review*.  After graduating from law school, I clerked for the Hon. Robert R. Merhige, Jr. in the United States District Court for the Eastern District of Virginia for one year, then practiced law for five years in Chicago before becoming a full-time law professor.

12. I was a full-time professor in the law school at Washington University in St. Louis from 1983 to 1992, receiving tenure in 1989.  I joined the faculty of Hofstra University School of Law with tenure in 1992.  I resigned from Hofstra in 2011 to pursue other interests.

13. From 1985 through 2009, I taught a law school course in professional responsibility for lawyers at least once each year (a total of about thirty-five times).

14. Since 1986, I have devoted virtually all of my scholarly time and effort to the field of professional responsibility (often called "legal ethics").  I am the author or co-author of two annual (or nearly annual) books on legal ethics, which I describe below.

15. I spend a substantial amount of time in bar association activities relating to legal ethics in New York State.  My present and past positions include:

    a. Chair (2014-2016), Co-Chair (2016-present), Chief Reporter (since 2003), and member (since 2000) of the New York State Bar Association's Committee on Standards of Attorney Conduct ("COSAC"), which monitors and proposes changes to the New York Rules of Professional Conduct and other regulations of New York lawyers.

    b. Member (1995-present) and former Chair (2008-2011) of the New York State Bar Association Committee on Professional Ethics.

    c. Former member (1993-2012) and former Chair (1996-1998) of the Nassau County Bar Association Professional Ethics Committee.

    d. Former member (2005-2008) of the New York City Bar Committee on Professional Responsibility.

    e. Former member (2002-2005 and 2012-2015) of the New York City Bar Committee on Professional Ethics.

f.  Former member (1995-1998) of the New York City Bar Committee on Professional Discipline.

g.  Former member (2005-2006) of the New York City Bar's Task Force on the Role of the Lawyer in Corporate Governance (a special task force that has completed its work).

h.  Former chair (1993) of the Section on Professional Responsibility of the Association of American Law Schools.

### Publications

16. In the last ten years, I have written or co-authored the following books:

a.  SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED (Thomson Reuters, 20th ed. 2019) (with co-author Nicole Hyland).  This 2,000-page treatise, of which I was the sole author from 1995 until 2015, annotates and explains the New York Rules of Professional Conduct and other sources regulating New York lawyers. (From 1995 through 2008, the book was entitled SIMON'S NEW YORK CODE OF PROFESSIONAL RESPONSIBILITY ANNOTATED.)   In January 2015, the New York State Bar Association Committee on Professional Ethics presented me with the Sanford D. Levy Memorial Award for my "contributions to the field of legal ethics," including this book.

b.  REGULATION OF LAWYERS:  STATUTES AND STANDARDS (Wolters Kluwer, 30th ed. 2019) (co-authored by Professors Stephen Gillers and Andrew Perlman).  This annual volume compiles and annotates the ABA Model Rules of Professional Conduct, the New York Rules of Professional Conduct, and various statutes, court rules, and other sources governing lawyers.

c.  LAWYERS AND THE LEGAL PROFESSION: CASES AND MATERIALS (LexisNexis, 4th ed. 2009) (co-authored by Professors Carol Needham and Burnele Powell).  This is a textbook for law students taking legal ethics.  I have been the lead co-author since 1992.

17. From its inception in April 1998 until it ceased publication shortly after the death of its publisher (Lazar Emanuel) in November 2011, I published an article virtually every month (more than 160

Declaration of Professor Roy D. Simon, Jr.                                                    8
───────────────────────────────────────────────

total articles) in the *New York Professional Responsibility Report* ("*NYPRR*"), a monthly newsletter with articles of interest to lawyers who practice in New York.

18. In December 2016, I published Roy Simon, *Monroe Freedman: Friend, Role Model, and Colleague*, 44 HOFSTRA L. REV. 275 (2016).

19. In 2010, I published the Forward in *Symposium: The Ethics of Lawyers in Government*, 38 HOFSTRA L. REV. 825 (2010).

20. In 2015, I published articles in the first several issues of a new publication entitled *New York Legal Ethics Reporter*.  The article titles were as follows:

> *Rules Permitting Out-Of-State Lawyers to Practice Temporarily in New York: Temporarily Out of Order (Mar. 2015)*
>
> *New York Professional Responsibility Developments Since November 2011: Part 2 – The Battle Over Pro Bono (Feb. 2015)*
>
> *New York Professional Responsibility Developments Since November 2011: Part 1 (Jan. 2015)*

21. Since 1991, I have published a column entitled "Developments in the Regulation of Lawyers" at least once a year (twice a year until 2017) in the newsletter of the Professional Responsibility Section of the Association of American Law Schools, a publication circulated primarily to other law professors who teach professional responsibility courses.

## **Documents Reviewed in Forming My Opinions**

22. In working on this matter and forming my opinions, I reviewed all or parts of the following documents:

- August 18, 2017 Complaint of Alan Dershowitz against Sigrid McCawley to the Office of Disciplinary Counsel, Board on Professional Responsibility, for the District of Columbia Court of Appeals (with redactions)
- August 28, 2017 Complaint of Alan Dershowitz against Sigrid McCawley to the Attorney Consumer Assistance Program of the Florida Bar (with redactions)
- November 28, 2017 Complaint of Alan Dershowitz against David Boies to the State of New York Attorney Grievance Committee for the Ninth Judicial District (with redactions)
- March 9, 2018 Answer of David Boies to Alan Dershowitz's New York Attorney Grievance Complaint (with redactions)
  - Exhibit 1 – December 1, 2017 Affidavit of David Boies (redacted)
  - Exhibit 2 – July 25, 2006 Palm Beach Police Report

- o   Exhibit 3 – November 20, 2015 Declaration of Virginia Giuffre
- o   Exhibit 4 – September 3, 2008 Victim Notification Letter from U.S. Department of Justice to Virginia Giuffre
- o   Exhibit 5 – November 6, 2017 Declaration of Professor Paul G. Cassell (redacted)
- o   Exhibit 6 – October 6, 2017 Affidavit of J. Stanley Pottinger (redacted)
- o   Exhibit 7 – November 22, 2017 Stephen N. Zack Affidavit (redacted)
- o   Exhibit 8 – April 8, 2016 Press Release "Lawyers Acknowledge Mistake In Filing Sexual Misconduct Charges Against Professor Dershowitz"
- o   Exhibit 9 – November 24, 2017 Affidavit of Carlos M. Sires
- o   Exhibit 10 – November 27, 2017 Affidavit of Stuart H. Singer
- o   Exhibit 11 – E-mail chain between Carlos M. Sires, Alan Dershowitz, and attorneys from Sweder & Ross LLP
- o   Exhibit 12 – February 9, 2015 Memorandum from Nicholas A. Gravante, Jr., to Boies Schiller Employees Screening Carlos Sires and Stuart Singer from Virginia Roberts Matter
- o   Exhibit 13 – November 30, 2017 Affidavit of Sigrid S. McCawley (redacted)
- o   Exhibit 14 – September 8, 2009 Excerpt of Deposition Transcript of Juan Alessi
- o   Exhibit 15 – Excerpts from July 29, 2009 and August 7, 2009 Deposition Transcript of Alfredo Rodriguez
- o   Exhibit 16 – November 1, 2017 Affidavit of David S. Stone (redacted)
- o   Exhibit 17 – August 22, 2016 E-mail from Jon L. Mills to Alan Dershowitz's Appellate Counsel (redacted)
- o   Exhibit 18 – October 17, 2016 E-mail from Edward Evans (Boies Schiller Director of Communications) to journalist Simon van Zuylen-Wood in response to statements by Alan Dershowitz in *Boston Magazine*
- o   Exhibit 19 – May 1, 2017 Affidavit of Sarah Ransome (redacted)
- September 10, 2018 Letter of Assistant Disciplinary Counsel Gayle Marie Brown Driver of the Washington D.C. Office of Disciplinary Counsel dismissing Alan Dershowitz's Complaint
- December 31, 2018 Letter of the State of New York Attorney Grievance Committee for the Ninth Judicial District dismissing Alan Dershowitz's Complaint
- April 16, 2019 Complaint of Virginia L. Giuffre against Alan Dershowitz (*Virginia L. Giuffre v. Alan Dershowitz*, S.D.N.Y., Case No. 19-cv-03377 [LAP])
  - o   Exhibit 1 – November 28, 2018 *Miami Herald* article, "Even from jail, sex abuser manipulated the system.  His victims were kept in the dark"
  - o   Exhibit 2 – December 1, 2018 "Letter to the Editor: Alan Dershowitz responds to Raw Story report"
  - o   Exhibit 3 – Letter to the Editor of the *Miami Herald* from Alan Dershowitz
  - o   Exhibit 4 – December 4, 2018 *LawandCrime.com* article, "Dershowitz Goes Off on Woman Who Made Underage Sex Allegations: 'She Should Be Seriously Punished'"
  - o   Exhibit 5 – December 5, 2018 Letter to the Editor of *The Harvard Crimson* from Alan Dershowitz

- o  Exhibit 6 – Image of March 2, 2019 Tweet posted by Alan Dershowitz (@AlanDersh)
- o  Exhibit 7 – January 13, 2006 Letter of Guy P. Fronstin (counsel to Jeffrey Epstein) to Lanna Belohlavek, Assistant State Attorney at Office of the State Attorney, West Palm Beach, Florida
- o  Exhibit 8 – March 2003 *Vanity Fair* article, "The Talented Mr. Epstein"
- o  Exhibit 9 – *Axios.com* article, "Alan Dershowitz says he's still advising Jeffrey Epstein"
- o  Exhibit 10 – March 4, 2019 Letter to the Editor of *The New York Times* from Jeffrey Epstein's Attorneys (Kenneth W. Starr, Martin G. Weinberg, Jack Goldberger and Lilly Ann Sanchez), "Jeffrey Epstein's Attorneys: A Fair Plea Deal"
- o  Exhibit 11 – January 15, 2015 article/interview with Alan Dershowitz published on *Law.com* (originally published on *The American Lawyer*), "Prof. Dershowitz, Tell Me How You Really Feel"
- o  Exhibit 12 – April 12, 2019 Affidavit of Maria Farmer
- o  Exhibit 13 – April 5, 2019 Affidavit of David S. Stone
- o  Exhibit 14 – April 8, 2019 Affidavit of Sarah Ransome
- o  Exhibit 15 – December 9, 2015 E-mails from Alan Dershowitz to David Boies
- o  Exhibit 16 – December 19, 2018 *Miami Herald* article, "An Epstein sex case is settled; Dershowitz denies latest allegation"
- • June 3, 2019 Declaration of Alan Dershowitz in Support of Motion to Disqualify
  - o  Exhibit A – April 16, 2019 Complaint of Virginia L. Giuffre against Alan Dershowitz in United States District Court Southern District of New York
  - o  Exhibit B – May 6, 2019 Disqualification Letter from Howard M. Cooper to Boies Schiller
  - o  Exhibit C – May 9, 2019 E-mail from Joshua I. Schiller to Howard M. Cooper
  - o  Exhibit D – March 5, 2011 *DailyMail* article, "Teenage girl recruited by paedophile Jeffrey Epstein reveals how she twice met Bill Clinton"
  - o  Exhibit E – April 8, 2016 Statement of Louis J. Freeh; January 22, 2016 Letter of Louis J. Freeh to Alan Dershowitz; April 6, 2015 FOIA Request from Patti Bescript to FOIA Officer for the Department of Homeland Security; January 15, 2016 Response from Department of Homeland Security FOIA/PA Officer to Patti Bescript's FOIA Request; March 9, 2019 Letter of James R. Bucknam, President and Chief Executive Officer of Freeh Group International Solutions, LLC
  - o  Exhibit F – Joint Statement of Brad Edwards, Paul Cassell and Alan Dershowitz regarding Settlement
  - o  Exhibit G – April 6, 2015 United States District Court for the Southern District of Florida Order Denying Petitioners' Motion to Join Under Rule 21 and Motion to Amend Under Rule 15
  - o  Exhibit H – E-mail chain between Alan Dershowitz, Carlos M. Sires, and attorneys from Sweder & Ross LLP
  - o  Exhibit I – February 10, 2015 Letter of Nicholas A. Gravante, Jr., to Alan Dershowitz

- o Exhibit J – Westlaw printout of October 31, 2013 Decision and Order in *Madison 92nd Street Associates, LLC v. Marriot International, Inc., Host Hotels & Resorts, Inc., Diamondrock Hospitality Co., and the New York Hotel & Motel Trades Counsel, AFL-CIO,* S.D.N.Y., Case No. 13 Civ. 291 (CM).
- June 4, 2019 Declaration of Bruce A. Green in Support of Motion to Disqualify
  - o Exhibit A – *Curriculum Vitae* of Bruce A. Green
- June 6, 2019 Memorandum of Law in Support of Alan Dershowitz's Motion to Disqualify
- June 12, 2019 Letter of Aidala, Bertuna & Kamins to Judge Preska regarding Pre-Motion Conference
- June 17, 2019 Letter of Joshua I. Schiller to Judge Preska regarding Pre-Motion Conference
- June 17, 2019 Order regarding Pre-Motion Conference
- June 17, 2019 Letter of Florida Bar Counsel Joi L. Pearsall to Alan Dershowitz closing Alan Dershowitz's Complaint

## **Factual Background**

23. I am assuming the truth of the facts set forth in this section.

### **Jeffrey Epstein went to prison for sexually abusing minors, including Ms. Giuffre**

24. Between 1999 and 2007, a billionaire named Jeffrey Epstein, who was a close friend of defendant Alan Dershowitz, sexually abused more than thirty underage girls.  In 2008, after the FBI and the United States Attorney's Office for the Southern District of Florida had investigated Mr. Epstein's misconduct, Mr. Epstein entered into a secret plea deal with federal authorities.  Under the deal, the federal government agreed not to prosecute Mr. Epstein or his collaborators on federal charges, and Mr. Epstein pled guilty to two state law felonies (felony solicitation of prostitution and procurement of minors to engage in prostitution).  He was sentenced to 18 months in prison followed by 12 months of community control (*i.e.,* house arrest), and he was designated as a registered sex offender.

25. Plaintiff Virginia Giuffre (formerly Virginia Roberts) was one of Mr. Epstein's underage victims.  She filed a civil action against Mr. Epstein in Florida federal court captioned *Jane Doe 102 v. Epstein.*  Mr. Epstein settled with Ms. Giuffre on a confidential basis.

26. Separately, two other victims of Mr. Epstein's sexual abuse filed a civil rights suit in a Florida federal court.  The suit alleged that the federal government's agreement not to prosecute Mr. Epstein on federal charges violated the Crime Victims' Right Act ("CVRA") because the victims of Mr. Epstein's sexual abuse had not been notified in advance of the deal.  The plaintiffs in the

CVRA suit were represented by two lawyers – Florida attorney Bradley Edwards and former United States District Judge Paul G. Cassell.  The CVRA suit remains pending.

27. In 2011, after a British reporter published an article about Ms. Giuffre, Bradley Edwards interviewed Ms. Giuffre as a potential witness in the CVRA suit. Ms. Giuffre identified various friends of Mr. Epstein to whom she had been trafficked for sex, including Alan Dershowitz.  After determining that Ms. Giuffre's allegations against Mr. Dershowitz were credible, Mr. Edwards and Mr. Cassell agreed to represent her *pro bono* and filed a motion seeking to add her as a plaintiff in the CVRA suit. In that motion, they attached an affidavit from Ms. Giuffre specifically identifying Mr. Dershowitz as one of her abusers.

28. Immediately after the motion to add Ms. Giuffre to the CVRA suit was filed, Mr. Dershowitz went on national television attacking Ms. Giuffre and denying the allegations.  He also attacked her lawyers, Paul Cassell and Bradley Edwards, calling them "unethical," saying they should be "disbarred," and stating they were "prepared to lie, cheat and steal."  He proceeded to call Ms. Giuffre a "liar" a "prostitute" and a "bad mother."

**Boies Schiller's confirms Ms. Giuffre's credibility and agrees to represent her**

29. In June 2014, David Boies had been asked by Stanley Pottinger, a former Assistant Attorney General in Charge of the Civil Rights Division of the United States Department of Justice, to assist in representing Ms. Giuffre. After Mr. Boies sought and received assurance from Mr. Pottinger that Ms. Giuffre was credible, Mr. Boies personally met with Ms. Giuffre.  Satisfied that her allegations against Mr. Dershowitz were credible, Mr. Boies agreed to represent her *pro bono.*

30. On January 6, 2015, Mr. Cassell and Mr. Edwards sued Mr. Dershowitz for defamation, *Edwards & Cassell v. Dershowitz*, No. 15-000072 (17th Judicial Circuit for Broward County, Florida) (the "Defamation Action").  Ms. Giuffre was a fact witness in that case and was represented by attorney Sigrid McCawley of Boies Schiller, who first became involved in the matter on February 3, 2015. (Mr. Edwards and Mr. Cassell ultimately settled the Defamation Action against Mr. Dershowitz on confidential terms.)

31. Boies Schiller also represented Ms. Giuffre in an appeal to Florida's Fourth District Court of Appeals in the Defamation Action, and in *Giuffre v. Maxwell*, Case No. 15-CV-0743 (S.D.N.Y.), which was filed in September 2015 before Judge Sweet in the Southern District of New York along with related appeals to the Second Circuit arising out of that matter.  The *Maxwell* case was

extensively litigated and involved multiple witnesses relating to the Epstein abuse issues and significant motion practice. The *Maxwell* case settled on the eve of a four week jury trial, but related appeals to the Second Circuit remain pending.

**Boies Schiller declines to represent Alan Dershowitz in the Defamation Action**

32. As mentioned above, on January 6, 2015, Bradley Edwards and Paul Cassell filed their Defamation Action against Mr. Dershowitz in Florida state court. The suit arose out of Mr. Dershowitz's attacks on them on national television. Ms. Giuffre was not a party to that action but she was a third-party witness.

33. On January 14, 2015, Mr. Dershowitz published an op-ed piece in the Wall Street Journal denying Ms. Giuffre's allegations. On January 22, 2015, Mr. Dershowitz was interviewed on the Today show regarding Ms. Giuffre's allegations that he had engaged in sex with her at Jeffrey Epstein's homes and ranch when she was an underage girl. Mr. Dershowitz denied Ms. Giuffre's allegations, called her a categorical liar, and presented details about some of his evidence to refute Ms. Giuffre (*e.g.,* he said he had "never seen her ... never met her," he accused Ms. Giuffre of submitting a "perjured affidavit," claimed he "couldn't have been in the places she said"). Mr. Sires, who happened to see this interview and wrote a "note of support" to Mr. Dershowitz. Mr. Dershowitz asked Mr. Sires to call him, and they spoke later that day. Mr. Dershowitz repeated the statements he had made during his Today show interview, then indicated that he would like Mr. Sires to join his defense team in the Defamation Action but could not afford Boies Schiller's rates. Mr. Sires responded that he would have to run a conflicts check before agreeing to any representation, and that only the Firm's Chairman, David Boies, could decide whether to accept the representation or agree on a fee schedule. Nothing that Mr. Dershowitz said during the phone conversation differed from what Mr. Dershowitz had said publicly earlier in the day during his interview on the Today show. Mr. Sires never spoke with Mr. Dershowitz on the telephone again.

34. After Mrs. conferred with Boies Schiller partner Stuart Singer, Mr. Sires wrote an email to Mr. Dershowitz saying, "Stuart and I think we can provide help. We think a meeting would be a good idea." The purpose of the proposed meeting was to learn more information so that Boies Schiller and Mr. Boies himself could decide whether to represent Mr. Dershowitz, and on what terms. (This proposed meeting never took place.)

35. Mr. Sires also asked Mr. Dershowitz to send him "the complaint and other submissions" to the court in the Defamation Action. Mr. Sires did not request or receive any confidential facts or any ideas or strategy suggestions from Mr. Dershowitz. Mr. Sires did receive an unexpected and unsolicited email from Mr. Dershowitz while Boies Schiller was still considering whether to accept the case, but that email was addressed to "Dear Friends" and contained nothing beyond what Mr. Dershowitz had said publicly on the Today show. Mr. Sires did not share Mr. Dershowitz's memorandum with Mr. Boies or discuss its contents with him.

36. While Boies Schiller was still considering whether to represent Mr. Dershowitz, Mr. Sires sent Mr. Dershowitz a case and a section of the Restatement of Torts addressing a person's conditional privilege to speak in self-defense to preserve his reputation. Mr. Sires did not accompany the case or Restatement section with any legal advice.

37. On January 30, 2015, before Boies Schiller had agreed to represent Mr. Dershowitz and before the proposed meeting with Mr. Dershowitz had taken place, Mr. Sires learned that Boies Schiller was already representing Ms. Giuffre and therefore could not represent Mr. Dershowitz. On the same day, Mr. Sires wrote to Mr. Dershowitz informing him that although Boies Schiller had "hoped" it could assist him, the Firm could not represent him due to a conflict. Mr. Dershowitz responded later that day with an email saying, "Darn. I was really hoping you could come on board. Thanks for considering it."

38. On February 9, 2015, Boies Schiller General Counsel Nicholas Gravante sent a screening Memorandum to "All Employees" at Boies Schiller on the subject of "Ethical Wall: Virginia Roberts [Giuffre] (Carlos Sires and Stuart Singer)." I have not seen any evidence that this screen has been breached.

**Mr. Dershowitz threatens to move to disqualify Boies Schiller but does not do so**

39. In February 2015, Boies Schiller partner Sigrid McCawley began representing Ms. Giuffre with respect to Ms. Giuffre's role as a third-party witness in the Defamation Action. Mr. Dershowitz would have learned about her representation of Ms. Giuffre within a matter of weeks. In March 2016, Mr. Dershowitz threatened to file a motion disqualify Boies Schiller from representing Ms. Giuffre, but he never filed such a motion.

40. In August 2016, during Ms. Giuffre's appeal to Florida's Fourth District Court of Appeal, Mr. Dershowitz's attorney threatened to move to disqualify Boies Schiller and supported the threat

with an unsigned affidavit headed "Affidavit of Alan Dershowitz in Support of Motion to Disqualify the Law Firm of Boies Schiller & Flexner On the Grounds That Partners Carlos Sires and Stuart Singer Had Confidential Lawyer-Client Communications with Me Regarding this Case." That unsigned affidavit contained the same allegations that Mr. Dershowitz is making against Boies Schiller here, but Mr. Dershowitz did not file the threatened motion to disqualify.

41. In 2017, Mr. Dershowitz filed grievances in New York against David Boies and in the District of Columbia and Florida against Sigrid McCawley. The complaints in all three grievances are virtually identical and contain much of the same language found in Mr. Dershowitz's motion to disqualify in this case. As noted above, disciplinary authorities in all three jurisdictions investigated Mr. Dershowitz's grievances and dismissed them without holding a hearing. All three found no violation of the Rules of Professional Conduct, and the Florida and D.C. disciplinary authorities expressly found insufficient evidence that any attorney at Boies Schiller had ever formed an attorney-client relationship with Mr. Dershowitz.

42. Mr. Dershowitz has alleged that Boies Schiller has conspired with Ms. Giuffre and others to accuse Mr. Dershowitz of improper sexual relations with himself and others as part of a scheme to extort money from Leonard Wexner, who is a billionaire. Mr. Dershowitz has not provided specific evidence of this alleged conspiracy.

## Analysis and Opinions

43. In this section of my declaration I will set forth my opinions and the grounds for each one.

### A.       The Dismissals of Mr. Dershowitz's Grievances Are Entitled to Great Weight

44. Mr. Dershowitz filed three virtually identical grievances against Boies Schiller lawyers in New York, the District of Columbia, and Florida, all based on the same allegations he has made here, often using language identical to the language in his motion to disqualify Boies Schiller in this matter. All of these grievances were investigated by disciplinary authorities and were then dismissed. The disciplinary authorities in all three jurisdictions did not even find that Mr. Dershowitz's disciplinary complaints merited a hearing.

45. In my opinion, the Court should give substantial and perhaps dispositive weight to the fact that in three separate jurisdictions, disciplinary authorities who spend day in and day out studying the Rules of Professional Conduct and attorney wrongdoing, dismissed Mr. Dershowitz's grievances

without even convening a disciplinary hearing.   In my opinion the dismissals are telling and highly relevant, especially since these disciplinary authorities were presented with the very same information and arguments that Mr. Dershowitz has put before this Court.

46. The complaints submitted by Mr. Dershowitz in these three jurisdictions were not typical complaints.   They were more than 100 pages long (including a table of contents and multiple exhibits) and they fully set forth Mr. Dershowitz's evidence and inferences against the Boies Schiller attorneys. Disciplinary authorities in each jurisdiction investigated his complaints and then dismissed them without even finding it necessary to convene a hearing.   This indicates that Mr. Dershowitz's grievances did not even indicate probable cause to believe that lawyers from Boies Schiller had violated the Rules of Professional Conduct.   Out of respect for the diligence and expertise of the disciplinary authorities in New York, the District of Columbia, and Florida, this Court should at the very least give substantial weight to the fact that each jurisdiction's disciplinary authorities, after investigating the facts and measuring them against the Rules of Professional Conduct, dismissed *all* of Mr. Dershowitz's charges.

### B.      Mr. Dershowitz Is Not a Former Client of Boies Schiller

47. Rule 1.9 of the New York Rules of Professional Conduct, entitled "Duties to Former Clients," provides, in relevant part, as follows:

> (a) A lawyer who has ***formerly represented a client*** in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the ***former client*** unless the ***former client*** gives informed consent, confirmed in writing. [Emphasis added.]

48. The plain language of Rule 1.9(a) makes clear that the rule applies only when the person invoking the rule is a "former client."   Whether a person was ever a "client" depends primarily on whether the person had a reasonable belief that he or she was a client.   Mr. Dershowitz purports (now) to have such a belief, but whether this belief was reasonable depends on various factors, such as whether the person signed a retainer agreement or paid a fee, and whether the lawyers provided legal advice or appeared on his behalf in a proceeding.   None of that happened here.   Mr. Dershowitz's mere subjective belief is not enough.   The belief must be objectively reasonable for the particular person in light of all of the facts and factors.   In my opinion, Mr. Dershowitz's claimed belief that he formed an attorney-client relationship with Boies Schiller was not

reasonable, especially given that Mr. Dershowitz was a lawyer himself, as well as a noted writer and professor in the field of legal ethics.

49. In my opinion, Mr. Dershowitz could not have formed a reasonable belief that he was a client in the circumstances presented here. He could not have formed such a reasonable belief for multiple reasons, including the following:

    a.  In his first (and only) telephone call with Mr. Sires, Mr. Dershowitz was told that Boies Schiller could not agree to represent him until it had checked for conflicts of interest and had received approval from the Firm's Chairman, David Boies. The Firm never advised Mr. Dershowitz that it had cleared conflicts or that Mr. Boies had approved the representation. These missing pieces would have been highly significant to a professor who had taught professional responsibility at Harvard Law School for many years and had written many articles about professional responsibility.

    b.  In his phone call with Mr. Sires, Mr. Dershowitz told Mr. Sires that he could not afford Boies Schiller's fees, and Mr. Dershowitz and Boies Schiller never agreed upon (or even discussed) the terms of a fee arrangement.

    c.  Mr. Dershowitz did not have another phone call with any Boies Schiller lawyer during the eight days the Firm was considering whether to accept the representation.

    d.  Mr. Dershowitz never signed a retainer agreement or received a letter of engagement. Nor was he told orally that the Firm would represent him.

    e.  Mr. Dershowitz never met in person with any lawyer at Boies Schiller while the Firm was considering whether to represent him. On the contrary, after the Firm had suggested an in-person meeting so that it could better evaluate whether to accept the representation, the Firm cancelled the meeting before it ever occurred.

    f.  Boies Schiller did not give Mr. Dershowitz any legal advice.

    g.  Mr. Dershowitz was a highly skilled lawyer, a professor of legal ethics, an author of articles on professional responsibility, and a sophisticated litigant who had personal experience forming attorney-client relationships with other lawyers, so he would

have understood that he could not consider himself a client of a law firm until the firm had completed a conflicts check, cleared conflicts, and agreed to represent him.

50. The best evidence of what Mr. Dershowitz believed is his own email to Mr. Sires immediately after Sires informed Dershowitz that Boies Schiller could not represent him due to a conflict. Dershowitz wrote, "Darn. I was really ***hoping*** you could come on board. ***Thanks for considering it.***" (Emphasis added.) If Mr. Dershowitz had truly believed he was *already* a client at the time Boies Schiller declined his matter, I would have expected him to write an email saying, "I thought you had agreed to represent me!" or "You have already taken me on as a client and I do not consent to your withdrawal," or words to that effect. He did not.

51. I am not alone in expressing the opinion that Mr. Dershowitz never formed an attorney-client relationship with Mr. Sires or with Boies Schiller. Florida Bar Counsel reached the same conclusion. On June 17, 2019, Ms. Joi Pearsall, Bar Counsel for The Florida Bar, sent Mr. Dershowitz a "Letter Report of No Probable Cause Finding by the Grievance Committee." This Letter Report said, in part:

> ... You filed a complaint with The Florida Bar against attorney Sigrid McCawley. After reviewing your complaint as well as Ms. McCawley's response to your complaint, the committee determined that there is no probable cause for further disciplinary proceedings in this matter.
>
> While it appears that you communicated with a member of Ms. McCawley's law firm and may have been a prospective client of the firm at one point, ***the documentation provided in this case does not show that you were a client of Ms. McCawley's law firm***. [Emphasis added.]

52. The same conclusion should apply here. The facts and evidence that Mr. Dershowitz has offered to this Court in support of his motion to disqualify does not show that he was ever a client of Ms. McCawley's law firm, Boies Schiller.

53. The same implication should be drawn from the letter sent by the Chairperson of New York's Ninth Judicial District Grievance Committee to David Boies on December 31, 2018 informing him of the results of the Grievance Committee's consideration of Mr. Dershowitz's complaint against Mr. Boies. "After deliberation," the letter said, "the Committee determined that there was no breach of the Rules of Professional Conduct on your part. Accordingly, the complaint was

dismissed." Likewise, in the District of Columbia, where Mr. Dershowitz filed the same complaint against Sigrid McCawley that he filed against her in Florida, the D.C. Office of Disciplinary Counsel wrote a letter to Mr. Dershowitz dated September 10, 2018 notifying him that it had "completed its investigation" and that it did "not find clear and convincing evidence that Ms. McCawley or any other member of Boies Schiller Flexner, LLP (the firm) represented you."

54. Because Mr. Dershowitz was never a client of Boies Schiller, he does not have the status of a former client under Rule 1.9, and Rule 1.9 is not grounds for disqualification.

55. However, the Florida Bar Letter Report of No Probable Cause Finding by the Grievance Committee mentions that Mr. Dershowitz may have been a "prospective client" of Boies Schiller, so I will leave Rule 1.9 behind and move on to my analysis of New York Rule 1.18 ("Duties to Prospective Clients"), the rule governing conflicts with former prospective clients.

## C.    Boies Schiller Has Fully Complied with Rule 1.18

56. Even though Mr. Dershowitz is not a "former client" of Boies Schiller, he was briefly a "prospective client," a term defined in New York Rule 1.18(a) as "a person who consults with a lawyer about the **_possibility_** of forming a client-lawyer relationship with respect to a matter ...." (Emphasis added.) Rule 1.18 expressly allows screening to cure a conflict with a former prospective client, and in my opinion Boies Schiller has met the standards established by Rule 1.18 for curing a conflict and avoiding disqualification. The most pertinent provisions of Rule 1.18 for present purposes are Rule 1.18(c) and (d).

57. Rule 1.18(c) provides as follows:

> (c) A lawyer ... shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter **_if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter_**, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d). [Emphasis added.]

58. In my opinion, Boies Schiller never "received information from the prospective client [Mr. Dershowitz] that could be significantly harmful" to him in this matter. Rather, the information that Boies Schiller received from Mr. Dershowitz consisted of public court filings (which Mr. Sires had requested), plus one email addressed to "Friends" (which Mr. Dershowitz sent on his own

volition, unsolicited, without awaiting a request from Mr. Sires). That unsolicited email contained information and ideas that Mr. Dershowitz had discussed in public, including on the Today show before an audience of millions.

59. On January 22, 2015, Mr. Sires had personally seen the interview of Mr. Dershowitz on the Today show. During that interview (available in full at *https://www.youtube.com/watch?v=ObmC6TO6xqo*), Mr. Dershowitz explained his strategy (calling his accusers categorical liars) and presented details about some of his evidence regarding Ms. Giuffre (*e.g.*, saying he had "never seen her ... never met her," accusing Ms. Giuffre of submitting a "perjured affidavit,", saying he "couldn't have been in the places she said," and asserting that he had visited a certain New Mexico ranch for only one hour, with his wife and daughter, and "was never out of their sight"). If Mr. Sires read the email from Mr. Dershowitz to "Friends," he was in a good position to know if anything in it went beyond what Mr. Dershowitz had already said on national television because he (Mr. Sires) had seen the Today show interview. If the email did not contain information beyond what Mr. Dershowitz had broadcast to millions on the Today show, then the email could not be "significantly harmful" to Mr. Dershowitz and certainly could not give Boies Schiller an unfair advantage over him, because the information the email contained was (like the court papers) was already in the public domain.

60. Indeed, the definition of "confidential information" in New York Rule 1.6(a) provides that information is not "confidential" if it is "generally known in the local community ...." In my opinion, any information that a person discusses on national television is "generally known in the local community" (and probably well beyond the local community). Information that is "generally known" cannot be "significantly harmful" to a client because the lawyer who receives it has no advantage over any other lawyer. No matter who represents Ms. Giuffre, the information in Mr. Dershowitz's email will be there for the taking.

61. Because Boies Schiller did not receive any information from Mr. Dershowitz that could be significantly harmful to him in this matter, Rule 1.18(c) would not prohibit Mr. Sires himself from working on this matter. Nor would Rule 1.18(c) prohibit any other lawyer at Boies Schiller from working on this matter. Nevertheless, out of an abundance of caution, Boies Schiller erected an ethical screen between Carlos Sires and Stuart Singer, on the one hand, and all other lawyers at Boies Schiller, on the other hand. As I will discuss next, that screen would be sufficient to avoid

disqualification of Boies Schiller even if Mr. Sires had received information from Mr. Dershowitz that could be significantly harmful to him (which he did not).

### D.    Screening Is Sufficient to Cure Any Conflict and Avoid Disqualification

62. Rule 1.18(d) governs the circumstances under which screening will avoid imputation when a law firm wants to oppose a former prospective client even though one or more lawyers in the firm are personally disqualified pursuant to Rule 1.18(c).   Here, for the reasons set out above regarding Rule 1.18(c), no lawyer at Boies Schiller would be disqualified from opposing Mr. Dershowitz in this matter. Nevertheless, I will assume for the sake of argument that Mr. Sires and Mr. Singer are personally disqualified pursuant to Rule 1.18(c), and I will analyze the screening provisions of Rule 1.18(d) in that light.

63. New York Rule 1.18(d) provides as follows:

> (d) When the lawyer has received disqualifying information as defined in paragraph (c), representation is permissible if:
>
>> (1) both the affected client and the prospective client have given informed consent, confirmed in writing; or
>>
>> (2) the lawyer who received the information took reasonable measures to avoid exposure to more ***disqualifying information*** than was reasonably necessary to determine whether to represent the prospective client; and
>>
>>> (i) the firm acts promptly and reasonably to ***notify, as appropriate, lawyers and nonlawyer personnel within the firm*** that the personally disqualified lawyer is prohibited from participating in the representation of the current client;
>>>
>>> (ii) ***the firm implements effective screening procedures*** to prevent the flow of information about the matter between the disqualified lawyer and the others in the firm;
>>>
>>> (iii) the disqualified lawyer is ***apportioned no part of the fee*** therefrom; and
>>>
>>> (iv) ***written notice is promptly given to the prospective client***; and
>>
>> (3) a reasonable lawyer would conclude that the law firm will be able to provide competent and diligent representation in the matter.

64. In my opinion, Boies Schiller has fully satisfied the standards set by Rule 1.18(d), as I will now explain section by section.

65. *With respect to Rule 1.18(d)(2),* Mr. Sires "took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client." The only documents he asked Mr. Dershowitz to send him were "the complaint and other submissions" to the court in *Edwards and Cassell v. Dershowitz* (the "Defamation Action"). Mr. Sires did not request any confidential facts or any ideas or any strategy suggestions. Mr. Sires did receive an unexpected and unsolicited email from Mr. Dershowitz while Boies Schiller was still considering whether to accept the case, but that email (as explained above) was addressed to multiple "Friends" and contained nothing beyond what Mr. Dershowitz had said willingly and publicly on the Today show.

66. *With respect to Rule 1.18(d)(2)(i),* as soon as Boies Schiller determined that it could not represent Mr. Dershowitz, the Firm acted "promptly and reasonably to notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client." Specifically, on February 9, 2015, less than ten days after Boies Schiller had notified Mr. Dershowitz that the Firm could not represent him, Boies Schiller General Counsel Nicholas Gravante sent a memorandum addressed to "BSF All Employees" on the subject of "Ethical Wall: Virginia Roberts [Giuffre] (Carlos Sires and Stuart Singer)." In my opinion, this Screening Memorandum constituted prompt and reasonable notification to the Firm's lawyers and nonlawyer personnel that Mr. Sires and Mr. Singer were "prohibited from participating in the representation of the current client," Virginia Roberts (now known as Virginia Giuffre).

67. *With respect to Rule 1.18(d)(2)(ii),* Boies Schiller implemented "effective screening procedures to prevent the flow of information about the matter between the disqualified lawyer and the others in the firm." The term "Screening" is defined in New York Rule 1.0(t), which provides as follows:

> (t) "Screened" or "screening" denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are ***reasonably adequate*** under the circumstances to protect information that the isolated lawyer or the firm is obligated to protect under these Rules or other law. [Emphasis added.]

68. The screening was accomplished via a detailed memorandum, on Boies Schiller letterhead, that provided as follows:

# MEMORANDUM

**TO: BSF All Employees**

**FROM: Nicholas A. Gravante, Jr.**

**DATE: February 9, 2015**

**RE: Ethical Wall: Virginia Roberts (Carlos Sires and Stuart Singer)**

Boies, Schiller & Flexner LLP ("BSF" or the "Firm") represents Virginia Roberts [Giuffre] in connection with providing legal advice regarding Ms. Robert's involvement as a victim of a sexual trafficking scheme (the "Roberts Representation"). The Firm's representation of Ms. Roberts is highly confidential.

Carlos Sires and Stuart Singer are partners in the Firm's Fort Lauderdale office. We are taking the following steps to screen Mr. Sires and Mr. Singer from the Roberts Representation. BSF has implemented the screening procedures below for handling all information and documents related to the Roberts Representation.

## Screening Procedures

1. No one may discuss with Mr. Sires or Mr. Singer any aspect of the Roberts Representation or any information in any way relating to those matters. Nor may anyone discuss the Roberts Representation in the presence of, or near, Mr. Sires or Mr. Singer. Similarly, no one may show Mr. Sires or Mr. Singer any documents relating to the Roberts Representation.
2. All files concerning the Roberts Representation will be segregated and secretarial and other staff assignments will be made so that those files will not be accessible to Mr. Sires or Mr. Singer. As part of these measures, Mr. Sires and Mr. Singer will not have access to the Firm's limited access computer drive in which data, information and documents in connection with the Roberts Representation are stored.
3. Mr. Sires and Mr. Singer will not discuss or share any data, information or documents regarding any aspect of the allegations against Alan Dershowitz or Alan Dershowitz's responses to those allegations with any BSF personnel or in the presence of or near any BSF personnel.
4. The Firm's executives and accounting department will take the necessary steps to ensure that Mr. Sires and Mr. Singer will not share in any fees paid to the Firm in connection with the Roberts Representation.
5. All BSF attorneys and non-attorney staff must fully comply with these Screening Procedures and instructions.

If you have any questions concerning these screening procedures, please telephone Nicholas Gravante or John LaSalle.

69. In my opinion, this memorandum, which was sent soon after the Firm had rejected Mr. Dershowitz as a client, constituted the "timely imposition of procedures" within the Boies Schiller firm that were "reasonably adequate under the circumstances to protect" any confidential information that Mr. Dershowitz had provided to the Firm.  In fact, these screening procedures are far more than "reasonably adequate" – they are exemplary.  But even if they were not exemplary, they would be sufficient under Rule 1.18(d) because New York federal courts have denied motions to disqualify even where ethical screens had "shortcomings." *See Arista Records LLC v. Lime Group LLC,* 2011 WL 672254 (S.D.N.Y. 2011) (even though the firm's screening procedures were "imperfect" and their implementation was "flawed," the Court denied a motion to disqualify Willie, Farr & Gallagher "because 'there are no facts from which it may be inferred' that Willkie has obtained confidential information, and thus, there is no real risk that the trial will be tainted").  Here, there is not an iota of evidence that the screen set up by Boies Schiller has been breached and not even defendant's ethics expert has criticized the screening procedures or their implementation, so there is likewise no real risk that the trial will be tainted.

70. *With respect to Rule 1.18(d)(2)(iii),* I understand that the two personally disqualified lawyers (Carlos Sires and Stuart Singer) are being "apportioned no part of the fee" from this case.  (Indeed, since Boies Schiller is handling the matter on a *pro bono* basis, no lawyer at Boies Schiller will receive a fee.)

71. *With respect to Rule 1.18(d)(2)(iv),* "written notice" was "promptly given to the prospective client" (Mr. Dershowitz) by Boies Schiller in the form of a letter advising Mr. Dershowitz that the Firm had erected a screen around Mr. Sires and Mr. Singer.

72. *With respect to Rule 1.18(d)(3),* in my opinion, a "reasonable lawyer would conclude that the law firm [Boies Schiller] will be able to provide competent and diligent representation" to its client (Ms. Giuffre) in this matter.  No one has raised any question regarding this factor.

**E.    The Advocate-Witness Rule Does Not Require Disqualification**

73. In my opinion, Mr. Dershowitz has shown no basis to disqualify Boies Schiller under the advocate-witness rule, New York Rule 3.7 ("Lawyer as Witness").  That Rule provides as follows:

(a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is ***likely*** to be a witness on a ***significant issue of fact*** unless:

(1) the testimony relates solely to an uncontested issue;

(2) the testimony relates solely to the nature and value of legal services rendered in the matter;

(3) disqualification of the lawyer would work **substantial hardship on the client**;

(4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or

(5) the testimony is **authorized by the tribunal**.

(b) A lawyer may not act as advocate before a tribunal in a matter if:

(1) another lawyer in the lawyer's firm is **likely** to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be **prejudicial** to the client; or

(2) the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9. [Emphasis added.]

74. Mr. Dershowitz has advanced a conspiracy theory under which David Boies and Carlos Sires would be witnesses, but he supports this theory only with pure speculation, not evidence. In my opinion, speculation is insufficient to meet the requirement under Rule 3.7(a) that a person is "**likely** to be a witness on a **significant issue of fact** ...." (Emphasis added.) As the Second Circuit said in *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009):

Rule 3.7 lends itself to opportunistic abuse. "Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions" under the witness-advocate rule. [Citation omitted.]

75. With respect to prejudice, which is a factor under Rule 3.7(b), the Second Circuit has been clear that a motion to disqualify a firm by imputation under Rule 3.7(b) should not be granted unless the moving party can show "specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the client of the advocate-witness's firm] is substantial." *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009). Mr. Dershowitz does not meet this high standard because he has not shown that Ms. Giuffre will suffer prejudice if Boies Schiller is permitted to remain in the case. In my view, therefore, Rule 3.7 provides no basis for Boies Schiller to be disqualified. And until sufficient discovery has been taken, it is not possible to assess whether any lawyer at Boies Schiller is likely to be a necessary witness on a significant issue of fact, or to assess whether any such testimony may be prejudicial to Ms. Giuffre.

76. The Second Circuit has sternly cautioned against imputed disqualification of an entire law firm under Rule 3.7(b), which is what Mr. Dershowitz seeks here.  In *Murray v. Metropolitan Life Ins. Co.*, *supra* at 178-179, the court said:

> ... [D]isqualification by imputation should be ordered sparingly, and only when the concerns motivating the rule are at their most acute.
>
> Therefore, we now hold that a law firm can be disqualified by imputation only if the movant proves by ***clear and convincing evidence*** that [A] the witness will provide testimony prejudicial to the client, and [B] the integrity of the judicial system will suffer as a result. This new formulation is consistent with our prior efforts to ***limit the tactical misuse of the witness-advocate rule***. [Emphasis added; citations omitted.]

77. In my opinion, Mr. Dershowitz has not presented "clear and convincing evidence" on either branch of the Second Circuit's demanding test – he has shown neither prejudice to Boies Schiller's client (Ms. Giuffre) nor that the integrity of the judicial system will suffer if Boies Schiller is allowed to continue representing her.

78. Moreover, as noted in the next section, disqualification of Boies Schiller would "work substantial hardship on the client" (Ms. Giuffre), thus triggering the express exception in Rule 3.7(a)(3).  As noted in Comment [4] to Rule 3.7, "paragraph (a)(3) recognizes that a balancing is required among the interests of the client, of the tribunal, and of the opposing party."  In my opinion, that balance weighs heavily in favor of Ms. Giuffre.

79. Other exceptions to Rule 3.7(a) might also apply.  For example, the testimony of an advocate-witness can be "authorized by the tribunal."  If an exception applies, then even an advocate may testify, and there is no basis for disqualifying either the advocate individually or his law firm by imputation.

## F.    Mr. Dershowitz Waited Too Long to File His Motion to Disqualify

80. An independent ground for denial of Mr. Dershowitz's motion to disqualify is laches.  In my opinion, he waited too long to bring this motion to disqualify, and by his delay he has waived his right to bring the motion.  He has known since at least March 2015 that Boies Schiller is representing Ms. Giuffre, but he has not moved to disqualify Boies Schiller until now.

81. My opinion is not based solely on the passage of time.  It is also based on the fact that over the past four years Mr. Dershowitz has had at least five discrete opportunities to file a motion to disqualify Boies Schiller, on the same grounds he asserts here – and he has at least twice expressly threatened

**Declaration of Professor Roy D. Simon, Jr.** 27

to file a motion to disqualify Boies Schiller – but he consciously decided not to file the motion.  For example:

a.  More than four years ago, in March 2015, Mr. Dershowitz was notified that Boies Schiller had agreed to represent Ms. Giuffre in her capacity as a witness in the Defamation Action that Ms. Giuffre's lawyers, Brad Edwards and Paul Cassell, had filed against Mr. Dershowitz.  If Mr. Dershowitz had sincerely believed that he was a former client of Boies Schiller, or even a former prospective client who had given Boies Schiller confidential information that could be "significantly harmful" to him, he could have moved to disqualify Boies Schiller at that time.

b.  More than three years ago, in March 2016, Mr. Dershowitz expressly threatened Boies Schiller with a motion to disqualify the Firm from representing Ms. Giuffre (as a witness) in the Defamation Action, but he never made good on his threat.

c.  Just under three years ago, on August 11, 2016, Mr. Dershowitz intervened in *Giuffre v. Maxwell*, Case No. 15-CV-0743 [DE 362-364].  He knew that Boies Schiller was representing Ms. Giuffre in that case but made no effort to disqualify the Firm.

d.  On August 19, 2016, during Ms. Giuffre's appeal to Florida's Fourth District Court of Appeal in Case No. 4D16-1847, Mr. Dershowitz's attorney threatened to disqualify Boies Schiller and sent Boies Schiller an unsigned affidavit titled "Affidavit of Alan Dershowitz in Support of Motion to Disqualify the Law Firm of Boies Schiller & Flexner On the Grounds That Partners Carlos Sires and Stuart Singer Had Confidential Lawyer-Client Communications with Me Regarding this Case."  That unsigned affidavit contained the same assertions Mr. Dershowitz is making before this Court.  Again, he never filed the threatened motion to disqualify.

e.  On November 16, 2016, Mr. Dershowitz filed an appeal against Ms. Giuffre in the United States Court of Appeals for the Second Circuit in Case No. 16-3945. Mr. Dershowitz knew that Boies Schiller was representing Ms. Giuffre but he took no steps to disqualify the Firm.

82. The grounds for filing a motion to disqualify in those earlier matters would have been identical to the grounds here with respect to former clients and prospective clients because all of those cases

are "substantially related" to Boies Schiller's supposed representation of Mr. Dershowitz in Edwards and Cassell's Defamation Action against him.  As defendant's own ethics expert states, "The factual relationship between the two representations could scarcely be closer.  The essential disputed question in both is whether Prof. Dershowitz had sexual relations with Giuffre." (Declaration of Bruce Green, ¶ 18.)  Thus, whatever grounds Mr. Dershowitz has for seeking disqualification now, he also had then.

83. Courts in New York, including courts in the Southern District of New York, are wary of motions to disqualify because such motions are often used as a form of "tactical maneuvering" and raise concerns about tactical abuse.  They have the potential to deprive adversaries of their chosen counsel and to impose unnecessary expense and delay on the courts and the parties.  Often, a motion to disqualify is motivated not by fear that the opposing law firm has an unfair advantage against its former client or prospective client, but rather by a desire to inflict pain and inconvenience on the opposing firm's client and to sideline a capable adversary.

84. Those concerns about tactical abuse are troubling in this case.  At this point, after Ms. Giuffre has been represented by Boies Schiller for more than four years.  She would suffer severe prejudice to her case if the Court were to disqualify the Firm.  Even defendant's legal ethics expert acknowledges that "Giuffre would be prejudiced by losing the services of a law firm with whom she has had a professional relationship for more than four years" (Green Declaration, ¶ 26).

85. Moreover, Boies Schiller is representing Ms. Giuffre *pro bono*, and she would likely encounter substantial difficulty finding replacement counsel that she can afford.  If she could not find new counsel, she would effectively be forced to abandon her case, because it is hard to imagine a nonlawyer representing herself against Professor Alan Dershowitz and his zealous team of lawyers. Even if she did locate new counsel, that new counsel would need time to get up to speed on this complex and hard-fought case, causing delay in the court system.  New counsel would need to review thousands of pages of documents not only in this case but also in related cases, such as *Edwards and Cassell v. Dershowitz* and *Giuffre v. Maxwell,* which revolve around the same nucleus of operative facts.  The record in those related cases is voluminous because Mr. Dershowitz is highly litigious and aggressive, and has filed numerous motions, discovery requests, and other court papers.

86. In sum, in my opinion Mr. Dershowitz, who has known about the possibility of filing a motion to disqualify Boies Schiller for the past four years, should not be allowed to gain a tactical advantage at the expense of Ms. Giuffre. He has delayed too long to bring this motion.

### G.     **Defendant's Expert Relies on Incorrect Facts and Faulty Analysis**

87. The declaration submitted by defendant's legal ethics expert, Professor Bruce Green, reaches erroneous conclusions because it is based on incorrect factual assumptions and flawed legal analysis.

88. Professor Green says early in his declaration that his opinion is "[b]ased on the facts provided for my review" (¶ 3), and specifically on "the facts set forth in Prof. Dershowitz's Declaration in support of his motion" (¶ 10).  Where those facts are incorrect, Professor Green's opinions are also incorrect.

89. Professor Green assumes that Mr. Dershowitz was a former client of Boies Schiller.  That is incorrect. Accordingly, his entire analysis under Rule 1.9 is incorrect. (*See* Green Declaration, ¶¶ 17-22.)  Rule 1.9 affords protection only to former clients. A person who is not a former client cannot base a motion to disqualify on Rule 1.9.

90. Mr. Dershowitz is a former "prospective client," and is thus entitled to the far more limited protections in Rule 1.18, but Professor Green's analysis of Rule 1.18 is factually and legally flawed. Contrary to Professor Green's opinions:

   a. Boies Schiller "took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client," thus complying with Rule 1.18(d)(2). Professor Green mistakenly assumes that Mr. Sires "offered to review relevant documents." (Green Declaration, ¶ 14.)  In fact, Mr. Sires asked Mr. Dershowitz to send him only "the complaint and other submissions" in the Defamation Action.  Mr. Sires did not request any facts or any ideas or strategy suggestions.

   b. Mr. Dershowitz never sent "prejudicial, disqualifying information" to Boies Schiller (Green Declaration, ¶ 25) or any information that could be "significantly harmful" to him in this matter.  Rather, he sent an unsolicited email to Mr. Sires, before Boies Schiller had agreed to accept his case, that was addressed to "Friends" and that

contained information that Mr. Dershowitz had already broadcast to an audience of millions on the Today show.

c.  Boies Schiller complied with Rule 1.18(d)(2)(i) by acting "promptly and reasonably to notify, as appropriate, lawyers and nonlawyer personnel within the firm that the personally disqualified lawyer is prohibited from participating in the representation of the current client."  Likewise, Boies Schiller complied with Rule 1.18(d)(2)(ii) by implementing "effective screening procedures to prevent the flow of information about the matter between the disqualified lawyer and the others in the firm." Professor Green objects that "there is no way to know how many other lawyers and non-lawyers at the Boies Schiller Firm had access to Prof. Dershowitz's information before the screen was purportedly put in place and how effectively the screen has been implemented during the four years prior to this lawsuit" (Green Declaration, ¶ 22) – but that objection is unpersuasive.  There is a way to know because the relevant attorneys have all submitted sworn affidavits confirming that they have abided by the screen.

91. With respect to Rule 3.7, Professor Green acknowledges that "motions under Rule 3.7 are often considered premature at the outset of a lawsuit, because it is often hard to know before depositions are taken whether a lawyer will be a necessary witness." (Green Declaration, ¶ 29.)  Here, Mr. Dershowitz's motion under Rule 3.7 is especially premature because he has not even answered the complaint and his conspiracy theory has not yet been tested by discovery or by a motion for summary judgment.  Ms. Giuffre's Complaint by itself does not transform David Boies and other lawyers at Boies Schiller into "necessary, indeed essential, witnesses" at this early stage of the litigation, as Professor Green asserts. (Green Declaration, ¶ 29.)

92. Even if Mr. Boies or other Boies Schiller lawyers are later determined to be "necessary" witnesses, it is sheer conjecture at this point to say that their testimony "will be prejudicial to Giuffre's claims that she in fact had sexual relations with Prof. Dershowitz ...." (Green Declaration, ¶ 30.)  Rule 3.7 and Second Circuit case law setting a stringent standard under that rule provide no basis to disqualify the entire Boies Schiller law firm, which has been representing Ms. Giuffre for more than four years, based on speculation that some lawyers

in that firm might at some point become necessary witnesses whose testimony may be prejudicial to their client.

93. With respect Mr. Dershowitz's long delay in seeking to disqualify Boies Schiller, Professor Green is incorrect that there "was not much more that Prof. Dershowitz could do until now, because the Firm was not previously adverse to him in a lawsuit in which he could move for disqualification." (Green Declaration, ¶ 26.) There was a great deal Mr. Dershowitz could have done, and he knew it. He twice expressly threatened to seek to disqualify Boies Schiller.

   a. In March 2016 in the Defamation Action, *Cassell and Edwards v. Dershowitz*, Mr. Dershowitz threatened to a motion disqualify Boies Schiller but never filed such a motion.

   b. In August 2016, during Ms. Giuffre's appeal to Florida's Fourth District Court of Appeal, Mr. Dershowitz's attorney threatened to move to disqualify Boies Schiller and supported the threat with an unsigned affidavit headed "Affidavit of Alan Dershowitz in Support of Motion to Disqualify the Law Firm of Boies Schiller & Flexner On the Grounds That Partners Carlos Sires and Stuart Singer Had Confidential Lawyer-Client Communications with Me Regarding this Case."  That unsigned affidavit contained the same allegations that Mr. Dershowitz levels against Boies Schiller here, but again Mr. Dershowitz did not file a motion to disqualify.

   c. Professor Green does not acknowledge either of these threats (or the other instances mentioned earlier where Mr. Dershowitz had opportunities to seek to disqualify Boies Schiller but failed to take any action).

   d. In my opinion, because Mr. Dershowitz has known four more than four years that Boies Schiller represents Ms. Giuffre in connection with cases revolving around Mr. Dershowitz's alleged sexual relations with her, because Mr. Dershowitz has bypassed multiple opportunities to seek the Firm's disqualification, and because Ms. Giuffre would suffer great prejudice if she were to lose her trusted counsel after four years of representation, Mr. Dershowitz has forfeited his opportunity to bring this motion.

## **Conclusion**

94. In my opinion, to a reasonable degree of professional certainty, there is no basis under the New York Rules of Professional Conduct for disqualifying Boies Schiller as counsel to Ms. Giuffre. Disciplinary authorities in New York, the District of Columbia, and Florida have dismissed grievances filed by Mr. Dershowitz based on the same facts and arguments that he presents here, and these dismissals demonstrate that he is not a former client of Boies Schiller and that his motion to disqualify lacks any basis in the Rules of Professional Conduct. In any event, Mr. Dershowitz has waited too long to file this motion to disqualify.

95. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 3, 2019.

Respectfully submitted,

Roy D. Simon, Jr.