

EXHIBIT 4



THE UNIVERSITY OF UTAH
**S.J. QUINNEY**
**COLLEGE OF LAW**

PAUL G. CASSELL
Ronald N. Boyce Presidential Professor of Criminal Law
and University Distinguished Professor of Law
Telephone: 801-585-5202
cassellp@law.utah.edu

November 6, 2017

The Florida Bar
651 E. Jefferson St.
Tallahassee, FL 32399

Re:  *Bar Complaint By Mr. Dershowitz*

Dear Florida Bar:

1.  I have been advised of assertions made by Mr. Dershowitz to the Florida Bar concerning attorneys David Boies and Sigrid McCawley.  I provide this affidavit at the request of counsel for Mr. Boies and Ms. McCawley in order to provide the Florida Bar with information that I have regarding the accuracy or inaccuracy of those assertions.

*Civil Cases Against Epstein and Connections with Mr. Dershowitz*

12.  While the CVRA case was proceeding, Mr. Edwards and I also represented several of Epstein's victims in civil cases against Epstein. During those civil cases, Mr. Epstein was deposed about others who might have been involved in his sexual abuse of minor girls.  Several civil attorneys asked Epstein about Mr. Dershowitz, and Epstein invoked his Fifth Amendment rights rather than answer questions about Dershowitz.  Efforts were made to depose Dershowitz on his connections, but they were unsuccessful.

13.  It was known at the time that Dershowitz had not only served as Epstein's legal counsel, but was also an extremely close personal friend of Epstein.[8] Household employees of Epstein also placed Dershowitz inside the Epstein mansion during time periods when Epstein was involved in sexually abusing minor girls.  For example, household employee Juan Alessi testified under oath that one of the famous visitors who came to the Epstein mansion was "a very famous lawyer that I'm sure you know, Alan Dershowitz."  (Alessi Depo., at 73:22-25.) According to Alessi's sworn testimony, Dershowitz came to the mansion "pretty often . . . at least four or five times a year" and would stay "two [or] three days." (73:22-25). Alessi also testified that Ms. Virginia Roberts Giuffre came to the house when Dershowitz was there. (73:18-20) Alessi answered "yes" when asked whether Dershowitz "had massages sometimes when he was there," (74:1-4). Alessi explained that "[a] massage was like a treat for everybody." (*Id.*)

14.  Similar testimony was provided by another household employee, who worked for Epstein at a different time period -- Alfredo Rodriguez. According to Rodriguez, Dershowitz was at Epstein's mansion when underage girls were there to give massages. (Rodriguez Depo. at 78:13-25, 279:9-280:2).  According to Rodriguez, Dershowitz stayed at the house in his role as Epstein's friend, as opposed to being his lawyer. (*Id.* at 279:5-8; 385:1-6).

15.  Dershowitz was present alone, without his family, at the home of Jeffery Epstein in the presence of young girls. (*Id.* at 199:12-13, 279:9-12, 426:16-25, 427:1). Rodriguez testified that when the underage girls would come over, Dershowitz would drink wine and read books on the couch. (*Id.* at 426:16-25; 427:1.)

16.  Ultimately Epstein choose to settle his civil suits with Jane Doe 1, Jane Doe 2, and Ms. Virginia Roberts Giuffre. However, Epstein did not settle the CVRA case, and Mr. Edwards and I have continued to attempt to secure factual evidence that would demonstrate that the plea decisions made by the Government were improper or improperly influenced.

---

[8] *See, e.g.*, Vicky Ward, *The Talented Mr. Epstein*, in *Vanity Fair* (Jan. 2005) (quoting Dershowitz as stating "I'm on my 20th book. . . . The only person outside of my immediate family that I send drafts to is Jeffrey."); *see also* Ray Gustini, *Vanity Fair Reminds Us When Jeffrey Epstein Wasn't a Creep*, in *The Wire* (June 21, 2011) (quoting Dershowitz as stating that even if Epstein went bankrupt, "I would be as interested in him as a friend if we had hamburgers on the boardwalk in Coney Island and talked about his ideas.").

17. One witness who became available to Mr. Edwards and me in the CVRA case was Ms. Virginia Roberts Giuffre. She had previously fled to Australia to escape from Mr. Epstein's sexual abuse. But at some point, in around spring 2014, we learned that she was in the United States and was willing to provide testimony in our CVRA case.

18. Because the CVRA case continues to be litigated today, nothing in this affidavit is intended to disclose – nor does it disclose – any confidential communications we received from Ms. Giuffre. However, I can report that in approximately May, 2014, I flew from Utah to Fort Lauderdale, Florida, where Mr. Edwards and I conducted a full-day interview of Ms. Giuffre to learn what evidence she had and to determine whether it was credible.

19. Without going into specific lawyer-client communications that we had with our client, Mr. Edwards and I determined that Ms. Giuffre's allegations of having been sexually abused by Epstein were credible. Ms. Giuffre also said that she had been sexually abused by Mr. Dershowitz. Mr. Edwards and I determined, based on that interview and subsequent careful follow-up, that her allegations were credible and were relevant to our allegations of improper influences affecting the Epstein plea negotiations.

20. Ms. Giuffre also credibly alleged that she had been sexually abused by other rich and powerful friends of Epstein. It appears that she had civil claims that she could file against Epstein's friends. However, because I am law professor with limited litigation resources, I recommended to Mr. Edwards that we should attempt to locate additional litigation support before pursuing lawsuits against abusers who could be expected to marshal considerable financial and other resources in response.

21. Mr. Edwards agreed and ultimately discussed the civil cases with Mr. David Boies, the name partner in the New York-based law firm of Boies Schiller Flexner LLP. I was aware that Mr. Boies not only had a well-regarded large litigation firm, but also had a strong track record of providing legal services for legal cases that might not otherwise attract attention from civil law firms (including cases involving sex trafficking victims).

22. I thought Mr. Boies was an excellent choice to help represent Ms. Giuffre. It is my understanding that Mr. Edwards conveyed to Mr. Boies – as well as, at some point, to his law partner Sigrid McCawley – that I had personally interviewed Ms. Giuffre, had investigated her allegations against Dershowitz and others, and had found them to be credible.

23. Because the CVRA revolved primarily around criminal law issues – an area where both Mr. Edwards and I had considerable experience – we did not require any assistance from Mr. Boies in the CVRA case and we did not approach him about assisting in that case. In 2014, we had successfully handled the CVRA case for more than six years, winning multiple motions without needing outside assistance, and anticipated no need for further help.

*Filing Ms. Giuffre's Allegations and Dershowitz's Attacks*

24. After more than six months of follow-up investigation, on December 30, 2014, Mr. Edwards and I filed Ms. Virginia Giuffre's allegations of abuse by Epstein, Dershowitz, and others in the CVRA case as part of a motion for her to join the CVRA case. The decision to file was made by Mr. Edwards and me. To the best of my recollection, I did not inform Mr. Boies of our intentions and, to my knowledge, neither he, nor his partner Ms. McCawley, nor attorney Stan Pottinger, were informed in advance of the date or contents of the filing.

33. In the course of those public attacks, Mr. Dershowitz made a number of statements to the press that were inconsistent with information that I possessed.

34. Dershowitz said, for example, that his wife accompanied him everywhere: "I've been married to the same woman for 28 years. She goes with me everywhere. People know that I won't argue a case or give a speech unless my wife travels with me." (American Lawyer, Jan. 15, 2015.) Dershowitz also denied being with Epstein in the company of young women: "I was never alone with Jeffrey Epstein in the company of any young women. I can tell you that unequivocally." (Wall Street Journal, Jan. 2, 2015). He cited flight manifests: "As far as the planes are concerned, the flight manifests. They will prove I was never on any private airplane with any young women." (Hala Gorani, CNN Live, Jan. 5, 2015).

35. Contrary to these assertions, evidence I possessed showed the following things.

36. On February 9, 1998, Alan Dershowitz appears on flight #1073 to Teterboro Airport with Epstein, Ghislaine Maxwell, Emmy Taylor, Claire Hazel, Joel Pashcow, one unidentified female, Mandy and Dubins +1 (without his wife).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 11 | 11 | PBI | TCB | 1071 | JG, SOPHIE BIDDLE | |
| 6 | 11 | 11 | TCB | PBI | 1072 | JG, GM, CT, SOPHIE BIDDLE, EMB, CLAIRE DUBINS CALDEN DUBIN | |
| 9 | 11 | 11 | PBF | TCB | 1073 | JG, GM, GC CLAIRE HAZEL, JOEL PASHCOW, EMMY TAYLOR DERSHOWITZ, MANDY, DUBINS +1 | |

37. On February 5, 2004, Alan Dershowitz appears on flight #1695 to Teterboro Airport, then boards flight #1696 to Palm Beach with Epstein and Sarah Kellen (without his wife).

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 11 | 11 | TEST | TCB | 1693 | JG, AT, JLO, VM, TD, SK, ALAN + WEXNER | LV |
| 5 | 11 | 11 | TCB | BEO | 1694 | | LV |
| 5 | 11 | 11 | BEO | TCB | 1695 | ALAN DERSHOWITZ | LV |
| 5 | 11 | 11 | TEO | PBI | 1696 | JE, AD, SK | LV |

38. On November 17, 2005, Alan Dershowitz appears on flight #1841 to Montreal, Canada, then boards flight #1842 to Bedford, then flight #1843 to Teterboro with Epstein, Adriana Mucinska (AM), and Tatianna Kovylskna (without his wife).

| | | | From | To | | | |
|---|---|---|---|---|---|---|---|
| 12 | G-1159A | N909JE | TCB | TEST | 1839 | JG, ANDREW MUGENSEN TOLI, LEONARD, RAYS, TOE CANASH | |
| 16 | 11 | 11 | TEST | TCB | 1839 | JG, AT, 2M, VM | LV |
| 17 | 11 | 11 | TCB | BED | 1840 | JG, AT, AM | LV |
| 17 | 11 | 11 | BED | CYUL | 1841 | ALAN DERSHOWITZ | LV |
| 17 | 11 | 11 | CYUL | BED | 1842 | ALAN DERSHOWITZ | LV |
| 17 | 11 | 11 | BED | TCB | 1843 | JG, AM, AD, TATIANNA | LV |

39. To be clear, the flight logs that I had reviewed did not show Mr. Dershowitz alone with Ms. Giuffre. But I did not have a complete set of flight logs for the relevant time period and, in addition, it appears that Mr. Dershowitz had access to the flight logs before they were produced to law enforcement authorities. (See Police Detective Joe Recarey Depo. at 281, Jane Doe No. 2 v. Epstein, No. 9:08-cv-80119-KAM (Mar. 19, 2010) (Dershowitz personally provided the flight logs).)

40. To also be clear, the foregoing is not a complete recitation of the substantial information that I had that contradicted Mr. Dershowitz's claims.

43. During the lawsuit, Mr. Edwards and I realized that Ms. Giuffre would need separate legal counsel, apart from us, when she became a witness. As a result, we requested and helped to arrange for Ms. McCawley to provide that separate representation.

44. I recall that at some point during the lawsuit, Mr. Dershowitz met with Mr. Boies in an effort to persuade Mr. Boies of his innocence of abusing Ms. Giuffre. While I was not present at that meeting, it was my understanding from later events that Mr. Boies did not find Dershowitz's claims of innocence to be persuasive, particularly given that Dershowitz repeatedly made statements that were demonstrably untrue and apparently deliberate lies.

45. Ultimately, Mr. Edwards and I agreed to settle our defamation lawsuit against Mr. Dershowitz. The terms of the settlement were confidential and nothing in this affidavit should be construed as any disclosing confidential terms of that settlement.

46. That said, I can report that, contemporaneously with settling the case, my attorney, Jack Scarola, filed a Notice of Withdrawal of Motion for Partial Summary Judgment in which he responded to a public distortion made prominently by Mr. Dershowitz. Mr. Dershowitz claimed publicly that the word "mistake," contained in a jointly agreed public statement issued by him and us at the time of settlement, showed that we had supposedly exonerated him of the charges made by our client, Ms. Giuffre. To help keep the record from being distorted, Mr. Scarola included the following accurate statement:

> In the event that the noticed withdrawal is determined to be subject to Court approval, the Plaintiffs would show in support of this notice that Edwards and Cassell continue to represent Virginia Giuffre in separate pending matters, and shall continue to advance her legitimate legal interests in those matters. As expressly understood by the parties upon the execution of the Confidential Settlement Agreement and Mutual Release, Ms. Giuffre reaffirms her allegations, and the withdrawal of the referenced filings is not intended to be, and should not be construed as being, an acknowledgement by Edwards and Cassell that the allegations made by Ms. Giuffre were mistaken. Edwards and Cassell do acknowledge that the public filing in the Crime Victims' Rights Act case of their client's allegations against Defendant Dershowitz became a major distraction from the merits of the well-founded Crime Victims' Rights Act case by causing delay and, as a consequence, turned out to have been a tactical mistake. For that reason, Edwards and Cassell have chosen to withdraw the referenced filing as a condition of settlement.

Notice of Withdrawal of Motion for Partial Summary Judgment, *Edwards & Cassell v. Dershowitz*, No. 15-000072 (17th Judicial Circuit for Broward County, Florida) (Apr. 8, 2016).

### *No Extortion Plot Exists*

53. I understand that Mr. Dershowitz has alleged that, in around fall 2014, Mr. Boies and Ms. McCawley were involved in an "extortion plot" to obtain money from Mr. Wexner. I am not aware of any such plot or even any suggestion of such a plot. I would also find any such suggestion entirely at odds with the professionalism that I have seen exhibited by Mr. Boies and Ms. McCawley in the course of professional dealings with them, including working closely with them as co-counsel to represent Ms. Giuffre in the complicated *Giuffre v. Maxwell* case. At all times they have exhibited nothing but the highest levels of professionalism and adherence to ethical requirements.

54. I expected no less since I knew that Mr. Boies had served as legal counsel in many high profile cases before I had the chance to work with him, including representing the Vice President of the United States before the United States Supreme Court in *Bush v. Gore*. And

while I did not know Ms. McCawley before our contact in this case, I have since learned of her tremendous devotion to her clients and her admirable motivation to insure that victims of sexual abuse receive effective legal representation when attacks on their credibility are made.

### Conclusion

55. In light of all these facts, I believe that Mr. Dershowitz's bar complaint against Mr. Boies and Ms. McCawley is frivolous. The foregoing statements are my personal statements and are not an institutional position of the University of Utah. I request that this information be treated confidentially by the Florida Bar and not disseminated outside of the Bar (and those involved in this proceeding) in order to avoid any argument that I have somehow defamed anyone.

I declare that the foregoing statements are all true the best of my information and belief, and I make these statements under penalty of perjury.

Sincerely,

Paul G. Cassell, Esq.

Susan Baca
Notary Public
State of Utah
My Commission Expires April 25, 2021
695986

Susan Baca
Notary for the state of
Utah
Salt Lake County