

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10-16-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VIRGINIA L. GIUFFRE,

                Plaintiff,

-against-

ALAN DERSHOWITZ,

                Defendant.

---

19 Civ. 3377 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Virginia Giuffre ("Plaintiff" or "Giuffre") brings this action for defamation against Alan Dershowitz ("Defendant" or "Dershowitz").  Giuffre has long claimed that she was forced to engage in sexual activity with Dershowitz.  In response, Dershowitz has repeatedly called Giuffre a liar, said that she committed perjury, and claimed that she conspired with her lawyers at the law firm of Boies Schiller Flexner LLP ("the Firm" or "BSF") to extort Dershowitz and others.  Giuffre predicates this action on the grounds that Dershowitz's statements--which she avers are false--are actionable defamation.

Before the Court are Dershowitz's motions to dismiss the action for failure to state a claim and to disqualify BSF as Plaintiff's counsel.  For the reasons stated below, Dershowitz's motion to dismiss is denied, and his motion to disqualify the Firm is granted.

I.   Background

Two discrete sets of facts form the background of the two separate motions.  The first relates to the defamation claim itself, while the second relates to the run-up to and filing of this litigation.  Neither the truth of Giuffre's underlying claims nor Dershowitz's denial thereof is before the Court.

a. Motion to Dismiss

In allegations the Court is required to accept as true at this stage, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), Giuffre alleges that she was "forced to engage in sexual acts with Dershowitz in, among other locations, [Jeffrey] Epstein's mansion . . . ."  (Complaint ("Compl."), dated Apr. 16, 2019 [dkt. no. 1], at ¶ 36).  Prior to filing the Complaint, she had filed a joinder motion in 2014 in another case describing this alleged sexual activity.  (Id. at ¶ 10).  Thereafter, in 2015, Dershowitz said on national television that Giuffre's counsel on the joinder motion, Paul Cassell and Bradley Edwards, had engaged in "unethical behavior warranting disbarment for filing the Joinder Motion."  (Id. at ¶ 11).  Giuffre alleges that Dershowitz made this statement about her counsel "wrongfully." (Id.)  Cassell and Edwards sued Dershowitz for defamation, and that case was settled in April 2016.  (Id. at ¶¶ 11-12).

In 2015, Dershowitz made a number of statements in various media outlets, including The Wall Street Journal, The New York

2

Times, the BBC, CNN, the Today Show, and Reuters.   (Declaration
Of Michelle Proctus In Support Of Defendant Alan Dershowitz's
Motion To Dismiss Complaint ("Proctus Decl."), dated June 25,
2019 [dkt. no. 24], Ex. E; Proctus Decl. Ex. F; Proctus Decl.
Ex. H; Proctus Decl. Ex. G at 1-2, 8-9, 53-55, 61-63).   These
included saying Giuffre's story was "completely, totally
fabricated, made-up," that the allegations were "part of a
pattern of made up stories against prominent people and world
leaders," and that Giuffre is a "serial perjurer," a "serial
liar," and a "serial prostitute."   (Proctus Decl. Ex. E; Proctus
Decl. Ex. G at 2-28).

In November 2018, the Miami Herald published the first in a
series of articles that included references to Dershowitz's
alleged sexual abuse of Giuffre.   (Compl. at ¶ 13).   In
response, Dershowitz made a number of statements denying the
alleged abuse took place and questioning Giuffre's motives.
Dershowitz said, "[T]he story was 100% flatly categorically made
up" and "[Giuffre] and her attorneys [at BSF] fabricated the
assertion in order to get money from other powerful, wealthy
people."   (Id. at ¶ 17).   Dershowitz called Giuffre a
"certified, complete, total liar" who "simply made up the entire
story for money."   (Id.)   Dershowitz also accused Giuffre of
"committing the felony of perjury."   (Id. at ¶ 21).

Giuffre characterizes Dershowitz's "central assertion" as being that Giuffre committed perjury and that she and her attorneys at BSF "hatched a scheme to falsely accuse Dershowitz of sex trafficking as part of a criminal attempt to extort a settlement from another party."  (Id. at ¶ 14).

Giuffre alleges that Dershowitz knew his claims of perjury were false because "Dershowitz . . . knew that Dershowitz had in fact had sex with Plaintiff."  (Id. at ¶ 15).

    b. Motion to Disqualify

On January 22, 2015, Dershowitz appeared on the Today Show where he disputed Giuffre's allegations against him. Afterwards, Carlos Sires ("Sires"), a partner at the Firm's Fort Lauderdale office, emailed Dershowitz saying that Defendant had a "very strong appearance on the Today [S]how" and informing him, "If there is anything I can do for you, please let me know."  (Declaration of Alan Dershowitz ("Dershowitz Decl."), dated June 7, 2019 [dkt. no. 10], Ex. H at 18).  That day, Dershowitz responded, saying he would "love [Sires'] help." (Id. at 14).  Sires then wrote to Dershowitz saying, "I just exchanged emails with [BSF partner] Stuart [Singer] and voiced my desire to do what we can to help you out.  He shares that desire.  I will speak with him tomorrow in more detail . . . ." (Id. at 12).  The next day, Sires wrote Dershowitz saying, "Stuart and I think we can provide help."  (Id.)  Sires wrote to

Dershowitz that he and Singer "look forward to working with [Dershowitz] on this" and asked for copies of the pleadings. (Id. at 10).

Dershowitz had a document marked "CONFIDENTIAL L/C PRIVILEGE" ("Confidential Memorandum") sent to Sires and others (apparently all lawyers) that contained a discussion of the case and Dershowitz's thoughts on legal strategy. (Sealed Tr. at 73:3, Sept. 24, 2019; Declaration of Imran Ansari, dated July 23, 2019 (Sealed Document Placed in Vault [dkt. no. 42]), Ex. A). Dershowitz also sent Sires a number of court pleadings, which Sires said he would review. (Dershowitz Decl. Ex. H at 5, 9).

Sires wrote back saying, "I'm sure you have already looked at this issue, but the attached opinion and Restatement section relate to Alan's recently-circulated notes concerning his acting in 'self defense' to the charges leveled against him." (Id. at 6).

A day after receiving the Confidential Memorandum and after commenting on it, Sires informed Dershowitz that he and Singer were "precluded from assisting [Dershowitz] in this matter due to a conflict, the nature of which we are not at liberty to discuss." (Id. at 2). Dershowitz responded "Darn. I was really hoping you could come on board." (Id.)

David Boies ("Boies"), a name partner in the Firm, met with Giuffre in July 2014 and agreed to represent her. (Declaration of Joshua Schiller In Support Of Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion To Disqualify Boies Schiller Flexner("Schiller Decl."), dated July 3, 2019 [dkt. no. 36], Ex. 12 at ¶¶ 5-6)). Sigrid McCawley, a BSF partner, represented Giuffre as a fact witness in the since-settled defamation suit brought by Cassel and Edwards against Dershowitz in Florida. (Schiller Decl. Ex. 4 at ¶¶ 43, 45). The Firm also represented Giuffre on two other matters, an appeal to the Fourth District Court of Appeals in Florida and litigation filed in September 2015 in this district against Jeffrey Epstein's compatriot, Ghislaine Maxwell. (Schiller Decl. Ex. 12 at ¶ 8).

Sires says that on January 22, 2015, the same day he initially contacted Dershowitz offering assistance, Sires spoke telephonically with Dershowitz and informed him that the Firm would need to run a conflict check. While Dershowitz does not address this assertion, he says that by the next day, he believed there was no conflict check outstanding. (Schiller Decl. Ex. 8 at ¶ 5; Dershowitz Decl. at ¶¶ 33-36). Further, Dershowitz says that he offered to call David Boies, saying Boies is a friend, but that Sires said it would be unnecessary. (Dershowitz Decl. at ¶ 34). Singer contacted Boies and raised the possibility of representing Dershowitz; Boies informed

6

Singer that there was a conflict, and Singer immediately informed Sires.  (Schiller Decl. Ex. 8 at ¶ 16).  On January 30, 2015, Sires sent the email to Dershowitz saying that a conflict precluded the Firm from providing representation to Dershowitz. (Id. at 8-9; Schiller Decl. Ex. 8 at ¶ 16; Dershowitz Decl. Ex. H at 2).

On February 9, 2015, the Firm's General Counsel issued a screening memorandum to all Firm personnel, directing Sires and Singer not to discuss or share any information regarding any aspect of the allegations against Dershowitz or Dershowitz's responses to those allegations with any other Firm personnel. (Schiller Decl. Ex. 11).

Although these facts are largely undisputed, other facts relating to Dershowitz's interactions with Boies are vigorously disputed.

In May of 2015, Dershowitz met with Boies to discuss Giuffre's allegations.  (Compl. at ¶ 70; Dershowitz Decl. at ¶ 47).  Dershowitz says that he told Boies that Dershowitz's "records . . . demonstrated that Giuffre's allegations could not be true."  (Dershowitz Decl. at ¶ 48).  Dershowitz alleges that during this meeting, and in multiple phone calls afterwards, Boies stated that he did not believe Giuffre's allegations against Dershowitz.  (Id. at ¶¶ 48-61).  Dershowitz recorded one or more of these discussions and played them to reporters in

7

support of his allegation that the Firm's attorneys did not believe Giuffre. (Compl. at ¶ 69; Dershowitz Decl. at ¶ 59).

Giuffre acknowledges that these communications took place but alleges that Dershowitz's statements regarding his meeting with Boies are taken out of context and that the recordings Dershowitz produced to reporters were also "out of context." (Compl. at ¶ 69). Boies says that he "told Mr. Dershowitz that [he] was convinced Ms. Giuffre was telling the truth as she recalled it." (Supplemental Declaration of David Boies ("Boies Decl."), dated July 3, 2019 [dkt. no. 35], at ¶ 4). Boies also says that at the time Dershowitz "did not dispute that Ms. Giuffre was truthfully recounting what she believed happened" but Dershowitz asserted that Ms. Giuffre had "made an honest mistake and had confused [Dershowitz] with another friend of Mr. Epstein." (Id.) Boies says that Dershowitz "was never able to substantiate his assertions" and that the Firm was "increasingly uncovering evidence that was contrary to Mr. Dershowitz's assertions and supportive of Ms. Giuffre's report." (Id. at ¶ 7).

The Complaint alleges that Dershowitz said on December 2, 2018 that he was "deliberately framed for financial reasons" and that Dershowitz used as support for this claim the statement he attributed to Boies that Giuffre's claims were "wrong . . . simply wrong." (Compl. at ¶ 17(c)). Although the Complaint

does not state that Boies is the lawyer who made the statement,
it concedes that the statement was made and that the statement
was used to support Dershowitz's claim that Dershowitz was
extorted by Giuffre and her lawyers.  (Id. at ¶¶ 17, 69).  There
is no question that Dershowitz's allegations of extortion relate
to BSF.  At oral argument, the Court asked if "the gist of the
statement was that Giuffre conspired with people in [BSF] to
extort, among others, Wexner" to which counsel for Giuffre
(i.e., BSF) confirmed the Complaint's allegation that it was a
"defamatory statement."  (Tr. 65:3, Sept. 24, 2019).  A few
moments later, the Court again said to counsel for Giuffre
"[t]he defense says that they're going to call Mr. Boies and
. . . I don't know if it's Ms. McCawley or who, on the extortion
issue," to which BSF confirmed, "Right, your Honor."  (Tr.
66:12, Sept. 24, 2019).  Proving the point, several BSF partners
have submitted affidavits on these motions with respect to the
alleged scheme to extort Mr. Wexner.  E.g., Schiller Decl. Ex.
12 at ¶ 22 (Affidavit of David Boies sworn to on Dec. 1, 2017),
Ex. 13 at ¶ 5 (Affidavit of Sigrid S. McCawley sworn to on Nov.
30, 2017), Ex. 16 at ¶ 6 (Affidavit of Stephen N. Zack sworn to
on Nov. 22, 2017).

Dershowitz says he plans to produce the recordings of his
calls with Boies and call Boies to testify to these
conversations at trial.  (Dershowitz Decl. at ¶¶ 73-75).

According to the preliminary transcript of the call prepared by defense counsel, Boies told Dershowitz that he proposed to say to Giuffre, "[W]e have now reviewed the documentary evidence and we are convinced that your belief [that you had relations with Dershowitz] is wrong and we would like to explore with you how you could have come to this conclusion that is wrong." (Declaration of Alan Dershowitz, dated Sept. 25, 2019 ("Dershowitz Sept. 25 2019 Decl.") (Sealed Document Placed in Vault [dkt. no. 52]), Ex. A).  In connection with Giuffre's allegations that Dershowitz lied when he said she conspired with her attorneys at BSF to extort Dershowitz and others.  (Compl. ¶ 17(c)), Dershowitz also says he plans to take the depositions of lawyers in the Firm and call them as trial witnesses. (Dershowitz Decl. at ¶ 75).

   II.  Legal Standard

      a. Motion to Dismiss

   To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead enough facts "to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 663 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  Twombly, 550 U.S. at 570.  But a court is not bound to accept as true legal conclusions that are couched as factual allegations.

Iqbal, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (citing Twombly, 550 U.S. at 557).  If there are insufficient factual allegations to raise a right to relief above the speculative level, the complaint must be dismissed. Twombly, 550 U.S. at 555.

      b. Motion to Disqualify

The authority of federal courts to disqualify counsel "derives from their inherent power to preserve the integrity of the adversary process."  Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005)(internal quotation marks omitted).  In deciding whether to exercise this power, courts must weigh "a client's right freely to choose his counsel against the need to maintain the highest standards of the profession."  Id. (internal quotation marks omitted).

The rules of the American Bar Association and state disciplinary bodies "merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification."  Id.; see also Bd. of Ed. of City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).  Motions to disqualify are viewed with disfavor because of their "vulnerability to abuse as litigation tactics."  CQS ABS Master Fund Ltd. v. MBIA Inc., 2013 WL 3270322, at *8 (S.D.N.Y. June 24, 2013).  Nevertheless, "any doubt is to be resolved in favor

11

of disqualification." Hull v. Celanese Corp., 513 F.2d 568, 571
(2d Cir. 1975).  The Court must determine whether the attorney's
conduct would "tend[] to taint the underlying trial." Nyquist,
590 F.2d at 1246.

   III. Discussion

       a. Motion to Dismiss

   Dershowitz argues that (i) Giuffre's claims are time-
barred, and (ii) his statements are protected by the self-
defense privilege and therefore not actionable.

           1. Statute of Limitations and the Single

               Publication Rule

   In New York, the statute of limitations for slander and
libel is one year.  N.Y. C.P.L.R. 215(3).  New York's single
publication rule is that "a defamation claim accrues at
publication, defined as 'the earliest date on which the work was
placed on sale or became generally available to the public.'"
Van Buskirk v. The New York Times Co., 325 F.3d 87, 89 (2d Cir.
2003) (quoting Tomasino v. William Morrow & Co., 571 N.Y.S.2d
571, 572 (N.Y. App. Div. 2d Dep't 1991)).  Dershowitz invokes
the rule to argue that the statements he made in late 2018 and
early 2019 (facially made within the statute of limitations) are
in fact time-barred because they are "substantively identical"
to statements he previously made in 2015 (i.e., outside the one
year statute of limitations).  (Professor Alan Dershowitz

Memorandum In Support Of Motion To Dismiss Complaint ("Mot.
Dismiss"), dated June 25, 2019 [dkt. no. 23], at 10-11).  The
Court, however, is not persuaded by this argument, especially in
light of the rationale for this common law rule.

New York's adoption of the single publication rule came in
response to Duke of Brunswick v. Harmer (1849) 117 Eng. Rep. 75;
14 Q. B. 185, in which the plaintiff brought an action based on
a defamatory statement made in a newspaper published by the
defendant seventeen years earlier.  The defendant sold and
delivered a copy of the newspaper to the plaintiff's agent
seventeen years after publication, and, as the New York Court of
Appeals summarized it, the English court held "each delivery to
a third person of a defamatory article constituted a new
publication of the libel, which in turn gave rise to a new cause
of action."  Gregoire v. G. P. Putnam's Sons, 298 N.Y. 119, 122-
23 (N.Y. 1948).

New York rejected the English rule and instead adopted the
single publication rule to provide repose to defendants and
ensure that it could not be the case that "the Statute of
Limitation would never expire."  Id. at 125.  The New York Court
of Appeals expressly sought to preclude the specter that a book
printed fifty years ago could form the basis of a defamation
claim if the old book were sold today.  Id.

13

As Judge Sack explains:

> The . . . rule was applied traditionally to mass
> publications under which a plaintiff alleging
> defamation has a single cause of action, which
> arises at the first publication of an alleged
> libel, regardless of the number of copies of the
> publication distributed or sold.  Publication in
> a new form, republication of a person's spoken
> words in a book, or the publication of a
> hardcover book in softcover format or as a motion
> picture is a separate publication for which the
> statute begins to run anew.

Robert D. Sack, Sack on Defamation: Libel, Slander, and Related
Problems, § 2.6.4, Practising Law Institute, (5d ed.
2017)("Sack") (quotations omitted, emphasis added).

The single publication rule has been adapted to
publications on the Internet under a similar rationale.  Firth
v. State, 98 N.Y.2d 365, 370 (N.Y. 2002).  In adapting the rule
to the Internet, the New York Court of Appeals recognized that
one of the rationales for the rule was to prevent "endless
retriggering of the statute of limitations."  Id.

Firth and other cases applying the rule in the Internet
context did not hold that once a defendant makes a statement in
a prominent place on the Internet, he can proactively repeat
that claim in new places on the Internet ad infinitum and remain
immune from suit.  Republication to a new audience or in a new
forum does not come within the single publication rule.  Where a
defendant takes an affirmative step to republish the defamatory

14

material, he may not find refuge in the single publication rule which is designed to provide repose to inactive or passive defendants.  "The justification for [the republication] exception to the single publication rule is that the subsequent publication is intended to and actually reaches a new audience." Firth, 98 N.Y.2d at 371.  The single publication rule was meant to protect the weary, not the wily.

The case law distinguishes between those republications that include an "affirmative act" to present the material again and those that are passive.[1]  Clark v. Viacom Int'l Inc., 617 F.

---

[1] Examples of passive, non-actionable republication compiled in Clark include: third party's posting the statement elsewhere on the internet, see Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1087 (D.C. Cir. 2007); passively maintaining the website to which the defamatory statement is posted, see Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 616 (7th Cir. 2013); Ladd v. Uecker, 323 Wis.2d 798, 806-07 (Wis. Ct. App. 2010); failing to remove a statement from a website after receiving notice of its falsity, see Roberts v. McAfee, Inc., 660 F.3d 1156, 1167-68 (9th Cir. 2011); adding an unrelated story to the web page that hosts the allegedly defamatory statement, see Firth, 747 N.Y.S.2d at 371; creating hypertext links to previously published statements, see In re Philadelphia Newspapers, LLC, 690 F.3d 161, 174-75 (3d Cir. 2012)(collecting cases); revising other information at the URL at which the allegedly defamatory statement is found, but leaving the statement itself intact, see Yeager v. Bowlin, 693 F.3d 1076, 1083 (9th Cir. 2012); updating a website's user interface to give visitors additional avenues to access the allegedly defamatory statements, see Churchill v. State, 876 A.2d 311, 319 (N.J. Super. Ct. App. Div. 2005); or changing the URL at which the allegedly defamatory statement was posted (i.e., posting the statement verbatim to a new URL), see Canatella v. Van De Kamp, 486 F.3d 1128, 1134-35 (9th Cir. 2007).

App'x 495, 505 (6th Cir. 2015).  New York case law requires a
defamation plaintiff seeking to avoid the single publication
rule to allege "a separate aggregate publication from the
original on a different occasion which is not merely a 'delayed
circulation of the original edition.'"  Firth, 98 N.Y.2d at 371
(quoting Rinaldi v. Viking Penguin, 52 N.Y. 2d 422, 435 (N.Y.
1981) (actionable republication where publisher made a
"conscious and deliberate decision" to publish a paperback
version of a previously-published hardcover book with respect to
which plaintiff did not sue).)  Giuffre has alleged exactly
that.  (Compare Compl. at ¶ 11 with Compl. at ¶ 17).
Republication of the prior statements has also been found
actionable where additional material is added to the prior
statements.  E.g., In re Davis, 347 B.R. 607, 612 (W.D. Ky.
2006) (holding that adding "Breaking News!" and "Update!"
sections to previously published material constituted an
actionable republication).

Dershowitz, who has proclaimed his appreciation of
chutzpah, Alan Dershowitz, Chutzpah (1992), employs it to
advance the argument that his actions are analogous to a passive
republication.  Surveying the cases shows that this ain't that.

Relying on Clark, Dershowitz argues: "[W]here the allegedly
defamatory statements have been widely disseminated over the
internet via prominent news organizations with worldwide reach,

16

they have 'already been directed at most of the universe of probable interlocutors' and there is as a matter of law no new audience to reach, and no new cause of action accrues." (Reply Memorandum In Support Of Alan Dershowitz's Motion To Dismiss Complaint ("Def. Dismiss Rep."), dated July 16, 2019 [dkt. no. 40], at 4 citing Clark, 617 F. App'x. at 506) (emphasis added). Dershowitz's misreading of Clark is evident from the sentences before and after the sentence he quotes. The discussion of "no new audience" was specifically related to "run-of-the-mill hyperlinks, website updates, or interface redesigns." Clark, 617 F. App'x at 506. Such passive changes "typically demonstrate neither the intent nor the ability to garner a wider audience than the initial iteration of the online statement could reach." Id.

Because Dershowitz did not make only passive changes to a website or the like, he can find no refuge in Clark. His 2018-19 statements are alleged to be "a separate aggregate publication from the original on a different occasion [and] not merely a delayed circulation of the original [statements]." Firth, 98 N.Y.2d at 371; (See Compl. ¶¶ 17, 21, 86, 92, 98).

Giuffre alleges that Dershowitz's statements in 2018 and 2019 were an attempt to reach a whole new cohort of journalists who posted his statements to new audiences. Giuffre's opposition papers allege that Dershowitz communicated in 2015

through the Today Show and an op-ed in The Wall Street Journal,
(Pl. Disqualify Opp. at 7-8; Schiller Decl. Ex. 8 at ¶ 11),
while the Complaint alleges that in 2018 and 2019, he gave
interviews to the Miami Herald, CNN, the NY Daily News, Local 10
News, RawStory.com, Law & Crime, The Crimson, and Vanity Fair.
(Compl. Exs. 1-6).  As alleged, these are clearly new audiences
even if, _arguendo_, Dershowitz made the same statements.[2]  Thus,
Dershowitz cannot claim the benefit of the single publication
rule.  E.g., Firth, 98 N.Y.2d at 371 ("The justification for
[the replication exception] to the single publication rule is
that the subsequent publication is intended to and actually
reaches a new audience.")

Dershowitz's invocation of Hoesten v. Best, 34 A.D.3d 143
(N.Y. App. Div. 1st Dep't 2006), is similarly unavailing.  In
that case, the alleged republication occurred in a private
meeting and was "made to three ABC executives who were already
intimately familiar with the complaints previously levied
against plaintiff."  Id. at 151.  One of the three executives
had already received the prior publication, and the other two
executives had known of the activity relating to the allegedly

---

[2] Because the Complaint adequately alleges that Dershowitz's
2018-19 republication was not passive and was intended to reach
new audiences, the Court need not reach the likely jury question
of whether the 2018-19 statements were identical to the 2015
statements.

defamatory statement.  Id.  The court held that even if the larger organization, ABC, was not considered a single audience for republication purposes, the three executives cannot reasonably be seen as a new audience.  Id.  Given this and the fact that the statement made was "identical" to the prior complaint, the Court found no republication.  Id.

Analogizing Hoesten to this case is beyond a stretch.  The putative "new audience" in Hoesten was comprised of three easily identifiable individuals who were "intimately familiar" with the prior, identical statements, and thus the three executives who heard the defamatory statements could not "reasonably be seen as a new audience."  Id.  Here, no particularized individuals are identified as comprising either the prior or present audiences, and there is no plausible assertion that all of the myriad unidentified 2018-19 recipients of the statements were familiar with Dershowitz's prior statements from 2015 (other than Dershowitz's novel and unsupported concept that publication "disseminated over the internet via prominent news organizations with worldwide reach" always necessarily means that "as a matter of law [there is] no new audience to reach, and no new cause of action accrues upon their repetition."  (Def. Dismiss Rep. at 4).)

The Complaint alleges that Dershowitz actively republished his 2015 statements in 2018 and 2019 and evinced an intent to

19

garner a wider audience in 2018-19 than he had reached in 2015, (Compl. ¶¶ 50-51, 92, 98), and by Dershowitz's own account he "has made every lawful effort available to him to defend himself and his reputation against the outrageous, knowingly false and defamatory allegation publicly and maliciously leveled against him by the Plaintiff." (Mot. Dismiss at 1). In other words, he admits he took affirmative steps to republish his prior statements to defend himself and his reputation by influencing new audiences or re-influencing old audiences. Said differently, Dershowitz went looking for trouble, and by his repeated affirmative republications, he found it.

Finally, it is worth noting that there is no limiting principle to Dershowitz's bold position. It cannot be the law that, having spoken in 2015 and not having been sued within one year, Dershowitz is now able to "go on TV seven days a week, 20 channels a day forever and say the same things." (Tr. 4:25,

Sept. 24, 2019).[3]  That is because the rationale undergirding the single publication rule is to provide repose to passive defendants while affording plaintiff the possibility of a recovery for affirmative republications.

Dershowitz argues that "Giuffre could have sued Prof. Dershowitz over his denials (notwithstanding their truth) within a year of their original publication in 2015." (Def. Dismiss Rep. at 5).  But this would also be true for a plaintiff who sues over a softcover edition of a book after having foregone the opportunity to sue over the hardcover, which is exactly what occurred in <u>Rinaldi</u>, <u>supra</u>, and is perfectly permissible:

> [A] rebroadcast of a television show, a reprint of a magazine article, or a new edition of a book—even if substantively identical to the initial iteration (such as a paperback edition of a previously published book, <u>see</u>, e.g., <u>Rinaldi v. Viking Penguin, Inc.</u>, 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377, 382

---

[3] [The Court:] So tell me this.  What is the limiting principle? Does your argument mean that Professor Dershowitz can go on TV seven days a week, 20 channels a day forever and say the same things?
  Mr. Cooper: Yes, your Honor.  (Tr. 4:23-5:2, Sept. 24, 2019)
***
  The Court: So that is essentially if you put it on the internet you're immune.
  Mr. Cooper:  Yes.  (Tr. 14:11-13, Sept. 24, 2019)
***
  [The Court:] You argue at page 5 of your reply that if Ms. Maxwell's simple denials destroyed the plaintiff's reputation, then Professor Dershowitz's worldwide rebuke, you say, destroyed her reputation even more and now she's essentially libel proof. So is the rule to be taken from that that if you blast them pretty well the first time you can keep blasting them?
  Mr. Cooper:  Well, you Honor, the answer to that question is yes.  (Tr. 18:13-21, Sept. 24, 2019)

> (1981)[("the bringing out of the paperbacks
> unquestionably was that of a new edition and, as such,
> a republication.")]]—generally will reset the
> limitations period, because each is produced to garner
> an audience that the preexisting dissemination of the
> statement could not reach.  See Restatement (Second)
> of Torts § 577A, cmt. d.

Clark, 617 F. App'x at 505.  Dershowitz would have the Court

reverse this well-established jurisprudence.  The Court declines

to do so and instead adheres to established precedent.

> 2. Self-Defense Privilege

Dershowitz additionally argues that his statements are

subject to a qualified privilege because they were made in reply

to false charges that gave rise to his right to defend himself.

(Mot. Dismiss at 16).  New York courts recognize a qualified

privilege of reply:

> "[a] person also has a right to defend himself or
> herself from charges of unlawful activity . . . . An
> individual is privileged to publish defamatory matter
> in response to an attack upon his or her reputation;
> the speaker is given more latitude in such a situation
> than if the statements were not provoked."

Sack, at § 9.2.1; Reynolds v. Pegler, 223 F.2d 429, 433 (2d

Cir. 1955); Konikoff v. Prudential Ins. Co. of Am., 1999 WL

688460, at *12 (S.D.N.Y. Sept. 1, 1999), aff'd, 234 F.3d 92

(2d Cir. 2000).

Although defendants are not required to "follow Marquis of

Queensberry rules" while allowing plaintiffs to "fight

freestyle," there are definite limitations to the qualified

privilege.  R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 392

22

(1992); <u>Collier v. Postum Cereal Co.</u>, 150 A.D. 169, 178 (N.Y. App. Div. 1st Dep't 1912) ("One in self-defense is not confined to parrying the thrusts of his assailant.  Of course, the counter attack must not be unrelated to the charge, but surely the motives of the one making it are pertinent.")  Defendant and Plaintiff both cite a Nevada case that laid out a standard for forfeiting the qualified privilege: "The privilege may be lost . . . if the reply: (1) includes substantial defamatory matter that is irrelevant or non-responsive to the initial statement; (2) includes substantial defamatory material that is disproportionate to the initial statement; (3) is excessively publicized; or (4) is made with malice in the sense of actual spite or ill will."  <u>State v. Eighth Judicial Dist. Court ex rel. County of Clark</u>, 42 P.3d 233, 239 (Nev. 2002).

In a case related to this one, the Court's dear departed colleague, Judge Robert W. Sweet, held that because the qualified privilege of reply is an affirmative defense that a plaintiff has a right to rebut, it is not appropriate for resolution on a motion to dismiss.  <u>Giuffre v. Maxwell</u>, 165 F. Supp. 3d 147, 155 (S.D.N.Y. 2016).  The Court of Appeals has said that if "the defendant's reply was made in bad faith . . . the defense fails" and that "[i]t is the function of the jury to pass upon the question of whether or not defendant published the alleged defamatory matter in good faith, as this is a subject on

23

which reasonable men may differ." Reynolds v. Pegler, 223 F.2d at 433.

In Giuffre v. Maxwell, Giuffre, as she does here, alleged that defendant Ghislaine Maxwell's statements in that case were made "with malice and knowledge of their falsity." 165 F. Supp. 3d at 155. This was a sufficient pleading to defeat a qualified privilege defense at the motion to dismiss stage. Id.

Dershowitz attempts to distinguish Maxwell on the grounds that (1) Dershowitz is a public figure who thus should be afforded more "latitude" to respond to an attack and (2) the court in Maxwell applied the wrong standard of malice.

First, on the greater latitude argument, Dershowitz's citations to Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) and New York Times Co. v. Sullivan, 376 U.S. 254, 305 (1964) are unavailing. Dershowitz argues that because as a public figure he would have a higher burden if he were suing for defamation, he should be afforded more latitude in responding when others allegedly defame him. In Sullivan, Justice Goldberg illuminated some of the concerns the Court was targeting, writing, "[T]he Constitution accords citizens and press an unconditional freedom to criticize official conduct." Sullivan, 376 U.S. at 305 (Goldberg, J., concurring). What animated the Court and Justice Goldberg in Sullivan were concerns about the need to protect discussion of "public issues" and "official conduct," not a

24

public figure's right to respond. Gertz explains that "[T]he
state interest in compensating injury to the reputation of
private individuals requires that a different rule should obtain
with respect to [public persons]." Gertz, 418 U.S. at 343.
These cases do not address and certainly do not establish that
public figures somehow have an enhanced right to defame.

Second, Dershowitz argues that the court in Maxwell applied
the wrong standard for defeating the self-defense privilege,
i.e., it misstated what Giuffre must plead in order to preclude
Dershowitz from availing himself of the self-defense privilege.
(Def. Dismiss Rep. at 9). Dershowitz argues that "the self-
defense privilege is only forfeited by a reply that is excessive
in scope or content, or which is motivated solely by ill will or
spite." (Id. at 10) (emphasis added). In other words, he
argues that Giuffre was required to plead that Dershowitz was
motivated solely by ill will or spite and that because she did
not, this motion can be granted on the face of the Complaint.

However, the court in Maxwell held that either common law
or constitutional malice can defeat the defense of qualified
privilege in New York. 165 F. Supp. 3d at 155; cf. Liberman v.
Gelstein, 80 N.Y.2d 429, 438 (N.Y. 1992). The New York Court of
Appeals has defined constitutional malice as "knowledge of
falsity or reckless disregard for truth or falsity," Liberman,

80 N.Y.2d at 434, and Giuffre most assuredly has pleaded that. (E.g., Compl. at ¶¶ 15, 17, 47-52).[4]

Dershowitz, however, argues that the self-defense privilege is unique and only a showing of "ill will or spite" can properly defeat it. (Def. Dismiss Rep. at 9). Dershowitz cites no binding authority that would impel the Court to limit the holding of the New York Court of Appeals in Liberman v. Gelstein, 80 N.Y.2d at 434, in this way. Instead of citing a case, Dershowitz invokes "common sense," arguing that "[w]ere the self-defense privilege to be defeated by an allegation of knowing falsity or reckless disregard for the truth, it would be no privilege at all." (Def. Dismiss Rep. at 10). Whatever he means by this formulation, it does not trump the New York Court of Appeals. The Court agrees with Judge Sweet's holding in

---

[4] E.g. "As Defendant and Epstein well knew, Dershowitz's assertion was false. Dershowitz and Epstein knew that Dershowitz had in fact had sex with Plaintiff. Dershowitz and Epstein also knew that Roberts's assertions about Dershowitz were not part of any criminal extortion plot. Indeed, Dershowitz and Epstein knew that Roberts had identified Dershowitz as a sexual predator years before December 2014." (Compl. at ¶ 15) (emphasis added); "Dershowitz made his false and defamatory statements as set forth above on behalf of himself and on behalf of his co-conspirator and client Epstein, in the Southern District of New York and elsewhere, in a deliberate effort to maliciously discredit Roberts and silence her efforts to expose the sexual abuse she suffered. Dershowitz and Epstein did so with the purpose and effect of having others repeat such false and defamatory statements and thereby further damaged Roberts's reputation. Dershowitz and Epstein knew Dershowitz's statements were false." (Id. at ¶ 47) (emphasis added).

<u>Giuffre v. Maxwell</u> that either constitutional malice or common
law malice can defeat the self-defense privilege, <u>Maxwell</u>, 165
F. Supp. 3d at 155, and the question of "good faith" regarding
an assertion of that qualified privilege is to be proven at a
later stage, <u>Reynolds</u>, 223 F.2d at 433.[5]

Dershowitz invokes a nightmare scenario where courts
encourage defamation suits by false accusers and "First
Amendment protected advocacy would be chilled to the point of
freezing important debate."  Dershowitz pits this as a story of
fairness as between accusers and repliers.  "Surely, Prof.
Dershowitz has at least as much right to call his accuser a liar
as the accuser had to call him a pedophile and rapist. Either
the law must protect both the accuser and accused in such a
cases, or it must not protect either."  (Mot. Dismiss at 21).
While as a matter of ultimate law this may well be correct, it
pretermits that Dershowitz was always free to sue Giuffre if he
felt aggrieved by what he views as her false and defamatory

---

[5] Dershowitz's argument does raise an interesting thought that
the parties will have to confront at trial: what is the
interplay between plaintiff's prima facie case and Dershowitz's
"affirmative defense" of truth?  If Plaintiff fails to prove
falsity on her direct case, she loses for failure of proof, and
there is no need for any defense, affirmative or otherwise.
Here, Giuffre's claims and Dershowitz's truth defense are the
mirror images of each other: the falsity of the statements
complained of will either be proven or not, and that will end
the case.  If Giuffre proves falsity, she will have disproven
Dershowitz's truth defense; if she doesn't prove falsity, he
will require no defense.

statements about him.  But the Federal Rules of Civil Procedure require Dershowitz, at the motion to dismiss stage, to satisfy different requirements from those applied to Plaintiff.  The putative "unfairness" Dershowitz complains of applies to any civil action-plaintiffs can put their allegations out to the world and must only plead them, not prove them, at the motion to dismiss stage.  The question the Court must address is whether they are sufficient, not whether they are true.

If the Court's decision somehow encourages defamation suits, then Dershowitz's quarrel properly is with the Federal Rules of Civil Procedure which "represented a major break from the common law and code systems."  Arthur R. Miller, From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure, 60 Duke L.J. 1, 3-5 (2010) (Explaining that the drafters of the Federal Rules "reshaped civil litigation to reflect core values of citizen access to the justice system and adjudication on the merits based on a full disclosure of relevant information."); see Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944).

Therefore, the Court adopts the reasoning of Maxwell. Giuffre has repeatedly pled that Dershowitz's statements were made with malice and knowledge of their falsity.  (Compl. at ¶¶ 15-17, 47-52).  Specifically, Giuffre has pled that she was "forced to have sex with Alan Dershowitz."  (Id. at ¶ 36).

Taking this fact to be true, as the Court must, it is a logical conclusion that a false denial of this charge was necessarily made with knowledge of falsity; Dershowitz could not have had sex with Giuffre and falsely denied that fact without knowing that what he was saying was untrue.  Cf. Maxwell, 165 F. Supp. 3d at 155-56.  If at trial Giuffre fails to prove that she was "forced to have sex with Alan Dershowitz" or if Dershowitz proves that he did not have sex with her at all, then the truth or falsity of his statements will be established, and if they are true his lack of knowledge of falsity will be established, but determination of this issue will await a jury.  For now, Giuffre has pled sufficient facts to defeat the qualified self-defense privilege.

Accordingly, the motion to dismiss is denied.

b. Motion to Disqualify

Dershowitz argues the Firm should be disqualified for two independent reasons.  First, based on a conflict of interest (Memorandum Of Law In Support Of Alan Dershowitz's Motion To Disqualify ("Def. Disqualify Mot."), dated June 7, 2019 [dkt. no. 8], at 16) and, second, based on the advocate-witness rule, (id. at 26).

On conflict of interest, Dershowitz argues that he was a former client of the Firm, he provided the Firm with confidential information, and the Firm is now adverse to him in

a substantially related litigation.  (Id. at 16).  Dershowitz

argues that Sires' conflicts should be imputed to the Firm.

(Id. at 25).  The Firm argues that Dershowitz has waived this

argument by having failed to move timely after it arose.

On the advocate-witness rule, Dershowitz argues that Boies

and other Firm lawyers who represent Giuffre are necessary

witnesses on substantial issues in this action.  (Id. at 12).

The credibility of these advocate-witnesses may have to be

challenged by other members of the Firm who "will not have the

necessary independence."  (Id. at 13).  He argues that the rule

should not only disqualify Boies, McCawley, and other relevant

lawyers but also the entire firm based on imputation.  (Id. at

26).

Because disqualification is so clearly required under the

advocate-witness rule, the Court does not reach the conflict of

interest argument advanced by Dershowitz.  It is thus

unnecessary to reach the waiver argument in that it applies only

to the conflict of interest branch of the disqualification

motion.  The advocate-witness branch of the motion to disqualify

arises out of the language of the Complaint itself, and

Dershowitz moved on that basis within eight weeks of the filing

thereof.

1. Advocate-Witness Rule

The advocate-witness rule prohibits an attorney from representing a party where the attorney will be called as a witness. <u>Rizzuto v. De Blasio</u>, 2019 WL 1433067, at *3 (E.D.N.Y. Mar. 29, 2019); N.Y. R. Prof'l Conduct § 3.7.

Rule 3.7 of the New York Rules of Professional Conduct states:

> a)   A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact [. . .]
> b)   A lawyer may not act as advocate before a tribunal in a matter if:
> (1) another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client;

N.Y. R. Prof'l Conduct § 3.7.

The rule differentiates between an attorney who will be called on behalf of his client and an attorney who will be called as a witness other than on behalf of his client. <u>Id.</u> "In order to disqualify an attorney based on the advocate-witness rule, 'a party must demonstrate that the testimony is both necessary and substantially likely to be prejudicial.'" <u>Prout v. Vladeck</u>, 316 F. Supp. 3d 784, 809 (S.D.N.Y.), <u>reconsideration denied</u>, 319 F. Supp. 3d 741 (S.D.N.Y. 2018) (quoting <u>Decker v. Nagel Rice LLC</u>, 716 F. Supp. 2d 228, 232 (S.D.N.Y. 2010)).

A lawyer may also not act as an advocate where "another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client." Murray v. Metropolitan Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009) (quoting N.Y. R. Prof'l Conduct § 3.7(b)(1)). The Court of Appeals has noted, though, that this rule "lends itself to opportunistic abuse." Id.

The Court of Appeals explained that Rule 3.7(a) is designed to alleviate the risks that:

> (1) the lawyer might appear to vouch for his own credibility; (2) the lawyer's testimony might place opposing counsel in a difficult position when she has to cross-examine her lawyer-adversary and attempt to impeach his credibility; (3) some may fear that the testifying attorney is distorting the truth as a result of bias in favor of his client; and (4) when an individual assumes the role of advocate and witness both, the line between argument and evidence may be blurred, and the jury confused.

Murray, 583 F.3d at 178. The movant "bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial." Id.

As developed at oral argument, (Tr. 59:2-60:1; 62:4-14; 63:3-16, Sept. 24, 2019), the gravamen of Dershowitz's motion to disqualify is that Giuffre alleges in her complaint that Dershowitz's statements that she conspired with her BSF lawyers

32

to extort him and others are false; she also refers to the
statement made by Boies in the recorded call that Giuffre was
"wrong . . . simply wrong." (Compl. at ¶ 17(c), 69). By so
pleading, Giuffre made the truth of these statements
(Dershowitz's ultimate defense on the merits), including the
actions and motivations of at least one of the Firm's attorneys,
a necessary--indeed essential--part of the Complaint.
Dershowitz has proclaimed that his defense to these claims is
that his statements are true; that Plaintiff did in fact
conspire with Boies, McCawley, and other attorneys in the Firm
to extort him. (Tr. 63:14, Sept. 24, 2019); see Martin v.
Hearst Corp., 777 F.3d 546, 552 (2d Cir. 2015) ("truth is an
absolute defense to a defamation claim.")

Dershowitz's allegation of an extortion conspiracy is no
mere throwaway line. Giuffre explicitly characterizes
Dershowitz's "central assertion" as the facts that Giuffre
committed perjury and that she and her attorneys "hatched a
scheme to falsely accuse Dershowitz of sex trafficking as part
of a criminal attempt to extort a settlement from another
party." (Compl. at ¶ 14). Giuffre pleads that such statements
are false and defamatory. (Id. at ¶ 17). At trial, she will
seek to prove, inter alia, that BSF did not participate in such
a scheme (rendering Dershowitz's statements false), while
Dershowitz will seek to prove that that is exactly what BSF did

33

(rendering his statements true).  Either way, BSF is immersed in the facts it pled.

By including these allegations in the Complaint drafted, signed pursuant to Rule 11, and filed by BSF, Giuffre raises the specter of one set of BSF lawyers' examining another set of BSF lawyers, including name partner David Boies.  Because plaintiffs are "masters of their complaints," Standard Fire Ins. Co. v. Knowles, 568 U.S. 588, 595 (2013), the Firm is thus hoist on its own petard.

Beyond that dispositive point, the Complaint also refers to conversations and communications between Boies and Dershowitz in which Dershowitz asserted that Giuffre was mistaken in her claim about having sex with Dershowitz.  (Compl. at ¶¶ 69-81; Def. Disqualify Mot. at 6).  Regarding these admitted conversations, Giuffre alleges they were taken "out of context."  (Compl. at ¶ 69).  Dershowitz says he plans to adduce evidence that Boies agreed with Dershowitz's denial of Giuffre's allegations, which will help Dershowitz prove that Dershowitz was telling the truth when he said that the Firm and Giuffre conspired to extort him. In order to prove his defense, Dershowitz has stated his intention to call Boies, McCawley, and other BSF attorneys to testify to these communications and expects, "if testifying truthfully, these witnesses will offer testimony adverse and prejudicial to their own client, Giuffre."  (Def. Disqualify

Mot. at 27; Dershowitz Decl. ¶ 74).  Dershowitz says Boies might
seek to explain his statements in a manner "not embarrassing to
[Boies] and [thus] detrimental to Giuffre" or may seek to assert
that his statements were merely "hypothetical."  (Def.
Disqualify Mot. at 13).  Dershowitz contends that because such
an explanation may be harmful to her, "Giuffre's trial counsel
must be free to discredit Boies's prejudicial statements even at
the expense of Boies's own professional reputation."  (Def.
Disqualify Mot. at 13).  Dershowitz argues that the Firm's
partners and associates will not have the necessary independence
to pursue a line of questioning that might damage the
professional reputation of the name partner of their firm in
favor of a client.  (Id. at 13).  At a minimum, the scenario
Dershowitz paints--which cannot be disregarded--would be
unseemly in the extreme.

     Giuffre points to Interpharm, Inc. v. Wells Fargo Bank,
N.A., where this court denied a motion to disqualify.  2010 WL
1141201, at *6 (S.D.N.Y. Mar. 25, 2010); (Plaintiff's Opposition
To Defendant's Motion To Disqualify Boies Schiller Flexner LLP
("Pl. Disqualify Opp."), dated July 3, 2019 [dkt. no. 33], at
21-22).  However, in Interpharm, the court noted that the movant
"offer[ed] no evidence whatsoever that [opposing counsel] will
offer any testimony or has any information that would warrant
his disqualification" under Rule 3.7.  2010 WL 1141201, at *5.

Here, Dershowitz offers tape-recorded evidence of the statements which he contends support the truth of his extortion statement.  (Compl. at ¶ 69).  For example, the preliminary transcript prepared by defense counsel quotes Boies as proposing that he and McCawley say to Giuffre, "[W]e have reviewed the documentary evidence and we are convinced that your belief [that you had relations with Dershowitz] is wrong and we would like to explore with you how you could have come to this conclusion that is wrong."  (Dershowitz Sept. 25 2019 Decl. Ex. A).  Giuffre concedes these tapes exist and alleges that they purport to show statements made by Boies that "based on what was shown in [Dershowitz's] summary, it would have been impossible for [Giuffre's] assertions about him to be true, and that if his assertions proved out, [Giuffre's] counsel would undertake to convince her that she must have made a mistake."  (Compl. at ¶¶ 69, 71).  However, she adds that Boies also told Dershowitz "(i) that [Dershowitz's] assertions would have to be proven, (ii) that Ms. [Giuffre] had always been very clear that she recalled having had sex with Dershowitz multiple times, and (iii) that everyone was convinced that Ms. [Giuffre] was telling the truth as she recalled it."  (Id. at ¶ 71).

Giuffre contends that Dershowitz will be unable to elicit such testimony because it will be inadmissible as statements made during settlement discussions.  (Pl. Disqualify Opp. at

22).   The Complaint questions the propriety of Dershowitz's

having made the recordings, (Compl. at ¶ 69), and Dershowitz

responds that he "was not wearing his attorney hat when that was

recorded," (Tr. 51:7; 52:4, Sept. 24, 2019), whatever that

means.   Giuffre included some of the details of these

discussions with Boies in her Complaint drafted and filed by

BSF, (Compl. ¶¶ 70-71), thus necessarily making them part of her

case.   In any event, admissibility will be determined in limine

or at trial.

The discussions between Boies and Dershowitz are not the

only facts beyond the face of the Complaint itself that raise

the issue of the witness-advocate rule--they are simply the most

developed at this stage.   Dershowitz has also announced his

intention to take the depositions of several BSF lawyers to help

prove the truth of his extortion assertion.   (Tr. 35:6, Sept.

24, 2019).   Again, it is essential to follow the litigation

jujitsu at work here: Giuffre says Dershowitz defamed her by

falsely saying she and BSF engaged in an extortion scheme;

Dershowitz says he said it and it is true.   Giuffre's burden is

to prove it is false in the face of Dershowitz's vehement claim

that it is true.   Truth, of course, is a complete defense.

Printers II, Inc. v. Professionals Pub., Inc., 784 F.2d 141, 146

(2d Cir. 1986).   Dershowitz stated that "if testifying

truthfully, these witnesses will offer testimony adverse and

37

prejudicial to their own client, Giuffre," because their
testimony will tend to prove what Dershowitz said is true.
(Def. Disqualify Mot. at 27; Dershowitz Decl. ¶ 74).  Thus, it
is plain that several of the Firm's lawyers will be essential
trial witnesses on a major claim in the Complaint,[6] likely to be
called by both parties and not merely called to identify
documents as in Murray.  583 F.3d at 179.  Even if each of those
lawyers denied participation in such a plot (and pretermitting
cross-examination), some or all of the concerns raised by the
Court of Appeals in Murray are present, particularly that "some
may fear that the testifying attorney is distorting the truth as
a result of bias in favor of his client."  583 F.3d at 178.
Accordingly, the Firm must be disqualified to "preserve the
integrity of the adversary process," Hempstead Video, 409 F.3d
at 132 (quoting Nyquist, 590 F.2d at 1246), and avoid
"taint[ing] the underlying trial, Nyquist, 590 F.2d at 1246.
Dershowitz has carried his burden of imputation under Rule
3.7(b).  He has shown that at the very least Boies "is likely to
be called as a witness on a significant issue," i.e., whether
Dershowitz's extortion claims (which the Complaint says are
false) are true.  Murray, 583 F.3d at 178.  Dershowitz has also

---

[6] As noted above, three BSF lawyers have submitted affidavits on
the topic of the alleged scheme to extort Wexner.  See supra p.
9.

shown that "the testimony may be prejudicial to the client" based on the recorded conversations.   Id.

Giuffre claims that the motion to disqualify is "premature at this point in time." (Pl. Disqualify Opp. at 21).   However, disqualification early in the proceeding can give a plaintiff time to find a new attorney to represent her without delaying trial.   Gorbaty v. Wells Fargo Bank, N.A., 2011 WL 318090, at *3 (E.D.N.Y. Feb. 1, 2011); Gleason v. Zocco, 941 F. Supp. 32, 36 (S.D.N.Y. 1996) (noting that granting a motion to disqualify "immediately after the action was commenced" would make "prejudice to plaintiff of having to change counsel . . . insignificant").   Further, there is no justification for allowing an attorney to represent a "plaintiff during the pre-trial aspect of [a] litigation when it is clear that he may be a material witness at trial, and it is clear that he could be required to testify."   Fulfree v. Manchester, 945 F. Supp. 768, 772 (S.D.N.Y. 1996).

Plaintiff's attorneys must be independent and free to challenge the credibility of Boies and other BSF partners in order to test the allegations made in the Complaint they drafted and filed.   Murray, 583 F.3d at 178.   Accordingly, the motion to disqualify the Firm from representing Giuffre is granted.

IV.   Conclusion

Defendant's motion to dismiss the complaint [dkt. no. 22] is denied.   Defendant's motion to disqualify the law firm of Boies Schiller Flexner LLP [dkt. no. 7] is granted.

New counsel for Plaintiff and counsel for Defendant shall confer and submit a proposed discovery plan no later than November 13.   Counsel shall appear for a Rule 16 conference on November 20 at 11:00 A.M.

SO ORDERED.

Dated:   New York, New York
         October 16, 2019

                    _Loretta A. Preska_
                    LORETTA A. PRESKA
                    Senior United States District Judge

40