**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VIRGINIA GIUFFRE,

                    Plaintiff,

        v.

ALAN DERSHOWITZ,                            Civil Action No. 1:19-cv-3377 (LAP)

                    Defendant.

ALAN DERSHOWITZ,

            Counterclaim Plaintiff,

        v.

VIRGINIA L. GIUFFRE,

            Counterclaim Defendant.

**<u>AMENDED COMPLAINT</u>**

Plaintiff, VIRGINIA L. GIUFFRE, formerly known as Virginia Roberts, for her Complaint against Defendant, Alan Dershowitz, avers upon personal knowledge as to her own acts and status and upon information and belief and to all other matters:

## NATURE OF THE ACTION

1.     This suit arises out of Defendant's sexual abuse of Plaintiff, his defamatory statements of and concerning Plaintiff, and his unlawful interception of Plaintiff's communications.

2.     During 2000–2002, beginning when Plaintiff was 16, Plaintiff was the victim of sex trafficking and abuse by convicted sex offender Jeffrey Epstein.

3.     Epstein's trafficking scheme involved recruiting young girls, often by claiming they would be paid $200 for simply providing a massage to a wealthy billionaire. The young girl would then be brought up to Epstein's bedroom where Epstein would be on a massage table; Epstein would then sexually abuse the girl. This same pattern was repeated numerous times with numerous children.

4.     "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach, Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others." Opinion and Order, Doc. No. 435 at 1–2, *Jane Doe 1 and Jane Doe 2 v. United States*, Case No. 9:08-cv-80736 (S.D. Fla. Feb. 21, 2019) ("Order") (internal citations omitted). One of the persons with whom Epstein acted in concert was Defendant.

5.      Like other minor children who came before and after her, Plaintiff was initially recruited to provide massages, and thereafter to engage in a variety of sexual acts, for Epstein. Plaintiff was required to be on call for Epstein for sexual purposes and frequently traveled with him both nationally and internationally. Plaintiff was regularly abused by Epstein and was lent out by Epstein to others for sexual purposes.

6.      Defendant was Epstein's lawyer, close friend, and co-conspirator. Defendant was also a participant in sex trafficking, including as one of the men to whom Epstein lent out Plaintiff for sex. Between 2000 and 2002, Defendant sexually abused Plaintiff on numerous occasions, including at least once in New York.

7.      When Epstein was arrested for sex trafficking in 2006, Defendant defended his friend and client by falsely attacking the truthfulness of his accusers, including calling the children whom Epstein had abused (and, in the case of Plaintiff, whom the Defendant himself had also abused) liars and prostitutes.

8.      Despite his significant criminal activity, Epstein's criminal charges were resolved by a guilty plea to a single Florida state law charge and a non-prosecution agreement ("NPA") with the U.S. Attorney for the Southern District of Florida. Unknown to the public and the victims at the time, Epstein's lawyers, including Defendant, were pressuring the Government to commit to the NPA without informing the victims. Epstein's multiple victims, including Plaintiff, were kept in the dark and many victims were told to be "patient" while Defendant participated in the drafting of the NPA and worked to protect Epstein and other "potential co-conspirators" (including himself) from prosecution.

9.      On July 7, 2008, a challenge to the NPA was brought on behalf of two of Epstein's victims (not including Plaintiff) based on the fact that, contrary to the requirements of

the Crime Victims' Rights Act (the "CVRA"), the NPA had been concealed from Epstein's victims.

10.     In December 2014, Plaintiff, who had not initially been part of the CVRA action, was asked to, and did, provide information to plaintiffs' lawyers in the CVRA case in which she discussed her sex trafficking by Epstein. On December 31, 2014, Plaintiff's lawyers in the CVRA proceeding (Brad Edwards and Paul Cassell) filed a Motion Pursuant to Rule 21 for Joinder in the Action ("Joinder Motion") on behalf of Plaintiff. Plaintiff's joinder motion described how she had been sexually trafficked by Jeffrey Epstein and was forced to have sex with, among others, Defendant.

11.     Based on Plaintiff's December 2014 filing, Defendant, as he had previously done to Epstein's victims, publicly and viciously attacked Plaintiff's lawyers in the CVRA actions, Brad Edwards and Paul Cassell. Defendant, in nationally televised news interviews, wrongfully claimed that Edwards and Cassell had engaged in unethical behavior warranting disbarment for filing the Joinder Motion that described Defendant's involvement with Epstein and Plaintiff. Edwards, who is a prominent lawyer for sexually abused women and children, and Cassell, who is a former United States District Court judge who left the bench to advocate for criminal victims, sued Defendant for defamation. Edwards and Cassell asserted that the factual allegations that Defendant had knowledge of and participated in Epstein's criminal conduct were entirely proper and well founded and that Defendant's statements about Edwards and Cassell were defamatory.

12.     In April 2016, Defendant settled the Edwards and Cassell defamation claims against him. As a condition of the settlement, Defendant required that the financial terms of the settlement be kept confidential.

13.     In November 2018, after conducting a lengthy investigation that involved interviewing over eighty (80) women, the *Miami Herald* published the first in a series of articles exposing how Epstein and his lawyers had corrupted the legal system to obtain the NPA and referring to Defendant's sexual abuse of Plaintiff. Defendant's response on behalf of himself and his client and co-conspirator Epstein has been a desperate barrage of false and increasingly defamatory attacks on Plaintiff. The purpose and effect of these attacks has been to damage Plaintiff's reputation and credibility and to try to intimidate her into silence.

14.     Defendant's central assertion is that Plaintiff has committed perjury, and that in December 2014, Plaintiff and her lawyers hatched a scheme to falsely accuse Defendant of sex trafficking as part of a criminal attempt to extort a settlement from another party.

15.     As Defendant well knew, Defendant's assertion was false. Defendant knew that he had in fact had sex with Plaintiff. Defendant also knew that Plaintiff's assertions about Defendant were not part of any criminal extortion plot. Indeed, Plaintiff had identified Defendant as a sexual predator years before December 2014.

16.     Defendant's knowledge of the falsity of his attacks on Plaintiff have not, however, limited the scope or scale of those attacks.

17.     Examples of Defendant's knowingly false and malicious defamatory statements are:

> (a)     November 28, 2018, in an interview with the *Miami Herald*: "[T]he story was 100 percent flatly categorically made-up," and "Roberts and her attorneys fabricated the assertion in order to get money from other powerful, wealthy people . . . ."[1]

---

[1] Julie K. Brown, *Even from jail, sex abuser manipulated the system. His victims were kept in the dark*, MIAMI HERALD (Nov. 28, 2018), https://hrld.us/38XIHYW.

(b)    December 1, 2018, in a letter to the editor of *Raw Story*: "I never met Roberts; I never had sex with her; she simply made up the entire story for money."[2]

(c)    December 2, 2018, in a letter to the editor of the *Miami Herald*: "I was 'deliberately framed for financial reasons'"; Plaintiff made her claims about Defendant "in order to obtain money from a wealthy businessman, and . . . Roberts had never previously included me among the people with whom she claimed to have had sex"; "one of Roberts' own lawyers has acknowledged in front of witnesses that her claims against me are 'wrong' 'simply wrong'"; "I never met Roberts; I never had sex with her; she simply made up the entire story for money."[3]

(d)    December 4, 2018, in an interview on the Law&Crime Network: Plaintiff is a "certified, complete, total liar"; "I can prove conclusively that she made the whole thing up." At the same time Defendant claimed "that the FBI recognized the evidence showed he was not where she said he was."[4]

(e)    December 5, 2018, in a letter to the editor of *The Harvard Crimson*: "Roberts made up the accusation out of whole cloth in order to obtain millions of dollars from Leslie Wexner," and "[t]here is evidence that directly proves I was framed. These include emails between Roberts and a journalist, a book manuscript by Roberts and a legal brief that are smoking guns showing that I was 'deliberately framed for financial reasons.'"[5]

---

[2] *Letter to the Editor: Alan Dershowitz responds to Raw Story report*, RAW STORY (Dec. 1, 2018), https://bit.ly/35P6ust.
[3] Alan Dershowitz, *Letter to the Editor*, MIAMI HERALD (Dec. 2, 2018), https://hrld.us/35HFR8s.
[4] Ronn Blitzer, *Dershowitz Goes Off on Woman Who Made Underage Sex Allegations*, LAW & CRIME (Dec. 4, 2018), https://bit.ly/2EASaYl.
[5] Alan M. Dershowitz, *Letter to the Editor: Article Misrepresented Dershowitz*, THE HARVARD CRIMSON (Dec. 5, 2018), https://bit.ly/2S8ISe5.

(f)        March 2, 2019, on Twitter: "My perjuring accusers are Virginia Roberts and
Sarah Ransomme [sic] [who reported that Epstein lent her out to Defendant for sex
at the same time as Defendant was, at Epstein's request, representing Ransome as
her lawyer]. Both have long records of lying."[6]

(g)        April 16, 2019, in an interview with *The Daily Mail*: [7]

    *i.*   "They [FBI agents] just have to walk down the block from the New
York FBI headquarters, sit in on the trial and they will hear perjury
being committed in their presence in a Federal court. The result will be
[Plaintiff] will be prosecuted for perjury. This is a Federal crime being
committed in a Federal courthouse. . . . This is an opportunity for me
finally to have a judicial forum to prove that she made up the whole
story and that she's a perjurer."

    *ii.*   "[Plaintiff] hurts the Me Too movement terribly because when it's
proved she lied for money the real victims will be people who have
really been abused. She is a fake victim."

(h)        May 2, 2019, on *The View*: "I support the Me Too movement, but when a
women falsely accuses, for financial reasons—she was hoping to get a third of a
billion dollars suing Leslie Wexner, the owner of Victoria's Secret. She also
accused him in private, after accusing me in public, hoping to get a third of a billion

---

[6] Alan Dershowitz (@AlanDersh), Twitter (Mar. 2, 2019, 6:42 PM), https://bit.ly/35Gq0Hd.
[7] Ben Ashford & Cheyenne Roundtree, *EXCLUSIVE: Defiant Alan Dershowitz brands Virginia Roberts a 'fake MeToo victim' as she files defamation suit claiming the lawyer who defended pedophile Jeffrey Epstein had underage sex with her and repeatedly called her a liar*, Dailymail.com (Apr. 16, 2019), https://dailym.ai/2ScPyrF.

dollars. Where do I get that figure from? She told that to her best friend. I have that on tape."[8]

(i)     July 5, 2019, on Twitter: Materials unsealed by the Second Circuit "prove that my false accuser—who I never even met—was told to include me in her manuscript describing her alleged sexual encounters, in order to help her market her book, despite her admitted knowledge of my total innocence. . . . When the materials are unsealed , [sic] the public will see the evidence in my accuser's own words that . . . prove I was framed for financial reasons & that I'm totally innocent, as I've consistently asserted since the day I was falsely accused." [9]

(j)     July 10, 2019, on CBS *This Morning*: "This is a woman with a long, long record of lying for money."[10]

(k)     July 12, 2019, on Fox News: "Let me repeat categorically, she made up the whole story. I never met this woman. It was part of an extortion plot to obtain a billion dollars from Leslie Wexner."[11]

(l)     July 15, 2019, on NPR: "She made up the whole story out of whole cloth for financial reasons. The goal was to try to get a billion dollars from Leslie Wexner. The plan was to accuse me in public and then accuse Leslie Wexner in private of the identical conduct and say to him, essentially, if you don't want to have happen to you what happened to Dershowitz, there are ways of resolving it."[12]

---

[8] The View, *Alan Dershowitz on Epstein Case and Current Lawsuit*, YOUTUBE (May 2, 2019), https://bit.ly/2McRSeF.

[9] Alan Dershowitz (@AlanDersh), TWITTER (Jul. 5, 2019, 6:50 AM), https://bit.ly/2EE9HyI.

[10] CBS This Morning, *Alan Dershowitz, Jeffrey Epstein's former lawyer, claims to have proof his accuser is lying*, YOUTUBE (Jul. 10, 2019), https://bit.ly/38UNevs.

[11] The Ingraham Angle, *Alan Dershowitz responds to Epstein accuser's defamation suit, sexual assault allegations*, FOX NEWS (Jul. 12, 2019), https://bit.ly/35GIQ0Z.

[12] Transcript: Alan Dershowitz Denies Epstein Rape Accusations And Defends Role In Sweetheart Deal, NPR (July 15, 2019), https://n.pr/2PYsv0U.

(m)     July 18, 2019, on Newsmax TV: "In the end, I hope David Boies goes to prison, because he has done terrible things in this case. All the women who have accused me started to commit their perjury only after they met David Boies. In other words, in every case, the woman said, 'I didn't have anything to do with Dershowitz. I never met him or had no association with him.' And then they meet David Boies, and suddenly they make accusations. There's a term for that, and I want the federal government to be examining whether Boies is guilty of subornation of perjury. I want the federal government to examine whether Boies is guilty of extortion, of trying to get a billion dollars from Leslie Wexner by essentially saying to Wexner privately, if you don't want to have happen to you what happened to Alan Dershowitz in public, there are ways of resolving this."[13]

(n)     July 19, 2019, on Fox News:[14]

  *i.*  "I have emails from the accuser in which she admits she didn't have sex with me and that she put me in her book in order to help sell the book and then she puts me in the book as somebody she didn't have sex with. . . . These are the most tainted, serial liars imaginable, and they all started telling their lies after they met David Boies."

  *ii.*  "Each of the two accusers had said I didn't do it, and then they met David Boies, and he changed their minds. So they committed perjury after meeting David Boies. There's no coincidence about that."

---

[13] Newsmax TV, *Alan Dershowitz Discusses Relationship with Jeffrey Epstein*, YᴏᴜTᴜʙᴇ (July 18, 2019), https://bit.ly/2PEMenA.

[14] The Ingraham Angle, *Dershowitz: Accusers said I didn't do it until David Boies changed their minds*, Fᴏx Nᴇᴡs (Jul. 19, 2019), https://bit.ly/2EEb4gQ.

(o)     July 19, 2019, in an interview with *New York Magazine*: "I know that I am a victim of a serious crime, a crime of perjury."[15]

(p)     July 26, 2019, on Newsmax TV: [16]

     *i.*   "The women first indicate they never had sex with me; then they meet Boies. Then they suddenly 'remember' they had sex with me. Boies must know that both Accusers cannot be believed and that they made up the stories about me in the hope of getting money (which they got). Yet, he submitted their false affidavits, vouching for their credibility without disclosing to the courts their documented history of lying about prominent people."

     *ii.*   "In all three instances, my false Accusers have refused to make their accusations to the media on the record. They have made them only in court papers, hiding behind the litigation privilege, which precludes defamation suits for false statements. This is a tactic developed and employed by David Boies to prevent any legal accountability for false accusations."

(q)     July 29, 2019, on NewsmaxTV: "I'm gonna continue to call them liars and perjurers. That's the truth. It's not victim shaming; it's criminal shaming. They're criminals. They belong in jail."[17]

---

[15] Andrew Rice, *Alan Dershowitz Cannot Stop Talking*, NY MAGAZINE (Jul. 19, 2019), https://nym.ag/2Q2f6oJ.
[16] Alan Dershowitz, *Open Letter to The New Yorker Exposes False Allegations*, NEWSMAX (Jul. 26, 2019), https://nws mx/2PHXe3r.
[17] Newsmax TV, *Alan Dershwitz [sic] Responds to New Yorker Article*, YOUTUBE (Jul. 29, 2019), https://bit.ly/36T5eoc.

(r)      August 9, 2019, on Twitter: "The unsealed documents prove Roberts made up accusations after being pressured by her lawyers."[18]

(s)      August 10, 2019, on Fox News:[19]

    *i.*      "She told her best friend she didn't want to name me because I was innocent but she was pressured to do it by her lawyer because she saw a pot of gold at the end of the rainbow. She is a complete and total liar."

    *ii.*      "We're gonna go to court and we're gonna prove that this woman is a liar who was put up to it by her lawyers. . . . We're gonna prove that for years and years and years she said she never had sex with me. . . . Now I don't know whether she is making up and fantasizing about these other people. I can tell you she is totally fantasizing about me. She's made up the whole story. There is no truth to it."

(t)      August 12, 2019, in a press statement issued after the Second Circuit's ruling in *Giuffre v. Maxwell*: "She invented the false accusation against me only in 2014, when her lawyers 'pressured' her to do so for financial reasons."[20]

(u)      August 30, 2019, on NewsmaxTV:[21] "[A]s soon as [Plaintiff] met David Boies and the other lawyers, suddenly she remembered having had sex with me. It's totally made up. I never met her."

(v)      October 19, 2019, on Twitter: "I will prove that Giuffre never falsely claimed to have had sex w/ me until she was pressured by her lawyers. I will also

---

[18] Alan Dershowitz (@AlanDersh), TWITTER (Aug. 9, 2019, 3:52 PM), https://bit.ly/38UL6Uv.
[19] The Ingraham Angle, *Alan Dershowitz responds to new allegations from Epstein case*, FOX NEWS (Aug. 10, 2019), https://bit.ly/38TIV3r.
[20] David A. Patten, *Dershowitz: New Documents 'Categorically Prove' No Epstein-Related Sex*, NEWSMAX (Aug. 12, 2019), https://nws.mx/2Md1OEZ.
[21] Newsmax TV, *Alan Dershowitz Denies Claims from Epstein Accuser*, YOUTUBE (Aug. 30, 2019), https://bit.ly/2s3vLjQ.

prove I never met her and she invented the entire story for money. Now she will have to give back all the money she made from her lies."[22]

(w)    November 16, 2019, on BBC Radio: "She is lying about me. I have recorded evidence from her own lawyer admitting that she was wrong about me. I am a victim of her perjury."[23]

(x)    November 19, 2019, in *Guilt by Accusation: The Challenge of Proving Innocence in the Age of #MeToo*:[24]

   i.   "Although I am the victim here—the victim of a deliberate frame-up motivated by money—I am being treated as a perpetrator, despite the fact that I have done absolutely nothing wrong." (1–2)

   ii.   "[T]he decision to accuse me in public, while accusing others in private, was part of a carefully calculated shakedown plot to get money from a wealthy individual who was not publicly named—at least not yet." (21)

   iii.   "Giuffre's lawyers had to be aware of her history of lying when they vouched for her credibility by submitting perjured affidavits by her falsely accusing me of sexual misconduct with her." (36)

   iv.   "After meeting with her lawyers—and 'feeling pressure' from them— Giuffre suddenly 'remembers' having sex with me seven times between 2001 and 2002 (when she was 18 and 19)." (45)

   v.   "Even after it was proved conclusively that she had committed numerous acts of perjury, she remained a free woman, unpunished for

---

[22] Alan Dershowitz (@AlanDersh), Twitter (Oct. 19, 2019), https://bit.ly/2Z5VqV2.
[23] *BBC Radio Broadcast 16/11/2019*, BBC RADIO 4 (Nov. 16, 2019) (audio on file with counsel).
[24] ALAN DERSHOWITZ, GUILT BY ACCUSATION: THE CHALLENGE OF PROVING INNOCENCE IN THE AGE OF #METOO (2019).

repeatedly lying under oath and deliberately seeking to destroy the reputation of an innocent victim of a financially motivated frame-up. Nor was I the only victim of her perjury. Every real victim of sexual assault suffers when a false 'victim' is caught in a lie, as Giuffre has been." (57–58)

vi. "It is these realities that incentivized Giuffre and her lawyers to falsely accuse me of a crime with complete impunity: they believed that I could not sue them, because their allegations were contained in a court filing, and were thus immune from a defamation suit." (58)

(y) December 8, 2019, on Fox News:[25]

i. "She remembered after telling everybody she didn't have sex with me; she had an exchange of emails with somebody in which she said she never met me, she never met me. And then she meets her lawyers and suddenly she remembers not only having sex with me, but on seven occasions in places that I never was during the relevant time period."

ii. "This was all part of an extortion plot against Leslie Wexner. . . . The plot was to accuse me publicly, and then privately go to Leslie Wexner, which they did and essentially say to him look if you don't want to have happen to you what happened to Dershowitz, there are ways of resolving this."

---

[25] *Alan Dershowitz Defends Himself Against #MeToo Accusation in Interview with Mark Levin*, YOUTUBE (Dec. 8, 2019), https://bit.ly/35HTWCT.

18.     In addition to these examples, in countless public statements, Defendant has accused Plaintiff of being a liar, of lying, and has otherwise impugned her integrity and reputation for truthfulness.

19.     Defendant knew his assertions about Plaintiff, including his assertions referenced in paragraph 17 above, were, and would be taken by persons who read and heard them to be, specific statements of fact.

20.     Defendant has repeatedly, publicly claimed that he wanted to have a trial that would determine the facts concerning his conduct. He said on national television that he would waive the statute of limitations so that Plaintiff could sue him for sex abuse. However, when Plaintiff's lawyer asked Defendant to do so, Defendant refused—and continues to refuse.

21.     When Defendant was faced with an actual case brought by Plaintiff's then-lawyers Edwards and Cassell, which would have determined the veracity of Plaintiff's claims, however, Defendant settled to avoid that determination.

22.     More recently, Defendant has again taken to claiming publicly that he demands a trial on the question whether Plaintiff committed perjury and made up her statements about him for money. For example, on March 2, 2019: My "accusers are Virginia Roberts and Sarah Ransomme [sic]. . . . I hereby accuse my false accusers of committing the felony of perjury and challenge them to sue me for defamation."

23.     Defendant now has what he claims to have been looking for.

## **JURISDICTION AND VENUE**

24.     This is an action for damages in an amount in excess of the minimum jurisdictional limits of this Court.

14

25.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) because one claim in this action arises under the laws of the United States, and the remaining claims are so related to the claim within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), in that Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

26.     This Court has personal jurisdiction over Defendant. Defendant resides in New York City; Defendant conducts regular business in New York City; and this action arose, defamatory statements were made, and abuse occurred, within the Southern District of New York.

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (1) Defendant resides within this District, and (2) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

## **PARTIES**

28.     Plaintiff Virginia Giuffre is an individual who is a citizen of the State of Colorado.

29.     On information and belief, Defendant Alan Dershowitz is an individual who is a citizen of the State of New York and resides in the Southern District of New York at 2 Tudor City Place Apt. 10EN, New York, New York 10017.

## FACTUAL ALLEGATIONS

A.   **Epstein's Sex Trafficking Enterprise**

30.     Plaintiff became a victim of sex trafficking and repeated sexual abuse after being recruited by Ghislaine Maxwell and Jeffrey Epstein when Plaintiff was under the age of eighteen.

31.      Between 2000 and 2002, Epstein sexually abused Plaintiff at numerous locations including his mansions in West Palm Beach, Florida, New Mexico, the Virgin Islands, and this District. Epstein also flew Plaintiff on his plane nationally and internationally numerous times when she was under the age of 18. Only portions of the flight logs of Epstein's private planes are yet known, and Epstein also flew Plaintiff frequently on commercial airlines to meet him and others. However, the chart below, which shows Plaintiff's flights on Epstein's private plane from the limited logs that are available, illustrates the international scope of Epstein's sex trafficking.



32.     Between 1999 and 2007, with the assistance of numerous co-conspirators, Epstein abused more than thirty (30) minor underage girls, a fact confirmed by state and federal law enforcement.

16

33.     After years of abuse, Epstein sent Plaintiff to Thailand in September 2002. One of Plaintiff's assignments from Epstein was to bring a young girl back to Epstein in the United States. Fearing for her life, and not wanting to subject another young girl to the abuse she was forced to endure, Plaintiff fled from Thailand to Australia to escape from Epstein.

**B.        Defendant's Role with Epstein and Abuse of Plaintiff**

34.     Defendant has been "a close friend of Mr. Epstein" for many years. In 2003, Defendant said "I'm on my 20th book… The only person outside of my immediate family that I send drafts to is Jeffrey." Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Jun. 27, 2003), https://bit.ly/2S9MzQU. Defendant also described Epstein as his friend. "I would be as interested in him [Epstein] as a friend if we had hamburgers on the boardwalk in Coney Island and talked about his ideas." Ray Gustini, *Vanity Fair Reminds Us When Jeffrey Epstein Wasn't a Creep*, THE ATLANTIC (June 21, 2011), https://bit.ly/38ZwHGK. Defendant frequently traveled with Epstein, including on Epstein's private plane. In addition, Epstein's employees have confirmed that Defendant visited Epstein's Palm Beach and New York City mansions often, would stay overnight, and was present when the victims of Epstein's sex trafficking were there. Defendant also visited Epstein's other homes.

35.     In addition to their close friendship, Defendant represented Epstein as his lawyer. On or about December 2, 2018, Defendant stated that he was still Epstein's lawyer.

36.     During the time period that Plaintiff was being trafficked by Epstein, she was forced to have sex with Defendant. Plaintiff was forced to engage in sexual acts with Defendant in various locations.

37.     On one such occasion, in late 2000 or early 2001, Defendant sexually assaulted Plaintiff at Epstein's mansion located at 9 East 71st Street, New York, New York 10021.

38.     At the time of the incident, Plaintiff was under the age of 18. Epstein had taken her from her home, family, and friends in Palm Beach, Florida, and flown her to New York, New York, where he repeatedly sexually abused her. In the weeks immediately prior to the incident, Defendant had met Plaintiff in circumstances that would have put a reasonable person on notice that she was being sexually trafficked.

39.     Defendant entered Epstein's bedroom immediately after one incident of abuse by Epstein, while Plaintiff was alone and unclothed. Without obtaining her consent to the contact, he proceeded to engage in sexual intercourse with her.

40.     As Defendant knew, Plaintiff did not consent to the sexual intercourse but rather was under the coercive influence of Epstein and/or his co-conspirators.

**C.     The Arrest and Prosecution of Epstein**

41.     Epstein ultimately pleaded guilty to procuring a minor for prostitution and was a registered sex offender until his death on August 10, 2019.

42.     In September 2007, while Defendant was representing him, Epstein entered into a Non-Prosecution Agreement ("NPA") in which the United States Attorney for the Southern District of Florida agreed not to prosecute Epstein for numerous federal sex crimes committed in that District.

43.     In the NPA, the United States Attorney for the Southern District of Florida additionally agreed that it would not institute any federal criminal charges against any potential co-conspirators of Epstein.

44.     Epstein flippantly referred to his sexual abuse of multiple minors, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City—and making wisecracks about his just-ended jail stint

for having sex with an underage girl. 'I am not a sexual predator, I'm an "offender,"' the financier told The Post yesterday. 'It's the difference between a murderer and a person who steals a bagel,' said Epstein." *See* Amber Sutherland, *Billionaire Jeffrey Epstein: I'm a Sex Offender, Not A Predator*, NEW YORK POST (Feb. 25, 2011), https://bit.ly/2s3ebwk.

**D.      The Criminal Victims' Rights Act Proceeding**

45.      Rather than confer with the victims about the NPA, the U.S. Attorney's Office and Epstein, who was represented by Defendant at that time, agreed to a "confidentiality" provision in the Agreement barring its disclosure to anyone—including Epstein's victims. As a consequence, the victims were not told about the NPA.

46.      On July 7, 2008, a young woman identified as Jane Doe No. 1, one of Jeffrey Epstein's victims (other than Plaintiff), filed a petition to enforce her rights under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, alleging that the Government failed to provide her the rights promised in the CVRA with regard to the plea arrangement with Epstein.

47.      On February 21, 2019, the Court found that the victims' rights had been violated and granted summary judgment in favor of the victims finding: "It was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute." Order at 31. In its Order the Court acknowledged that: "Jeffrey Epstein sexually abused more than 30 minor girls." *Id.* at 1. The Court also found: "Among other provisions, the NPA expanded immunity to any 'potential coconspirator' of Epstein's: 'In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to

Sarah Kellen, Adriana Ross, Lesley Groff or Nadia Marcinkova.' . . . From the time the FBI

began investigating Epstein until September 24, 2007—when the NPA was concluded—the

Office never conferred with the victims about a NPA or told the victims that such an agreement

was under consideration." *Id.* at 8.

**E.**     **Victims Refuse Silence**

48.     Ultimately, as a mother and one of Epstein's many victims, Plaintiff concluded

that she should speak out about her sexual abuse experiences in hopes of helping others who had

also suffered from sexual trafficking and abuse, and of possibly protecting future potential

victims.

49.     On December 23, 2014, Plaintiff incorporated an organization called Victims

Refuse Silence, Inc., a Florida not-for-profit corporation.

50.     Plaintiff intended Victims Refuse Silence to change and improve the fight against

sexual abuse and human trafficking. The goal of her organization was, and continues to be, to

help survivors surmount the shame, silence, and intimidation typically experienced by victims of

sexual abuse and to help others to escape becoming victims of sex trafficking.

**F.**     **Defendant Acted Maliciously to Defame, Discredit, and Intimidate Plaintiff**

51.     Defendant made his false and defamatory statements as set forth above in the

Southern District of New York and elsewhere, in a deliberate effort to maliciously discredit

Plaintiff and silence her efforts to expose the sexual abuse she suffered. Defendant did so with

the purpose and effect of having others repeat such false and defamatory statements and thereby

further damaged Plaintiff's reputation. Defendant knew his statements were false.

52.     Defendant made his statements to discredit Plaintiff in concert with Epstein and

others, including Ghislaine Maxwell, one of Epstein's long-time procurers, as part of a

20

conspiracy to discredit and try to silence Plaintiff. Epstein was particularly interested in

discrediting and silencing Plaintiff because he feared a reopening of a federal criminal

investigation of him.

53.     Defendant made his statements pursuant to his conspiracy with Epstein and

Maxwell maliciously as part of an effort to conceal sex trafficking crimes committed around the

world by Epstein and other powerful persons.

54.     Defendant intended his false and defamatory statements set out above to be

broadcast around the world and to intimidate and silence Plaintiff from making further efforts to

expose sex crimes committed by Epstein and other powerful persons, including Defendant.

55.     Defendant intended his false statements to be specific statements of fact.

Defendant's false statements were, as he intended, broadcast around the world and were

reasonably understood by those who heard them to be specific factual claims by Defendant that

he had not had sex with Plaintiff, that Plaintiff was intentionally lying about having sex with

Defendant, that Plaintiff committed the crime of perjury, that Plaintiff had committed the crime

of extortion, and that Plaintiff had intentionally fabricated her assertions about Defendant to

extort money from others.

56.     Epstein also worked with other of his lawyers to attack Plaintiff's allegations,

including in a false statement they made in a letter to the editor to the New York Times asserting:

"The number of young women involved in the investigation has been vastly exaggerated, there

was no 'international sex-trafficking operation' and there was never evidence that Mr. Epstein

'hosted sex parties' at his home." Kenneth W. Starr, Martin G. Weinberg, Jack Goldberger, and

Lilly Ann Sanchez, *Jeffrey Epstein's Attorneys: A Fair Plea Deal*, NY TIMES (Mar. 4, 2019),

https://nyti.ms/2EGHpnf.

G.   **Defendant's Lies**

57.    From the beginning, Defendant has sought to hide his crimes behind a curtain of

lies. In response to Plaintiff's description of Defendant's participation in Epstein's sex

trafficking, Defendant began a series of intentional, outright lies designed to distance himself

from Epstein, to cover up his own wrongdoing, and to discredit Plaintiff and intimidate her into

silence.

58.    Defendant's repeated lies are compelling evidence both of his lack of credibility

and his guilt. Only a person seeking to conceal improper conduct would have engaged in the

pattern of lies which has characterized Defendant's statements since his sex trafficking was

revealed.

59.    In an attempt to conceal his relationship with Epstein, Defendant in January 2015

asserted that "my relationship with him was entirely professional. It is a total bum rap to say that

I…was 'chummy' with him." That was a lie, as Defendant knew (*see*, *e.g.*, paragraphs 34–35).

60.    Both to conceal Defendant's relationship with Epstein and to discredit Plaintiff,

Defendant has repeatedly asserted that he was not at Epstein's residence in Palm Beach at all

during the period when Plaintiff was trafficked. However, Juan Alessi, a long time Epstein

household employee whose tenure with Epstein included the period of Plaintiff's trafficking, has

confirmed that Defendant visited Epstein "pretty often. I would say at least four or five times a

year" and that he would "typically" stay two or three days. Similarly, Alfredo Rodriguez, who

worked for Epstein in Palm Beach approximately only six months several years later, confirmed

that during that six-month period, Defendant visited Epstein twice.

61.    Again, both to conceal his relationship with Epstein and to discredit Plaintiff,

Defendant has repeatedly asserted that he was never in Epstein's residence in the presence of

young women. As Defendant knows, that assertion was also false. As Mr. Rodriguez has confirmed, there were "also young ladies in the house at the time he [Defendant] was there." Mr. Rodriguez also confirmed that "Mr. Dershowitz was there" when "women came to Mr. Epstein's home to give a massage." Mr. Rodriguez also confirmed that "Alan Dershowitz was at the house" with "the local Palm Beach girls" whom he was "told to call masseuses," although he did not himself know whether Dershowitz personally received a massage.

62.     Maria Farmer was an employee of Epstein responsible for manning the front door at his New York mansion and keeping records of people who came to the home.

(a)     Ms. Farmer witnessed a number of school-age girls coming to the house; some of the young girls would be wearing their school uniforms and would be escorted upstairs.

(b)     Ms. Farmer was told these young girls were interviewing for modeling positions even though it did not seem credible to her that these young girls were interviewing for modeling positions.

63.     Ms. Farmer asserts that she witnessed Defendant visit Epstein at his New York mansion a number of times when she was working for Epstein. Defendant was very comfortable at the home and would come in and walk upstairs. On a number of occasions, she witnessed Defendant going upstairs at the same time there were young girls under the age of 18 who were present upstairs in the house.

64.     Ms. Farmer, like other victims of, and witnesses to, Epstein's and Defendant's sex trafficking and abuse, has been subjected to attacks and intimidations. Her courageous testimony, together with the sworn testimony of victims such as Sarah Ransome and witnesses such as Mr. Alessi and Mr. Rodriguez, show that Defendant's claims that he was never present where

Plaintiff was trafficked and never in the presence of young girls are lies intended to cover up his culpability.

65.    Again, both to conceal his relationship with Epstein and to discredit Plaintiff, Defendant has repeatedly asserted that he has records that prove that it would have been "impossible" for him to be with Plaintiff because he was never in the same place and time as Plaintiff. As Defendant knew, that too was a lie. The testimony of Epstein's household staff establishes that Defendant was repeatedly present at Epstein's residence. Even Defendant's own selected, incomplete, and apparently revised, records demonstrate that Defendant was present at locations where Plaintiff was with Epstein.

66.    Defendant's assertion that Plaintiff accused him of having sex with her only after her lawyers convinced her to do so in late 2014 is not only false, as Defendant knows, but thoroughly disproved by the record.

67.    Plaintiff had identified Defendant as a participant in her sexual abuse at the time it occurred. She did so again in 2009. In 2010, Epstein's co-conspirators were repeatedly asked about Defendant. For example:

      (a)    Adriana Ross refused to answer on Fifth Amendment grounds whether "Alan Dershowitz stays at Jeffrey Epstein's house . . . when underage minor females have been in the bedroom with Jeffrey Epstein".

      (b)    Nadia Marcinkova refused to answer on Fifth Amendment grounds: "Alan Dershowitz is also somebody that you also know to have been at the house when L.M. was being sexually abused in Jeffrey Epstein's bedroom, correct?"

68.    In 2011, lawyers for Edwards wrote Defendant:

     (a)     On August 23, 2011: "We…have reason to believe that you have personally observed Jeffrey Epstein in the presence of underage females."

     (b)     On September 7, 2011: "Multiple individuals have placed you in the presence of Jeffrey Epstein on multiple occasions and in various locations when Jeffrey Epstein was in the company of underage females subsequently identified as victims of Mr. Epstein's criminal molestations."

69.     Defendant lied and stated that he had never flown on Epstein's plane with a young woman and always flew with his wife. *See* Hala Gorani, *Alan Dershowitz: Lawsuit claims 'utterly untrue'*, CNN (Jan. 5, 2015), https://cnn.it/2SbaAXU. However, even the limited publicly available flight logs of Epstein's private plane demonstrate that Defendant flew often on Epstein's planes without his wife; with young women, including a Victoria's Secret model; with Epstein's co-conspirator and procurer Ghislaine Maxwell; and Sarah Kellen who was identified by the Government as Epstein's co-conspirator in his sex-trafficking.

70.     Defendant also lied by saying that he "never" got a massage from anybody: "I never got a massage from anybody. It's made up out of whole cloth." Dareh Gregorian, *Alleged 'sex slave' Virginia Roberts says she didn't have sex with former President Bill Clinton, but in explosive court filing, details 11-person orgy with Prince Andrew and others*, NY DAILY NEWS (Jan. 21, 2015), https://bit.ly/2Z3gX0K. However, after it was revealed that Epstein's household staff identified Defendant as one of the recipients of "massages" at Epstein's Palm Beach mansion, Defendant changed his story and admitted he got a massage at Epstein's Palm Beach home but claimed: **"I kept my underwear on during the massage."** Bob Norman, *Alan Dershowitz: 'Sex slave' accuser is serial liar, prostitute,* LOCAL 10 NEWS (Jan. 22, 2015), https://bit.ly/36YraOR.

71.     Defendant lied and said he never saw any naked pictures of females in Epstein's Palm Beach home during his many visits, yet the police footage that was obtained from the search of Epstein's home proves that there were naked pictures of females throughout the home, including in the common areas.

72.     Defendant also lied to attempt to deflect Sarah Ransome's revelations about him. Ms. Ransome revealed that during the time she was a victim of Epstein's sex trafficking, Epstein arranged for his lawyer, Defendant, to also represent Ms. Ransome. Ms. Ransome also described how, during the time Defendant was her lawyer, Epstein lent her out to Defendant for sex.

73.      Defendant asserted that he never had sex with Ms. Ransome, that he never represented Ms. Ransome, that he did not even know Ms. Ransome, and that Ms. Ransome's statements about him were fabricated by Plaintiff's lawyer in retaliation for a bar complaint that Defendant had filed against that lawyer. However, as Defendant knew:

> (a)     He did have sex with Ms. Ransome.
>
> (b)     He was Ms. Ransome's lawyer.

74.     Ms. Ransome's statements about her involvement with Defendant preceded any contact with Plaintiff's lawyers. For example, Ransome's first contact with any of Plaintiff's lawyers was in November 2016, and at least as early as October 2016, Ransome had identified Defendant in writing to a reporter as someone who had had sex with one or more of the girls provided by Epstein and that Epstein had arranged for Defendant to be Ransome's lawyer.

## H.     Defendant's Conspiracy Theory

75.     In a desperate attempt to deflect attention from his own misconduct, Defendant fabricated an extortion plot by Plaintiff and her lawyers. Defendant falsely told the media that he was being used by Plaintiff and her lawyers as a pawn to extort money from a billionaire

business mogul and colleague of Epstein. Defendant claims that he was framed in order to send a message to the billionaire that this is what would happen to the billionaire if the billionaire did not pay Plaintiff and her lawyers. As Defendant knew:

      (a)    No complaint was ever made against the billionaire.

      (b)    No money was either paid by or demanded from the billionaire.

      (c)    There was no such extortion plot.

76.    Defendant also falsely claimed that Plaintiff's lawyer had told him that he had concluded that Plaintiff was "wrong" and "simply wrong" in accusing Defendant. Defendant, in violation of the canons of ethics and in at least one case in violation of federal and state law, surreptitiously tape-recorded confidential settlement negotiations in which he had engaged with Plaintiff's lawyer, David Boies.

77.    During these conversations, Boies was acting as Plaintiff's lawyer and agent, and neither he nor she consented to the recording.

78.    Defendant then played and/or described excerpts from those tapes out of context to reporters and in court filings to make it appear that Plaintiff's lawyer's hypothetical comments and characterizations of Defendant's assertions represented that lawyer's conclusions. As the sworn testimony of Defendant's own lawyer and the facts set forth below demonstrate, Defendant's assertions about what Plaintiff's lawyer said are, again, false.

79.    In May 2015, Defendant requested confidential settlement negotiations with Plaintiff's lawyers in which Defendant sought to convince Plaintiff's lawyers that Plaintiff was mistaken, and that the person to whom Epstein had lent Plaintiff was Nathan Myhrvold, not Defendant. Defendant claimed that from 1999-2002, he had not visited Epstein's Palm Beach home, that he had never been in the vicinity of Epstein's island, and that he had been at Epstein's

New Mexico ranch only once for a few hours (with his family). Defendant provided a summary of his whereabouts during the period from 1999–2002 that purported to prove that his assertions were true.

80. Defendant was told that, based on what was shown in his travel summary, it would have been impossible for Plaintiff's assertions about him to be true, and that if his assertions proved out, Plaintiff's lawyers would undertake to convince her that she must have made a mistake.

(a) Defendant was also told, however, (i) that his assertions would have to be proven, (ii) that Plaintiff had always been very clear that she recalled having had sex with Defendant multiple times, and (iii) that everyone was convinced that Plaintiff was telling the truth as she recalled it.

(b) Defendant responded that he did not doubt that Plaintiff was telling the truth as she recalled it and that she would have no difficulty passing a lie detector test. He said he simply believed Plaintiff had made an honest mistake in confusing him with Nathan Myhrvold.

81. Following Defendant's presentations, Defendant's representations were investigated and repeatedly proven false.

(a) Defendant's alleged backup for his travel summary proved to be incomplete, inconsistent, and in some instances, apparently altered.

(b) Defendant's key claims about the frequency with which he visited Epstein's houses were proven false, including by the testimony of Epstein's household employees Mr. Alessi (*see* paragraph 60 above) and Mr. Rodriguez

(*see* paragraphs 60–61 above), as well as the testimony of Ms. Ransome and Ms. Farmer.

(c)     Defendant's claim that Plaintiff confused him with Nathan Myhrvold was tested by showing Plaintiff pictures of both. She confirmed that it was Defendant, not Myhrvold, with whom she had sex.

(d)     Defendant's claim he had never been on Epstein's plane without his wife was proven false by plane logs.

(e)     Defendant's claim that he had never seen pictures of young females at Epstein's house was proven false by Palm Beach police and FBI reports.

(f)     Defendant's claim that he had never been in the presence of young females was proven false by the testimony of Epstein's household employee (*see* paragraphs 60–61) and of young women themselves.

82.     After Defendant's claimed proof of exonerating evidence collapsed, and the evidence of his guilt grew, Plaintiff's lawyers told Defendant in writing that they "had discovered evidence inconsistent with some of [your] representations," and that his travel "records were incomplete."

83.     Plaintiff's lawyer explicitly told Defendant that neither Plaintiff nor her lawyer would make any statement saying or implying that Plaintiff was mistaken in her charge that Defendant participated in her sexual trafficking and abuse.

84.     Faced with the mounting evidence of his guilt, Defendant abandoned his attempt to get Plaintiff or her lawyer to concede a mistake or that Plaintiff had been wrong, and desperately sought even a suggestion that an error was "possible."

85.     In December 2015, Plaintiff's lawyers again told Defendant that "Virginia is adamant about her current recollection" and that neither Plaintiff nor her lawyers believed she was mistaken in identifying Defendant as one of the men to whom Epstein had lent her out for sex. In response, Defendant did not claim that Plaintiff's lawyers had told him that they did not believe her.

86.     Instead, the morning of December 9, 2015, Defendant pleaded: "David, Have we given up on a mutually acceptable statement from VR or you. Let's keep trying. We are not that far apart." When Plaintiff's lawyer did not immediately respond, Defendant wrote later the same day:

> We should be aiming at a short simple statement such as: "The
> events at issue occurred approximately 15 years ago when I was a
> teenager. Although I believed then and continued to believe that AD
> was the person with whom I had sex, recent developments raise the
> possibility that this may be a case of mistaken identification."

Defendant went on to write: "It would be acceptable if the statement came from you rather than her, if she prefers."

87.     Wholly absent at this point was any assertion by Defendant that Plaintiff was lying, or that she made up her charge as part of an extortion claim, or that after investigating his alleged evidence Plaintiff's lawyer did not believe her. On the contrary, Defendant expressly recognized that Plaintiff's belief was an honest one. All Defendant was pleading for was an acknowledgement that there was a "possibility" that there "may be" a case of mistaken identification.

88. Defendant has played selective portions of his recordings to members of the press in an effort to persuade the public that Plaintiff's lawyers disbelieve her. He has also made sworn representations concerning the contents of the tape to the Court. In his statements, Defendant conspicuously omits any reference to the statements by Plaintiff's lawyers after they had investigated his representations and concluded that they were false.

89. Defendant's present PR claim that Plaintiff's lawyers disbelieved their client, and that Plaintiff intentionally committed perjury as part of an extortion scheme, is just another Defendant lie. His reliance on statements from settlement negotiations that have been taken out of context, his failure to include the statements of Plaintiff's lawyer after Defendant's supposed evidence had been investigated, and the damning admissions of his own lawyer, reveal Defendant's total lack of support for his allegation that Plaintiff and her lawyers concocted knowingly false allegations against him as part of a supposed extortion plot.

90. Further belying his conspiracy theory, Defendant settled the case against him brought by Plaintiff's then-lawyers Edwards and Cassell accusing him of defamation for publishing false accusations that they conspired with Plaintiff to fabricate her claims.

91. After the settlement, Defendant told the media he had been vindicated, while at the same time insisting that the terms of the settlement remains confidential. Edwards and Cassell responded: "Following the announcement of the settlement of defamation claims against Alan Dershowitz, he has been making public statements suggesting that he has prevailed in the lawsuit and that the terms of the settlement exonerate him of any wrongdoing. Those statements are at best misleading. It is a mistake for anyone to conclude based upon Mr. Dershowitz's statements that the case against him was abandoned due to lack of factual support. It is a mistake for anyone to conclude based upon Mr. Dershowitz's statements that Bradley Edwards and Paul

Cassell had determined that the allegations against Alan Dershowitz made by Virginia Roberts Giuffre were false or unfounded. Neither the terms of settlement nor the agreed upon joint public statement issued as part of the settlement support any such conclusions, and it is false to state or suggest otherwise." *Dershowitz Settles Sex Case, But Is He Vindicated?*, THE AMERICAN LAWYER (Apr. 10, 2016), https://bit.ly/2tAuSQd.

92.     Defendant continues to this day to insist that the terms of his settlement with Edwards and Cassell remain confidential—a position that can be explained only by Defendant's knowledge that revealing how much he had paid to avoid a trial of the allegations against him would confirm his guilt.

93.     As described above, Dershowitz has also repeatedly asserted that he wanted to have a trial to establish his innocence. By contrast, he settled the case that would have provided that trial (and refuses to disclose the amount paid to the plaintiffs). He even lied about his being willing to waive the statute of limitations so that Plaintiff could sue him for sex abuse—a lie almost immediately exposed when he was promptly asked to do so and refused.

## COUNT I DEFAMATION

94.     Plaintiff re-alleges paragraphs 1–93 as if the same were fully set forth herein. Defendant made his false and defamatory statements deliberately and maliciously with the intent to intimidate, discredit and defame Plaintiff.

95.     In November 2018, and thereafter, Defendant intentionally and maliciously released to the press his false statements about Plaintiff in an attempt to destroy Plaintiff's reputation and brand her as a liar and extortionist and also to cause her to lose all credibility in her efforts to help victims of sex trafficking.

96.     Defendant knew that his assertions would dilute, discredit, and neutralize Plaintiff's public and private messages to sexual abuse victims and ultimately prevent Plaintiff from effectively providing assistance and advocacy on behalf of other victims of sex trafficking, or exposing her abusers.

97.     Using his role as a powerful lawyer with powerful friends, Defendant's statements were published nationally and internationally for the malicious purpose of further damaging Plaintiff, a sexual abuse and sex trafficking victim; to destroy Plaintiff's reputation and credibility; to cause the world to disbelieve Plaintiff; and to destroy Plaintiff's efforts to use her experience to help others suffering as sex trafficking victims.

98.     Defendant, personally, intentionally, and maliciously made false and damaging statements of fact concerning Plaintiff, as detailed above, in the Southern District of New York and elsewhere.

99.     The false statements that Defendant made not only called Plaintiff's truthfulness and integrity into question, but also exposed Plaintiff to public hatred, contempt, ridicule, and disgrace.

100.     At the time Defendant made his false statements, he knew full well that they were completely false and defamatory.

101.     Defendant's false statements constitute libel and/or slander, as he knew that they were going to be transmitted in writing, widely disseminated on the internet and in print. Defendant intended his false statements to be published by newspaper, television, radio, and other media outlets nationally and internationally, and they were, in fact, published globally, including within the Southern District of New York.

102.     Defendant's false statements constitute libel per se and/or slander per se because they accuse her of crimes including perjury and extortion, and because they expose Plaintiff to public contempt, ridicule, aversion, and disgrace, and induced an evil opinion of her in the minds of right-thinking persons.

103.     Defendant's false statements also constitute libel per se and/or slander per se, inasmuch, among other reasons, as they tended to injure Plaintiff in her professional capacity as the president of a non-profit corporation designed to help victims of sex trafficking, and inasmuch as they destroyed her credibility and reputation among members of the community that seeks her help and that she seeks to serve.

104.     Defendant's false statements directly stated and also implied that in speaking out against sex trafficking Plaintiff acted with fraud, dishonesty, and unfitness for the task. Defendant's false statements directly and indirectly assert that Plaintiff lied about being sexually trafficked and abused by Epstein and having sex with Defendant, all for the purpose of extorting money from wealthy third parties, and that Plaintiff committed and conspired with her lawyers to commit the crimes of perjury and extortion. Defendant's false statements were reasonably understood by many persons who read, and/or heard, and/or witnessed his statements as conveying that specific intention and meaning.

105.     Defendant's false statements were reasonably understood by many persons who read, and/or heard, and/or witnessed those statements as making specific factual claims that Plaintiff was lying about specific facts and that she committed the crimes of perjury and extortion and conspired with her lawyers to commit those crimes.

106.     Defendant specifically directed his false statements at Plaintiff's true public description of factual events, and many persons who read Defendant's statements reasonably

34

understood that those statements referred directly to Plaintiff's account of the abuse she suffered at the hands of Epstein and Defendant.

107.    Defendant intended Defendant's false statements to be widely published and disseminated in his book, on television and radio, through newspapers and other print media, by word of mouth, and on the internet and other electronic media. As intended by Defendant, Defendant's false statements were published and disseminated around the world.

108.    Defendant made his false statements in reckless disregard of their truth or falsity and with malicious intent to destroy Plaintiff's reputation and credibility; to prevent her from further disseminating her life story; and to cause persons hearing or reading Plaintiff's descriptions of truthful facts to disbelieve her entirely. Defendant knew that his defamatory statements were false and/or entertained serious doubts as to their truth when he made them. Defendant made his false statements wantonly and with the specific intent to maliciously damage Plaintiff's good name and reputation in a way that would destroy her efforts to administer her non-profit foundation, or share her life story, and thereby help others who have suffered from sexual abuse.

109.    As a result of Defendant's campaign to spread false, discrediting, and defamatory statements about Plaintiff, Plaintiff suffered substantial damages in an amount to be proven at trial.

110.    Defendant's false statements have caused, and continue to cause, Plaintiff economic damage, psychological pain and suffering, mental anguish and emotional distress, and other direct and consequential damages and losses.

111.    Defendant's campaign to spread his false statements nationally and internationally was unusual and particularly egregious conduct. Defendant and Epstein sexually abused and

trafficked Plaintiff, conspired to avoid having these crimes properly prosecuted and discovered, and Defendant wantonly and maliciously set out to falsely accuse, defame, and discredit Plaintiff to deny and conceal the scope and scale of his crimes and wrongdoing. In so doing, Defendant's efforts constituted a public wrong by deterring, damaging, and setting back Plaintiff's efforts to help victims of sex trafficking. Accordingly, this is a case in which exemplary and punitive damages are appropriate.

112.    Punitive and exemplary damages are necessary in this case to deter Defendant and others from wantonly and maliciously using a campaign of lies to discredit Plaintiff and other victims of sex trafficking.

## COUNT II BATTERY

113.    Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–93 as if fully set forth herein.

114.    Defendant intentionally committed battery by engaging in offensive and wrongful sexual intercourse with and abuse of Plaintiff without her consent.

115.    Plaintiff's action is timely under N.Y.C.P.L.R. § 214-g, which provides that "[n]otwithstanding any provision of law which imposes a period of limitation to the contrary . . . every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, . . . which conduct was committed against a child less than eighteen years of age, which is barred as of the effective date of this section because the applicable period of limitation has

expired . . . is hereby revived . . . ." Defendant's actions constitute sexual offenses as defined in New York Penal Law Article 130, including but not limited to:

    (a)    Sexual abuse as defined in Article 130.55, because during the battery, Defendant subjected Plaintiff to sexual contact under circumstances in which Plaintiff did not expressly or impliedly acquiesce in his conduct; and

    (b)    Forcible touching as defined in Article 130.52, because during the battery, Defendant forcibly touched Plaintiff's sexual parts for the purpose of gratifying his sexual desire, under circumstances in which Plaintiff did not expressly or impliedly acquiesce in his conduct.

116.    As a direct and proximate result of Defendant's acts, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and other direct and consequential damages.

117.    Because Defendant's conduct was wanton and malicious and violated criminal statutes, Plaintiff is entitled to punitive damages.

## COUNT III WIRETAP ACT

118.    Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–112 as if fully set forth herein.

119.    In 2015, Defendant surreptitiously taped one or more telephone calls and/or in-person meetings between himself and Boies. At the time, Boies was acting as Plaintiff's lawyer and agent. He engaged in the conversation on Plaintiff's behalf to discuss the merits of her claims and a potential settlement. Neither he nor Plaintiff consented to Defendant recording the conversation.

120.    Defendant is a "person" within the meaning of 18 U.S.C. §§ 2510(6), 2511(d).

121.    In violation of 18 U.S.C. § 2511(1)(a), Defendant intentionally intercepted or endeavored to intercept Plaintiff's wire, oral, or electronic communications by recording telephone calls between himself and Plaintiff's agent, Boies.

122.    In violation of 18 U.S.C. § 2511(1)(b), Defendant intentionally used an electronic, mechanical, or other device to intercept an oral communication by Plaintiff's agent, Boies, when Defendant knew or had reason to know that such device or a component thereof was sent through the mail or transmitted in interstate or foreign commerce.

123.    In violation of 18 U.S.C. § 2511(1)(c) and (d), Defendant intentionally disclosed to another person and used, or endeavored to use, the contents of Plaintiff's wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through an interception in violation of § 2511(1).

124.    Plaintiff's communications were intercepted for the purpose of committing the criminal act of perjury or a tortious act of defamation in violation of the laws of the United States and of New York.

125.    Plaintiff and her agent had a reasonable expectation that the communications would remain confidential and would not be intercepted.

126.    Plaintiff and her agent did not discover that the communications had been intercepted until the interception was reported in the press in November 2018.

127.    Neither Plaintiff nor her agent expressly or impliedly consented to the interception.

128.    Plaintiff had a justifiable expectation that her wire, oral, or electronic communications were not subject to interception.

129.    Plaintiff is a "person" whose wire, oral, or electronic communications were intercepted within the meaning of 18 U.S.C. § 2520.

130.    As a direct and proximate result of Defendant's actions, Plaintiff suffered injury to her reputation and her ability to vindicate her rights through the zealous representation by her counsel of choice, economic damage, psychological pain and suffering, mental anguish and emotional distress, and other direct and consequential damages and losses, and she is entitled to an award of the greater of the actual damages suffered or statutory damages pursuant to 18 U.S.C. § 2520(c).

131.    In light of the egregious nature of Defendant's violations, Plaintiff is entitled to punitive damages and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 2520(b)(2) & (3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendant, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial, but in excess of the $75,000 jurisdictional requirement; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated: April 14, 2020

/s/ Charles J. Cooper
Charles J. Cooper*
Michael W. Kirk*
Nicole J. Moss*
Haley N. Proctor*
COOPER & KIRK PLLC

1523 New Hampshire Ave. NW
 Washington, DC 74008
(202) 220-9600
*Admitted PHV