FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
INDEX NO. 160874/2019
NYSCEF DOC. NO. Case 1:19-cv-03377-LAP Document 125-7 Filed 05/29/20 Page 5 of 55
RECEIVED NYSCEF: 01/27/2020

Epstein, a multimillionaire hedge fund manager whose friends included a constellation of entertainers, politicians, business titans and royalty, for years <u>lured teenage girls to his Palm Beach mansion as part of a cult-like sex pyramid scheme,</u> police in the town of Palm Beach found.

The girls arrived, sometimes by taxi, for trysts at all hours of the day and night. Few were told much more than that they would be paid to give an old man a massage — and that he might ask them to strip down to their underwear or get naked. But what began as a massage often led to masturbation, oral sex, intercourse and other sex acts, police and court records show. The alleged abuse dates back to 2001 and went on for years.



Palm Beach multimillionaire Jeffrey Epstein has been a free man, despite sexually abusing dozens of underage girls according to police and prosecutors. His victims have never had a voice, until now.

BY **EMILY MICHOT** ✉ | **JULIE K. BROWN** ✉

In 2007, despite ample physical evidence and multiple witnesses corroborating the girls' stories, federal prosecutors and Epstein's lawyers quietly put together a remarkable deal for Epstein, then 54. He agreed to plead guilty to two felony prostitution charges in state court, and in exchange, he and his accomplices received

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
INDEX NO. 160874/2019
NYSCEF DOC. NO.
Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 2 of 55
RECEIVED NYSCEF: 01/27/2020

He served 13 months in a private wing of the Palm Beach County stockade. His alleged co-conspirators, who helped schedule his sex sessions, were never prosecuted.

The deal, called a federal non-prosecution agreement, was sealed so that no one — not even his victims — could know the full scope of Epstein's crimes and who else was involved. The U.S. attorney in Miami, Alexander Acosta, was personally involved in the negotiations, records, letters and emails show.

Acosta is now a member of President Donald Trump's Cabinet. As U.S. secretary of labor, he has oversight over international child labor laws and human trafficking and had recently been mentioned as a possible successor to former U.S. Attorney General Jeff Sessions, who resigned under pressure in early November. It was reported on Thursday, a day after this story posted online, that he was no longer in the running.



Case 1:19-cv-03377-LAP    Document 125-7    Filed 05/29/20    Page 3 of 55

HERRERA *TNS*

The Miami Herald <u>analyzed thousands of pages of court records and lawsuits</u>, witness depositions and newly released FBI documents, and also identified more than 80 women who say they were victimized. They are scattered around the country and abroad. Until now, those victims — today in their late 20s and early 30s — have never spoken publicly about how they felt shamed, silenced and betrayed by the very people in the criminal justice system who were supposed to hold Epstein accountable.

"How come people who don't have money get sent to jail — and can't even make bail — and they have to do their time and sit there and think about what they did wrong? He had no repercussions and doesn't even believe he did anything wrong,'' said Licata, now 30.



Michelle Licata, 30, is overcome with emotion while discussing her sexual encounters with Jeffrey Epstein. 'He had no repercussions and doesn't even believe he did anything wrong,' she said. Emily Michot

Case 1:19-cv-03377-LAP Document 125-7 Filed 05/29/20 Page 4 of 55

The series

Attorney's Office as victims of Epstein, now 65. But after the FBI case was closed in 2008, witnesses and alleged victims testified in civil court that there were <u>hundreds of girls who were brought to Epstein's homes</u>, including girls from Europe, Latin America and former Soviet Republic countries.

But Acosta and Epstein's armada of attorneys — Harvard professor Alan Dershowitz, Jay Lefkowitz, Gerald Lefcourt, Jack Goldberger, Roy Black, Guy Lewis and former Whitewater special prosecutor Kenneth Starr — reached a consensus: Epstein would never serve time in a federal or state prison.

**Read Next**

LOCAL

Sex abuser Jeffrey Epstein was surrounded by powerful people. Here's a sampling

NOVEMBER 28, 2018 8:00 AM

## POLICE UNDER PRESSURE

There were really just two people willing to risk their careers to go after Epstein: Palm Beach Police Chief Michael Reiter and Detective Joseph Recarey.

For Reiter, business tycoon Jeffrey Epstein wasn't any more formidable than any of the other 8,000 or so wealthy and powerful people living on the island. Police had handled sensational cases involving wealthy residents before — from the murders of heiresses to the rape case involving William Kennedy Smith, of the Kennedy family.

The easternmost town in Florida, Palm Beach is a 10.4-square-mile barrier island between the Intracoastal Waterway and the Atlantic Ocean populated by some of the richest people in the country. President Trump has his "winter White House" in Palm Beach, and the town makes news as much for its glitz as it does for its unusual efforts to preserve its well-mannered image, like banning shirtless joggers.

But it was a little surprising, even to Reiter, to learn that one of its residents had a revolving door of middle and high school girls coming to his gated compound throughout the day and night.

1/27/2020                    How a future Trump cabinet member gave a serial sex abuser the deal of a lifetime | Miami Herald
Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 9 of 55

pressured by then-Palm Beach State Attorney Barry Krischer to downgrade the case to a misdemeanor or drop it altogether.



Former Palm Beach County Police Detective Joseph Recarey was the lead detective on the solicitation-of-minors case against the multimillionaire Epstein. Emily Michot *EMICHOT@MIAMIHERALD.COM*

Between March of 2005 — when the case was opened — and seven months later, when police executed a search warrant at Epstein's home, Recarey had identified 21 possible victims, according to a copy of the unredacted police report obtained by the Herald. By the time police felt they had enough evidence to arrest Epstein on sex charges, they had identified about 35 possible underage victims and were tracking down at least a dozen more, the police report said.

"I was surprised at how quickly it snowballed. I thought at some point there would be a last interview, but the next victim would supply me with three or four more

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
INDEX NO. 160874/2019
NYSCEF DOC. NO. Case 1:19-cv-03377-LAP Document 125-7 Filed 05/25/20 RECEIVED NYSCEF: 01/27/2020

By then, word had gotten back to Epstein from some of the girls that they had been questioned by police. Epstein hired famed lawyer Alan Dershowitz.

"Alan Dershowitz flew down and met privately with Krischer," Recarey said. "And the shenanigans that happened, I don't think I've ever seen or heard of before."

Police reports show that Epstein's private investigators attempted to conduct interviews while posing as cops; that they picked through Reiter's trash in search of dirt to discredit him; and that the private investigators were accused of following the girls and their families. In one case, the father of one girl claimed he had been run off the road by a private investigator, police and court reports show.

# Support investigative journalism

The Miami Herald obtained thousands of FBI and court records, lawsuits, and witness depositions, and went to federal court in New York to access sealed documents in the reporting of "Perversion of Justice." The Herald also tracked down more than 60 women who said they were victims, some of whom had never spoken of the abuse before.

Your digital subscription, starting at $0.99 for the first month, supports investigative journalism like this.

CLICK TO SUBSCRIBE

Several of the girls said they felt intimidated and frightened by Epstein and Sarah Kellen, the millionaire's assistant and alleged scheduler of massages, who warned them not to talk to police, according to the police report.

Dershowitz, in an interview with the Herald, said he had nothing to do with gathering background on the girls — or in directing anyone to follow the police, or the girls and their families.

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM  INDEX NO. 160874/2019
NYSCEF DOC. NO.    Case 1:19-cv-03377-LAP  Document 125-7  Filed 05/29/20  Page 7 of 55   RECEIVED NYSCEF: 01/27/2020

The series

He nevertheless convinced Krischer that the girls would not be credible on the witness stand, according to Reiter and Recarey.

The defense team's investigators compiled dossiers on the victims in an effort to show that Epstein's accusers had troubled pasts.

Dershowitz met with Krischer and Recarey, sharing with them the results of an investigation into one of the girls, described by Dershowitz as "an accomplished drama student" who hurled profanities at his investigator at "a furious pace."

"Our investigation had discovered at least one of her websites and I am enclosing some examples ... the site goes on to detail, including photos, her apparent fascination with marijuana, " Dershowitz wrote in an undated letter to Recarey. He also disputed the claim that one of the defense team's private investigators had misrepresented himself as a police officer.

Recarey stood his ground.



According to Palm Beach police, State Attorney Barry Krischer was initially ready to prosecute a major case against Epstein, but ultimately lost interest.

"His attorneys showed us a MySpace page where one of the girls was holding a beer in her hand, and they said, 'oh look, she is underage drinking,' " Recarey recalled. "Well, tell me what teenager doesn't? Does that mean she isn't a victim because she drank a beer? Basically, what you're telling me is the only victim of a sexual battery could be a nun."

Krischer and the lead state prosecutor on the case, Assistant State Attorney Lanna Belohlavek, began to dodge Recarey and Reiter's phone calls and emails, and they dragged their feet on approving subpoenas, Reiter and Recarey said.

"Early on, it became clear that things had changed, from Krischer saying, 'we'll put this guy away for life,' to 'these are all the reasons why we aren't going to prosecute

The series

Krischer, who is now retired and in private practice, did not respond to multiple requests from the Herald for comment. Belohlavek also did not respond to an email sent to her office.

"It became apparent to me that some of our evidence was being leaked to Epstein's lawyers, who began to question everything that we had in our probable cause affidavit," Reiter said.

The day of the search on Oct. 20, 2005, they found that most of Epstein's computer hard drives, surveillance cameras and videos had been removed from the house, leaving loose, dangling wires, according to the police report.

But the girls' description of the house squared with what detectives found, right down to the hot pink couch and the dresser drawer of sex toys in Epstein's bathroom.

Reiter said his own trash was disappearing from his house, as his life was put under Epstein's microscope. Private investigators hired by Epstein's lawyers even tracked down Reiter's grade school teachers, the former chief said. Questions were raised about donations that Epstein had made to the police department, even though Reiter had returned one of the donations shortly after the investigation began.

Recarey, meanwhile, said he began to take different routes to and from work, and even switched vehicles because he knew he was being tailed.

"At some point it became like a cat-and-mouse game. I would stop at a red light and go. I knew they were there, and they knew I knew they were there. I was concerned about my kids because I didn't know if it was someone that they hired just out of prison that would hurt me or my family," Recarey said.

Despite relentless political pressure, Reiter and Recarey soldiered on, and their determination yielded evidence that supported most of the girls' allegations, the former cops said. They had phone records that showed Epstein and his assistant, Kellen, had called many of the girls. Epstein's flight logs showed that the calls were made when Epstein was in Palm Beach.

indication of Epstein's vast circle of influential friends. There were also messages from girls, and their phone numbers matched those of many of the girls Recarey had interviewed, Recarey said. They read: "Courtney called, she can come at 4," or "Tanya can't come at 7 p.m. tomorrow because she has soccer practice."

They also found naked photographs of underage girls in Epstein's closet, Recarey said.

There were also witnesses: Two of Epstein's butlers gave Recarey sworn interviews, confirming that young girls had been coming and going at the house. One of the butlers, Alfredo Rodriguez, told Recarey that when he was tasked with cleaning up the master bath after Epstein sessions with the girls, he often discovered sex toys. Once, he accidentally stumbled on a high school girl, whom he identified, sleeping naked in Epstein's spa, he testified in a 2009 court deposition.

Rodriguez said he was given the job of paying the girls, telling Recarey that he was "a human ATM machine" because he was ordered by Epstein to keep $2,000 on him at all times. He was also assigned to buy the girls gifts. Rodriguez gave Recarey copies of pages from a book that Epstein and his staff kept with the names and phone numbers for many of the Palm Beach County girls, Recarey said.

Rodriguez, however, held onto the bulk of Epstein's "little black book," and in November 2009 tried to sell it for $50,000 to an undercover FBI agent posing as a victim's lawyer. He was arrested and sentenced in 2012 to federal prison, and died three years later following an illness. The book — listing personal phone numbers for a cavalcade of Epstein's powerful friends and celebrities — eventually became public as part of a civil lawsuit. It listed more than 100 female names and phone numbers under the headings "massage" in every city where Epstein had homes.

In May 2006, Recarey drew up probable cause affidavits, charging Epstein, two of his assistants and one recruiter with sex-related crimes. Instead, Krischer took what Recarey said was the unusual step of referring the case to a state grand jury. Epstein was indicted in state court on a minor charge of solicitation of prostitution.

The series

police had lined up more than a dozen girls and witnesses at that time.

Believing that the case had been tainted, Reiter — that same month, May 2006 — took a very public stance against Krischer, writing a letter, which was released to the news media, calling on Krischer to remove himself from the case. The chief then referred it to the FBI, which opened its own investigation in July 2006, FBI records show.

Reiter said he was effectively blackballed in some Palm Beach circles as a result of going over Krischer's head, and their relationship, once strong, would never be the same.

Reiter has no regrets about what he did.

"There are challenges here that don't exist in a lot of other places because of the affluence in the community, but the only way I could approach this case was that none of that matters. The truth is still the truth. The facts are the facts. Everybody is treated the same.''

In the years that followed, several of the victims obtained lawyers and filed civil lawsuits against Epstein. About two dozen lawsuits were filed, starting in 2008. The early cases were particularly brutal for his victims, the court records show. The girls faced fierce grilling from another pack of Epstein's civil attorneys, who questioned them about their boyfriends, drinking, drug use, social media posts, their parents and even their medical histories.

One girl was asked about her abortions, and her parents, who were Catholic and knew nothing about the abortions, were also deposed and questioned.

Licata said the questions from Epstein's civil lawyers were so intimate that she became paranoid that people were following her.

"His lawyers were just in my life inside and out. They asked if I had a baby, if I had an abortion, 'did you sleep with 30 different guys' and 'do you think that played a part?' I said, 'you're going to come at me like that when you represent a guy who is doing this to hundreds of girls? How do you sleep at night?' "

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM    INDEX NO. 160874/2019
NYSCEF DOC. NO. Case 1:19-cv-03377-LAP Document 125-7 Filed 05/29/20 Page 11 of 55 NYSCEF: 01/27/2020

The series

jersey. Epstein was born in Brooklyn, the son of a New York parks department worker. In one of several depositions he gave as part of the lawsuits filed against him, he said he attended the Cooper Union school for the advancement of science and art and then studied physics at New York University. But he never obtained a degree, instead going on to teach at the Dalton School, an elite K-12 private academy on Manhattan's Upper East Side. Various news profiles over the years have speculated about how he made his vast fortune, calling him an "International Moneyman of Mystery" and "The Talented Mr. Epstein."

He then struck out on his own, opening J. Epstein & Co. His fortunes improved when he became a financial advisor for Leslie Wexner, founder of The Limited stores and owner of Victoria's Secret brands. Later, Epstein would boast that he would manage the portfolios of only those clients who had $1 billion or more. This much is known: He got his start on Wall Street after being offered a job by the father of one of his students. At Bear Stearns, he became a derivative specialist, applying complex math formulas and computer algorithms to evaluate financial data and trends.

Through Wexner, he acquired a seven-story stone mansion that is considered the largest private residence in Manhattan — a 21,000-square-foot fortress with heated sidewalks that spans the entire block on 71st Street between Fifth and Madison Avenues.

He also owns a 10,000-acre ranch, named "Zorro," in New Mexico, a private island called "Little St. James" in the Virgin Islands, the $13 million house in Palm Beach, a Gulfstream jet and, at one point, owned a Boeing 727.

He has never been in the Forbes 400 list of the wealthiest Americans, largely because the magazine has never been able to determine the source or the size of his wealth.

He has been dogged by questions about his financial dealings. A former business partner, Steven Hoffenberg, sued him in 2016, claiming that Epstein was the mastermind behind a $500 million Ponzi scheme that Hoffenberg was imprisoned for in 1995. Hoffenberg served

The series

In August, two of Hoffenberg's former investors rekindled the lawsuit against Epstein, but the case was dropped in October.

Epstein and his associate, British-born socialite Ghislaine Maxwell, were also accused in a 2015 federal civil suit of organizing underage sex parties on his private plane, nicknamed "The Lolita Express," and at Epstein's various homes. Maxwell, who has never been charged with wrongdoing, has denied allegations made in the lawsuit that she was Epstein's "madam." The suit, filed by victim Virginia Roberts, was settled in 2017.



Virginia Roberts says she was used as a sex slave for Jeffrey Epstein for years starting at the age of 16. Roberts says that Epstein also lent her out to some of his wealthy, powerful acquaintances for sex.
*COURTESY OF VIRGINIA ROBERTS*

Virginia Roberts was working at Mar-a-Lago when she was recruited to be a masseuse to Palm Beach hedge fund manager Jeffrey Epstein. She was lured into a life of depravity and sexual abuse. BY **EMILY MICHOT** ✉ | **JULIE K. BROWN** ✉

The series

Spacey, comedian Chris Tucker and others to South Africa on his private jet as part of a fact-finding AIDS mission in support of the Clinton Foundation.

But Epstein, a Clinton donor who contributed hundreds of thousands of dollars to Democratic candidates and causes, realized that his Democratic connections weren't going to help him in 2006, when the federal prosecutor was Acosta, a conservative Republican appointed during the George W. Bush administration.

## ENTER KENNETH STARR

Epstein's tactic: hire the most aggressive and politically connected lawyers that his money could buy.

At the top of his list: Kenneth Starr, a Republican icon because of his pursuit of Bill Clinton during the Whitewater investigation, which led to the impeachment (but not conviction) of the president after it was revealed he'd had sex with a young White House intern. Like Acosta, Starr had worked at the prestigious law firm Kirkland & Ellis. Epstein also tapped Jay Lefkowitz, also of Kirkland, who worked as a domestic policy advisor and later as a special envoy to North Korea during the George W. Bush presidency.

Epstein also hired Bruce Reinhart, then an assistant U.S. attorney in South Florida, now a U.S. magistrate. He left the U.S. Attorney's Office on Jan. 1, 2008, and went to work representing Epstein's employees on Jan. 2, 2008, court records show. In 2011, Reinhart was named in the Crime Victims' Rights Act lawsuit, which accused him of violating Justice Department policies by switching sides, implying that he leveraged inside information about Epstein's investigation to curry favor with Epstein.



Reinhart, in a sworn declaration attached to the CVRA case, denied the allegation, saying he did not participate in Epstein's criminal case and "never learned any confidential, non-public information about the Epstein matter."

Kenneth Starr, who as independent counsel built an

Case 1:19-cv-03377-LAP Document 125-7 Filed 05/29/20 Page 14 of 55

The series

about the case.

Contacted for this story, Reinhart, in an email, said he never represented Epstein — only Epstein's pilots; his scheduler, Sarah Kellen; and Nadia Marcinkova, described by some victims as Epstein's sex slave. Reinhart also pointed out that a complaint filed against him by victims' lawyer Paul Cassell was dismissed by the Justice Department.

That same year, 2011, more girls continued to come forward, including Roberts, who claimed in a British tabloid story that Epstein directed her — while she was underage by Florida standards — to have sex, not only with him, but with other powerful men, including his attorney, Alan Dershowitz, and Prince Andrew. Dershowitz and Andrew denied her claims, but after she filed a sworn affidavit in federal court in Miami, the ensuing news media firestorm forced Acosta, then dean of the law school at Florida International University, to explain why he'd declined to prosecute Epstein.



...having sex with an intern, joined the legal team fighting to keep Epstein out of prison. ERIC GAY *AP*

Bruce Reinhart left the U.S. Attorney's Office on Jan. 1, 2008, and went to work representing Epstein's employees on Jan. 2, 2008, court records show. *PR NEWSWIRE*

In a written, public statement on March 20, 2011, Acosta asserted that the deal he struck with Epstein's lawyers was harsher than it would have been had the case remained with the state prosecutor, Krischer, who favored charging Epstein with only a misdemeanor prostitution violation.

Acosta also described what he called a "year-long assault" on prosecutors by Epstein's "army of legal superstars" who, he said, investigated individual prosecutors and their families, looking for "personal peccadilloes" to disqualify them from Epstein's case.

Dershowitz, in an interview, denied that Epstein's lawyers would ever investigate prosecutors.

The series

case, even as the FBI was uncovering evidence of victims and witnesses in other states, FBI and federal court documents show.

A 53-page federal indictment had been prepared in 2007, and subpoenas were served on several of Epstein's employees, compelling them to testify before a federal grand jury. The court records reveal that emails began to fly back and forth between prosecutors and Epstein's legal team. Those emails show that federal prosecutors kept acquiescing to Epstein's demands.

Prosecutors allowed Epstein's lawyers to dictate the terms of each deal that they drew up, and repeatedly backed down on deadlines, so that the defense essentially controlled the pace of the negotiations, the emails and letters show.

It's clear, from emails and other records, that prosecutors spent a lot of time figuring out a way to settle the case with the least amount of scandal. Instead of charging Epstein with a sex offense, prosecutors considered witness tampering and obstruction charges, and misdemeanors that would allow Epstein to secretly plead guilty in Miami instead of in Palm Beach County, where most of the victims lived, thereby limiting media exposure and making it less likely for victims to appear at the sentencing.

"I've been spending some quality time with Title 18 [the U.S. criminal code] looking for misdemeanors," the lead prosecutor, A. Marie Villafaña, wrote to Epstein's lawyers on Sept. 13, 2007, adding that she was trying to find "a factual basis" for one or more non-sex-related crimes to charge him with.

The email chain shows that prosecutors sometimes communicated with the defense team using private emails, and that their correspondence referenced discussions that they wanted to have by phone or in person, so that there would be no paper trail.

"It's highly unusual and raises suspicions of something unethical happening when you see emails that say 'call me, I don't want to put this in writing.' There's no reason to worry about putting something in writing if there's nothing improper or unethical in the case," said former federal prosecutor Francey Hakes, who worked in the Justice Department's crimes against children unit.

the U.S. Attorney's Office to keep the agreement secret, even though under the Crime Victims' Rights Act, prosecutors were required to inform the victims that a plea deal had been signed.

"We ... object to your sending a letter to the alleged victims," Lefkowitz wrote on Nov. 28. "... Any such letter would immediately be leaked to the press, your actions will only have the effect of injuring Mr. Epstein and promoting spurious civil litigation directed at him. We also request that if your office believes that it must send a letter to go to the alleged victims ... it should happen only after Mr. Epstein has entered his plea."



The girls who were abused by Jeffrey Epstein and the cops who championed their cause remain angry over what they regard as a gross injustice, while Epstein's employees and those who engineered his non-prosecution agreement have prospered. BY MARTA OLIVER CRAVIOTTO ✉ | EMILY MICHOT ✉ | JULIE K. BROWN ✉

By December, Epstein had still not agreed to a date for his plea hearing, and was technically in violation of the September agreement, which required him to appear in court by November, Acosta noted in a letter to Kenneth Starr in December 2007.

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM    INDEX NO. 160874/2019
NYSCEF DOC. NO.    Case 1:19-cv-03377-LAP  Document 125-7  Filed 05/29/20  Page 17 of 55    RECEIVED NYSCEF: 01/27/2020

The series

Acosta wrote. "It appears to them that as soon as resolution is reached on one issue, defense counsel finds ways to challenge the resolution collaterally. ... Some in our office are deeply concerned that defense counsel will continue to mount collateral challenges to provisions to the agreement, even after Mr. Epstein has entered his guilty plea and thus rendered the agreement difficult, if not impossible, to unwind."

And that's exactly what happened.

Villafaña frequently showed her frustration.

"I thought we had worked very well together in resolving this dispute. ... I feel that I bent over backwards to keep in mind the effect that the agreement would have on Mr. Epstein," Villafaña wrote to Epstein attorney Lefkowitz on Dec. 13, 2007.

By then the deal had been signed for two months, and Jeffrey Sloman, Acosta's top assistant, told Lefkowitz he intended to begin notifying Epstein's victims.

An indignant Lefkowitz wrote to Acosta, objecting strenuously, and reminding him of his earlier pledge not to have his staff contact the young women.



As the months went on, with the agreement still in limbo, federal prosecutors once again began to prepare indictments against Epstein, court records show. The FBI investigation briefly resumed, and additional witnesses were interviewed in New York and New Mexico, the records show. In January 2008, several Epstein victims were sent letters informing them that the FBI investigation was "ongoing" as negotiations to finalize the plea bargain continued behind the scenes.

Marie Villafaña, the assistant U.S. attorney directly in charge of the Epstein case, frequently expressed frustration with the tactics of Epstein's legal team.

Starr finally appealed to the Justice Department in Washington, challenging federal jurisdiction of the case, but in May 2008, the Justice Department affirmed Acosta's right to prosecute.

negotiations, finally admitting in 2013 that federal prosecutors had backed down under relentless pressure by Epstein's attorneys.

"The government admits that, at least in part as a result of objections lodged by Epstein's lawyers to victim notifications, the [United States Attorney's Office] reevaluated its obligations to provide notification to victims and Jane Doe #1 was thus not told that the USAO had entered into a non-prosecution agreement with Epstein until after it was signed," wrote Assistant U.S. Attorney Dexter Lee.

Said Hakes, the former federal prosecutor: "I have never heard of a case where federal prosecutors consult with a defense attorney before they send out standard victim notification letters. To negotiate what the letters would say and whether they would be sent at all suggest that the victims' rights were violated multiple times."

Starr's aggressive advocacy for Epstein against allegations of improper sexual behavior was in stark contrast to the path he took investigating then-President Clinton. The Starr Report, the summary of his findings in the Whitewater investigation, which started as a probe of a land deal gone sour and veered into an investigation of sexual misconduct, savaged the president for his involvement with White House intern Monica Lewinsky and was the basis for impeachment.

Starr himself would face criticism in 2016 — he stepped down as president of Baylor University amid allegations that he and other university officials mishandled sexual assault allegations brought by female students against members of the school's football team.

The Herald reached out to Starr, through certified letter and through a spokesman for his current law firm, the Lanier Firm, but did not receive a response for this story.

Palm Beach police detective Recarey, one of the most highly decorated officers on the Palm Beach Police Department, called the Epstein case the most troubling of his 23-year career.

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
INDEX NO. 160874/2019
NYSCEF DOC. NO.
Case 1:19-cv-03377-LAP Document 125-7 Filed 05/29/20 Page 19 of 55
RECEIVED NYSCEF: 01/27/2020

The series

Privately, Reiter and Recarey said, they held onto a hope that Epstein would be brought to trial someday, but they said that that notion had faded.

"I always hoped that the plea would be thrown out and that these teenage girls, who were labeled as prostitutes by prosecutors, would get to finally shed that label and see him go to prison where he belongs,'' Recarey said.

Recarey died in May after a brief illness. He was 50 years old.

*This story has been corrected to remove a quotation from Jay Lefkowitz, Jeffrey Epstein's attorney, that was presented out of sequence.*

----

*Update: At a news conference on July 9, 2019, announcing his resignation as labor secretary over the Epstein matter, Alexander Acosta defended his handling of the case, noting that Epstein's non-prosecution agreement had been signed on Sept. 24, 2007, and that there were no changes and no outstanding issues to discuss at his October meeting at the Palm Beach Marriott with Epstein attorney Jay Lefkowitz. Letters show this was not the case. On Oct. 10, 2007, two days before the Oct. 12 meeting, Lefkowitz wrote an eight-page letter to Acosta, labeled as "confidential, for settlement purposes" and citing "serious disagreements."*

*In it, Lefkowitz outlined a number of what he called "open issues.'' Among the issues he listed was victim notification, which he said would violate the agreement that was signed, an addendum to the agreement involving civil restitution and a liability waiver.*

*"Alex, as you know, when Mr. Epstein signed the Agreement, he did so in order to reach finality with your office and with the express representation that the federal investigation against him would cease. To that end, I would like your assurance that after you and I agree to the issues raised in this letter, that will be the end of the United States' involvement barring a willful breech of the agreement. Specifically, the Government or any of its agents will not make any further communications to the identified individuals,'' which referred to the victims.*

1/27/2020    Prosecutors worked on serial sex abuser Jeffrey Epstein's deal | Miami Herald

Case 1:19-cv-03377-LAP    Document 125-4    Filed 05/29/20    Page 10 of 55

The series

## More from the series



**How a future Trump Cabinet member gave a serial sex abuser the deal of a lifetime**

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
INDEX NO. 160874/2019

NYSCEF DOC. NO. Case 1:19-cv-03377 Prosecutors worked to cut sex abuser Jeffrey... 05/29/20 Miami Herald 1 of 55 RECEIVED NYSCEF: 01/27/2020

The series



Cops worked to put serial sex
abuser in prison. Prosecutors
worked to cut him a break



Even from jail, sex abuser
manipulated the system. His
victims were kept in the dark

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM INDEX NO. 160874/2019
NYSCEF DOC. NO. Case 1:19-cv-03377-LAP Document 125-7 Filed 05/29/20 Page 22 of 55 RECEIVED NYSCEF: 01/27/2020

Sex abuser Jeffrey Epstein was surrounded by powerful people. Here's a sampling

For years, Jeffrey Epstein abused teen girls, police say. A timeline of his case

Read

# How Miami Herald journalists investigated Jeffrey Epstein

**The Team**

**Investigative Reporter:** Julie K. Brown

**Investigations Editor:** Casey Frank

**Visual Journalist:** Emily Michot

**Interaction Designer:** Aaron Albright

The series

**Drone Footage:** Pedro Portal
**Director of Design:** Jessica Gilbert
**Senior Manager of Design:** Eddie Alvarez

## Take Us With You

Real-time updates and all local stories you want right in
the palm of your hand.



**MIAMI HERALD APP →**

**VIEW NEWSLETTERS →**

### SUBSCRIPTIONS

Start a Subscription

Customer Service

eEdition

Vacation Hold

Pay Your Bill

### LEARN MORE

About Us

Contact Us

Newsletters

News in Education

Public Insight Network

Reader Panel

Archives

### ADVERTISING

Place a Classified

Media Kit

Public Notices

The series

COPYRIGHT

**COMMENTING POLICY**

**PRIVACY POLICY**

**TERMS OF SERVICE**

On Thu, Sep 5, 2019 at 3:55 PM, Dershowitz, Alan <<u>REDACTED BY COUNSEL</u>> wrote:

Why won't they show them to you ? They know I can't.  I will comply with the law even if you are asking me to break it.
In any event, based on your past history , you would not publish the emails if they destroyed her credibility, just as you refused to publish documentation of Giuffres lack of credibility.

Sent from my iPhone

On Sep 5, 2019, at 3:45 PM, Brown, Julie <<u>REDACTED BY COUNSEL</u>> wrote:

Alan,
You can send them. There are many documents floating around in this case, so I'm sure no one will go after you. As it is you who is making the allegation that she sent these emails, and you believe it goes to show she is a liar, then you can produce them.
As of now, I will say the emails are subject to a sealing order. They've acknowledged that she sent them and that they contained information that was false.

On Thu, Sep 5, 2019 at 3:20 PM, Dershowitz, Alan <<u>REDACTED BY COUNSEL</u>> wrote:

I'm not permitted to send them. I am subject to a sealing order. She is not subject to that order and she can show them to you.  If she refuses it's because she is hiding something. I would love to send them to you. Ask her and  her lawyers whether they consent to have me send them. If they refuse, you should report that.

Sent from my iPhone

# Exhibit S

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
NYSCEF DOC. NO. 127
INDEX NO. 160874/2019
RECEIVED NYSCEF: 01/27/2020



## Alan Dershowitz on Epstein Case and Current Lawsuit | The View

249,215 views • May 2, 2019    👍 1.4K    👎 837    ↗ SHARE    ≡+ SAVE    •••



**The View** ✓        SUBSCRIBE
791K subscribers

The attorney discusses his defense of Epstein, and the lawsuit filed against him.

MORE FROM 'THE VIEW':

SHOW MORE

Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 28 of 55

# Exhibit T



## STATEMENT OF LOUIS J. FREEH

"Over the past several months, an independent investigation was conducted, under my supervision, by former senior federal law enforcement officials. We interviewed many witnesses and reviewed thousands of pages of documentary evidence. Our investigation found no evidence to support the accusations of sexual misconduct against Professor Dershowitz. In fact, in several instances, the evidence directly contradicted the accusations made against him.

In my opinion, the totality of the evidence found during the investigation refutes the allegations made against Professor Dershowitz."

###

Dated:            April 8, 2016

Professor Alan Dershowitz
Harvard Law School
1575 Massachusetts Avenue
Hauser Hall 518
Cambridge, MA 02138

Hon. Louis J. Freeh
Mobile: 202.215.8321
Freeh@FreehGroup.com

January 22, 2016

RE: FOIA Request

Dear Professor Dershowitz:

As you know, on April 6, 2015, a request was made to the United States Secret Service under the federal Freedom of Information Act (FOIA; 5 U.S.C. Sec. 552), relating to the period 1/01/01 to 1/1/03, for "any and all shift logs, travel records, itineraries, reports and other records for USSS personnel traveling with former President Bill Clinton to Little St. James Island and the US Virgin Islands" (Attachment A).

The basis of the above-described FOIA request was a claim by Virginia Roberts, in court papers filed in early 2015 in Florida federal court, that she and former President Clinton were on Little St. James Island at the same time during the 1/01/01 to 1/1/03 period.

As set forth in a January 16, 2016 letter from Kim E. Campbell, United States Secret service Special Agent In Charge, Freedom of Information Act and Privacy Act Officer, the "USSS has conducted a reasonable search for responsive records. It appears, from a review of USSS main indices, that there are no records pertaining to your request that are referenced in these indices" (Attachment B).

I therefore conclude from this response that former President Clinton did not in fact travel to, nor was he present on, Little St. James Island between January 1, 2001 and January 1, 2003.

Based upon my experience and knowledge of the duties, protocols and operations of USSS Protective Details, the Special Agents accompany and escort former President Clinton 24 hours per day, and would have certainly went with him to Little St. James Island during the period at issue. If the Agents had accompanied the former President to that location, they would had been required to make and file shift logs, travel vouchers and related documentation relating to the visit.

The total absence of any such records and documentation, in my opinion, strongly establishes that former President Clinton was not present on Little St. James Island during the period at issue.

Best Regards,

Louie Freeh

Patti Bescript
3711 Kennett Pike
Suite 130
Wilmington, DE 19807
302 824 7144

April 6, 2015

Delores Barber
Deputy Chief FOIA Officer, Director, Disclosure & FOIA, The Privacy Office
Department of Homeland Security
Headquarters & Privacy Office
Building 410 - STOP-0655
245 Murray Drive, SW
Washington, DC 20528-0655

**FOIA REQUEST**

Dear FOIA Officer:

Pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552, I request access to and copies of For the period 1/1/01 to 1/1/03, any and all shift logs, travel records, itineraries, reports, and other records for USSS personnel traveling with former President Bill Clinton to Little St James Island and the US Virgin Islands.

I agree to pay reasonable duplication fees for the processing of this request.

If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also expect you to release all segregable portions of otherwise exempt material. I, of course, reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

I look forward to your reply within 20 business days, as the statute requires.

Thank you for your assistance.

Sincerely,

Patti Bescript



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information Act and Privacy Act Branch
Communications Center
245 Murray Lane, SW, Building T-5
Washington, D.C. 20223

Date: MAR 15 2016

Patti Bescript
3711 Kennett Pike, Suite 130
Wilmington, DE 19807

File Number: 20150826

Dear Requester:

This is the final response to your Freedom of Information Act/Privacy Acts (FOIA/PA) request originally received by the United States Secret Service (USSS) on April 16, 2015, for information pertaining to any and all shift logs, travel records, itineraries, reports, and other records for USSS personnel traveling with former President Bill Clinton to Little St. James Island and the US Virgin Islands.

In response to your request, the USSS has conducted a reasonable search for responsive records. It appears, from a review of USSS main indices, that there are no records pertaining to your request that are referenced in these indices. Enclosed is a copy of your original request.

Alternatively, if you deem our decision an adverse determination, you may exercise your appeal rights. Should you wish to file an administrative appeal, your appeal should be made in writing and received within sixty (60) days of the date of this letter, by writing to: Freedom of Information Appeal, Deputy Director, U.S. Secret Service, Communications Center, 245 Murray Lane, S.W., Building T-5, Washington, D.C. 20223. If you choose to file an administrative appeal, please explain the basis of your appeal and reference the case number listed above.

If you have any questions or would like to discuss this matter, please contact this office at (202) 406-6370. FOIA File No. 20150826 is assigned to your request. Please refer to this file number in all future communication with this office.

Sincerely,

Kim E. Campbell
Special Agent In Charge
Freedom of Information Act & Privacy Act Officer

Enclosure: Copy of Original Request



March 9, 2019

To Whom It May Concern:

In 2015, Professor Alan Dershowitz retained Freeh Group International Solutions, LLC ("FGIS") to conduct an independent investigation into allegations of sexual misconduct that had been made against him by Ms. Virginia Roberts. Ms. Roberts also made allegations against others, including former President William Clinton.

During the course of our investigation, personnel from FGIS, including a former senior prosecutor and investigator from the U.S. Department of Justice with more than a half century of collective experience conducting criminal investigations, carefully examined thousands of pages of documentary evidence, much of which Professor Dershowitz supplied to us; sought to reconstruct events in New York City, Palm Beach, Little St. James Island, a ranch in New Mexico, and on a private aircraft; and, identified and interviewed many witnesses who were able to provide relevant details regarding Ms. Roberts' allegations. In our opinion, the totality of the evidence found during the investigation refutes the allegations made against Professor Dershowitz.

In addition, FGIS made a Freedom of Information Act ("FOIA") request to the U.S. Secret Service ("USSS") for "any and all sift logs, travel records, itineraries, reports and other records for USSS personnel traveling with former President William Clinton to Little St. James Island." This was done in an effort to determine whether former President Clinton had been there as Ms. Roberts alleged.

On January 16, 2016, the official in charge of the USSS's FOIA/PA Office replied by letter that the "USSS has conducted a reasonable search for responsive records" and "from a review of USSS main indices, that there are no records pertaining to your request that are referenced in these indices." Thus, the conclusion that can be drawn that, contrary to Ms. Roberts' allegation, former President Clinton did not in fact travel to, nor was he present on, Little St. James Island between January 1, 2001 and January 1, 2003. The FOIA results not only directly impeach Ms. Roberts' specific allegations against Professor Dershowitz, but in our opinion completely undermine her credibility. Together with our other factual findings and conclusions, it is our opinion that all of these allegations against him were made without any basis.

At the conclusion of our investigation, which was conducted under the supervision of FGIS Chairman Louis J. Freeh, FGIS concluded that we "found no evidence to support the accusations of sexual misconduct against Professor Dershowitz. In fact, in several instances, the evidence directly contradicted the accusations made against him."

We stand by our investigation and that conclusion.

Very truly yours,

James R. Bucknam
President and Chief Executive Officer

Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 34 of 55

# Exhibit U

Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 35 of 55

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
MARIA FARMER,

        Plaintiff,

    - against -

DARREN K. INDYKE and RICHARD D. KAHN,

        Defendants.
----------------------------------------X

**ORDER**

19 Civ. 10474 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Non-party Alan Dershowitz ("Dershowitz") seeks permission to file a motion for limited intervention in order to move to strike the following allegation from plaintiff's complaint:  "Among the guests that came to the mansion, Maria observed Alan Dershowitz, a lawyer, on a number of occasions, and observed that he would go upstairs at the same time the young girls were there."  ECF No. 1 ¶ 39.  In the alternative, Dershowitz requests that the Court strike the allegation *sua sponte.*

    Having considered the several letters on this issue, see ECF Nos. 9-11, the Court exercises its authority, pursuant to Federal Rule of Civil Procedure Rule 12(f)(1), to strike *sua sponte* the aforementioned language.  See Fed. R. Civ. P. 12(f)(1) ("[O]n its own," a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.").  The Court briefly addresses its reasons for doing so.

1

Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 36 of 55

First, the allegation is neither material nor directly pertinent to any claim or defense in this action. Nor does Rule 8 require plaintiff to plead credibility or to anticipate a response to a statute of limitations defense. Moreover, there already exists a forum for exploring the veracity of the allegation. See Giuffre v. Dershowitz, No. 19 Civ. 3377 (S.D.N.Y. Apr. 16, 2019), ECF No. 1-12.

In light of the foregoing, the Court denies as moot Dershowitz's request for leave to submit a motion to intervene, which was requested solely for the purpose of moving to strike the language at issue.[1]

**SO ORDERED.**

DATED:    New York, New York
          December 23, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[1] This ruling is limited to the pleading issue presented, rather than any potential evidentiary issue.

2

Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 37 of 55

# Exhibit V

The New York Times    https://nyti.ms/2YbajVT

# Jeffrey Epstein, Blackmail and a Lucrative 'Hot List'

A shadowy hacker claimed to have the financier's sex tapes. Two top lawyers wondered: What would the men in those videos pay to keep them secret?

By Jessica Silver-Greenberg, Emily Steel, Jacob Bernstein and David Enrich

Nov. 30, 2019

Soon after the sex criminal Jeffrey Epstein died in August, a mysterious man met with two prominent lawyers.

Towering, barrel-chested and wild-bearded, he was a prodigious drinker and often wore flip-flops. He went by a pseudonym, Patrick Kessler — a necessity, he said, given the shadowy, dangerous world that he inhabited.

He told the lawyers he had something incendiary: a vast archive of Mr. Epstein's data, stored on encrypted servers overseas. He said he had years of the financier's communications and financial records — as well as thousands of hours of footage from hidden cameras in the bedrooms of Mr. Epstein's properties. The videos, Kessler said, captured some of the world's richest, most powerful men in compromising sexual situations — even in the act of rape.

---

**Watch "The Weekly," The Times's new TV show on FX and Hulu**

A mysterious man told us he had surveillance footage from Jeffrey Epstein's properties. Then his story took a turn.

---

Kessler said he wanted to expose these men. If he was telling the truth, his trove could answer one of the Epstein saga's most baffling questions: How did a college dropout and high school math teacher amass a purported nine-figure fortune? One persistent but unproven theory was that he ran a sprawling blackmail operation. That would explain why moguls, scientists, political leaders and a royal stayed loyal to him, in some cases even after he first went to jail.

Kessler's tale was enough to hook the two lawyers, the famed litigator David Boies and his friend John Stanley Pottinger. If Kessler was authentic, his videos would arm them with immense leverage over some very important people.

Mr. Boies and Mr. Pottinger discussed a plan. They could use the supposed footage in litigation or to try to reach deals with men who appeared in it, with money flowing into a charitable foundation. In encrypted chats with Kessler, Mr. Pottinger referred to a roster of potential targets as the "hot list." He described hypothetical plans in which the lawyers would pocket up to 40 percent of the settlements and could extract money from wealthy men by flipping from representing victims to representing their alleged abusers.

The possibilities were tantalizing — and extended beyond vindicating victims. Mr. Pottinger saw a chance to supercharge his law practice. For Mr. Boies, there was a shot at redemption, after years of criticism for his work on behalf of Theranos and Harvey Weinstein.

In the end, there would be no damning videos, no funds pouring into a new foundation. Mr. Boies and Mr. Pottinger would go from toasting Kessler as their "whistle-blower" and "informant" to torching him as a "fraudster" and a "spy."

Kessler was a liar, and he wouldn't expose any sexual abuse. But he would reveal something else: The extraordinary, at times deceitful measures elite lawyers deployed in an effort to get evidence that could be used to win lucrative settlements — and keep misconduct hidden, allowing perpetrators to abuse again.

Mr. Boies has publicly decried such secret deals as "rich man's justice," a way that powerful men buy their way out of legal and reputational jeopardy. This is how it works.

## 7 men and a headless parrot

The man who called himself Kessler first contacted a Florida lawyer, Bradley J. Edwards, who was in the news for representing women with claims against Mr. Epstein. It was late August, about two weeks after the financier killed himself in a jail cell while awaiting trial on federal sex-trafficking charges.

Mr. Edwards, who did not respond to interview requests, had a law firm called Edwards Pottinger, and he soon referred Kessler to his New York partner. Silver-haired and 79, Mr. Pottinger had been a senior civil-rights official in the Nixon and Ford administrations, but he also dabbled in investment banking and wrote best-selling medical thrillers. He was perhaps best known for having dated Gloria Steinem

and Kathie Lee Gifford.



John Stanley Pottinger at a 1984 party with, from left, the TV host Phil Donahue, Marlo Thomas and Gloria Steinem.  Bill Cunningham/The New York Times

Mr. Pottinger recalled that Mr. Edwards warned him about Kessler, saying that he was "endearing," "spooky" and "loves to drink like a fish."

After an initial discussion with Kessler in Washington, Mr. Pottinger briefed Mr. Boies — whose firm was also active in representing accusers in the Epstein case — about the sensational claims. He then invited Kessler to his Manhattan apartment. Kessler admired a wall-mounted frame containing a headless stuffed parrot; on TV, the Philadelphia Eagles were mounting a comeback against the Washington Redskins. Mr. Pottinger poured Kessler a glass of WhistlePig whiskey, and the informant began to talk.

In his conversations with Mr. Pottinger and, later, Mr. Boies, Kessler said his videos featured numerous powerful men who were already linked to Mr. Epstein: Ehud Barak, the former Israeli prime minister; Alan Dershowitz, a constitutional lawyer; Prince Andrew; three billionaires; and a prominent chief executive.

All seven men, or their representatives, told The New York Times they never engaged in sexual activity on Mr. Epstein's properties. The Times has no reason to believe Kessler's supposed video footage is real.

In his apartment, Mr. Pottinger presented Kessler with a signed copy of "The Boss," his 2005 novel. "One minute you're bending the rules," blares the cover of the paperback version. "The next minute you're breaking the law." On the title page, Mr. Pottinger wrote: "Here's to the great work you are to do. Happy to be part of it."

Mr. Pottinger also gave Kessler a draft contract to bring him on as a client, allowing him to use a fake name. "For reasons revealed to you, I prefer to proceed with this engagement under the name Patrick Kessler," the agreement said.

Case 1:19-cv-03377-LAP Document 125 Filed 05/29/20 Page 40 of 55

Despite the enormities of the Epstein scandal, few of his accusers have gotten a sense of justice or resolution. Mr. Pottinger thought Kessler's files could change everything. This strange man was theatrical and liked his alcohol, but if there was even a chance his claims were true, they were worth pursuing.

"Our clients are said to be liars and prostitutes," Mr. Pottinger later said in an interview with The Times, "and we now have someone who says, 'I can give you secret photographic proof of abuse that will completely change the entire fabric of your practice and get justice for these girls.' And you think that we wouldn't try to get that?"

## A victim becomes a hacker

Mr. Pottinger and Mr. Boies have known each other for years, a friendship forged on bike trips in France and Italy. In legal circles, Mr. Boies was royalty: He was the one who fought for presidential candidate Al Gore before the Supreme Court, took on Microsoft in a landmark antitrust case, and helped obtain the right for gays and lesbians to get married in California.

But then Mr. Boies got involved with the blood-testing start-up Theranos. As the company was being revealed as a fraud, he tried to bully whistle-blowers into not speaking to a Wall Street Journal reporter, and he was criticized for possible conflicts of interest when he joined the company's board in 2015.

Two years later, Mr. Boies helped his longtime client Harvey Weinstein hire private investigators who intimidated sources and trailed reporters for The Times and The New Yorker — even though Mr. Boies's firm had worked for The Times on other matters. (The Times fired his firm.)

By 2019, Mr. Boies, 78, was representing a number of Mr. Epstein's alleged victims. They got his services pro bono, and he got the chance to burnish his legacy. When Mr. Pottinger contacted him about Kessler, he was intrigued.

Mr. Boies, who is representing several of Jeffrey Epstein's accusers, arriving at federal court in New York.  Mark Kauzlarich/Bloomberg

Mr. Pottinger, right, in July with two women who have accused Mr. Epstein of sexual abuse.  Louis Lanzano/Bloomberg

On Sept. 9, Mr. Boies greeted Kessler at the offices of his law firm, Boies Schiller Flexner, in a gleaming new skyscraper at Hudson Yards on Manhattan's West Side. Kessler unfurled a fantastic story, one he would embroider and alter in later weeks, that began with him growing up somewhere within a three-hour radius of Washington. Kessler said he had been molested as a boy by a Bible school teacher and sought solace on the internet, where he fell in with a group of victims turned hackers, who used their skills to combat pedophilia.

Kessler claimed that a technology executive had introduced him to Mr. Epstein, who in 2012 hired Kessler to set up encrypted servers to preserve his extensive digital archives. With Mr. Epstein dead, Kessler boasted to the lawyers, he had unfettered access to the material. He said the volume of videos was overwhelming: more than a decade of round-the-clock footage from dozens of cameras.

Kessler displayed some pixelated video stills on his phone. In one, a bearded man with his mouth open appears to be having sex with a naked woman. Kessler said the man was Mr. Barak. In another, a man with black-framed glasses is seen shirtless with a woman on his lap, her breasts exposed. Kessler said it was Mr. Dershowitz. He also said that some of the supposed videos appeared to have been edited and cataloged for the purpose of blackmail.

"This was explosive information if true, for lots and lots of people," Mr. Boies said in an interview.

Mr. Boies and Mr. Pottinger had decades of legal experience and considered themselves experts at assessing witnesses' credibility. While they couldn't be sure, they thought Kessler was probably legit.

## A chance to sway the Israeli election

Within hours of the Hudson Yards meeting, Mr. Pottinger sent Kessler a series of texts over the encrypted messaging app Signal.

According to excerpts viewed by The Times, Mr. Pottinger and Kessler discussed a plan to disseminate some of the informant's materials — starting with the supposed footage of Mr. Barak. The Israeli election was barely a week away, and Mr. Barak was challenging Prime Minister Benjamin Netanyahu. The purported images of Mr. Barak might be able to sway the election — and fetch a high price. ("Total lie with no basis in reality," Mr. Barak said when asked about the existence of such videos.)

"Can you review your visual evidence to be sure some or all is indisputably him? If so, we can make it work," Mr. Pottinger wrote.

Kessler said he would do so. Mr. Pottinger sent a yellow smiley-face emoji with its tongue sticking out.

"Can you share your contact that would be purchasing," Kessler asked.

"Sheldon Adelson," Mr. Pottinger answered.

Mr. Adelson, a billionaire casino magnate in Las Vegas, had founded one of Israel's largest newspapers, and it was an enthusiastic booster of Mr. Netanyahu. Mr. Pottinger wrote that he and Mr. Boies hoped to fly to Nevada to meet with Mr. Adelson to discuss the images.

"Do you believe that adelson has the pull to insure this will hurt his bid for election?" Kessler asked the next morning.

Mr. Pottinger reassured him. "There is no question that Adelson has the capacity to air the truth about EB if he wants to," he said, using Mr. Barak's initials. He said he planned to discuss the matter with Mr. Boies that evening.

Mr. Boies confirmed that they discussed sharing the photo with Mr. Adelson but said the plan was never executed. Boaz Bismuth, the editor in chief of the newspaper, Israel Hayom, said its journalists were approached by an Israeli source who pitched them supposed images of Mr. Barak, but that "we were not interested."

## 'These are wealthy wrongdoers'

The men whom Kessler claimed to have on tape were together worth many billions. Some of their public relations teams had spent months trying to tamp down media coverage of their connections to Mr. Epstein. Imagine how much they might pay to make incriminating videos vanish.

You might think that lawyers representing abuse victims would want to publicly expose such information to bolster their clients' claims. But that is not how the legal industry always works. Often, keeping things quiet is good business.

One of the revelations of the #MeToo era has been that victims' lawyers often brokered secret deals in which alleged abusers paid to keep their accusers quiet and the allegations out of the public sphere. Lawyers can pocket at least a third of such settlements, profiting off a system that masks misconduct and allows men to abuse again.

Mr. Boies and Mr. Pottinger said in interviews that they were looking into creating a charity to help victims of sexual abuse. It would be bankrolled by private legal settlements with the men on the videos.

Mr. Boies acknowledged that Kessler might get paid. "If we were able to use this to help our victims recover money, we would treat him generously," he said in September. He said that his firm would not get a cut of any settlements.

Such agreements would have made it less likely that videos involving the men became public. "Generally what settlements are about is getting peace," Mr. Boies said.

Mr. Pottinger told Kessler that the charity he was setting up would be called the Astria Foundation — a name he later said his girlfriend came up with, in a nod to Astraea, the Greek goddess of innocence and justice. "We need to get it funded by abusers," Mr. Pottinger texted, noting in another message that "these are wealthy wrongdoers."

Mr. Pottinger asked Kessler to start compiling incriminating materials on a specific group of men.

"I'm way ahead of you," Kessler responded. He said he had asked his team of fellow hackers to search the files for the three billionaires, the C.E.O. and Prince Andrew.

"Yes, that's exactly how to do this," Mr. Pottinger said. "Videos for sure, but email traffic, too."

"I call it our hot list," he added.

## A quiet table at the back of Grand Sichuan

In mid-September, Mr. Boies and Mr. Pottinger invited reporters from The Times to the Boies Schiller offices to meet Kessler. The threat of a major news organization writing about the videos — and confirming the existence of an extensive surveillance apparatus — could greatly enhance the lawyers' leverage over the wealthy men.

Before the session, Mr. Pottinger encouraged Kessler to focus on certain men, like Mr. Barak, while avoiding others. Referring to the reporters, he added, "Let them drink from a fountain instead of a water hose. They and the readers will follow that better."

The meeting took place on a cloudy Saturday morning. After agreeing to leave their phones and laptops outside, the reporters entered a 20th-floor conference room. Kessler was huge: more than 6 feet tall, pushing 300 pounds, balding, his temples speckled with gray. He told his story and presented images that he said were of Mr. Epstein, Mr. Barak and Mr. Dershowitz having sex with women.

Barely an hour after the session ended, the Times reporters received an email from Kessler: "Are you free?" He said he wanted to meet — alone. "Tell no one else." That afternoon, they met at Grand Sichuan, an iconic Chinese restaurant in Manhattan's Chelsea neighborhood. The lunch rush was over, and the trio sat at a quiet table in the back. A small group of women huddled nearby, speaking Mandarin and snipping the ends off string beans.

Kessler complained that Mr. Boies and Mr. Pottinger were more interested in making money than in exposing wrongdoers. He pulled out his phone, warned the reporters not to touch it, and showed more of what he had. There was a color photo of a bare-chested, gray-haired man with a slight smile. Kessler said it was a billionaire. He also showed blurry, black-and-white images of a dark-haired man receiving oral sex. He said it was a prominent C.E.O.

Soup dumplings and Gui Zhou chicken arrived, and Kessler kept talking. He said he had found financial ledgers on Mr. Epstein's servers that showed he had vast amounts of Bitcoin and cash in the Middle East and Bangkok, and hundreds of millions of dollars' worth of gold, silver and diamonds. He presented no proof. But it is common for whistle-blowers to be erratic and slow to produce their evidence, and The Times thought it was worth investigating Kessler's claims.

The conversation continued in a conference room at a Washington hotel five days later, after a text exchange in which Kessler noted his enthusiasm for Japanese whiskey. Both parties brought bottles to the hotel, and Kessler spent nearly eight hours downing glass after glass. He veered from telling tales about the dark web to professing love for "Little House on the Prairie." He asserted that he had evidence Mr. Epstein had derived his wealth through illicit means. At one point, he showed what he said were classified C.I.A. documents.

Kessler said he had no idea who the women in the videos were or how the lawyers might go about identifying them to act on their behalf. From his perspective, he said, it seemed like Mr. Boies and Mr. Pottinger were plotting to use his footage to demand huge sums from billionaires. He said it looked like blackmail — and that he could prove it.

## 'We keep it. We keep everything'

Was Kessler's story plausible? Did America's best-connected sexual predator accumulate incriminating videos of powerful men?

Two women who spent time in Mr. Epstein's homes said the answer was yes. In an unpublished memoir, Virginia Giuffre, who accused Mr. Epstein of making her a "sex slave," wrote that she discovered a room in his New York mansion where monitors displayed real-time surveillance footage. And Maria Farmer, an artist who accused Mr. Epstein of sexually assaulting her when she worked for him in the 1990s, said that Mr. Epstein once walked her through the mansion, pointing out pin-sized cameras that he said were in every room.

"I said, 'Are you recording all this?'" Ms. Farmer said in an interview. "He said, 'Yes. We keep it. We keep everything.'"

During a 2005 search of Mr. Epstein's Palm Beach, Fla., estate, the police found two cameras hidden in clocks — one in the garage and the other next to his desk, according to police reports. But no other cameras were found.

If such a surveillance system did exist, nothing that Kessler told or showed The Times proved that he had access to it. The photos he shared were too grainy to establish anyone's identity. And many other elements of his story failed to hold up under scrutiny.

Kessler claimed to have been an early investor in a North Carolina coffee company, whose sticker was affixed to his laptop. But its founder said no one matching Kessler's description had ever been affiliated with the company. Kessler insisted that he invested in 2009, but the company wasn't founded until 2011.

The contents of Kessler's supposed C.I.A. documents turned out to be easily findable using Google. At one point, Kessler said that one of his associates had been missing and was found dead; later, Kessler said the man was alive and in the southern United States. He said that his mother had died when he was young — and that he had recently given her a hug. A photo he sent from what he said was a Washington-area hospital featured a distinctive blanket, but when The Times called local hospitals, they didn't recognize the pattern.

After months of effort, The Times could not learn Kessler's identity or confirm any element of his back story.

"I am very often being purposefully inconsistent," Kessler said, when pressed.

## A Weinstein cameo

On the last Friday in September, Mr. Boies and Mr. Pottinger sat on a blue leather couch in the corner of a members-only dining room at the Harvard Club in Midtown Manhattan. Antlered animal heads and oil paintings hung from the dark wooden walls.

The lawyers were there to make a deal with The Times. Tired of waiting for Kessler's motherlode, Mr. Pottinger said they planned to send a team overseas to download the material from his servers. He said he had alerted the F.B.I. and a prosecutor in the United States attorney's office in Manhattan.

Mr. Boies told an editor for The Times that they would be willing to share everything, on one condition: They would have discretion over which men could be written about, and when. He explained that if compromising videos about particular men became public, that could torpedo litigation or attempts to negotiate settlements. The Times editor didn't commit.

Mr. Boies and Mr. Pottinger later said those plans had hinged on verifying the videos' authenticity and on having clients with legitimate legal claims against the men. Otherwise, legal experts said, it might have crossed the line into extortion.

The meeting was briefly interrupted when Bob Weinstein, the brother of Harvey Weinstein, bounded up to the table and plopped onto the couch next to Mr. Boies. The two men spent several minutes talking, laughing and slapping each other on the back.

While Mr. Boies and Mr. Weinstein chatted, Mr. Pottinger furtively displayed the black-and-white shot of a man in glasses having sex. Both lawyers said it looked like Mr. Dershowitz.

## 'You don't keep your glasses on when you're doing that'

One day in late September, Mr. Dershowitz's secretary relayed a message: Someone named Patrick Kessler wanted to speak to him about Mr. Boies.

The two lawyers had a long-running feud, and Mr. Dershowitz returned the call from his apartment. He also recorded it. Kessler explained his Epstein story, and that he no longer trusted Mr. Boies and Mr. Pottinger.

"The problem is that they don't want to move forward with any of these people legally," Kessler said. "They're just interested in trying to settle and take a cut."

"Who are these people that you have on videotape?" Mr. Dershowitz asked.

"There's a lot of people," Kessler said, naming a few powerful men. He added, "There's a long list of people that they want me to have that I don't have."

"Who?" Mr. Dershowitz asked. "Did they ask about me?"

"Of course they asked about you. You know that, sir."

"And you don't have anything on me, right?"

"I do not, no," Kessler said.

"Because I never, I never had sex with anybody," Mr. Dershowitz said. Later in the call, he added, "I am completely clean. I was at Jeffrey's house. I stayed there. But I didn't have any sex with anybody."

What was the purpose of Kessler's phone call? Why did he tell Mr. Dershowitz that he wasn't on the supposed surveillance tapes, contradicting what he had said and showed to Mr. Boies, Mr. Pottinger and The Times? Did the call sound a little rehearsed?

Mr. Dershowitz said that he didn't know why Kessler contacted him, and that the phone call was the only time the two men ever spoke. When The Times showed him one of Kessler's photos, in which a bespectacled man resembling Mr. Dershowitz appears to be having sex, Mr. Dershowitz laughed and said the man wasn't him. His wife, Carolyn Cohen, peeked at the photo, too.

"You don't keep your glasses on when you're doing that," she said.

## Data set (supposedly) to self-destruct

In early October, Kessler said he was ready to produce the Epstein files. He told The Times that he had created duplicate versions of Mr. Epstein's servers. He laid out detailed logistical plans for them to be shipped by boat to the United States and for one of his associates — a very short Icelandic man named Steven — to deliver them to The Times headquarters at 11 a.m. on Oct. 3.

Kessler warned that he was erecting a maze of security systems. First, a Times employee would need to use a special thumb drive to access a proprietary communications system. Then Kessler's colleague would transmit a code to decrypt the files. If his instructions weren't followed precisely, Kessler said, the information would self-destruct.

Specialists at The Times set up a number of "air-gapped" laptops — disconnected from the internet — in a windowless, padlocked meeting room. Reporters cleared their schedules to sift through thousands of hours of surveillance footage.

On the morning of the scheduled delivery, Kessler sent a series of frantic texts. Disaster had struck. A fire was burning. The duplicate servers were destroyed. One of his team members was missing. He was fleeing to Kyiv.

Two hours later, Kessler was in touch with Mr. Pottinger and didn't mention any emergency. Kessler said he hoped that the footage would help pry $1 billion in settlements out of their targets, and asked him to detail how the lawyers could extract the money. "Could you put together a hypothetical situation," Kessler wrote, not something "set in stone but close to what your thinking."

Mr. Pottinger obliged — and walked into what looked like a trap. He described two hypotheticals, both of which were consistent with what had been discussed with The Times at the Harvard Club.

In one, which he called a "standard model" for legal settlements, Mr. Pottinger said the money would be split among his clients, the Astria Foundation, Kessler and the lawyers, who would get up to 40 percent.

In the second hypothetical, Mr. Pottinger wrote, the lawyers would approach the videotaped men. The men would then hire the lawyers, ensuring that they would not get sued, and "make a contribution to a nonprofit as part of the retainer."

"No client is actually involved in this structure," Mr. Pottinger said, noting that the arrangement would have to be "consistent with and subject to rules of ethics."

"Thank you very much," Kessler responded.

Mr. Pottinger later said that the scenario would have involved him representing a victim, settling a case and then representing the victim's alleged abuser. He said it was within legal boundaries. (He also said he had meant to type "No client *lawsuit* is actually involved.")

Such legal arrangements are not unheard-of. Lawyers representing a former Fox News producer who had accused Bill O'Reilly of sexual harassment reached a settlement in which her lawyers agreed to work for Mr. O'Reilly after the dispute. But legal experts generally consider such setups to be unethical because they can create conflicts between the interests of the lawyers and their original clients.

## 'I just pulled it out of my behind'

The lawyers held out hope of getting Kessler's materials. But weeks passed, and nothing arrived. At one point, Mr. Pottinger volunteered to meet Kessler anywhere — including Ljubljana, the capital of Slovenia.

"I still believe he is what he purported to be," Mr. Boies wrote in an email on Nov. 7. "I have to evaluate people for my day job, and he seemed too genuine to be a fake, and I very much want him to be real." He added, "I am not unconscious of the danger of wanting to believe something too much."

Ten days later, Mr. Boies arrived at The Times for an on-camera interview. It was a bright, chilly Sunday, and Mr. Boies had just flown in from Ecuador, where he said he was doing work for the finance ministry. Reporters wanted to ask him plainly if his and Mr. Pottinger's conduct with Kessler crossed ethical lines.

Would they have brokered secret settlements that buried evidence of wrongdoing? Did the notion of extracting huge sums from men in exchange for keeping sex tapes hidden meet the definition of extortion?

Mr. Boies said the answer to both questions was no. He said he and Mr. Pottinger operated well within the law. They only intended to pursue legal action on behalf of their clients — in other words, that they were a long way from extortion. In any case, he said, he and Mr. Pottinger had never authenticated any of the imagery or identified any of the supposed victims, much less contacted any of the men on the "hot list."

Then The Times showed Mr. Boies some of the text exchanges between Mr. Pottinger and Kessler. Mr. Boies showed a flash of anger and said it was the first time he was seeing them.

By the end of the nearly four-hour interview, Mr. Boies had concluded that Kessler was probably a con man: "I think that he was a fraudster who was just trying to set things up." And he argued that Kessler had baited Mr. Pottinger into writing things that looked more nefarious than they really were. He acknowledged that Mr. Pottinger had used "loose language" in some of his messages that risked creating the impression that the lawyers were plotting to monetize evidence of abuse.

Several days later, Mr. Boies returned for another interview and was more critical of Mr. Pottinger, especially the hypothetical plans that he had described to Kessler. "Having looked at all that stuff in context, I would not have said that," he said. How did Mr. Boies feel about Mr. Pottinger invoking his name in messages to Kessler? "I don't like it," he said.

But Mr. Boies stopped short of blaming Mr. Pottinger for the whole mess. "I'm being cautious not to throw him under the bus more than I believe is accurate," he said. His longtime P.R. adviser, Dawn Schneider, who had been pushing for a more forceful denunciation, dropped her pen, threw up her arms and buried her head in her hands.

In a separate interview, The Times asked Mr. Pottinger about his correspondence with Kessler. The lawyer said that his messages shouldn't be taken at face value because, in reality, he had been deceiving Kessler all along — "misleading him deliberately in order to get the servers."

The draft retention agreement that Mr. Pottinger had given to Kessler in September was unsigned and never meant to be honored, Mr. Pottinger said. And he never intended to sell photos of Mr. Barak to Mr. Adelson. "I just pulled it out of my behind," he said, describing it as an act to impress Kessler.

As for the two hypotheticals about how to get money out of the men on the list, Mr. Pottinger said, he never planned to do what he carefully articulated. "I didn't owe Patrick honesty about this," he said.

Mr. Pottinger said that he had only one regret — that "we did not get the information that this liar said he had."

He added, "I'm building legal cases here. I'm trying not to engage too much in shenanigans. I wish I didn't, but this guy was very unusual."

Ronen Bergman contributed reporting. Susan Beachy contributed research.

# Exhibit W

☰        THE
         NEW YORKER

NEWS DESK

# HOW THE LAWYER DAVID BOIES TURNED A YOUNG NOVELIST'S SEXUAL PAST AGAINST HER



**By Sheelah Kolhatkar**

December 1, 2017

f        𝕏        ✉        🔖



*David Boies is famous for having high ideals in a profession that isn't always known for them; more recently, however, questions have been raised about the tactics he has employed when representing men in disputes with women.* Photograph by Jabin Botsford / TNY via Redux

I n February, 2017, the novelist Emma Cline received a fifteen-page letter from the law firm Boies Schiller Flexner LLP containing a list of accusations against her. Cline had recently found literary success with the publication of her first book, a novel called "The Girls." Random House had paid an advance of close to two million dollars for worldwide rights to the book—an extraordinary sum for a first novel—and the Hollywood producer Scott Rudin had optioned the film rights. During the summer of 2016, when "The Girls" came out, it was rare to enter a bookstore without seeing the book's psychedelic red-and-indigo cover prominently displayed. The novel was a finalist for numerous literary prizes, and Cline landed on various "rising young writer" lists. The *Times Book Review* pronounced the book "spellbinding." (Cline worked in *The New Yorker's* fiction department in 2013 and 2014, and has published fiction in the magazine. Random House published my book, "Black Edge.")

In the letter, which also made allegations against Random House, Boies Schiller accused Cline of stealing fragments of written work from a former boyfriend and using them in a draft of her novel. Additionally, the letter said, Cline had spent years improperly snooping on the e-mail accounts of the ex-boyfriend, Chaz Reetz-Laiolo, and two of the former couple's female friends. The letter alleged that Cline had installed spyware on her laptop computer, which Reetz-Laiolo and the friends occasionally used, and which he later bought from Cline; the spyware recorded the computer's keystrokes and browser activity. Boies Schiller said it was prepared to file a lawsuit, which would seek an immediate halt to the sale of "The Girls" and the movie production—but it also offered Cline a second option. "We believe . . . that it may be fruitful to engage in a confidential negotiation or mediation to determine whether our clients can reach a resolution with you rather than file our complaint," the letter said. The names of three attorneys appeared at the bottom of the letter, including that of David Boies, the firm's founder.

Boies is famous for his role as the lead attorney for the former Vice-President Al Gore during the 2000 Presidential-election vote recount and, later, as the co-lead counsel in the case that established the constitutional right for gay and lesbian couples to get married in California. One of the most powerful and well-respected lawyers in the country, Boies has had a long and celebrated career in private practice and in government; he developed a reputation for integrity and high ideals in a profession that isn't always known for them. More recently, however, questions have been raised about some of the tactics that Boies has employed when representing men in disputes with women. On November 6th, *The New Yorker* published an article by Ronan Farrow that detailed Boies's role representing Harvey Weinstein, who is alleged to have sexually harassed or assaulted dozens of actresses and former employees. (Weinstein has denied engaging in non-consensual sex.) As part of his work for Weinstein, Boies hired private investigators from

several different firms who, among other tasks, gathered information—including personal and sexual history—intended to discredit an actress, Rose McGowan, who has accused Weinstein of rape. Boies has since severed professional ties with Weinstein and said that his firm's involvement with the investigators was "a mistake." In an e-mail to his firm's staff that was then leaked to the press, Boies wrote that "I would never knowingly participate in an effort to intimidate or silence women or anyone else. . . . That is not who I am."

During the months after his firm sent its first letter to Cline, Boies remained involved in Reetz-Laiolo's case. Attorneys on both sides outlined arguments and counter-arguments in a series of letters back and forth. At one point, Boies Schiller—which represents Reetz-Laiolo and the two women whom Cline had also allegedly snooped on—asserted that the damages caused by Cline's activity was almost two billion dollars, an amount arrived at by calculating that the spyware that Cline used had resulted in thousands of alleged violations of federal privacy laws. Cline had installed a program called Refog Keylogger on her laptop; Reetz-Laiolo eventually bought the laptop from her, for three hundred dollars, and the software remained on the machine.

Cline's attorneys argued that the plagiarism allegations were false, and asserted in a letter that Reetz-Laiolo—who was thirty-three years old when the two started dating, while Cline was twenty—had been emotionally and physically abusive toward her, that he had cheated on her, and that she had installed the spyware in order to monitor his behavior and protect herself, not to steal his writing. (In a statement, Reetz-Laiolo said that Cline had made "false accusations of physical abuse against me," and that she'd offered no defense for allegedly accessing his co-plaintiff's online accounts.)

On May 26th, Boies Schiller responded by sending a hundred-and-ten-page draft of a complaint that it said it was prepared to file in court if the two sides did not reach a settlement. David Boies's name appeared at the top of it. Reading through the allegations, Cline was stunned to find a section titled "Cline's History of Manipulating Older Men," which purported to illustrate how Boies Schiller would easily discredit her arguments about her former boyfriend's treatment of her before a jury. "[E]vidence shows that Cline was not the innocent and inexperienced naïf she portrayed herself to be, and had instead for many years maintained numerous 'relations' with older men and others, from whom she extracted gifts and money," the section began. What followed were thirteen pages containing screenshots of explicit chat conversations with lovers, including one in which Cline had sent a naked photo of herself (the photo was blacked out in the letter) to a boyfriend, explicit banter with people she'd met online, and snippets of her most intimate diary entries. All of this material had been recorded by the spyware and remained on Cline's old laptop, which Reetz-Laiolo now had in his possession.

VIDEO FROM THE NEW YORKER

THE
NEW YORKER

A letter that Boies Schiller sent along with the draft complaint included even more graphic sexual details and screenshots pertaining to Cline's romantic relationships. Cline had "engaged in random sexual encounters with strangers she met on Craigslist"; "frequently participated in sexual chat groups in which she, inter alia, posted pornographic 'selfies' "; and "authored pornographic 'stories,' " the letter stated, including images showing exchanges and erotic writings in excruciating detail, all of which also came from Cline's old computer. Furthermore, the letter argued, because Cline had said kind things about Reetz-Laiolo and exchanged "warm and friendly" e-mails with him both before and after their breakup, her allegations of abuse were obviously false.

The letter went on to state that Cline's arguments—that she had been abused by her former boyfriend, and that her concern about infidelity was the reason for her cyber-espionage—had "placed Ms. Cline's sexual conduct directly at issue." The implications from Cline's perspective were clear: Cline was to negotiate a significant monetary payment to her ex-boyfriend and former friends right away, or she would be sued through a public court filing, and her most private sexual thoughts and activity would be released into the public realm for anyone to see.

Cline's attorneys were outraged by what they regarded as Boies Schiller's attempt to use embarrassing sexual material that had nothing to do with the heart of the legal dispute to push her to settle the case. "I'm not going to speculate about their motives, but it was content that was completely inappropriate and ludicrous, just based on how sexually graphic it was, to put in a complaint," Carrie Goldberg, who specializes in representing victims of revenge porn and other forms of harassment, and is one of several attorneys representing Cline in the case, told me. "Legal complaints are public record, and, basically, they're saying, 'Hey, if you don't give us what our client wants, we're going to put this very personal

≡ NEW YORKER

information out into the open, and the whole world is going to know the inner workings of your sex life and your sexual history and every proclivity that you have.' "

ADVERTISEMENT

Boies Schiller counters that argument by saying that Cline's lawyers were the first ones to introduce character as an issue in the dispute. "[H]er lawyer tried to excuse the inexcusable by raising aspects of the parties' sexual history," Edward Normand, the lead lawyer on Reetz-Laiolo's team, said in a statement. "Only then did we respond, as lawyers must, describing why her claimed defense was inconsistent with the relevant facts." During the sole in-person negotiation discussion between Cline's attorneys and Boies Schiller, Goldberg explained the concept of "slut-shaming" to David Boies, who, according to Goldberg, claimed to be unfamiliar with it.

Stephen Gillers, a professor of legal ethics at New York University's law school, said that there were limits to what lawyers could do in the service of representing their clients, and that the use of such personal sexual material in a lawsuit could potentially be deemed irrelevant by a judge. "It's true that lawyers have a duty of what they call zealous representation. 'Zealous' is a word that lawyers love, because it seems to authorize the most aggressive activity on behalf of a client. So lawyers do engage in tactics that others might find offensive," Gillers said. But, he added, ethics guidelines prohibited the use of such material solely for the purposes of embarrassing the other party, or to motivate a settlement by implying that it would be publicly released; the material's pertinence would be doubtful even in the case of discussing an opponent's character, he said. "Lawyers can refuse to engage in tactics they find morally repulsive," Gillers added. "This is especially true here because the screenshots, even if not entirely extraneous to the dispute, are of barely marginal relevance."

Over the summer, the two sides were at an impasse. Then, in October, the *Times* and *The New Yorker* published the first of several articles outlining harassment and assault allegations against Boies's client Harvey Weinstein. After several days of ensuing public outcry, and as Farrow was preparing to publish a follow-up story detailing Weinstein's use of private investigators to try to gather material about his female accusers, Cline and her publisher received an amended draft complaint. The section containing all of her private sexual activity had been removed. Boies Schiller says it was taken out as a "gesture of good faith."

Just after midnight on Thursday, Boies Schiller and Cline's legal team filed nearly simultaneous lawsuits against one another. Cline's lawsuit charges Reetz-Laiolo with waging a campaign to "extract millions of dollars by intimidation and threat." In an e-mail to me on Thursday, Cline wrote, "I never, in any scenario, could have imagined publishing a novel would have resulted in a bunch of lawyers combing through records of my porn habits, or choosing which naked photo of me to include in a legal document. Whatever independence I gained, as a writer and as a person, felt meaningless in the face of this kind of onslaught." Reetz-Laiolo's lawsuit, which names Cline, her publisher, and her literary agent as defendants, left out the sexually explicit material included in the draft sent earlier this year. The firm also removed David Boies's name from the complaint.

≡        THE
         NEW YORKER

_Sheelah Kolhatkar_ is a staff writer at The New Yorker, where she writes about Wall Street, Silicon Valley, economics, and politics. She is the author of "_Black Edge: Inside Information, Dirty Money, and the Quest to Bring Down the Most Wanted Man on Wall Street._"

More:     Emma Cline     David Boies     Boies Schiller Flexner     Lawsuits     #MeToo     Sexual Harassment

# THE DAILY

Sign up for our daily newsletter and get the best of _The New Yorker_ in your in-box.

**Enter your e-mail address**

| Your e-mail address | Sign up |

Will be used in accordance with our _Privacy Policy_.

## Read More

NEWS DESK

### HARVEY WEINSTEIN'S ARMY OF SPIES

The film executive hired private investigators, including ex-Mossad agents, to track actresses and journalists.

**By Ronan Farrow**

NEWS DESK

### HARVEY WEINSTEIN'S SECRET SETTLEMENTS

The mogul used money from his brother and elaborate legal agreements to hide allegations of predation for decades.

**By Ronan Farrow**

VIDEO

### HARVEY WEINSTEIN'S SECRET SETTLEMENTS

Ronan Farrow discusses his investigation of the sexual-assault allegations against Harvey Weinstein.

**By The New Yorker**

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM INDEX NO. 160874/2019

NYSCEF DOC. NO. 28    Case 1:19-cv-03377-LAP    Document 125-7    Filed 05/29/20    Page 53 of 55    RECEIVED NYSCEF: 01/27/2020

≡

THE
NEW YORKER

---

SECTIONS

News                                              Crossword

Books & Culture                                   Video

Fiction & Poetry                                  Podcasts

Humor & Cartoons                                  Archive

Magazine                                          Goings On

---

MORE

Customer Care                                     Jigsaw Puzzle

Buy Covers and Cartoons                           RSS

Apps                                              Site Map

Newsletters

---

About                                             Media Kit

Careers                                           Press

Contact                                           Accessibility Help

FAQ

Case 1:19-cv-03377-LAP   Document 125-7   Filed 05/29/20   Page 54 of 55

## THE NEW YORKER

---

SECTIONS

| | |
|---|---|
| News | Crossword |
| Books & Culture | Video |
| Fiction & Poetry | Podcasts |
| Humor & Cartoons | Archive |
| Magazine | Goings On |

---

MORE

| | |
|---|---|
| Customer Care | Jigsaw Puzzle |
| Buy Covers and Cartoons | RSS |
| Apps | Site Map |
| Newsletters | |

---

| | |
|---|---|
| About | Media Kit |
| Careers | Press |
| Contact | Accessibility Help |
| FAQ | |

© 2020 Condé Nast. All rights reserved. Use of this site constitutes acceptance of our User Agreement (updated 1/1/20) and Privacy Policy and Cookie Statement (updated 1/1/20) and Your California Privacy Rights. The New Yorker may earn a portion of sales from products that are purchased through our site as part of our Affiliate Partnerships with retailers. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Condé Nast. Ad Choices

FILED: NEW YORK COUNTY CLERK 01/27/2020 06:10 PM
INDEX NO. 160874/2019

NYSCEF DOC. NO. 28
RECEIVED NYSCEF: 01/27/2020

≡ 　　THE
　NEW YORKER