KBOAGIUCps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VIRGINIA L. GIUFFRE,

4                   Plaintiff,

5           v.                                19-cv-7433 (LAP)

6   ALAN DERSHOWITZ,

7                   Defendant.               Conference

8   ------------------------------x

9                                           New York, N.Y.
                                            **(via telephone)**
10
                                            November 24, 2020
11                                          1:30 p.m.

12
    Before:
13
                        HON. LORETTA A. PRESKA
14
                                            District Judge
15

16                             APPEARANCES

17  COOPER & KIRK, PLLC
         Attorneys for Plaintiff
18  BY:  CHARLES J. COOPER
         NICOLE J. MOSS
19       MICHAEL W. KIRK

20  LAW OFFICES OF AIDALA & BERTUNA, P.C.
         Attorneys for Defendant
21  BY:  IMRAN H. ANSARI
         ARTHUR L. AIDALA
22       -and-
    TODD & WELD LLP
23       Attorneys for Defendant
    BY:  HOWARD M. COOPER
24       CHRISTIAN KIELY

25

KBOAGIUCps

1          (Via telephone)

2          THE COURT:  In reading your letters, I wasn't quite

3    sure of what the universe of documents was that we're fighting

4    over, and I'm particularly looking at the November 19th letter,

5    document 209, where you're saying –– and I'm looking at the

6    last paragraph –– "That leaves 475 files that contain

7    confidentiality designations, a significant portion of which

8    contain material that matches the definition of "Confidential

9    Information" to which defendant has already agreed."  And then

10   it goes on to say "another significant portion have been

11   produced in this action without a confidentiality designation.

12   The remaining documents are the only documents at issue."  How

13   many is that?  Do we have any clue?

14         MS. MOSS:  Your Honor, this is Nicole Moss for the

15   plaintiffs.  I don't think we have a precise number of how many

16   we're talking about.  I don't think it's likely to be a very

17   significant number given, I think, the agreement among the

18   parties that anything having to do with financial, medical, or

19   victim identity information is appropriately under a protective

20   order, and given the fact that, again, much of the other

21   documentation, emails that have been reproduced in this matter

22   that may have at one time had a confidentiality designation in

23   the *Giuffre v. Maxwell* matter, have been reproduced, many of

24   them, in this matter without that designation.  So it's some

25   smaller subset.

KBOAGIUCps

1        THE COURT:  OK.  Thank you.

2        May I ask Mr. Dershowitz's counsel, what is the issue

3   with saying when you want to use something publicly?  I think

4   in counsel's letter, she said that, for example, if you want to

5   use a document at a deposition, you just go ahead and use it,

6   and ask for permission to make it public later on.  I'm not

7   sure I understand what use we will make of the document that

8   will not be easily fixed by just saying, do you care about this

9   document or not?

10        MR. KIELY:  Your Honor, this is Christian Kiely for

11   Professor Dershowitz.

12        I believe, your Honor, that the parties are now in

13   agreement here.  There were essentially two aspects to the

14   dispute.  The first is what categories of documents are

15   properly designated confidential in this case.  And the second

16   is the procedure for de-designating or redesignating documents

17   that were originally produced in the *Maxwell* case.  I don't

18   agree that it imposes some undue burden on the plaintiff to

19   rereview these 475 documents to make redesignations.  However,

20   we have agreed that we will follow the procedure which is set

21   forth in plaintiff's letter where we can make a request for a

22   redesignation on an as-needed basis and they will take up that

23   request promptly.  The only thing is that we want the

24   definition of "Confidential Information" -- and I believe the

25   parties are in agreement on this -- to be the definition that's

KBOAGIUCps

1    set forth in the attachments to both parties' letters, which

2    are those four categories of confidential information that

3    Ms. Moss just listed, which would be personally identifiable

4    information, victim identity information, and medical and

5    financial information.  So I believe that this dispute is

6    essentially resolved.

7              THE COURT:  Ms. Moss, is that right?

8              MS. MOSS:  I think that's largely true, with the

9    following caveat: it appears to us from the defendants'

10   response letter and from what Mr. Kiely has just said that he

11   wants to remove any ability that we may have, if there is a

12   category of documents that they bring to our attention, that

13   doesn't fit neatly within the definitions of the proposed

14   protective order -- we of course would want to reserve the

15   right to bring that to the Court's attention.  An example I can

16   provide you -- and I don't know that this would ever be a

17   dispute -- but an example I can provide you is, I know that

18   plaintiff's settlement agreement with Jeffrey Epstein was one

19   of the documents that she produced in her document production

20   in the *Giuffre v. Maxwell* case.  That settlement agreement has

21   confidentiality requirements separate and apart from the

22   *Giuffre v. Maxwell* protective order.  And so we would, even if

23   the *Giuffre v. Maxwell* order is set to one side, would not be

24   at liberty to remove the confidentiality.

25              Now, they have not asked to us do that, to be clear,

KBOAGIUCps

and I don't know that there would be a dispute.  But we need to

have the ability, if documents come up that there's some reason

we believe they need to remain confidential, that we can seek

the Court's intervention and guidance if we can't reach an

agreement with the defendants.

THE COURT:  Mr. Kiely, you don't care about that, do

you?

MR. KIELY:  Your Honor, not with respect to the

specific example that Ms. Moss just gave.  The concern here is

that there would be a reservation of essentially unlimited

discretion for documents not falling into these enumerated

categories.  The proposed language that we propose actually

includes a carve-out for precisely the type of document that

Ms. Moss just mentioned because, in that case, Ms. Giuffre

could not unilaterally remove the confidentiality designation

because there's a contractual confidentiality designation which

she owes under that settlement agreement.  That's not the kind

of thing we're talking about.

THE COURT:  OK.  But can't these smart lawyers figure

out a reservation clause that will work?  This is not a big

deal.  And if, let's just say, if Ms. Giuffre decides she's not

going to waive any of it, then we have our remedies for that

too.  But can't you guys figure this out?

MS. MOSS:  Plaintiff certainly believes that that's

the appropriate course, your Honor.  And that's what we've

KBOAGIUCps

1    suggested.

2           MR. KIELY:  Your Honor, think we can go back to the

3    drawing board one more time and try to come up with some

4    language that adequately satisfies both of our concerns here.

5           THE COURT:  Wonderful.

6           What else would you like to talk about?

7           MS. MOSS:  Your Honor, while we're on the topic of the

8    protective order -- and I don't know if this remains a dispute

9    or not -- but as I read the language that the defendant has

10   proposed, it would extend to the deposition transcript of the

11   plaintiff from the *Maxwell* matter.  If I'm incorrect about

12   that, then certainly Mr. Kiely can correct me.  But that is

13   another area where we do not believe that the parties in this

14   case should be removing confidentiality designations over a

15   deposition transcript that, as we understand it, has been the

16   subject of separate proceedings in the *Giuffre v. Maxwell* case,

17   and we would not of course want to interfere with any rulings

18   or decisions that you may have made in that case.

19          THE COURT:  I'm not sure how the parties in this case

20   can agree that a deposition transcript that was marked

21   confidential under the *Maxwell* protective order is no longer

22   confidential.  How does that work?

23          MR. H. COOPER:  Well, your Honor, that has -- this is

24   Howard Cooper.

25          And by the way, he's too polite to tell you, Ms. Moss,

KBOAGIUCps

 1    that it's Christian "KIGH-lee," not "KEE-lee."

 2              MS. MOSS:  I apologize.

 3              MR. H. COOPER:  That's no problem at all.

 4              But obviously, your Honor, that starts bleeding into

 5    issues with regard to the overall situation that's given rise

 6    to the disqualification motion that we've filed.  So there's no

 7    simple answer to that question, unfortunately.  We do recognize

 8    the limitations that we're currently all operating under.

 9              THE COURT:  I didn't understand one word of that

10    answer.  It would seem to me that deposition transcripts that

11    are marked confidential in *Maxwell* are subject to the

12    interminable unsealing process in *Maxwell* and you people have

13    no say over it.  Is that wrong?

14              MR. H. COOPER:  Correct.

15              THE COURT:  Am I wrong on that?

16              MR. H. COOPER:  No.  There's no disagreement from

17    Professor Dershowitz's side.

18              MR. C. COOPER:  Nor from the plaintiff's side.  Nicki?

19              MS. MOSS:  That is correct.  But there is wording in

20    the defendant's proposed protective order that if the plaintiff

21    were to reproduce her transcript, as we have done under this

22    Court's order in this matter, that somehow we would, we the

23    plaintiff, would have the ability to lift that confidentiality

24    designation.  We do not believe that that is in fact the case.

25              THE COURT:  I know you can draft around this.

KBOAGIUCps

1          MR. H. COOPER:  Well, with regard to the plaintiff's

2     own testimony, of course we believe she can lift

3     confidentiality.  But my prior answer, your Honor, really just

4     reflected the situation that Professor Dershowitz finds himself

5     in, which I know is a topic for another day.  Your Honor has

6     ordered the production of certain things from the *Maxwell* case,

7     but we of course understand the Court's continued process.  And

8     nothing in this order is meant to suggest that we're trying to

9     go around it.

10          THE COURT:  All right, then.  It sounds like, if we're

11     not in agreement now, we can draft around so that we are in

12     agreement.  Yes?

13          MS. MOSS:  Yes.

14          MR. KIELY:  Yes, your Honor.

15          THE COURT:  What else?

16          MS. MOSS:  Your Honor, from plaintiff's perspective, I

17     don't know that there is anything else that we view as

18     necessarily ripe.  I mean, we certainly have concerns about

19     discovery, but it would be our expectation that we would

20     attempt to continue working those out with defense counsel and

21     bring them to you when they are ripe.  I'm happy to discuss

22     those if you want, but there's nothing that I think necessarily

23     requires a ruling from you at this point.

24          THE COURT:  Mr. Kiely, do you have anything else on

25     your agenda today?

KBOAGIUCps

1          MR. KIELY:  Well, your Honor, I do think that we

2     want -- I'm not sure exactly -- I know that the Court called

3     this status conference for an update on the status it of

4     discovery.  If the Court wants to have a conversation about the

5     scheduling of discovery we're certainly prepared to discuss

6     that, but otherwise we could defer that to another day.  I do

7     agree with Ms. Moss that the particular disputes that we

8     previewed in our joint letter to the Court are not ripe at this

9     point for the Court's consideration.

10          THE COURT:  Right.  I guess the real question is, how

11    long is this going to take?  Going into it, I would not have

12    thought we would still be worried about our documents at this

13    stage.  And yet it seems that we have a lot of unreviewed

14    documents.  When is that going to be concluded?

15          MR. KIELY:  Well, your Honor, I can speak to that.  I

16    mean, we have undertaken really, in terms of private-party

17    litigation between individuals, what is a really massive email

18    review based upon an agreed set of search terms, and that

19    relates to Professor Dershowitz's Gmail account, and there is a

20    process in place relating to the Harvard account that, again, I

21    don't think is ripe for your Honor's consider at this time.

22    But we're talking about tens of thousands of emails.  The final

23    agreed-upon set after much deliberation for the Gmail account

24    was something on the order of 50,000 emails.  And they require

25    a careful review for not only responsiveness but privilege,

KBOAGIUCps

1    particularly where Professor Dershowitz is a practicing

2    attorney and lots of the nonresponsive information is

3    privileged vis-a-vis other clients of his having nothing to do

4    with this case, and we have made a very diligent effort and

5    made our way through a good percentage of those documents, but

6    there are a number that remain outstanding.  And plaintiff is

7    seeking to have us do a similarly broad review of Professor

8    Dershowitz's Harvard email account.  And that frankly takes

9    time.

10               THE COURT:  It doesn't sound like the last is in

11   process yet.

12               MR. KIELY:  Well, yes, your Honor.  It is in process.

13   Defense counsel had attempted to negotiate a voluntary

14   collection process with Harvard University that started in

15   August once the parties had agreed on search terms.  For

16   various reasons that I won't get into, that process stalled and

17   about a month later plaintiff issued her own subpoena to

18   Harvard.  And since then the parties have been conferring with

19   Harvard in a way to move this forward that works for all

20   parties and protects the parties' various interests, including

21   the attorney-client privilege, which Professor Dershowitz holds

22   not only with respect to his counsel in this matter and related

23   matters but also vis-a-vis other clients of his.

24               THE COURT:  OK.  When is the answer?  You're telling

25   me you're in process.  I don't want to be sitting here at the

KBOAGIUCps

1    end of the first quarter saying, why have you not finished your

2    document discovery.

3         MR. KIELY:  Well, your Honor, that depends in part

4    largely on the volume of email that we end up, from Harvard,

5    that we end up having to go through.

6         Now, again, I don't think this is quite ripe for your

7    Honor's consideration, but Harvard has its own review that it

8    needs to do to, under FERPA and for its own confidential

9    information, before it even releases any of these documents to

10   either of the parties, whether it be to Professor Dershowitz

11   for a privilege review or to the plaintiff.

12        And that process needs to occur before the parties

13   even get their hands on the documents.  So I think that that

14   process is going to take at least several months.

15        THE COURT:  It sounds to me like that process hasn't

16   even commenced.

17        MS. MOSS:  That's correct, your Honor.  It should not

18   be surprising, your Honor, that from the plaintiff's

19   perspective this has been woefully lacking.  The defendant knew

20   from the minute this lawsuit was filed back in April of 2019

21   that he was going to need to produce email from his Harvard

22   email account.  And he knew from his prior experience in the

23   *Edwards v. Dershowitz* matter, in which it took several months

24   to negotiate a protocol with Harvard, that that was going to be

25   necessitated.

KBOAGIUCps

1          Now, I'm not suggesting that he needed to collect his

2     email before document requests were served on him, which we did

3     in February of this year, but he didn't even begin those

4     discussions with Harvard.  And all we have been hearing since

5     we served those discovery requests is that it's in process.

6     Then it was that we needed to have search terms.  And then the

7     excuse was, well, we're not doing anything because you, the

8     plaintiff, served a subpoena on Harvard.

9          What I can tell you is, within weeks of the return

10    date for that subpoena, Harvard had extracted the email, they

11    had provided us information on the volume of email.  They ran

12    proposed search terms on that email.  And we were able to get

13    that ball rolling with Harvard fairly quickly and are committed

14    to in good faith continue to work to narrow those search terms

15    and date filters to get the volume down to something that would

16    approximate a reasonable review.  But the ball is really in the

17    defendant's court.  These are his emails.  He needs to work a

18    process out with Harvard for how they're going to conduct that

19    FERPA review and how it's going to be paid for.  And that is

20    between him and Harvard.  All we can do is try to give input

21    regarding the search terms and date filters to make the review

22    reasonable, which we have done and we are continuing to be in

23    the process of doing.

24         MR. KIELY:  Your Honor, the suggestion that we've not

25    been diligent here is not correct.  We did not have an

KBOAGIUCps

1    agreed-upon set of search terms.  And by the way, by "agreed

2    upon" I mean preliminary, a preliminary sense of what kind of

3    volume we're talking about before we can even begin to have a

4    conversation as to the burden involved, the burden on us and

5    the burden on Harvard.  That set was not agreed upon until

6    August, and we immediately undertook a voluntary collection

7    process from Harvard at that point.  They required us to agree

8    to pay for all of their costs before even allowing us to run

9    the search terms to know what kind of volume we're talking

10   about or have any other basic information that we need to make

11   an estimate of those costs and the burden to Professor

12   Dershowitz.

13           So it's been a challenging process, and we've been

14   diligent throughout it.

15           THE COURT:  Can I ask you one question?

16           MR. KIELY:  Yes.

17           THE COURT:  What's your alternative?  You've got to do

18   it one way or the other.  Counsel says that Harvard has run the

19   search terms and knows the volume on those search terms.  I

20   don't understand what's holding this up.

21           MR. KIELY:  Your Honor, that was last week that we

22   first got that set of search terms, and that returned, I think,

23   150,000 emails.  That is not at all reasonable, in light of --

24   that imposes a massive undue burden, in terms of cost, in terms

25   of time, and it's not at all proportional to the needs of the

KBOAGIUCps

case, and particularly in light of the massive production of

email we have already made from Professor Dershowitz's Gmail

account.  And there are indications from that production that

the most -- there are indications from that production that

responsive information contained within the Harvard account was

forwarded to the Gmail account and has or will be produced to

the plaintiff.  We can't do a review of 150,000 emails from

Professor Dershowitz's Harvard account.

THE COURT:  What are you doing about it?  Have you

talked to counsel about narrowing the terms or the time?

MR. KIELY:  Your Honor, we are having those

discussions.  As I said, we just got that search term report

late last week.  We had a call with plaintiff's counsel and

Harvard's counsel on Friday.  We are working on exchanging

proposals to narrow the search terms.  Hopefully we can reach

agreement.  If not, we will provide both of those proposals to

Harvard's counsel, who will then run the terms and see what

kind of reduction it produces.  But it's an iterative process.

We're working with a third party.  And it takes time.

MR. H. COOPER:  I don't think it's fair for Ms. Moss

to suggest that there was any sort of willful attempt to delay

this process.  As Mr. Kiely has suggested, we've been working

with plaintiff's counsel.  We're working with Harvard's

counsel.  And we're trying to make this process, with a large,

massive volume of documents, as expeditious as possible.  So I

KBOAGIUCps

1    don't think it's fair to suggest that Professor Dershowitz was

2    delaying in any sort of way.

3            THE COURT:  OK.  But this was not a surprise.

4    Apparently he's gone through this before in connection with

5    other cases.  And what's going to happen now is, you're going

6    to tell me in three weeks that you've finally reached

7    agreement, and then Harvard is going to go on vacation, and

8    then we're going to be at the end of the first quarter.

9            All right.  Am I wrong that this is the largest batch

10   of documents still awaiting review?

11           MS. MOSS:  I believe that's correct, your Honor.  We

12   also have not received any text messages or any Twitter Direct

13   Messages or anything like that from the defendants either, but

14   we don't know the volume, and I would suspect that this Harvard

15   email account is the most voluminous.

16           THE COURT:  What's the story with whatever counsel

17   just said?

18           MR. KIELY:  Your Honor, we have not received any text

19   messages from plaintiff either.  We have to have a

20   meet-and-confer process about the extent to which there is

21   going to be an exchange of text messages.  But essentially,

22   just to give your Honor some background here, we have

23   plaintiff, who has largely relied upon her productions from

24   *Maxwell* of email that was reviewed and produced in that case,

25   and is now criticizing us for the time it's taking to take on a

KBOAGIUCps

1    much more voluminous review, that's many magnitudes larger, of

2    what she had to do.  And we've been work extremely diligently

3    on it for months.  Our time records would indicate that.  It's

4    a ton of email to slog through.

5         And it's important to note here that, you know, unlike

6    in some other cases where you can apply privilege terms and

7    then produce anything that's not privileged, Professor

8    Dershowitz is a practicing attorney.  The nonresponsive

9    documents contain privileged information vis-a-vis other

10   clients of his, and it requires a careful linear review of, for

11   the Gmail, 50,000, for the Harvard email I expect to negotiate

12   a number that is much lower than that so that the process can

13   be completed more quickly.  But it just takes time.

14        And the burden has not been -- the burden here is not

15   symmetrical with regard to discovery of email.  And so it's

16   absolutely going to take more time for Professor Dershowitz to

17   complete his productions on a rolling basis, per the parties'

18   agreement, than it is for plaintiff to complete her

19   productions.

20        THE COURT:  All right.  How about this?  Would you

21   write to me, in -- let me just get a date -- how about you

22   write to me no later than December 22, and tell me where you

23   are and what you're up to, please.

24        MR. KIELY:  Yes, your Honor, certainly.

25        THE COURT:  What else, friends?

KBOAGIUCps

1          MR. H. COOPER:  Your Honor, this is Howard Cooper for

2     Professor Dershowitz.  I don't want to interrupt if plaintiff's

3     counsel has additional items, but if they're done, there is an

4     item I would like to raise.

5          THE COURT:  Yes, sir.

6          MR. C. COOPER:  Before we move to other items, I

7     think, if you will indulge another moment, I think Ms. Moss

8     ought to update on where we are in terms of producing a

9     voluminous amount of text messaging, which is Ms. Giuffre's

10    apparently preferred method of electronic communication, and

11    our expectation that Professor Dershowitz will likewise produce

12    his relevant discoverable text messaging.

13         Would you please proceed, Ms. Moss.

14         MS. MOSS:  Certainly.  And to be clear, your Honor,

15    the document requests for both of the parties included and

16    defined "Documents" to include text messages.  We collected the

17    plaintiff's text messages.  We have reviewed them.  We reviewed

18    them for privilege, reviewed them for confidentiality, and

19    indeed we were poised to be able to do a production, when we

20    inquired about the status of the defendant's text message

21    production and learned that it apparently hasn't even been

22    collected or the process even been put in place.  And so we did

23    not make our initial production until it was going to be clear

24    that this was going to be reciprocal, because of course we

25    don't believe that the burden should only be on her or the

KBOAGIUCps

1    obligation should only be on the plaintiff to produce text

2    messages.  It should be a two-way street here.  And we've even

3    redacted them for confidentiality so that they could be

4    produced in advance of there being an agreed protective order,

5    redactions that we would likely be able to remove once a

6    protective order is in place.

7              And we've done that likewise, going to great effort to

8    collect and put her Twitter Direct Messages –– which are far

9    more difficult to collect and put in a review process than text

10   messages are.  We've done that process as well and produced

11   them.

12             So we believe that we are very close, with the caveat

13   that we still have confidential information to produce once

14   there's a protective order in place, of being complete with the

15   plaintiff's document production.

16             THE COURT:  OK.  Mr. Kiely, it's not your position

17   that texts and tweets are not documents, is it?

18             MR. KIELY:  Your Honor, no, that's not our position.

19   The question would be –– and I was not prepared to address this

20   particular issue today.  More homework needs to be done.  But

21   the question would be, I know from my experience in other cases

22   that collecting text messages and particularly iMessages is an

23   enormously complex and expensive process, and oftentimes there

24   is no guarantee of success of recovering anything relevant.  So

25   we need to understand what would be involved in doing that and

KBOAGIUCps

the extent to which Professor Dershowitz even has relevant text

messages.

         And with regard to tweets, tweets of course are public

information.  They are equally accessible to plaintiff.

         With respect to Direct Messages, we don't -- plaintiff

has produced those.  We have no objection to producing relevant

Direct Messages from Professor Dershowitz's Twitter.

         THE COURT:  I wasn't sure what you said about texts,

please.

         MR. KIELY:  Well, your Honor, I'm not prepared to

address the Court on our final position with respect to the

production of Professor Dershowitz's texts.  I certainly don't

dispute that they fall within the definition of "Documents."

The question is, what is involved in collecting them and

producing them for use in litigation.  I know from prior

experience it is a massively complex and expensive process.  So

we need to understand what that burden would be before we can

have a discussion about text messages.  And I didn't.  So

that's our position.

         THE COURT:  Why have we not made inquiry until now?

         MR. KIELY:  Your Honor, I would have to go back and

look at the formal document requests, but there have not been

any follow-up requests from plaintiff for the production of

text messages, and we have been focused on making as much email

production as we possibly can.

KBOAGIUCps

1              THE COURT:  All right.  It sounds like you had better

2      look at it.  I think I heard Ms. Moss say that these were

3      defined terms.

4              Ms. Moss, am I wrong, what you said?

5              MS. MOSS:  The definition of "Documents" included

6      texts.  Yes.

7              MR. KIELY:  Your Honor, I will have to go back and

8      look at our objections.  Parties include all kinds of things

9      within the definition of "Documents" that are not ultimately

10     produced in litigation.  So, again, I was not prepared to

11     address this right now.

12             MR. C. COOPER:  Your Honor, we are in a litigation

13     where text messages are not -- typically and routinely

14     understood to be within the definition of "electronic

15     documents" and are produced.  So I don't know where this

16     dispute is coming from.

17             MR. H. COOPER:  There is no dispute here yet, your

18     Honor.  And I think it's fair to say that from Professor

19     Dershowitz's perspective, given the level of time, energy and

20     effort that has gone into responding to plaintiff's requests,

21     which are asymmetrical in part because of the significant

22     spoliation issue on the plaintiff's side, it's surprising that

23     we are getting into this level of detail, when all of this is

24     under discussion.  And what I can say from the defendant's

25     perspective is, we are committed to moving this case forward.

KBOAGIUCps

You've asked us to file a report by December 22nd.  We will do
so.  We will have a position with regard to text messages and
proportionality by then.  But in the interim we're hopeful that
the multitude of discussions that have taken place to date,
trying to work these things out cooperatively, will continue,
rather than prematurely placing them in front of you.

THE COURT:  All right.  The only thing, Mr. Cooper,
that I'll check -- I'm sorry -- Mr. Howard Cooper.  The only
thing that concerned me was hearing that no inquiry had even
been made yet with respect to texts and all of that other
tweety stuff.  That was the concern.

MR. H. COOPER:  And, your Honor, if that's what you
heard, I understand the Court's concern.  I think it's fair to
say that we are working diligently on everything, and we are
regularly in discussion with plaintiff's counsel, and for
anyone in this call to suggest otherwise is without basis in
fact.  And I think that we ought to direct our efforts
prospectively to move this case forward, which is certainly
what it sounds like all counsel and all parties are interested
in doing.

THE COURT:  All right.

MR. C. COOPER:  Amen to that.

MR. H. COOPER:  In that regard, your Honor, I did have
another issue, but I don't want to interrupt plaintiff's
counsel if they're still placing things in front of you.

KBOAGIUCps

|    |    |
|----|----|
| 1 | THE COURT:  Mr. Charles Cooper, have you finished? |
| 2 | MR. C. COOPER:  Your Honor, I know of nothing that's |
| 3 | come up that we need to elaborate or add to.  Thank you. |
| 4 | THE COURT:  OK.  Mr. Howard Cooper. |
| 5 | MR. H. COOPER:  Thank you, your Honor. |
| 6 | We have been asking for months to take the plaintiff's |
| 7 | deposition.  I recognize that factors such as an unprecedented |
| 8 | pandemic have intervened, so I'm not faulting anybody for the |
| 9 | plaintiff's lack of -- unavailability.  But basically what |
| 10 | we've been told to date is that she's not available, she can't |
| 11 | travel to the United States.  The parties have agreed to two |
| 12 | days for each of Ms. Giuffre and Professor Dershowitz, and we |
| 13 | would like to get that on the calendar.  And to be clear, it's |
| 14 | a deposition that we will be videotaping.  We would prefer to |
| 15 | do it in person, socially distanced, at a mutually acceptable |
| 16 | location so that everybody is comfortable, done in accordance |
| 17 | with CDC guidelines.  We're not asking to do it next week.  But |
| 18 | this really could not drag on, and we would like some |
| 19 | assistance from the Court in getting Ms. Giuffre's deposition |
| 20 | on the calendar.  Thank you. |
| 21 | THE COURT:  Were you going to do it before you have |
| 22 | all the documents? |
| 23 | MR. H. COOPER:  Your Honor, we would like to get it on |
| 24 | the calendar, assuming that it will be at a date after the |
| 25 | documents have been produced. |

KBOAGIUCps

1          MR. C. COOPER:  Your Honor, may I speak to this issue?

2          THE COURT:  Yes.

3          MR. C. COOPER:  Thank you.

4          We certainly recognize that Ms. Giuffre's deposition

5    will be taken.  Two points.  First, the same question you ask

6    is the question that we ask, and we believe that neither her

7    deposition nor Professor Dershowitz's deposition should or can

8    reasonably be taken before both sides have completed their

9    document production, number one.  And, number two, there have

10   been, sadly, Ms. Giuffre has experienced a number of

11   health-related problems, quite apart from the pandemic, that

12   have presented obstacles, at least thus far, to scheduling a

13   deposition.  We can certainly commit to scheduling a deposition

14   pending travel restrictions, and hopefully the vaccine and

15   other prayed-for events that are going to make this pandemic

16   issue, particularly for somebody who lives in Australia,

17   relaxed -- but we're not resisting in the slightest the

18   deposition.  It's these other obstacles that I think are going

19   to have to be cleared before either side can really

20   realistically take the depositions of the two parties in this

21   case.

22         MR. KIELY:  May I respond, your Honor?

23         THE COURT:  Yes, sir.

24         MR. KIELY:  This is the first I'm hearing about health

25   issues, and I obviously regret hearing about that and will

KBOAGIUCps

1    defer to them.  I will note that the travel restrictions are

2    difficult to parse.  Ms. Giuffre is a United States citizen.

3    We understand that in connection with other matters, since this

4    case has been filed, she has come to the United States a couple

5    times and perhaps had been doing so regularly.  We don't think

6    that we need necessarily to, at all, to complete Professor

7    Dershowitz's document production, again recognizing the

8    asymmetry in those productions, in the parties' productions,

9    before going forward with Ms. Giuffre's deposition.  She after

10   all is the plaintiff who initiated this case.  So what I would

11   ask, as a practical matter, is to hear from plaintiff's counsel

12   when in the next 60 to 90 days we can reserve two days for her

13   to do a deposition.  As I said, we would like do it socially

14   distanced, in the same room, large conference room, CDC

15   guidelines to be followed, and obviously everything will be

16   subject to whatever particular needs exist, restrictions exist

17   at the time.  We'll all have to be flexible.  But given the

18   difficulty we've had and the age of the case, we would like to

19   get her deposition on the books as soon as we reasonably can.

20            MS. MOSS:  Your Honor, if I may -- this is Ms. Moss.

21   The pandemic began in March.  She has not traveled out of

22   Australia since then and the travel restrictions that have been

23   put in place by the Australian government, which have run the

24   gamut from not allowing travel outside but, as importantly, her

25   concern about being allowed to return to Australia, where her

KBOAGIUCps

1  children, her minor children, live.  So even if she could come

2  to the United States for this deposition, she for obvious

3  reasons is quite concerned about whether she would be able to

4  return back to Australia.  And realistically, until we have a

5  better sense of what's going to be allowed in terms of this

6  global pandemic, it just -- you know, the notion that we have

7  not been agreeing to dates, it has been -- we all well know

8  that, since March of 2020, which is just a few short months

9  after we took over representing Ms. Giuffre, this pandemic came

10 into being.  And that has been the primary reason that we have

11 not been able to schedule anything.  And I don't see that

12 changing any time soon, unfortunately.

13        MR. C. COOPER:  And I would just hasten to add this.

14 We are united with counsel for defendants in the strong

15 preference that the depositions in the case take place in

16 person under proper health-related protocols.  And we are

17 committed and will in good faith negotiate with our friends on

18 the other side to make that happen when it can reasonably be

19 done, your Honor.

20        THE COURT:  All right.  Why don't you do this.  Why

21 don't you write to me no later than January 15 on where you are

22 on your dates.  We ought to know a lot more by then, and

23 hopefully you'll have a better sense of what is doable and not

24 doable.

25        MR. C. COOPER:  Very well, your Honor.

KBOAGIUCps

1           MR. KIELY:  Very well, your Honor.

2           THE COURT:  Anything else?  Yes, sir.

3           MR. KIELY:  The only other item I had hoped to ask the

4    Court about is, your Honor, we will shortly have to the Court

5    the fully briefed disqualification motion.  I don't know

6    whether your Honor intends to hear argument on that, but we're

7    hoping to have the opportunity to address it.  We think it's an

8    important motion.

9           THE COURT:  Yes, sir.  We'll take a look.

10          MR. KIELY:  Thank you, your Honor.

11          THE COURT:  Anything else, friends?

12          MR. C. COOPER:  Not from the plaintiff's side, Judge

13   Preska.

14          MR. H. COOPER:  And your Honor, from the defendant's

15   side, I just wish everybody a happy Thanksgiving and a safe

16   one.

17          THE COURT:  And you as well.  Thank you.

18          MR. C. COOPER:  And the same to you, Howard, as well,

19   and friends.

20          COUNSEL:  Thank you.

21          OOO

22

23

24

25