# Cooper & Kirk

### Lawyers

A Professional Limited Liability Company

Charles J. Cooper
ccooper@cooperkirk.com

1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036

(202) 220-9600
Fax (202) 220-9601

November 12, 2021

**VIA ECF**
Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:     ***Giuffre v. Dershowitz*, Case No.: 19-cv-03377-LAP**
        **Supplemental Filing re ECF No. 297**

Dear Judge Preska:

I write on behalf of Plaintiff Virginia Giuffre to respond to Defendant's supplemental filing, Doc. 352, in support of his motion for a *Zolin* examination of Ms. Giuffre's communications with her former lawyers.

Defendant claims that the recent deposition testimony of Rebecca Boylan and Michael Spallholtz support his allegation that "Plaintiff and her former attorneys made the decision to falsely accuse Prof. Dershowitz as part of a plot to extort Leslie Wexner." Doc. 352 at 1. Defendant can only make this claim by failing to provide the Court with the portions of Ms. Boylan's testimony that fatally undermine Defendant's false and defamatory extortion theory.

The central evidence Defendant has repeatedly cited to support his extortion allegations is the claim that Ms. Boylan, who had been Ms. Giuffre's best friend when they were young, had told him that Plaintiff "admitted to her … that she was pressured into falsely accusing me to make money off of Leslie Wexner." i24NewsEnglish, *Alan Dershowitz: False Accusations Damage My Advocacy for Israel*, beginning at 08:46, YOUTUBE (July 16, 2020), bit.ly/3dX5pDR; *see also* Megyn Kelly Show, Alan Dershowitz on Scotus, Epstein, and OJ, at 54:46, APPLE PODCASTS (Oct., 14, 2020), https://apple.co/3FcyTtu; Alan Dershowitz, *The Ghislaine Maxwell I Know*, THE SPECTATOR (July 3, 2020), https://bit.ly/3olVFs5. Ms. Boylan unequivocally testified in her deposition that Defendant's claim is false:

> Q.     Did you ever say to Mr. Dershowitz that Virginia told you that she was going after Mr. Dershowitz in order to pressure the Ohio Victoria's Secret billionaire [i.e., Leslie Wexner]?
>
> A.     No.
>
> *     *     *
>
> Q.     Virginia never said to you, the lawyers are pressuring me to go after Dershowitz in order to in some way get at the Victoria's Secret billionaire.

November 12, 2021
Page 2

*     *     *

THE WITNESS: No. No.

Rebecca Boylan 10/18/2021 Dep. Tr. ("Boylan Dep.") 109:09–13; 110:1–12 (attached hereto as Ex. A).

More generally, Ms. Boylan's testimony fatally undermines the inferences that Defendant attempts to wring from his selective taping of his conversations with Ms. Boylan in April 2015. And the evidence from Mr. Spallholtz—a new recollection of statements Plaintiff purportedly made about Defendant—lacks any credibility as we demonstrate below. Read in context and as a whole, their testimony—like the testimony of Mr. Wexner's lawyer, John Zeiger, flatly denying that there was any extortion plot and confirming that he told Defendant there was no extortion plot—conclusively demonstrates the Defendant's statements accusing Ms. Giuffre and her former lawyers of extortion were made knowing that they were false. This testimony likewise confirms that there is no basis for the Court to conduct a *Zolin* examination of Ms. Giuffre's communications with her lawyers, much less a basis for piercing the privilege under the crime–fraud exception.

**Background**

Plaintiff and Ms. Boylan were childhood friends who lost contact after Plaintiff escaped from Jeffrey Epstein, got married, and moved to Australia. Boylan Dep. 8:21–9:5, 19:10—21. They reconnected via Facebook and grew close again, especially after Plaintiff returned to live in Florida with her family in October 2013. Boylan Dep. at 25:16–26:25; Ex. A, Boylan Dep. Ex. 1 at p. 1. In November 2014, Plaintiff moved with her family to Colorado where her mother was living. That December, Plaintiff (as Jane Doe) named Defendant as one of the men to whom Epstein had trafficked her in a filing in a CVRA action, and she established a charity called Victims Refuse Silence ("VRS") to assist other young victims of sexual abuse and trafficking. Doc. Second Amended Complaint ¶¶ 9, 49–50[1].

Early the next year, Plaintiff invited Ms. Boylan and her husband, Mr. Spallholtz, to serve on the charity's board. Boylan Dep. 72:2–23. They agreed and planned to move to Colorado to join Plaintiff, Boylan Dep. 67:13–16, 72:14–16. At the time, however, they were experiencing financial difficulties, including a lawsuit for unpaid credit card bills, and were living with Ms. Boylan's parents in Florida to save money. Boylan Dep. 65:13–23, 66:17–67:19; Michael Spallholtz 10/18/2021 Dep. Tr. ("Spallholtz Dep.") 46:1–25 (attached hereto as Ex. B).

Plaintiff loaned them $1,500 for moving expenses and sent the money to Ms. Boylan via Western Union on April 10, 2015. Boylan Dep. 76:6–77:3; ███████████████████████████ ████████████████████████████████████████████████████████████████ Ms. Boylan and Mr. Spallholtz promptly resigned from the board of Plaintiff's charity on April 13, 2015. Boylan Dep. 81:22–82:24.

Two days later, on April 15, Mr. Spallholtz, with Ms. Boylan's knowledge and agreement, emailed Defendant anonymously, offering "information about Virginia that her lawyer's are trying

---

[1] Consistent with the Court's November 10, 2021 Order (Doc. 355), Plaintiff will file her Second Amended Complaint in short order, and we cite the paragraphs of that forthcoming pleading.

2

November 12, 2021
Page 3

to hide that will hurt her credibility and her ability to lead VRS." Ex. B, DERSH053609/Spallholtz Dep. Ex 1; Boylan Dep. 83:24–84:1, 97:20–22. He claimed that the information "is definitely worth something." Ex. B, DERSH053609/Spallholtz Dep. Ex 1.; *see also* Boylan Dep. 83:21–84:1; Spallholtz Dep. 39:24–40:3. In response, Defendant arranged one or more telephone calls with Ms. Boylan and Mr. Spallholtz, and he taped at least three separate excerpts of his conversation(s) with Ms. Boylan. Specifically, as Defendant and Ms. Boylan conversed, Defendant asked Ms. Boylan three times if he could tape a portion of the discussion, she agreed, and Defendant would ask her to repeat something she had told him. *See* Boylan Dep. 105:18–106:3; Boylan Dep. Ex. 6. Defendant apparently did not tape any of his April 2015 conversations with Mr. Spallholtz, for he has not produced any such tapes to Plaintiff. The only tape of a conversation between Defendant and Mr. Spallholtz that Defendant produced occurred in August 2019.

There were several significant portions of the telephone call(s) that Defendant chose not to tape and has never shared with the Court. First, Ms. Boylan testified that she told Defendant about the financial difficulties she and Mr. Spallholtz were facing, explaining that she had provided two weeks' notice quitting her job based on the plan to move to Colorado and that Mr. Spallholtz had given up his interest in a gym that had been losing money. Boylan Dep. 88:7–17; *id*. at 90:7–12; 66:18–25. During the same conversation, Defendant told Ms. Boylan that he wanted to help her and Mr. Spallholtz. *Id*. at 90:23–25. Defendant chose not to tape the parts of the conversation in which Ms. Boylan described the financial difficulties she and Mr. Spallholtz were experiencing, and Defendant stated that he wanted to help them. *Id*. at 90:19—25; 106:13–107:5; Boylan Dep. Ex. 6; Spallholtz Dep. 20–41:3.

In the days following the telephone conversation, Mr. Spallholtz repeatedly pressed Defendant to explain what "help" he would provide in exchange for this information:

- "Rebecca remembered a few other things that will be helpful, but we would like to know what it is you mean when u say u would like to help us." Ex. B, DERSH053609/Spallholtz Dep. Ex. 1.
- "When you say 'we' are going to go after the lawyers. What do you mean? We have given u a lot of info that I know is a help to you. I am curious how plan // to help us." Spallholtz Dep. 44:7–16.

**Boylan Testimony**

During separate portions of the April 2015 telephone conversation(s) that Defendant recorded, Ms. Boylan informed Defendant that Plaintiff had told her that (a) Plaintiff felt pressured by her attorneys to name Defendant in the CVRA action, and (b) Plaintiff and her attorneys hoped to sue businessman Leslie Wexner for a substantial sum. Boylan Dep Ex. 6. In her deposition, Ms. Boylan stood by these representations to Defendant from 2015. Boylan Dep. 31:13–20, 38:2–6. While Defendant has claimed that these statements support the inescapable inference, he says, that Plaintiff's allegations against him were "made up" in order to extort money from Mr. Wexner, he has failed to disclose to the Court testimony that affirmatively refutes his extortion theory and undermines the strained inferences he has drawn from the statements Ms. Boylan has made.

Defendant's conspiracy theory rests on the implausible assertion that Plaintiff plotted with her former attorneys, all of whom are highly experienced, well-respected officers of this and many

3

November 12, 2021
Page 4

other courts, to extort money from Mr. Wexner by falsely naming *Defendant* in the CVRA action. Like Wexner's own attorney, however, Ms. Boylan testified at her deposition that she saw no connection whatsoever between Plaintiff's decisions to name Defendant publicly and to explore a potential claim against Wexner. Asked whether Plaintiff had told her "that the lawyers were pressuring [Plaintiff] to accuse Mr. Dershowitz in order to obtain money from the Victoria's Secret billionaire," Ms. Boylan answered "no." Boylan Dep. 108:2–6. Asked whether she had ever told Defendant that "the lawyers were pressuring [Plaintiff] in order to obtain money from the Victoria's Secret billionaire," Ms. Boylan answered "no." Boylan Dep. 108:8–11; *see also id.* 108:24–110:12. Indeed, Ms. Boylan emphatically denied telling Defendant "that there was any connection between the claim against Mr. Dershowitz and the claim against the Victoria's Secret billionaire." Boylan Dep. 110:8–12; s*ee also* Boylan Dep. 116:19–117:2. Thus, her testimony flatly contradicts Defendant's numerous public representations that Plaintiff "admitted to her best friend that she was pressured into falsely accusing me to make money off of Leslie Wexner." i24 News (July 16, 2020); *see also* Megyn Kelly Show (Oct. 14, 2020); THE SPECTATOR (July 3, 2020).

Moreover, Ms. Boylan testified that Plaintiff had told her that the reason she was working with her lawyers to develop a claim against Mr. Wexner was that "she wanted to make all the monsters pay." Boylan Dep. 58:21–59:1. It was Ms. Boylan's "sense that [Plaintiff] was angry at these people because they had done some very bad things." Boylan Dep. 58:2–6. Ms. Boylan testified that she did "not think [Plaintiff] was making it up that these monsters had done evil things." Boylan Dep. 58:19–24.

The only specific accusation about which Ms. Boylan expressed doubt was Plaintiff's accusation against Defendant, but she admitted that she had no direct knowledge about the truth of any accusation. Boylan Dep. 60:1–9. And her sole basis for doubting the accusation against Defendant was Plaintiff's alleged statement that she was reluctant to "go after" Defendant. Boylan Dep. 45:25–46:2; *see also* Boylan Dep. 115:1–4, 115:25–116:4. Any reluctance Plaintiff may have had in no way undermines the credibility of her allegations against Defendant; many, if not most, young abuse victims would be reluctant to go after one of the most prominent and well-connected lawyers in the country, who has cultivated a reputation for aggressive tactics and had previously smeared and harassed many of Mr. Epstein's other accusers. *See, e.g.*, Larry Keller*, Billionaire's lawyer tried to discredit teen girls, police say*, PALM BEACH POST (July 29, 2006), bit.ly/3tnanAF.

Notably, contrary to another inference Defendant has repeatedly sought to draw, Docs. 298 at 13, 352 at 1, Ms. Boylan did not suggest that her statement that Plaintiff had not previously named Defendant as one of her abusers in any way implied that Plaintiff's allegation against Defendant is untrue. To the contrary, Ms. Boylan did not recall that Plaintiff had ever mentioned that any of Epstein's associates or even Epstein himself had sexually abused her. Boylan Dep. 56:21–58:10. Any failure by Plaintiff to mention Defendant to Ms. Boylan, accordingly, means nothing.

Most importantly, Ms. Boylan confirmed that Plaintiff never told her that Plaintiff's accusation against Defendant was false. Boylan Dep. 115:8–23. Nor, according to Ms. Boylan herself, did Ms. Boylan ever tell Defendant that she "did not believe there was any sexual contact between" him and Plaintiff. Boylan Dep. 116:5–17. Once again, Ms. Boylan's testimony serves only to contradict Defendant's numerous public representations and allegations in this court, that Plaintiff "told her best friend she didn't want to name me because I was innocent," Alan

November 12, 2021
Page 5

Dershowitz responds to new allegations from Epstein case, at 01:16, Fox News (Aug. 10, 2019), https://bit.ly/3n8sd9v, "[t]old her best friends she never met me or knew me," *The Ben Shapiro Show*, Alan Dershowitz, Sunday Special Ep. 85, at 20:55, YouTube (Mar. 8, 2020) https://bit.ly/3wI5VyL, and "admitted to her best friend that she was pressured to *falsely* accuse me," The Spectator (July 3, 2020) (emphasis added); *see also* i24 News (July, 16, 2020), Megyn Kelly Show (Oct. 14, 2020).

## **Spallholtz Testimony**

Unlike Ms. Boylan, Mr. Spallholtz testified that Plaintiff did tell him that Defendant "wasn't involved" and that "she's never seen him do anything." Doc. 352 at 1. This supposed recollection is wholly unreliable for at least three reasons.

First, the recollection came to him in his deposition for this case—more than six years after his conversation with Plaintiff allegedly occurred. Mr. Spallholtz claimed that he told Defendant similar things when they spoke by telephone in 2015, Spallholtz Dep. 23:7–12, but that claim is not credible because Defendant surely would have taped such a statement had Mr. Spallholtz actually made it. As noted previously, both Mr. Spallholtz and Ms. Boylan confirmed that Defendant selectively recorded parts of their conversations in the hope of capturing statements to support his defense against Plaintiff's accusations. Boylan Dep. 103:6–107:5; Spallholtz Dep. 52:3–53:14. There can be no doubt that Defendant would have recorded Mr. Spallholtz relaying Plaintiff's alleged statements that Defendant "wasn't involved" and that "she's never seen him do anything" if Mr. Spallholtz had actually said that. Mr. Spallholtz himself admitted that, if the statement is not on tape, he must not have said it. Spallholtz Dep. 36:13–37:3. Mr. Spallholtz also admitted that his 2015 statements to Defendant would have been more accurate than his current testimony because his memory would have been fresher, and thus more reliable, closer in time to the alleged conversation with Plaintiff. Spallholtz Dep. at 34:3–19; 57.

Indeed, the only recorded conversation with Mr. Spallholtz that Defendant has produced occurred in 2019, when Mr. Spallholtz reached out for Defendant's advice about selling supposed information to the press. Plaintiffs' alleged statements are nowhere to be heard. Rather, in halting fashion,[2] Mr. Spallholtz begins to adopt *Ms. Boylan's* doubts about Plaintiff's accusation before questioning his own recollection and advising that Defendant would "have to ask Rebecca." Spallholtz Ex. 3 p. 14; *see also* Spallholtz Dep. 55:20–56:5. Although, in the course of describing his wife's recollections, he attributed to Plaintiff the statement that Defendant "didn't do anything," Spallholtz immediately qualified that statement by adding, "I can't remember." Spallholtz Ex. 3 p. 14.

Second, Ms. Boylan has no such recollection of Plaintiff saying that Defendant "wasn't involved" or that "she's never seen him do anything." Defendant's counsel suggested at

---

[2] "Basically what she felt – you know, like we told you before, she felt she had been pressured into saying something that, you know, really didn't happen. She didn't really, you know – you know, like going after you or – and that you didn't do anything // I can't remember. You'd have to ask Rebecca. I think – there was stuff she said, too. She doesn't remember meeting you. But I can't – I don't want to say that for sure, because I can't remember exactly what she said." Ex. B, Spallholtz Dep. Ex. 3, p. 14.

November 12, 2021
Page 6

Ms. Boylan's deposition that perhaps Plaintiff had made this stunning admission to Mr. Spallholtz out of Ms. Boylan's earshot. Boylan Dep. 46:8–12. But this suggestion is not just implausible: it contradicts Mr. Spallholtz's own testimony that Ms. Boylan was present during "[t]he one conversation [he] was there for" in late 2014 or early 2015, and Plaintiff and Ms. Boylan "were talking." Spallholtz Dep. at 10:9–11, 32:22–33:3. Mr. Spallholtz himself admitted that his wife's recollection of Plaintiff's statements would be more accurate than his. Spallholtz Dep. 66:22–67:17.

Mr. Spallholtz acknowledges the possibility that his "memory has morphed a little over the years on this point," Spallholtz Dep. 37:5–10, which is bolstered by his own admission to Defendant that he is a devoted follower of Defendant's writing, Spallholtz Ex. 3 p. 13–14 ("I actually follow — read all the things that you write . . . you are constantly commenting and giving your opinion; so I constantly read it").

Finally, Mr. Spallholtz's testimony in general lacks credibility because he offered it as part of a proposed *quid pro quo* with Defendant, whose "help" he repeatedly sought at a time when he was in admittedly difficult financial straits. Whether Defendant provided the requested help is irrelevant; at a minimum, Defendant encouraged Mr. Spallholtz and Ms. Boylan to believe that unspecified "help" would be forthcoming. *See* Boylan Dep. 90:23–25; Ex. B, Spallholtz Dep. 44:7–10 & Ex. 1. Mr. Spallholtz's communications with Defendant make it clear that his motive was pecuniary. His efforts to explain away his requests for "help" and his assertion that his information was "worth something," are thoroughly unconvincing. Spallholtz Dep. 40:1–42:6, 43:25–45:15.[3]

\*     \*     \*

Far from supporting Defendant's motion, Ms. Boylan's and Mr. Spallholtz's deposition testimony serve only to underscore how incredible Defendant's facially far-fetched conspiracy theory really is. Plaintiff respectfully requests that the Court deny Defendant's motion to compel and alternative request for *in camera* review.

Respectfully,

/s/ Charles J. Cooper
Charles J. Cooper

cc: Counsel of Record

---

[3] Reinforcing the commonsense proposition that "worth something" has pecuniary connotations, Mr. Spallholtz himself used the exact same phrase—"worth something"—when testifying about the media's monetary offers for Ms. Boylan's story. Spallholtz Dep. at 54:20–55:8.