# Cooper & Kirk

Lawyers
A Professional Limited Liability Company

| | | |
|---|---|---|
| Nicole J. Moss<br>nmoss@cooperkirk.com | 1523 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036 | (202) 220-9636<br>Fax (202) 220-9601 |

December 15, 2021

**Via ECF**
Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re:    *Giuffre v. Dershowitz*, Case No.: 19-cv-03377-LAP
              Reply re Pre-Motion Discovery Conference

Dear Judge Preska:

      I write on behalf of Plaintiff Virginia Giuffre in reply to Defendant Alan Dershowitz's letter of December 13, 2021, opposing Plaintiff's request for a pre-motion conference concerning various discovery disputes between Plaintiff and Defendant. ECF No. 380 ("Def's. Ltr.").

      Defendant has no one to blame but himself for the timing of these disputes. Defendant forced Plaintiff to subpoena his own emails from his Harvard email account and to undergo many months of negotiations before Plaintiff received a single production from that account. *See* ECF No. 190 at 2, ECF No. 228 at 1, ECF No. 241 at 1. Defendant did not even purport to complete his productions from that account and did not produce privilege logs for either of his accounts until October of this year. Just over six weeks later, Plaintiff had reviewed the emails and the thousands of privilege log entries, sent Defendant a detailed deficiencies letter, conferred with Defendant's counsel, and submitted unresolved disputes to the Court. That Plaintiff's objections are substantial and made in good faith is confirmed by the fact that, over the past month, Defendant has made no fewer than five productions consisting of more than one thousand pages to correct deficiencies. Moreover, the disputes that Plaintiff has submitted to the Court should come as no surprise to Defendant, as he has known of Plaintiff's positions on most of these matters since before the Court held that depositions must await the substantial completion of discovery.

      **I.**      **Defendant Wrongfully Asserts Privilege Over Non-Privileged Documents.**

      Defendant contends that the extraordinary number of logged documents "is a direct consequence of Plaintiff's overbroad document requests and search parameters." Def's. Ltr. 380 at 2. A review of the logs tells a different story. Of the more than 23,000 entries across Defendant's two logs, more than 18,500 are dated after Plaintiff's accusations against Defendant became public, and it is apparent even from the metadata Defendant has provided that the vast majority of those relate to the core matters in dispute. The volume of materials is solely a function of Defendant's penchant for writing and his overbroad conception of privilege.

<u>Common Interest with Epstein.</u> Defendant overstates the scope of the parties' dispute concerning his communications with Jeffrey Epstein. Plaintiff does not attack "all of [Defendant's] claims of privilege over communications with his longtime client Epstein." Def's. Ltr. at 3. Plaintiff did not demand that Defendant log or even review presumptively privileged communications with Epstein dated before June 30, 2008. Exhibit S. Plaintiff has not challenged Defendant's assertions of privilege over his communications with Epstein dated before December 30, 2014, the earliest date on which he claims to have had a common legal interest with Epstein.[1] Finally, Plaintiff has not challenged Defendant's assertions of privilege over his post-2014 communications with Epstein that are unrelated to the matters in which Defendant was personally interested.

Instead, Plaintiff seeks to compel Defendant to produce only (1) those communications with Epstein and/or his counsel over which Defendant has asserted a joint-defense privilege, and (2) any other communications with Epstein and/or his co-counsel that Defendant claims are privileged attorney-client communications and that relate to matters in which Defendant has claimed to have a personal interest. *See* Ltr. from N. Moss to Hon. Preska, ECF No. 374 at 6, n.4 (Dec. 3, 2021) ("Pl.'s Ltr."). These communications all occurred on or after December 30, 2014. Here is what we know about that period:

1. Defendant has produced no retainer agreement between Defendant and Epstein for that period.

2. Defendant insists that after 2005, he billed Epstein "for every minute [Defendant] spent with [Epstein]." Washington Journal, *Alan Dershowitz on Efforts to Impeach President Trump*, C-SPAN (Dec. 16, 2019), https://bit.ly/3oVoywW; *see also* The Megyn Kelly Show, *Alan Dershowitz on SCOTUS, Epstein, and OJ*, APPLE PODCASTS (Oct. 14, 2020), https://apple.co/3GNl3ic ("I was never ever his friend or acquaintance once I . . . knew what he had done, or even what he was accused of doing. . . . [O]nce he was accused every minute[ ] he spen[t] with me he paid, he paid not only for his case, but for the pro-bono cases I do fifty-percent of my cases on, and so it was a completely professional relationship."); Naama Lanski, *Dershowitz's War for the Truth*, ISRAEL HAYOM (Oct. 12, 2020), https://bit.ly/3q2YCyL ("I had a relationship with him until the day he was arrested. That relationship ended and it became a formal legal relationship where he paid me for every single second that I advised him."); *see* Casey Sullivan, *Alan Dershowitz Extends Truce Offer to David Boies Amid Bitter Feud*, BLOOMBERG LAW (Apr. 11, 2016) https://bit.ly/3seFhNT ("Remember, I'm a lawyer – I bill by the hour. I have a record of every single day."). Yet for the period in question, Defendant has produced only two bills, dated five days apart in February 2016: unitemized invoices from "Alan Dershowitz Consulting LLC" "for consultation services rendered on the CVRA case." Exhibit T. He has produced no bills for legal services.

---

[1] Defendant has asserted a "Joint Defense" privilege over approximately two dozen emails dated between 2007 and 2008. We have assumed that the common interest in question was between Epstein and someone other than Defendant and that Defendant was acting as Epstein's lawyer in these communications. If that assumption is incorrect, then we also challenge these designations.

Hon. Loretta A. Preska
December 15, 2021
Page 3

3. ██████████████████████████████████████ Exhibit G, ECF No. 373-7. Defendant has asserted similar personal interests in other proceedings about which he communicated with Epstein.

4. Defendant and Epstein were never party to the same litigation.[2]

5. Defendant and Epstein apparently negotiated a written joint defense agreement covering two proceedings, but it appears that Epstein did not execute it. Exhibit D, ECF No. 373-4.

6. Defendant and Epstein did not negotiate a written joint defense agreement covering any of the other proceedings or matters in which Defendant asserts that they had a common legal interest.

These facts cast serious doubt on the proposition that Defendant and Epstein agreed to engage in confidential communications for the purpose of pursuing a common legal strategy. And they cast serious doubt on the proposition that many of the communications they exchanged were even attorney-client privileged to begin with. In the face of these doubts, Defendant does next to nothing to meet his burden to support his privilege assertion. He provides only two pieces of evidence: (1) his sworn testimony, given in October 2015, that he represented still Epstein, and (2) a signature page from the common interest agreement with Martin Weinberg's missing signature on it. See Def's. Ltr. at 2, 4. n. 4. The first piece of evidence is self-serving and, in any event, covers only the first ten months of the five-year period during which Defendant now claims to have represented Epstein in connection with proceedings in which Defendant had a personal interest. The second piece of evidence is just puzzling. Defendant conspicuously does not claim that the signature he has produced to Plaintiff dates to 2015, although that is plainly the inference he wants Plaintiff and the Court to draw. Id. at 4, n.4. If Mr. Weinberg signed the agreement *recently* to signify his recollection that he executed the agreement in 2015, the signature affords considerably weaker evidence of an agreement than would a contemporaneous signature.

In any event, even if Defendant and Epstein believed that they shared a common legal interest, that would not make it so. Defendant uses legal words to describe their interest (e.g., "defend" and "charge"), but he identifies no litigation or palpably threatened litigation in which he and Epstein had shared or even overlapping legal stakes in defending against Plaintiff's charges. Def's. Ltr. at 3; see United States v. Aramony, 88 F.3d 1369, 1392 (4th Cir. 1996) ("[B]ecause Aramony has not shown how UWA would be affected (apart from the stain of its reputation) by the allegations concerning him, the joint defense privilege is inapplicable here."). Nor does their status as co-conspirators entitle them by default to shield their communications in the absence of concretely threatened litigation or prosecutions in which they both faced liability for their conspiracy, and for which they were formulating a common defense. See Ambac Assur. Corp. v. Countrywide Home Loans, Inc., 57 N.E.3d 30, 37–38 (N.Y. 2016) (describing requirement that parties to a common interest agreement must reasonably anticipate litigation in which they will have to mount a common claim or defense); Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252

---

[2] Although Epstein was introduced in the "party" section of Plaintiff's original complaint in this action, he was never party to this action.

F.R.D. 163, 172 (S.D.N.Y. 2008) (same); *People v. Osorio*, 549 N.E.2d 1183, 1186 (N.Y. 1989) (co-conspirators do not necessarily share common legal interests).

Finally, even if Defendant and Epstein did share common legal interests in reasonably anticipated litigations, Defendant has not met his burden to establish that the communications he has withheld sought or shared legal advice in furtherance of those interests. On this score, Defendant boasts that he "did not make a blanket claim of privilege over all of his communications with Epstein as might have been justified under the circumstances." Def's. Ltr. at 2. This statement reflects a misunderstanding of privilege law. The attorney-client privilege does not cover every communication between a client and his attorney. *Allied Irish Banks, P.L.C.*, 252 F.R.D. at 168. Rather, it covers only those communications that seek or convey legal advice. *See Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*, 215 F.R.D. 466, 470 (S.D.N.Y. 2003). And the joint defense privilege does not cover every communication between parties who share common legal interests. *See United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017). Rather, it covers only those communications that are privileged to begin with and that are shared in furtherance of the parties' common legal strategy. *See United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). Defendant gets no extra credit for following the law by producing communications that are not privileged.

Neither should the volume of Defendant's productions lay to rest doubts that he has adequately screened the purported joint defense communications. Defendant has produced 318 emails on which Epstein was a participant. He has withheld 4,800. Plaintiff does not challenge his privilege assertions for all (or even most) of these, but for those Plaintiff does challenge, Defendant has not met his burden to support the privilege.

Finally, Defendant argues that the communications are protected by the work-product doctrine, as well. As Defendant implicitly acknowledges, however, his work-product theory rises or falls with his common interest theory. Def's. Ltr. at 6 (arguing that parties sharing a common interest may share work product without waiving the protection).

<u>Harvard Email Account After April 1, 2015</u>. Plaintiff stands by the arguments outlined in her earlier letter to the Court, Letter from N. Moss to Hon. Preska, ECF No. 241, at 3 (Feb. 26, 2021), and respectfully requests permission to file a motion that further develops those arguments.

<u>Lawyer Associates</u>. "It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987). Without conceding that Defendant has met his burden, Plaintiff is not challenging his communications with individuals or firms with whom he had a formal retainer agreement or his communications with individuals who have confirmed that they understood their communications with Defendant to be privileged. For the remaining lawyer associates, Defendant has not met his burden.

While it is true that the existence, or absence, of a formal retainer agreement is not dispositive of whether an attorney-client relationship truly exists, the absence an agreement undermines a party's assertion that a privileged relationship exists. *See United States v. Adlman*, 68 F.3d 1495, 1500 (2d Cir. 1995). Defendant's case is further weakened by the sheer volume of

attorneys he claims represented him in connection with a few discrete matters. *See* Ex. H, Doc. 373-8. It is also weakened by the fact that at least three of the lawyers Defendants claimed were his attorneys have disclaimed the relationship. And it is weakened further still by the failure of more than twenty individuals with whom Defendant has asserted a privileged relationship to respond to counsel's investigative emails. The only affirmative "evidence" Defendant has offered to dig himself out of this evidentiary hole is his counsel's unsworn assertion that a privileged relationship exists. That does not suffice. *Gulf Islands Leasing v. Bombardier Cap.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003).

Defendant argues that little can be inferred from his associates' failure to respond to Plaintiff's inquiries because they were sent "in the middle of the Thanksgiving holiday weekend." Def's. Ltr. at 7. (In fact, counsel sent the emails on a business day, Exhibit I, Doc. 373-9.) It nevertheless detracts from Defendant's case that these individuals could not be bothered to respond, as holidays usually do not deter attorneys from helping their clients. At best, Defendant's argument makes the hole in which he finds himself slightly less deep.

Finally, Defendant argues that most of the challenged communications are also work product. Def's. Ltr. at 7. Defendant does not meet his burden. To begin, a significant portion of these communications were written by individuals whose attorney-client relationship with Defendant has not been established. These communications would not be privileged. FED. R. CIV. P. 26(b)(3)(A) (work product is prepared by a "party or its representative"). In any event, Defendant has not even established that his relationship with these individuals was sufficiently confidential that his disclosure of work product to them would not waive the protection.

## II. Defendant Refuses To Produce Responsive Documents to which Plaintiff Is Entitled.

*Dershowitz v. Netflix* and *Boies v. Dershowitz* Discovery. The materials Plaintiff requests from *Dershowitz v. Netflix*, No. 1:21-cv-21961-CMA (S.D. Fla.) and *Boies v. Dershowitz*, No. 160874/2019 (N.Y. Cnty. Sup. Ct.) are relevant to the present litigation because they concern the same defamatory statement(s). Defendant makes no effort to engage Plaintiff's arguments on burden or fairness. Plaintiff stands by them.

*Edwards v. Dershowitz* Settlement Amount. Plaintiff also stands by her position that the monetary amount that Defendant paid to settle in *Edwards v. Dershowitz* ("*Edwards*") is relevant to the present litigation. Defendant attempts to reframe his earlier litigation as "a claim involving alleged unethical conduct by Edwards and Cassell," Def's. Ltr. at 8, but the allegedly unethical conduct is the very conduct that is at the heart of Plaintiff's extortion-conspiracy-based defamation claims.

Tax Returns. Where tax returns are relevant to a party's damages claims, and no other financial documents are produced to reveal the same information, there is a compelling need for their production. *See Wexler v. Allegion (UK) Ltd.*, No. 16-2252, 2021 WL 1226596, at *3 (S.D.N.Y. Mar. 31, 2021). Defendant has conceded the relevance of these records by requesting them from Plaintiff. And Defendant does not dispute that only his tax returns can show a comprehensive picture of Defendant's income over the relevant period. Pl.'s Ltr. at 13. Plaintiff

Hon. Loretta A. Preska
December 15, 2021
Page 6

should not be limited to Defendant's cherry-picked evidence of injury or his imperfect recollection of Epstein's payments.

Harvard Emails. Defendant's counsel has reviewed and produced more emails than has Plaintiff's counsel for one reason only: Defendant has more emails. Defendant cites nothing for the proposition that parties' discovery burdens must be symmetrical where the amount of relevant, discoverable information each possesses is not. The rules demand proportionality not between the parties, but instead between the burden and the needs to the case.

The emails Plaintiff seeks have obvious relevance to the present litigation because all presumptively refer to Epstein, the locations of his properties, or a witness Defendant has deposed (Sharon Churcher).[3] Although Defendant has run search terms containing Epstein's name, those searches have all contained limiters that have resulted in the exclusion of relevant communications referring to Epstein.[4] Defendant does not dispute, for example, that relevant communications between Defendant and a producer of the documentary series in which Defendant alleges that Plaintiff defamed him remain unproduced in this action. Pl.'s Ltr. at 14. Plainly, the current search terms are inadequate to capture all relevant communications in Defendant's Harvard email account—and not just marginally relevant communications, but communications that Defendant believed to be important enough that he highlighted them in another complaint about the same allegedly defamatory statement.

With respect to the expenditure of time and treasure on discovery in this litigation, Defendant is not alone. In the last eighteen months, Plaintiff's counsel have expended significant resources to negotiate and initiate the document review process it was Defendant's duty to drive. Defendant's burden—and Plaintiff's—would have been far less if Defendant had simply fulfilled his discovery obligations up front.

### III.   Defendant Refuses Fully To Answer Plaintiffs' Interrogatories.

Plaintiff's opening letter explains in detail why the answer Defendant quotes in his letter does not provide all of the requested information. *Compare* Def's Ltr. at 10, *with* Pl.'s Ltr. at 15. Defendant offers no substantive response, and Plaintiff stands on her explanation. Though Defendant argues that a deposition is the proper means to obtain the additional information Plaintiff seeks, the Court has already rejected that argument. *See* Order, Doc. 325. Defendant has made clear to anyone that will listen that his audio recordings are key to his case. *See 90.0 WBUR* (Jan. 7, 2020), https://wbur.fm/3pZseNx ("that admission on tape is gonna be very, very important

---

[3] Defendant argues in a separate pending letter motion that the Court should drastically limit discovery concerning Epstein. ECF No. 367. Plaintiff explains in her response why documents in Defendant's possession concerning Epstein are highly relevant.

[4] Defendant is wrong that he has "produced or logged every single email he exchanged with Jeffrey Epstein since 2007, as the parties negotiated an exclusion protocol that allowed Defendant to exclude most communications with Epstein and his other lawyers before June 30, 2008. Ex. S.

Hon. Loretta A. Preska
December 15, 2021
Page 7

at trial."). Plaintiff should not be required to rely on Defendant's half-answers and opportunistic omissions when evaluating this evidence.

### IV.  Party Depositions Should Not Proceed Until the Court Resolves the Foregoing Disputes.

The present exchange reveals substantial disputes that the Court and parties are unlikely to resolve before January. Plaintiff's position on the impact of outstanding document discovery has not changed and need not be rehashed here.[5] Separately, Defendants' pending letters concerning the scope of the protective order raise questions that must be resolved before Plaintiff's deposition, unless Defendant is willing to forego a second bite at the deposition apple if the Court revises the protective order in his favor.

Defendant now seeks to schedule his own deposition in January, as well. Mr. Kiely is wrong that he informed my colleagues and me that he intended to notice Professor Dershowitz's deposition for the month of January, and Plaintiff refused to agree to schedule a date. On November 29, Mr. Kiely told us during a meet and confer that he would notice Defendant's deposition for a date before the end of *December*, ███████████████████████████████████ We promptly informed him that we would object to proceeding with a deposition before Defendant substantially completed his document production. *See* Exhibit U. Mr. Kiely never responded.

Needless to say, it would be highly prejudicial for Plaintiff to be forced to cross-examine Defendant without the benefit of full discovery. Defendant's request is beyond the scope of Plaintiff's letter. If the Court is going to entertain it at the requested pre-motion conference, Plaintiff respectfully requests more than two business days to respond.

Respectfully,

s/ Nicole J. Moss
Nicole J. Moss

CC: Counsel of Record (via ECF)

---

[5] Moreover, Western Australia, where Plaintiff lives, is not set to open its borders until February. Narelle Towie, *Western Australia to reopen border on 5 February after almost two years sealed off from the world*, THE GUARDIAN (Dec. 13, 2021), https://bit.ly/3DXhNPh.