# EXHIBIT C

LC7VMAX1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA,
3
                v.                        20 CR 330 (AJN)
4
     GHISLAINE MAXWELL,
5
                     Defendant.           Jury Trial
6    ------------------------------x
                                          New York, N.Y.
7                                         December 7, 2021
                                          9:05 a.m.
8
     Before:
9                     HON. ALISON J. NATHAN,

10                                        District Judge

11                          APPEARANCES

12   DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
     BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
     HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
     BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
               -and-
19   BOBBI C. STERNHEIM
               -and-
20   COHEN & GRESSER
     BY:  CHRISTIAN R. EVERDELL
21
     Also Present:  Amanda Young, FBI
22                   Paul Byrne, NYPD
                     Sunny Drescher,
23                    Paralegal, U.S. Attorney's Office
                     Ann Lundberg,
24                    Paralegal, Haddon Morgan and Foreman

25

LC7VMAX3

1   were waiting for you.

2          MS. MOE:  No, your Honor.  I just apologize.  I got a

3   message saying that folks were waiting for me, so I apologize

4   for being late.

5          THE COURT:  Oh, no, no.  That's fine.  Everybody has a

6   lot going on.  I understand.

7          (Jury present)

8          THE COURT:  Thank you, members of the jury.

9          Ms. Comey, the government may call its next witness.

10         MS. COMEY:  The government calls Carolyn.

11         THE COURT:  The witness testifying under the name

12  Carolyn may come forward.

13   CAROLYN,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16         THE COURT:  Once seated, please remove your mask.

17         This witness will be testifying under the pseudonym

18  Carolyn.  I remind the sketch artists that my order is in place

19  requiring no exact likenesses of the witnesses testifying under

20  pseudonym.

21         MS. COMEY:  Your Honor, just to be clear, this witness

22  is testifying just under her first name, not a pseudonym.  But

23  we would ask the same order be in place.

24         THE COURT:  Thank you, Ms. Comey.

25         The witness is testifying under her first name, and

LC7VMAX3                    Carolyn - direct

```
 1    the anonymity order with respect to exact likenesses applies.

 2              Go ahead, Ms. Comey.

 3              MS. COMEY:  Thank you, your Honor.

 4              May I inquire?

 5              THE COURT:  You may.

 6    DIRECT EXAMINATION

 7    BY MS. COMEY:

 8    Q.  Good morning.

 9    A.  Good morning.

10    Q.  What's your first name?

11    A.  Carolyn.

12    Q.  Could you spell that for us please.

13    A.  C-A-R-O-L-Y-N.

14    Q.  Leading up to this trial, Carolyn, did you ask to testify

15    under just your first name to protect your privacy?

16    A.  Yes, ma'am.

17    Q.  I'd like to ask you to please take a look at the binder in

18    front of you.  Could you please turn to Government Exhibit 11.

19    Let us know when you're there.

20    A.  I'm here.

21    Q.  Do you recognize that?

22    A.  Yes.

23    Q.  What is that?

24    A.  My birth certificate.

25              THE COURT:  Sorry, Carolyn.  If you could come closer
```

1   to the microphone, please.

2   A.  My birth certificate.

3            MS. COMEY:  Your Honor, I would ask that the jury be

4   permitted to turn to Government Exhibit 11 in their binders,

5   please.

6            THE COURT:  Which is admitted?

7            MS. COMEY:  Which is admitted, yes, your Honor.

8            THE COURT:  All right.  Without objection?

9            MR. PAGLIUCA:  No objection.

10            THE COURT:  Thank you.

11            Jury, please turn to GX-11.

12   BY MS. COMEY:

13   Q.  Carolyn, at the top of the page here, without saying it out

14   loud, do you see the name at the very top?

15   A.  Yes.

16   Q.  Is that your full name?

17   A.  Yes.

18   Q.  And is the date of birth in the top right-hand corner your

19   date of birth?

20   A.  Yes.

21   Q.  Thank you.  You can set that aside.

22            And your Honor, I'd ask that the jurors be permitted

23   to put their binders back under their chairs.

24            THE COURT:  Yes.  Thank you.

25            Please do so, jury.  Thank you.

LC7VMAX3                          Carolyn - direct

1   Q.  Carolyn, where did you grow up?

2   A.  In New York.

3   Q.  And then did you move somewhere from New York?

4   A.  Yes, I moved down here to Florida.

5   Q.  And in what year did you move to Florida?

6   A.  In 1999.

7   Q.  I'm going to ask you to speak into the microphone.

8   A.  1999.

9   Q.  Thank you.

10          Carolyn, what is the last kind of school you attended?

11  A.  Middle school.

12  Q.  What is the last grade you attended before dropping out in

13  middle school?

14  A.  Seventh.

15  Q.  After you dropped out in seventh grade, did you ever go

16  back to school?

17  A.  No.

18  Q.  Carolyn, have you used drugs in your life?

19  A.  Yes.

20  Q.  Have you been addicted to drugs in your life?

21  A.  Yes.

22  Q.  What drugs have you been addicted to?

23  A.  Pain pills and cocaine.

24  Q.  I want to talk a little bit about when you were in middle

25  school.  Where did you go to middle school?

LC7VMAX3                        Carolyn - direct

```
 1    A.  At H. L. Watkins.

 2    Q.  In what town is H. L. Watkins?

 3    A.  Palm Beach Gardens.

 4    Q.  Is that in Florida?

 5    A.  Yes.

 6    Q.  When you were 14 years old, who lived at home with you?

 7    A.  My mom and my brothers.

 8    Q.  Are your brothers older or younger than you?

 9    A.  Younger.

10    Q.  What was your life like at home when you were 14 years old?

11    A.  I was allowed to do whatever I wanted.

12    Q.  Why is that?

13    A.  Because my mom was an alcoholic and a drug addict.

14    Q.  When you were between the ages of 14 and 16, how did you

15    make money?

16    A.  I went to Mr. Epstein's house and got money that way.

17    Q.  How did you first meet -- and when you say "Mr. Epstein,"

18    do you know his full name?

19    A.  Yes.

20    Q.  What's his full name?

21    A.  Jeffrey Epstein.

22    Q.  How did you first meet Jeffrey Epstein?

23    A.  Through the guy I was dating.

24    Q.  What's the first name of the guy you were dating when you

25    were 14?
```

LC7VMAX3                         Carolyn - direct

1    A.  Shawn.

2    Q.  Can you spell that for us?

3    A.  S-H-A-W-N.

4    Q.  How did you meet Shawn?

5    A.  He lives across the street from me.

6    Q.  In West Palm Beach?

7    A.  Yes.

8    Q.  About how old were you when you first started dating Shawn?

9    A.  Thirteen.

10   Q.  About how old was Shawn when you first started dating him?

11   A.  Seventeen.

12   Q.  I'd like you to please turn back to the binder and pull out

13   what's been marked for identification has Government Exhibit

14   20.  Let us know when you're there.

15   A.  I'm sorry, which exhibit?

16   Q.  Two zero, 20.

17   A.  I'm here.

18   Q.  Is the name on that exhibit, without saying it out loud,

19   Shawn's full name?

20   A.  Yes.

21          MS. COMEY:  Your Honor, the government offers this

22   exhibit under seal.

23          MR. PAGLIUCA:  No objection.

24          THE COURT:  Thank you.

25          GX-20 is admitted under seal to protect the identity

1   of the third party and the witness.

2           (Government's Exhibit 20 received in evidence)

3           MS. COMEY:  Your Honor, may we have the jurors please

4   turn to this exhibit in their binders.

5           THE COURT:  They may.

6           Please take out your binders.  GX-20.

7           MS. COMEY:  Thank you, your Honor.

8           I think the jurors can put the binders back down.

9           THE COURT:  Okay.  Please do so, jury.

10  BY MS. COMEY:

11  Q.  Carolyn, when you first met Shawn, how old did you tell him

12  you were?

13  A.  Seventeen.

14  Q.  How, if at all, to your knowledge, did Shawn learn how old

15  you actually were?

16  A.  I was going -- I had a birthday and I was going to be 14.

17  Q.  Did he come to your 14th birthday party?

18  A.  Yeah.

19  Q.  And is that how he learned your actual age?

20  A.  Yeah.

21          THE COURT:  I just ask again, Carolyn, please speak

22  directly into the mic so everyone can hear you.  Thank you.

23  Q.  How did Shawn lead you to meeting Jeffrey Epstein?

24  A.  Through friends of his, Virginia Roberts and Tony Figueroa.

25  Q.  How did you meet Virginia?

LC7VMAX3                      Carolyn - direct

1   A.   Through Shawn.

2   Q.   About how old were you when you met Virginia?

3   A.   Fourteen.

4           MS. COMEY:  Ms. Drescher, would you please pull up

5   what's in evidence as Government Exhibit 113.

6   Q.   Carolyn, do you recognize the person on the screen in front

7   of you?

8   A.   Yes.

9   Q.   Who is that?

10  A.   That's Virginia.

11  Q.   Is that the same Virginia we were just talking about?

12  A.   Yes, ma'am.

13          MS. COMEY:  We can take that down.  Thank you.

14  Q.   Who was Tony in relation to Virginia?

15  A.   Her boyfriend.

16  Q.   What would you, Shawn, Tony, and Virginia do together when

17  you were 14 years old?

18  A.   We would smoke pot.

19  Q.   How do you remember Jeffrey Epstein first coming up with

20  that group?

21  A.   Virginia asked me if I wanted to go make money.

22  Q.   Did she tell you what you would need to do to make that

23  money?

24  A.   Not right away.

25  Q.   Before you ultimately went, did she tell you?

LC7VMAX3                        Carolyn - direct

1   A.  No.

2   Q.  What did she tell you?

3   A.  That we were going to go to her friend's house who lived on

4   Palm Beach Island, and I was going to meet one of her wealthy

5   friends.

6   Q.  And do what?

7   A.  Give him a massage.

8   Q.  How did you respond?

9   A.  Okay.  I said okay.

10  Q.  Why did you say okay?

11  A.  Because I was going to make a lot of money.

12  Q.  About how old were you the first time you went to Jeffrey

13  Epstein's house?

14  A.  Fourteen.

15  Q.  Do you remember about what time of year it was the year you

16  were 14?

17  A.  Yes.  It is around spring, like going into summer.

18  Q.  How did you get to Jeffrey Epstein's house that first time?

19  A.  Virginia drove me.

20  Q.  When you got to Jeffrey Epstein's house -- withdrawn.

21          Where was Jeffrey Epstein's house?

22  A.  On Palm Beach Island.

23  Q.  What did the outside of the house look like that first day

24  you went there?

25  A.  I could tell it was a mansion and it was pink.

LC7VMAX3                         Carolyn - direct

1   Q.   Did you go there multiple times after that?

2   A.   Yes.

3   Q.   Did the color of the house change at some point?

4   A.   Yes.

5   Q.   To what?

6   A.   White.

7   Q.   That first day when you got to Jeffrey Epstein's house, who

8   went inside?

9   A.   Me and Virginia.

10  Q.   What room did you walk into?

11  A.   The kitchen.

12  Q.   When you walked into the kitchen, what happened?

13  A.   We were greeted by Ms. Maxwell.

14  Q.   What did Ms. Maxwell look like?

15  A.   An older lady.

16  Q.   Can you describe her.

17  A.   She had an accent and she had like shoulder-length black

18  hair.

19  Q.   How did you learn her name?

20  A.   She introduced herself.

21  Q.   Did she say just her last name or both her first and her

22  last name?

23  A.   Her first and her last name.

24  Q.   What did you call her?

25  A.   Maxwell.

1    Q.  Why did you call her Maxwell instead of using her first

2    name?

3    A.  Because I couldn't exactly pronounce her first name

4    correctly.

5    Q.  When Maxwell greeted you in the kitchen, what, if anything,

6    did Virginia say to Maxwell?

7    A.  That I was her friend.

8    Q.  Did she say your name?

9    A.  Yes.

10   Q.  What did she say?

11   A.  She said, This is my friend Carolyn.

12   Q.  And what did Maxwell say?

13   A.  You can bring her upstairs and show her what to do.

14   Q.  What happened next?

15   A.  We walked up the stairs that were in the kitchen, and we

16   passed a bunch of bedrooms and entered into Mr. Epstein's

17   bedroom, into his bathroom area.

18   Q.  Can you describe the bathroom that you went into off of

19   Mr. Epstein's bedroom.

20   A.  Yes.  When you walk in, there is a sink to your right,

21   there is a dresser to the left, there is a closet area, there

22   is a toilet area, there is a steam room, and then there's a

23   shower.

24   Q.  What, if any, seating do you remember?

25   A.  There is an ugly polka-dotted couch.

LC7VMAX3                         Carolyn - direct

1  Q.  After you went into that room with Virginia, what did

2  Virginia show you?

3  A.  Where the massage table was.

4  Q.  Then what happened?

5  A.  We walked into the little closet area and she was pulling

6  out the massage table.  And I was looking at all the photos

7  that were on the wall.

8  Q.  What else did Virginia show you, if anything?

9  A.  Where all the massage oils and lotions were kept.

10 Q.  And where was that?

11 A.  In the bottom drawer of the dresser that is on your

12 left-hand side.

13 Q.  After the massage table was set up, what did you and

14 Virginia do next?

15 A.  Virginia had taken off her clothes and she asked me if I

16 would be comfortable taking off mine.  And I told her I would

17 like to keep my bra and underwear on.

18 Q.  So at that point what was Virginia wearing?

19 A.  Nothing.

20 Q.  And what were you wearing?

21 A.  My bra and underwear.

22 Q.  What happened next?

23 A.  Mr. Epstein came into the room.

24 Q.  Then what happened?

25 A.  He brushed his teeth and then laid face down on the massage

LC7VMAX3                          Carolyn - direct

 1   table.

 2   Q.  While Mr. Epstein was face down on the massage table, what

 3   did you and Virginia do?

 4   A.  We massaged the backs of his legs up to his buttocks.

 5   Q.  Then what happened?

 6   A.  After 45 minutes, he had turned over.

 7   Q.  What happened when Mr. Epstein turned over?

 8   A.  Virginia got on top of him.

 9   Q.  And what did you see Virginia and Mr. Epstein doing?

10   A.  Having sex.

11   Q.  Where were you while Virginia and Mr. Epstein were having

12   sex on the massage table?

13   A.  I was sitting on the couch right in front of them.

14   Q.  Did Mr. Epstein touch you during this first massage?

15   A.  No.

16   Q.  After that ended, what happened next?

17   A.  I was paid.

18   Q.  Where did the money come from?

19   A.  It was on top of the sink.

20   Q.  In that same bathroom?

21   A.  Yes.

22   Q.  Who got money?

23   A.  Me and Virginia.

24   Q.  How much money did you get?

25   A.  $300.

LC7VMAX3                        Carolyn - direct

1   Q.  How much money did Virginia get?

2   A.  I'm not exactly sure.

3   Q.  What denominations were the bills?

4   A.  Hundred dollar bills.

5   Q.  After that first time, did you go back to Jeffrey Epstein's

6   house with Virginia again?

7   A.  No.

8   Q.  Why not?

9   A.  Because I didn't have to.

10  Q.  Why not?

11  A.  Because when we were leaving, Maxwell had asked me for my

12  telephone number.

13  Q.  And did you give her your telephone number?

14  A.  Yes.

15          MS. COMEY:  Ms. Drescher, would you please pull up

16  what's in evidence as Government Exhibit 115.

17  Q.  Carolyn, do you recognize the person in this photograph?

18  A.  Yes.

19  Q.  Who is that?

20          THE COURT:  I'm sorry, I need the witness to speak

21  into the microphone.

22  A.  That's Mrs. Maxwell.

23          THE COURT:  Thank you.

24          MS. COMEY:  Now, can we please go to Government

25  Exhibit 112, Ms. Drescher.

1   Q.   Do you recognize the person in this photograph?

2   A.   Yes.

3   Q.   Who is that?

4   A.   That's Mr. Epstein.

5          MS. COMEY:  Let's take that down please, Ms. Drescher.

6   Q.   Carolyn, in total, approximately how many times did you go

7   over to Mr. Epstein's house to give him massages?

8   A.   Over 100.

9   Q.   About how often did you go over to his house to provide

10  those massages?

11  A.   Two to three times a week.

12  Q.   About how old were you the first time you went over to his

13  house?

14  A.   Fourteen.

15  Q.   And about how old were you the last time you went over to

16  his house?

17  A.   Eighteen.

18  Q.   Do you remember the exact details of every encounter you

19  had at that house?

20  A.   A lot of them run together.

21  Q.   Do some of those details and events stand out more in your

22  mind though?

23  A.   Yes.

24  Q.   Carolyn, I'd like to ask you -- go ahead and get a drink.

25          Would you please pick up the binder again and turn to

1   what's been marked for identification as Government Exhibit

2   104.

3   A.  One 0 what?

4   Q.  104.

5        Do you recognize that?

6   A.  Yes, I do.

7   Q.  What is it?

8   A.  A picture of me when I was 14.

9   Q.  Does this fairly and accurately depict what you looked like

10  when you went to Jeffrey Epstein's house when you were 14 years

11  old?

12  A.  Yes.

13       MS. COMEY:  Your Honor, the government offers this

14  exhibit under seal.

15       MR. PAGLIUCA:  No objection.

16       THE COURT:  Thank you.  GX-104 is admitted under seal

17  to protect the anonymity of the witness who I've permitted to

18  testify under her first name.

19       (Government's Exhibit 104 received in evidence)

20       MS. COMEY:  Your Honor, may we please ask the jurors

21  to pull out their binders and look at Government Exhibit 104.

22       THE COURT:  Yes.  Please, jurors, take your binders.

23  GX-104.

24       MS. COMEY:  Thank you, your Honor.

25       The jurors can set their binders aside.

1        THE COURT:  All right.  Please do.  Thank you.

2   BY MS. COMEY:

3   Q.  Carolyn, how would you schedule times to go to Jeffrey

4   Epstein's house for massages?

5   A.  Maxwell would call and set up appointment times.

6   Q.  Would anyone else ever call?

7   A.  I sometimes called and there over time was Sarah Kellen

8   that would call.

9   Q.  Let me ask you some questions about that.

10        During about what time period do you remember Maxwell

11   being the person who would call to schedule massage

12   appointments with Jeffrey Epstein?

13   A.  For like the first year or two.

14   Q.  And then after that, who would call you to schedule your

15   appointments?

16   A.  Sarah or I would call.

17   Q.  Now, after Sarah started being the person to call you, did

18   you still see Maxwell at Epstein's house?

19   A.  Yes.

20   Q.  Where would she be?

21   A.  In an office area off the kitchen.

22   Q.  And you said that sometimes you would call to make

23   appointments?

24   A.  Yes.

25   Q.  Why would you call?

LC7VMAX3                      Carolyn - direct

1    A.  Because I was young and $300 was a lot of money to me.

2    Q.  What phone numbers would Maxwell and Sarah call you on in

3    order to make massage appointments?

4    A.  Either my cell phone, my mom's cell phone, or Shawn's home

5    phone.

6    Q.  How did they get all of those numbers?

7    A.  I give -- I had given them to Maxwell.

8    Q.  Why did you give extra numbers to Maxwell?

9    A.  In case she couldn't get a hold of me on one.

10   Q.  Was that your idea?

11   A.  Yeah.

12   Q.  Do you remember any of those phone numbers?

13   A.  No, I can't.

14   Q.  Do you remember your mom's cell phone number?

15   A.  That I do.

16   Q.  Okay.  But you don't remember your own phone number or

17   Shawn's number?

18   A.  I -- I've blocked it out.  It's been a very long time.

19   Q.  This morning, Carolyn, did I ask you to write your mom's

20   cell phone number down on a piece of paper?

21   A.  Yes.

22   Q.  Could you please turn now to what's been marked for

23   identification as Government Exhibit 608 in your binder.

24          Are you there?

25   A.  Yes.

LC7VMAX3                        Carolyn - direct

1    Q.   Do you recognize that?

2    A.   Yes.

3    Q.   What is that?

4    A.   My mother's cell phone number.

5    Q.   Is that the phone number you wrote down on a piece of paper

6    this morning?

7    A.   Yes.

8              MS. COMEY:  Your Honor, the government offers this in

9    evidence under seal.

10             MR. PAGLIUCA:  No objection.

11             THE COURT:  GX-608 is admitted under seal to protect

12   the anonymity of this witness.

13             (Government's Exhibit 608 received in evidence)

14             MS. COMEY:  Thank you.  You can set that aside,

15   Carolyn.

16   Q.   Carolyn, what is your mother's first name?

17   A.   Dorothy.

18   Q.   Carolyn, when Maxwell called you to schedule appointments,

19   what did she say to you?

20   A.   She would ask if I would be available at this time,

21   sometimes because they would be out of town and be flying in.

22   Q.   During those times when Maxwell mentioned that they were

23   flying in, who's the "they" she referred to?

24   A.   Her and Mr. Epstein and I don't know who else.

25   Q.   And what did Maxwell say about where she and Mr. Epstein

LC7VMAX3                        Carolyn - direct

```
1    were during those conversations?

2    A.  Sometimes they said New York.

3    Q.  How would that come up?

4    A.  Well, they -- she said that they would be flying in from

5    New York, could I be available at this time.

6    Q.  And when Sarah would call you to schedule an appointment,

7    what would she say?

8    A.  She'd ask me if I would be available at this time.

9    Q.  Were you ever present when your mom received a phone call

10   that you later learned was from Maxwell?

11   A.  Sometimes, yeah, she would hand me the phone.

12   Q.  What do you remember happening on those occasions?

13   A.  Just my mom saying, Here, you have a phone call.

14   Q.  And then what would happen?

15   A.  It would be to schedule an appointment.

16   Q.  Were you ever present when Shawn received a phone call on

17   his phone --

18   A.  Yes.

19   Q.  -- from Maxwell?

20            What happened?

21   A.  Shawn would tell me that I have a phone call and to say yes

22   to the appointment.

23   Q.  About how many times do you remember Maxwell saying she was

24   calling from New York?

25   A.  Only a couple.
```

LC7VMAX3                        Carolyn - direct

1   Q.   Now, you mentioned that sometimes you would reach out to

2   schedule appointments yourself; is that right?

3   A.   Yes.

4   Q.   And you mentioned that Shawn would tell you to go to these

5   appointments, right?

6   A.   Yes.

7   Q.   Why were you reaching out to go to these appointments?

8   A.   For the money.

9   Q.   What were you doing with the money?

10  A.   I was buying drugs.

11  Q.   What drugs were you using?

12  A.   Marijuana, cocaine, alcohol, anything that could block out

13  for me to go to the appointment.

14  Q.   Did you become addicted to drugs at some point while you

15  were going over to Mr. Epstein's house?

16  A.   Yes, unfortunately.

17  Q.   What drugs did you become addicted to?

18  A.   Cocaine and pain pills.

19  Q.   How did you get to Jeffrey Epstein's house for appointments

20  in your home in West Palm Beach to Palm Beach?

21  A.   Sometimes it would be by a driver would be sent, or I would

22  take a cab, or Shawn would use my mom's car and drop me off,

23  and my mom has also dropped me off there.

24  Q.   Why couldn't you drive yourself?

25  A.   Because I wasn't of age.

LC7VMAX3                          Carolyn - direct

1   Q.  When you got a cab or a car was sent for you, how did you

2   know that those cars were on the way?

3   A.  I was told.

4   Q.  By who?

5   A.  Either Maxwell or Sarah, whoever called to schedule the

6   appointment.

7   Q.  What would they say?

8   A.  That we would be sending a cab or a Town Car.

9   Q.  Did Shawn ever go inside Jeffrey Epstein's house when he

10  drove you there?

11  A.  No.

12  Q.  Who, if anyone, did Shawn meet outside of Jeffrey Epstein's

13  house when he went with you there?

14          MR. PAGLIUCA:  Objection.

15          Lack of foundation, your Honor, under 602.

16          THE COURT:  Sustained.

17  Q.  When you and Shawn were together at Jeffrey Epstein's

18  house, did you ever see someone else?

19  A.  When we were together at Mr. Epstein's house, yes.

20  Q.  Who did you see?

21  A.  I mean, he didn't go inside.

22  Q.  But when you were outside, did you ever see anyone?

23  A.  Yes, Mr. Epstein.

24  Q.  How many times did you see Mr. Epstein when Shawn was with

25  you?

1    A.  Once.

2    Q.  What happened that one time?

3    A.  They were talking about the Shelby Cobra that he owned.

4    Q.  That who owned?

5    A.  Mr. Epstein.

6    Q.  Where did that conversation happen?

7    A.  In the driveway.

8    Q.  Carolyn, did you ever drive yourself to Jeffrey Epstein's

9    house even though you didn't have a license?

10   A.  Yes.

11   Q.  About how many times?

12   A.  A few.

13   Q.  When you went over to Jeffrey Epstein's house for massage

14   appointments, where did you enter the house each time?

15   A.  Through the kitchen.

16   Q.  During the first few months when you were going over to

17   that house for massages, who did you see when you first entered

18   the kitchen?

19   A.  Maxwell.

20   Q.  What, if any, conversations do you remember having with

21   Maxwell when you would meet her in the kitchen?

22   A.  She would just let me know that Mr. Epstein would be back,

23   he was on a jog or he was -- he'd be back any moment; I could

24   go upstairs and set up.

25   Q.  When you interacted with Maxwell, what, if any,

1    conversations did you have with her about your family?

2    A.  About my upbringing and things that were going on at the

3    time.

4    Q.  What did you tell Maxwell?

5    A.  That my mom was an alcoholic, and I had been molested, and

6    just random personal things.

7    Q.  What, if any, conversations do you remember having with

8    Maxwell about sexual abuse that you have had experienced in the

9    past?

10   A.  I'm sorry, can you repeat that?

11   Q.  What conversations do you remember having with her about

12   sexual abuse that you'd experienced?

13   A.  I remember telling her that I had been raped and molested

14   by my grandfather starting at the age of four.

15   Q.  What, if any, conversations did you have with Maxwell about

16   travel?

17   A.  I couldn't travel because I couldn't get a passport because

18   I was too young.  And my mom, no matter how messed up she was,

19   there was no way I would be able to leave the country.

20   Q.  How did that topic come up?

21   A.  I was invited to go to an island.

22   Q.  Who invited you?

23   A.  Mr. Epstein and Maxwell.

24   Q.  And did they invite you together in one conversation or in

25   separate conversations?

1   A.  Separate.

2   Q.  When you were speaking with Maxwell about that, what did

3   she say?

4   A.  She had asked if I ever traveled.  And I told her I've been

5   to New York, I used to live there, and just places I've been in

6   the United States.

7   Q.  And then where did she invite you to?

8   A.  To the island.

9   Q.  And how did you respond when Maxwell invited you to the

10  island?

11  A.  I told her that I was too young, and there is no way in

12  hell my mom was going to let me leave the country.

13  Q.  Did you tell her how old you were?

14  A.  Yes.

15  Q.  What did you say?

16  A.  I told her I was 14.

17  Q.  After you told Maxwell you were 14, did she continue to

18  call you to schedule massage appointments with Jeffrey Epstein?

19  A.  Yes.

20  Q.  What, if any, conversations do you remember having with

21  Maxwell about school?

22  A.  She had asked me if I had ever -- like, what I wanted to

23  do.  And I told her I wanted to become a massage therapist.

24  Q.  What, if any, conversations did you have with Maxwell about

25  sex toys?

1  A.  She asked me if I'd ever used them, and I told her no.

2  Q.  What, if any, conversations do you remember having with

3  Maxwell about your bra and hip size?

4  A.  I was upstairs setting up the massage table.  And at that

5  point I was kind of comfortable because I had been there so

6  many times, that at that point I was getting fully nude.  And

7  she came in and felt my boobs and my hips and my buttocks and

8  said that -- that Mr. Epstein would -- that I had a great body

9  for Mr. Epstein and his friends.

10 Q.  How did that relate to your breast and hip size?

11 A.  She just said that I had a good body type.

12 Q.  And just so we're clear about who she is?

13 A.  Maxwell.

14 Q.  You said she felt your boobs.  Did she touch you?

15 A.  Yes.

16 Q.  Where?

17 A.  On my breasts.

18 Q.  And where did that happen?

19 A.  In the massage room or the bathroom.

20 Q.  After that, did she leave the massage room?

21     You have to say the answer.

22 A.  Yes.

23 Q.  And then who came in?

24 A.  Mr. Epstein.

25 Q.  During each massage appointment at Jeffrey Epstein's house,

LC7VMAX3                      Carolyn – direct

1   after you went into the kitchen, where would you go from there?

2   A.  Upstairs to set up the massage table.

3   Q.  In what room did you set up the massage table?

4   A.  In his bathroom.

5   Q.  In whose bathroom?

6   A.  Mr. Epstein's.

7   Q.  Is that the same bathroom you described for us earlier?

8   A.  Yes.

9   Q.  When you first went into the massage room, what did you do

10  first?

11  A.  I would -- well, sometimes the massage table was already

12  set up, and all I would have to do is put the towel on it.  And

13  sometimes I would have to open the closet door and pull it out

14  and set it up.

15  Q.  After you set up the massage table, what would you do with

16  your clothing?

17  A.  I would take them off.

18  Q.  At first when you were first going over to that house, what

19  would you wear during the massages?

20  A.  I would keep my underwear on.

21  Q.  Did that change at some point?

22  A.  Yes.

23  Q.  What did it change to?

24  A.  To me being fully nude.

25  Q.  After -- withdrawn.

1           Other than Jeffrey Epstein, who else saw you fully

2    naked in the massage room?

3    A.   Maxwell, two of Mr. Epstein's friends, and two girls that I

4    don't know who they were.

5    Q.   We'll talk about them in a minute.

6           How many times approximately did Maxwell see you fully

7    naked in the massage room?

8    A.   Probably about three.

9    Q.   Was one of those the time when she touched your breasts?

10   A.   Yes.

11   Q.   Did she touch you the other two times that you can

12   remember?

13   A.   No.

14   Q.   After Maxwell saw you naked in the massage room, did she

15   continue calling you to schedule massage appointments with

16   Jeffrey Epstein?

17   A.   Yes.

18   Q.   About how old were you when Maxwell saw you naked in the

19   massage room and touched your breasts?

20   A.   I was going to be 15.

21   Q.   So were you 14, almost 15?

22   A.   Yeah.

23   Q.   Did anyone ever photograph you while you were at Jeffrey

24   Epstein's house?

25   A.   Yes.

LC7VMAX3                         Carolyn - direct

1   Q.   Who photographed you?

2   A.   Sarah.

3   Q.   How did Sarah come to photograph you?

4   A.   She had called me and asked -- well, she had said Mr.  --

5   she called and said she was calling in regards to Mr. Epstein;

6   and that I would get paid five to $600 if she could take

7   pictures of me.

8   Q.   How did you respond?

9   A.   I said okay.

10  Q.   Where were those pictures taken?

11  A.   In the Palm Beach house.

12  Q.   What were you wearing in those pictures?

13  A.   Nothing.

14  Q.   Who took those pictures?

15  A.   Sarah Kellen.

16  Q.   Do you remember anyone else being around at that time?

17  A.   No.  It was just me and her that I was aware of.

18  Q.   During the massage appointments, after you set up the

19  massage table and got undressed, who would come inside the

20  room?

21  A.   Mr. Epstein.

22  Q.   After Mr. Epstein came in the room, for the first

23  approximately 45 minutes in the room, what would you do?

24  A.   Massage him.

25  Q.   How would he be lying down?

LC7VMAX3                        Carolyn - direct

```
 1   A.  Face down.

 2   Q.  While you were massaging Mr. Epstein, what, if any,

 3   conversations did you have?

 4   A.  About my life, my upbringing.

 5   Q.  What did you tell him about your family, if anything?

 6   A.  That it was kind of screwed up; that my mom was an

 7   alcoholic and an addict.

 8   Q.  And what did you tell him about sexual abuse you had

 9   experienced in the past?

10   A.  I had told him that I had been molested and raped.

11   Q.  And what, if any, conversations did you have with him about

12   travel?

13   A.  He had also asked me a couple of times if I can travel.

14   And I told him there is no way that my mom's going to let me

15   because I was too young.

16   Q.  In those conversations, did you tell Jeffrey Epstein how

17   old you were?

18   A.  Yes.

19   Q.  What did you say?

20   A.  I told him that I was only 15 and I couldn't leave.

21   Q.  After each massage, what were you paid?

22   A.  Three to $400.

23   Q.  Usually where would the money be after each massage?

24   A.  On the sink.

25   Q.  Did anyone ever hand you money?
```

LC7VMAX3                        Carolyn - direct

```
 1  A.  Once or twice Ms. Maxwell did.

 2  Q.  About how much money do you remember Ms. Maxwell handing

 3  you after you engaged in a sexualized massage with Jeffrey

 4  Epstein?

 5  A.  $300.

 6  Q.  What denominations were the bills?

 7  A.  Hundreds.

 8  Q.  Other than money, what gifts, if any, did you receive from

 9  Jeffrey Epstein?

10  A.  I received lingerie.

11  Q.  How did you get that lingerie?

12  A.  Through FedEx.

13  Q.  Where did you receive a FedEx package?

14  A.  At my home.

15  Q.  In what town was your home?

16  A.  West Palm Beach.

17  Q.  Is that the home where you lived with your mom and your

18  younger brothers?

19  A.  Yes.

20  Q.  Did you notice the return address from those packages?

21  A.  Yes.

22  Q.  What was it?

23  A.  Manhattan, New York.

24  Q.  Any reason that stands out in your mind?

25  A.  Yeah.  Because I was born in New York, so -- and also I
```

1    knew that he had a home here in New York.

2    Q.   What was inside those packages?

3    A.   Lingerie from Victoria's Secrets.

4    Q.   How did Mr. Epstein get your address as far as you know?

5    A.   I had given --

6             MR. PAGLIUCA:  Objection, your Honor.

7             Lack of foundation.

8             THE COURT:  Sustained.

9    Q.   Did you give your address to anyone?

10   A.   Yes.

11   Q.   Who?

12   A.   Maxwell.

13   Q.   Why did you give your address to Maxwell?

14   A.   Because Jeffrey Epstein wanted to send me some items.  I

15   wasn't sure what the items were going to be.

16   Q.   And so did she ask for your address?

17   A.   Yes.

18   Q.   And did you give her your address?

19   A.   Yes.

20   Q.   Other than the lingerie, did you receive any other gifts?

21   A.   Yes.  A massage book for dummies, because I wanted to be a

22   massage therapist; and concert tickets to Incubus.

23   Q.   Other than Virginia, were there ever any other females in

24   the room with you when you were massaging Jeffrey Epstein?

25   A.   Yes.

LC7VMAX3                          Carolyn - direct

1   Q.   How did those other females end up in the room?

2   A.   They came in the room.

3   Q.   With who?

4   A.   Themselves.

5   Q.   Did you ever bring friends to Jeffrey's house?

6            You have to say the answer.

7   A.   Yes.

8   Q.   About how many friends did you bring to Jeffrey Epstein's

9   house?

10  A.   Two or three.

11  Q.   What are the names of some of the friends you remember

12  bringing?  First names.

13  A.   Amanda Lazlo, Tatum, and Julie Morgan.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax4                    Carolyn - direct

1    BY MS. COMEY:

2    Q.  About how old were they when you brought them over?

3    A.  Amanda was one year older than me, Tatum was the same age

4    as me, and so was Julie.

5    Q.  How old were you when you brought Amanda?

6    A.  I believe I was 15 or 16.

7    Q.  And so how old was Amanda?

8    A.  She was a year older than me.  So I believe she was going

9    to be 17.

10   Q.  And how old were you when you brought Tatum?

11   A.  When we were 15, going to be 16.

12   Q.  And how old were you when you brought Julie?

13   A.  16.

14   Q.  Why did you bring friends to Jeffrey Epstein's house?

15   A.  He asked me if I had any friends that were my age or

16   younger, and I told him I didn't hang out with younger people,

17   but I do have some friends I can ask.

18   Q.  Do you remember anyone else asking you to bring friends?

19   A.  No.

20   Q.  When you brought your friends over to Jeffrey's house,

21   where did you enter the house with them?

22   A.  Through the kitchen area.

23   Q.  Where did you go next?

24   A.  Up the stairs into the massage room.

25   Q.  And after the massage ended, what were you and the friend

LC7Cmax4                          Carolyn - direct

1    paid?

2    A.  I was paid $600 and my friend was paid $300.

3    Q.  In what denominations?

4    A.  Hundreds.

5    Q.  Why did you get extra?

6    A.  Because I brought her, a friend with me.

7    Q.  About how long did each massage with Jeffrey Epstein last?

8    A.  45 minutes.

9    Q.  After that first 45 minutes, what happened each time?

10   A.  He would turn over and start masturbating until he

11   ejaculated.

12   Q.  During how many of the massages you gave Jeffrey Epstein

13   did he masturbate?

14   A.  Every single time.

15   Q.  During how many of the massages you gave Jeffrey Epstein

16   did he touch your breasts?

17   A.  Every time.

18   Q.  During how many of the massages you gave Jeffrey Epstein

19   did he touch your buttocks?

20   A.  Every time.

21   Q.  Where else, if anywhere, did Jeffrey Epstein touch you

22   during these massages?

23   A.  He tried one time to use like a vibrating thing on me, and

24   I immediately told him I'm not comfortable with that.

25   Q.  And did he stop?

LC7Cmax4                          Carolyn - direct

```
 1   A.  Yes.
 2   Q.  Can you describe the vibrating thing that he tried to put
 3   on your vagina?
 4   A.  It looked like what now I know -- it looked like --
 5   Q.  Like a penis?
 6   A.  Yes.  Sorry.
 7   Q.  Did he actually touch that vibrator onto your vagina?
 8   A.  Yes.
 9   Q.  How did every massage you ever gave Jeffrey Epstein end?
10   A.  With him masturbating until he ejaculated.
11   Q.  Were there ever massages you provided Jeffrey Epstein where
12   nothing sexual happened?
13   A.  No.  Something sexual happened every single time.
14   Q.  During the massages when you brought friends, did sex acts
15   happen?
16   A.  The same thing, he would turn over and masturbate.
17   Q.  And where, if anywhere, did Jeffrey Epstein touch you and
18   your friends during those massages?
19   A.  On our breasts and butt.
20   Q.  Did Jeffrey ever bring anyone into the room?
21   A.  Yes.
22   Q.  Who did he bring into the room?
23   A.  On two separate occasions, he had pushed the button on the
24   phone and a girl came in that was already fully nude.
25   Q.  How many times did that happen?
```

1   A.  Twice.

2   Q.  I want to talk about those times.

3          Had you ever met them before?

4   A.  No.

5   Q.  Do you know their names?

6   A.  I have no idea.

7   Q.  Let's talk about the first one.  What did she look like?

8   A.  She was slender and she had blond -- long blond hair and

9   she had a really strong accent.

10  Q.  What happened when this first female came into the massage

11  room with you and Jeffrey Epstein?

12  A.  Jeffrey was having sex with her while she performed oral

13  sex on me.

14  Q.  And turning to the second female, what did she look like?

15  A.  She had darker brown hair.

16  Q.  And what happened when she came into the room with you and

17  Jeffrey Epstein?

18  A.  She came in nude and Jeffrey penetrated me a couple times

19  and I told him I wasn't comfortable.  So he had sex with the

20  model and she performed oral sex on me.

21  Q.  Just to be clear, did Jeffrey Epstein penetrate your vagina

22  with his penis?

23  A.  Yes.

24  Q.  And then when you said you weren't comfortable, did he

25  stop?

LC7Cmax4                      Carolyn - direct

1    A.  Yes.

2    Q.  What were you doing with the money that you made going to

3    Jeffrey Epstein's house?

4    A.  Buying drugs.

5    Q.  Was there ever a time, Carolyn, when you took a break from

6    going over to Jeffrey Epstein's house?

7    A.  Yes.

8    Q.  About when was that?

9    A.  When me and Sean ran away from Florida, we stole my mom's

10   car and went to Georgia.

11   Q.  Do you remember how old you were when you and Sean went to

12   Georgia?

13   A.  I was 16.  I was 16, going to be 17.

14   Q.  While you took that break from going over to Jeffrey

15   Epstein's house, what major life event, if any, happened?

16   A.  I got pregnant.

17   Q.  Did you have a baby?

18   A.  I did.

19   Q.  What month and year did you have a baby?

20   A.  March 12th, 2004.

21   Q.  What is the father of your son's first name, just his first

22   name?

23   A.  Sean.

24   Q.  After you had your son, your baby, did you ever go back to

25   Jeffrey Epstein's house?

LC7Cmax4                    Carolyn - direct

1   A.  Yes, I did.

2   Q.  About how many times?

3   A.  Well, I had gone there while I was pregnant --

4   Q.  I'm asking about after you had the baby.

5   A.  Okay.  I had gone back there more than, like, four or five

6   times, and he asked me if I had any younger friends and I said

7   no.  And that's when I realized I was too old.

8   Q.  Why did you go back after you had your baby?

9   A.  Because I needed the money because I was so young when I

10   had my son and I needed the money to buy stuff for him.

11   Q.  Why did you stop going to Jeffrey Epstein's house?

12   A.  Because I became too old.

13   Q.  How old were you?

14   A.  18.

15         MS. COMEY:  May I have a moment, your Honor?

16         THE COURT:  Yes.

17   Q.  Carolyn?

18   A.  Yes.

19   Q.  After you stopped seeing Jeffrey Epstein, did you continue

20   using drugs?

21   A.  Yes.

22   Q.  What drugs did you use?

23   A.  Cocaine and pain pills.

24   Q.  Were you addicted to both of those drugs?

25   A.  Yes.

LC7Cmax4                    Carolyn - direct

1    Q.  Have you ever been arrested as a result of your drug use?

2    A.  Yes.

3    Q.  In 2011, were you arrested for possessing cocaine?

4    A.  Yes.

5    Q.  What happened that led to you getting arrested?

6    A.  I handed the officer the drugs.

7    Q.  Why did you do that?

8    A.  Because I'm an idiot.  I handed him the drugs because I was

9    hoping I wouldn't get arrested.

10   Q.  Had you been pulled over in a car?

11   A.  Yes.

12   Q.  Did you ultimately plead guilty to felony possession of

13   cocaine as a result?

14   A.  Yes.

15   Q.  What was your sentence?

16   A.  I was on SOR.

17   Q.  What's that?

18   A.  Supervised own recognizance.

19   Q.  In 2013, were you arrested for possessing stolen property?

20   A.  Yes.

21   Q.  What happened that led to that arrest?

22   A.  Sean told me it was our son's Xbox.

23        MR. PAGLIUCA:  Objection.  Hearsay.

24        THE COURT:  Sustained.

25   Q.  Did you pawn an Xbox?

LC7Cmax4                         Carolyn - direct

1    A.  Yes, I did.

2    Q.  Was it your Xbox?

3    A.  No.

4    Q.  Did you tell the pawnbroker it was your Xbox?

5    A.  Yes.

6    Q.  Did you ultimately plead guilty to felony possession of

7    stolen property as a result?

8    A.  Yes.

9    Q.  And did you plead guilty to felony false verification of

10   ownership to a pawnbroker?

11   A.  Yes.

12   Q.  What was your sentence?

13   A.  I spent 52 days in jail.

14   Q.  After serving that sentence, did you go to drug treatment?

15   A.  Yes.

16   Q.  And after serving that sentence, did you go to therapy?

17   A.  Yes.

18   Q.  What medications do you currently take?

19   A.  I take methadone and Xanax and doxepine and Vyvanse.

20   Q.  What is methadone for?

21   A.  It's an opioid blocker so I can't take any pain pills

22   without being really sick.

23   Q.  So is that to help you with your opioid addiction?

24   A.  Yes.

25   Q.  What's the Xanax for?

LC7Cmax4                    Carolyn - direct

1   A.   For all the anxiety I have of thinking my daughters are

2   going to be trafficked or stolen or kidnapped from me.

3   Q.   And you mentioned two other types of medication.   What were

4   those for?

5   A.   My Vyvanse is to stay focused and my doxepine is for the

6   schizophrenia so I don't freak out if I -- because I am scared

7   that my kids are going to get kidnapped.

8   Q.   But you mentioned schizophrenia.   Do you have particular

9   symptoms?

10  A.   Yes.

11  Q.   What symptoms?

12  A.   I feel like people are out to get my children and traffic

13  them.

14  Q.   And do you hear voices telling you that someone's going to

15  take your children away?

16  A.   Sometimes.

17  Q.   Can you tell the difference between those voices and

18  reality?

19  A.   Absolutely.

20  Q.   How is that?

21  A.   Because I know that they're right there with me and I would

22  never let that happen.

23  Q.   Do any of those medications affect your ability to remember

24  what has happened to you?

25  A.   No.

LC7Cmax4                      Carolyn - direct

1    Q.  Do any of them affect your ability to tell the difference

2    between the truth and a lie?

3    A.  No.

4    Q.  About how often do you speak to Sean now?

5    A.  Never.

6    Q.  When did you break up?

7    A.  After the pawnshop thing.

8    Q.  Since breaking up with Sean, have you had any conversations

9    with him about what happened with Jeffrey Epstein?

10   A.  Nope.

11   Q.  Have you had any conversations with Sean about your

12   testimony here today?

13   A.  Absolutely not.

14   Q.  In 2007, were you interviewed by the FBI about Jeffrey

15   Epstein?

16   A.  Yes.

17   Q.  During that interview, did you tell the FBI that you

18   noticed an older lady with short black hair and an accent at

19   Epstein's residence the first time you went there with

20   Virginia?

21   A.  Yes.

22   Q.  Who was that?

23   A.  Maxwell.

24   Q.  During your interview with the FBI in 2007, did you mention

25   the other details of your interactions with Maxwell?

LC7Cmax4                          Carolyn - direct

1     A.   No.

2     Q.   Why not?

3     A.   I wasn't asked about Maxwell.

4     Q.   Who was the focus of that interview?

5     A.   Jeffrey Epstein.

6                MR. PAGLIUCA:   Objection, your Honor.   Speculation.

7                THE COURT:   Sustained.

8     Q.   Who did the FBI ask you questions about in 2007?

9     A.   Jeffrey Epstein.

10    Q.   After you stopped seeing Jeffrey Epstein when you were

11    about 18 years old, how did you make money?

12    A.   I worked for an escort service and was a stripper.

13    Q.   When you worked for the escort service, did you have sex

14    with men for money?

15    A.   Sometimes.

16    Q.   In or about 2009, did you bring a lawsuit against Jeffrey

17    Epstein and Sarah Kellen?

18    A.   Yes.

19    Q.   Why did you sue Jeffrey Epstein?

20    A.   Because of all the damage, emotional damage he did to me.

21    Q.   Why did you sue Sarah?

22    A.   Because she knew what was going on and she was -- she was

23    older than me, so she was an adult.   She knew what was

24    happening.

25    Q.   And what else did she do?

LC7Cmax4                    Carolyn - direct

1    A.  Took pictures of me while I was nude.

2    Q.  Without getting into the substance of any conversations,

3    who made the decision about who to sue in that lawsuit?

4         MR. PAGLIUCA:  Objection, your Honor.  602 without any

5    further foundation.

6         THE COURT:  Sustained.

7    Q.  Carolyn, did you hire a lawyer in order to bring this

8    lawsuit?

9    A.  Yes.

10   Q.  Without telling me the substance, did you have

11   conversations with that lawyer about who to sue?

12   A.  Yes.

13   Q.  And ultimately, after those conversations, based on your

14   understanding, who decided who would be sued in this lawsuit?

15        MR. PAGLIUCA:  Objection, your Honor.  Lack of

16   foundation.

17        THE COURT:  Sustained.

18        THE WITNESS:  Am I --

19        THE COURT:  I sustained.  It means don't answer.  Jury

20   will disregard.

21   Q.  In 2009, were you deposed as a part of that lawsuit?

22   A.  Yes.

23   Q.  During that deposition, were you asked about your time

24   working for the escort service?

25   A.  No.

LC7Cmax4                    Carolyn - direct

1   Q.  Did you lie during your deposition, Carolyn?

2   A.  Yeah.

3   Q.  What did you lie about?

4   A.  Being an escort and a stripper.

5   Q.  What did you say during the deposition?

6   A.  I didn't say anything about that.

7   Q.  Did you say that you worked for the escort service but

8   didn't sleep with anyone?

9   A.  Yes.

10  Q.  Was that true?

11  A.  No.

12  Q.  Why did you lie about that?

13  A.  I was embarrassed.

14          MS. COMEY:  May I have a moment, your Honor?

15          THE COURT:  Yes.

16          MS. COMEY:  Thank you, your Honor.

17          Ms. Drescher, could we please pull up, just for the

18  Court and the witness, 3505-403 at page 1.

19  BY MS. COMEY:

20  Q.  Carolyn, what was the date of your deposition in the

21  lawsuit?

22  A.  December 4th, 2009.

23          MS. COMEY:  Can we now please turn in this document,

24  Ms. Drescher, to page 36.  I want to go to deposition page 137,

25  lines 3 through 6.

LC7Cmax4                         Carolyn – direct

1              Your Honor, I would like to offer this and read it

2     into the record pursuant to 801(d)(1)(B).

3              MR. PAGLIUCA:  Lines 3 through 6?

4              MS. COMEY:  Yes, your Honor.

5              MR. PAGLIUCA:  I don't understand what this is being

6     offered for, your Honor.

7              THE COURT:  You'll confer.

8              MS. COMEY:  We've conferred, your Honor.

9              THE COURT:  Okay.  Mr. Pagliuca, do you have an

10    objection?

11             MR. PAGLIUCA:  Well, your Honor --

12             THE COURT:  Just objection or no.

13             MR. PAGLIUCA:  Yes.  Can we approach?

14             THE COURT:  Okay.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

LC7Cmax4                        Carolyn – direct

1            (At the sidebar)

2            MR. PAGLIUCA:  This is apparently being offered as

3    purported prior consistent statement?

4            THE COURT:  Right.

5            MR. PAGLIUCA:  The problem is, when read in context,

6    which really starts at line 20 on the page above and goes

7    through probably line 16 on the next page, we're simply just

8    parsing out two lines.

9            THE COURT:  She can read the whole thing.

10           MS. COMEY:  That's fine, your Honor.

11           THE COURT:  Okay?

12           MR. PAGLIUCA:  Okay.

13           MS. COMEY:  Starting at which line?

14           MR. PAGLIUCA:  I'd say 136, line 23.

15           MS. COMEY:  That's an answer.

16           MR. PAGLIUCA:  So the question is going to be line 20.

17           MS. COMEY:  Line 20 through line 6.

18           MR. PAGLIUCA:  Yes.

19           (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Okay, Ms. Comey.

3              MS. COMEY:  Ms. Drescher, I would like to pull up the

4    page just a little earlier, page 136, line 20, and we're going

5    to go through page 137, line 6.

6    BY MS. COMEY:

7    Q.  Carolyn, do you see that in front of you?

8    A.  Yes.

9    Q.  My question is, were you asked the following questions and

10   did you give the following answers.  I'm going to read this

11   aloud.  Just listen and read along with me.

12   "Q.  You would agree with me that you cannot recall the

13   specifics of each visit that you had at Mr. Epstein's home?

14   "A.  I don't remember the times and dates, but I can tell you

15   everything that happened while I was there.

16   "Q.  In your complaint in each count, you allege that you went

17   to Mr. Epstein's at his request?

18   "A.  Uh-huh.

19   "Q.  In fact, Mr. Epstein himself did not contact you on each

20   occasion and request you to come, did he?

21   "A.  No, he would have Sarah or Maxwell call me."

22             Did you give that testimony in December 2009, Carolyn?

23   A.  Yes.

24             MS. COMEY:  I'd like to go now, please, to page 33 of

25   the same document.

1          THE COURT:  Page and line numbers, please.

2          MS. COMEY:  We'll be doing deposition page 124, lines

3  8 through 20.

4          THE COURT:  Just a moment.  Mr. Pagliuca.

5          MR. PAGLIUCA:  That's fine, your Honor.

6          THE COURT:  All right.  Go ahead.

7          MS. COMEY:  Thank you, your Honor.

8  BY MS. COMEY:

9  Q.  Starting with line 8 on page 124:

10  "Q.  And for what reason were you placing calls to try to get

11  Mr. Epstein?

12  "A.  To go over there to see him.

13  "Q.  Were you seeking the opportunity to go over and massage

14  him and get paid?

15  "A.  Yes.

16  "Q.  And on these occasions that you called to see if you could

17  go over there and give him a massage, did you talk to him or

18  did you talk to others at his house?

19  "A.  I talked to Sarah or Maxwell.  I have also talked to -- I

20  don't know if it's the cook or somebody else that was there

21  that took phone messages."

22          Carolyn, did you give that testimony in December 2009?

23  A.  Yes.

24  Q.  Other than those two exchanges we just talked about, were

25  you asked any other questions about Maxwell during your 2009

LC7Cmax4                         Carolyn - direct

1   deposition?

2   A.   No.

3   Q.   How did your lawsuit against Jeffrey and Sarah end in 2009?

4   A.   I received money.

5   Q.   Did you settle the case?

6   A.   Yes.

7   Q.   Do you remember how much money you received?

8   A.   No.

9   Q.   Can you approximate for us?

10  A.   Like $250,000.

11  Q.   Have you participated in a victim compensation fund for

12  victims of Jeffrey Epstein?

13  A.   Yes.

14  Q.   What did you do to submit a claim to that fund for the

15  fund?

16  A.   I -- I don't understand the question.

17  Q.   Did you put in an application to the fund?

18  A.   My attorneys did.

19  Q.   Did you receive an award from the fund?

20  A.   Yes.

21  Q.   Do you know exactly how much the fund awarded you?

22  A.   No.

23  Q.   About how much do you remember it being?

24  A.   Somewhere between $1 million and $3 million.

25  Q.   Did that money come from the estate of Jeffrey Epstein?

LC7Cmax4                      Carolyn - cross

1   A.  Yes.

2   Q.  Has that money already been wired to you?

3   A.  Yes.

4   Q.  Are you waiting on any other money from the fund?

5   A.  No.

6   Q.  As part of receiving that money, did you have to sign a

7   waiver agreeing not to sue any of Jeffrey Epstein's employees?

8   A.  Yes.

9   Q.  To your understanding, can you sue Maxwell?

10  A.  No.

11  Q.  To your understanding, will the jury's verdict in this case

12  affect the award you received from that fund?

13  A.  No.

14  Q.  Do you have any financial stake in the outcome of this

15  case?

16  A.  No.

17          MS. COMEY:  May I have a moment, your Honor?

18          THE COURT:  You may.

19          MS. COMEY:  Nothing further.

20          THE COURT:  We have about 15 minutes before lunch.

21  Mr. Pagliuca, you may begin your cross.

22          MR. PAGLIUCA:  Thank you, your Honor.

23          THE COURT:  Thank you.

24  CROSS-EXAMINATION

25  BY MR. PAGLIUCA:

1   Q.  Good afternoon, Carolyn.

2           Carolyn, you had an acquaintance named Virginia

3   Roberts that was a friend of yours in 2002, approximately;

4   correct?

5   A.  Yes.

6   Q.  And you met her through your then boyfriend, Sean; is that

7   correct?

8   A.  Yes.

9   Q.  Sean was a friend of the man that Virginia Roberts was

10  living with, a fellow named Tony; is that correct?

11  A.  Yes.

12  Q.  And Tony and your boyfriend, Sean, were older than you;

13  correct?

14  A.  Yes.

15  Q.  About four years older than you; is that right?

16  A.  Yes.

17  Q.  And Ms. Roberts and Tony had an apartment together; is that

18  right?

19  A.  Yes.

20  Q.  And you had been to their apartment; correct?

21  A.  Yes.

22  Q.  You and Sean and Virginia Roberts and Tony hung out at that

23  apartment and smoked marijuana, for example?

24  A.  Yeah.

25  Q.  Drank alcohol; correct?

LC7Cmax4                    Carolyn - cross

1   A.  We didn't drink any alcohol.

2   Q.  Did other drugs?

3   A.  No.

4   Q.  Now, as I understand it, you were at a party when Virginia

5   Roberts approached you first about making $300; is that

6   correct?

7   A.  Absolutely not.

8   Q.  Do you remember speaking to the FBI in 2007?

9   A.  Yes.

10  Q.  And that was the first time that you talked to any law

11  enforcement about Mr. Epstein; correct?

12  A.  Yes.

13  Q.  And I'll direct --

14          MR. PAGLIUCA:  May I approach the witness, your Honor?

15          THE COURT:  You may.

16  Q.  If you could turn to tab 5 in that binder that I just

17  handed you, the big one, which is 3505-005, page 1.

18  A.  Sorry.  In which binder?

19  Q.  The big binder that I just gave you.

20          THE COURT:  Ms. Comey, do you have it?

21          MS. COMEY:  I do.  Thank you, your Honor.

22  A.  What number?  I'm sorry.

23  Q.  It's the first tab, it's got a 5 on it.

24  A.  It's upside down.  Hold on.

25  Q.  The first page.

1         MR. PAGLIUCA:  We can display this electronically if

2    it's easier, your Honor.

3    A.  Okay.

4    Q.  I want to direct your -- do you have the document?

5    A.  Yes.

6    Q.  Page 1, paragraph 2.

7    A.  Okay.

8    Q.  The fifth line down, do you see where it starts, "Virginia

9    approached Carolyn at a party and asked her if she would like

10   to make $300."  Do you see that?

11   A.  No, I don't.

12        MS. COMEY:  Your Honor, may we approach?  Actually,

13   may I confer with counsel?

14        THE COURT:  You may confer.

15   Q.  Carolyn, directing your attention to that paragraph, do you

16   see that?

17   A.  Yeah, I see the paragraph.

18   Q.  Where it says that, "Virginia approached Carolyn at a party

19   and asked her if she would like to make $300."  Do you see

20   that?

21   A.  Yes, I see that.

22   Q.  Is that what you told the FBI in 2007?

23   A.  No.

24   Q.  The FBI got it wrong?

25   A.  We weren't at a party.  We were at Virginia's house when

LC7Cmax4                         Carolyn - cross

1    she approached me.

2    Q.  Did Virginia explain to you that you could make $300 by

3    providing a man in Palm Beach with a massage?

4    A.  She told me that we were going to be meeting a friend of

5    hers in Palm Beach.

6    Q.  And the friend you were meeting was older; is that correct?

7    A.  Yes.

8    Q.  Now, when Roberts approached you about making this $500,

9    Ms. Maxwell, Ghislaine Maxwell was not there; correct?

10   A.  There was no $500.

11   Q.  $300.  Ms. Maxwell was not there; correct?

12   A.  No, it was me and Virginia.

13   Q.  And Ms. Maxwell was not involved in this conversation that

14   you had with Ms. Roberts about making this $300; correct?

15   A.  Correct.

16   Q.  During your conversation with Ms. Roberts, she told you

17   that you could make this $300 by massaging this older man; is

18   that right?

19   A.  No.  She said we were going to meet one of her friends

20   and -- I'm sorry.  Repeat the question.

21   Q.  She told you that you could make money by massaging an

22   older man; is that correct?

23          MS. COMEY:  Your Honor, can we just classify if

24   Mr. Pagliuca is asking her about a document or her memory as

25   she sits here today.

LC7Cmax4                          Carolyn - cross

1           THE COURT:  Sure.  You're asking about her memory?

2           MR. PAGLIUCA:  Yes.

3           THE COURT:  Start with that question.

4           THE WITNESS:  Why do I have the binder?

5           THE COURT:  You can close the binder.

6   BY MR. PAGLIUCA:

7   Q.  Ms. Roberts told you that you could make money by massaging

8   an older man; is that correct?

9   A.  No.

10  Q.  If you could go back to that same exhibit, 005 at page 1,

11  paragraph 2.

12  A.  Go ahead.

13  Q.  The last line, isn't it true that you told the FBI,

14  "Virginia explained that Carolyn could make $300 by providing a

15  man in Palm Beach with a massage."  Isn't it true, you told

16  them at that time?

17  A.  What paragraph are you on?

18  Q.  Paragraph 2, the last sentence.

19  A.  She didn't tell me anything about a massage at that time.

20  Q.  So you're saying you didn't tell that to the FBI in 2007

21  when they interviewed you?

22  A.  She told me that when we got to Mr. Epstein's house.

23  Q.  Carolyn, I'm just asking you a very simple question, are

24  you denying telling the FBI, in August of 2007, that Virginia

25  explained that Carolyn could make $300 by providing a man in

LC7Cmax4                    Carolyn - cross

1  Palm Beach with a massage?

2  A.  Yes, she told me that.

3  Q.  And that's what you told the FBI?

4  A.  Yes, I told the FBI that.

5  Q.  It's also true that Ms. Roberts told you that you could

6  make a lot of money real fast; correct?

7        MS. COMEY:  Your Honor, are we talking about a

8  document or her memory?

9        THE COURT:  Can you clarify the timeframe of your

10  question, both as to whether you're asking about her current

11  memory, and if so, what time you're asking her to recall.

12        MR. PAGLIUCA:  I'm asking about current memory, unless

13  I refer the witness to the document, your Honor.

14        MS. COMEY:  Your Honor, it might be helpful to have

15  the witness set the document aside.

16        MR. PAGLIUCA:  That's fine.

17        THE COURT:  Close the binder, please.

18        MR. PAGLIUCA:  Might be easier if we use the screen.

19        THE COURT:  Do that.

20        MR. PAGLIUCA:  That's fine.

21  BY MR. PAGLIUCA:

22  Q.  Carolyn, Ms. Roberts told you, you recall, this first time

23  that you could make a lot of money real fast; isn't that true?

24  A.  No.

25  Q.  If we can show the witness 005, page 1, third paragraph,

LC7Cmax4                    Carolyn - cross

1   first sentence, please.

2   A.  Yes, I did say that.

3   Q.  It's also true, Carolyn, that Ms. Roberts instructed you to

4   dress sexy; is that correct?

5   A.  Ms. Roberts dressed me sexy to be able to go.

6   Q.  Isn't it also true that Ms. Roberts instructed you that if

7   you didn't like something, to let her know; correct?

8   A.  Yes.

9   Q.  She also told you, before you went over to Mr. Epstein's,

10  that you might have to remove your shirt and pants, but could

11  keep your underwear on; is that correct?

12          MR. PAGLIUCA:  We can take this down while we're

13  asking questions.

14  A.  She had -- she asked me if I wanted to go with her to meet

15  a friend of hers who lived on Palm Beach and I would have to

16  dress provocatively. so she dressed me and said that we could

17  make money.  So she drove me there and when we got there is

18  when she told me that she would massage Mr. Epstein with me so

19  I would not feel uncomfortable.

20  Q.  Okay.  My question is, before you went over there,

21  Ms. Roberts told you that you might have to remove your shirt

22  and pants, but you could keep your underwear on.  Is that true

23  or not?

24  A.  She told me that when we were in the massage room.

25  Q.  Before you went over there, isn't it also true that

1    Ms. Roberts told you to say that you were 17 or 18?

2    A.   That is not true.

3    Q.   That's not true; is that your testimony?

4    A.   She said if somebody asked, I needed to say that.

5           MR. PAGLIUCA:   If we can show the witness the same

6    document at paragraph 4.

7    Q.   Do you see on the last two lines there, "Carolyn was

8    previously instructed by Virginia to tell Epstein she was 17."

9    Do you see that?

10   A.   Yeah.

11   Q.   Is that what you told the FBI in August of 2007?

12   A.   Yes, because I slipped up and told Mr. Epstein that I was

13   14.

14   Q.   I'm not asking you what you told Mr. Epstein, I'm asking

15   you first, that's what Ms. Roberts told you and, at first, you

16   said no, and now you're saying yes?

17   A.   She told me if anybody asked, I needed to say I was 17.

18           MR. PAGLIUCA:   We can take that down.

19   Q.   Do you remember Ms. Roberts saying that he, Epstein, was a

20   friend of hers, we can go there, you can give him a massage,

21   and he will pay.  Do you remember that?

22   A.   Yes.

23   Q.   Now, I want to talk about the timeframe that you've

24   testified about.  Isn't it true that the date you first went to

25   Epstein's house at the invitation of Roberts was in May or June

LC7Cmax4                    Carolyn - cross

1   of 2002?

2   A.  I don't recall.

3   Q.  Ms. Comey showed you your deposition testimony from

4   December 2009.  Do you recall that?

5   A.  Yes.

6   Q.  And that was in connection with your civil lawsuit against

7   Jeffrey Epstein and Sarah Kellen; correct?

8   A.  I don't remember.

9           MR. PAGLIUCA:  Let's show the witness 3505-043 at page

10  33 at deposition page 125, lines 23 through 24 through 126,

11  line 2.

12  Q.  Do you have that?  Isn't it true that, under oath in August

13  of 2009, you were asked the question:

14  "Q.  All right.  So for purposes --

15          THE COURT:  I'm sorry.  It's small again.

16          MR. PAGLIUCA:  Can we enlarge that, please.

17          THE COURT:  Can we get the page and line numbers that

18  you intend to read.

19          MR. PAGLIUCA:  Certainly, your Honor.  So we'll start

20  at the bottom, which is page 33, deposition page 125, lines 23

21  through 25 on that page, over to page 126, line 1, and we'll

22  continue down to line 10, your Honor.

23          THE COURT:  Okay.

24  BY MR. PAGLIUCA:

25  Q.  Isn't it true, Carolyn, that, under oath, you were asked

LC7Cmax4                         Carolyn - cross

1   the question:

2   "Q.  All right.  So for purposes of this case, the total period

3   of time that you had any interaction with Mr. Epstein was

4   between May of '02 and August of '03.

5   "A.  Uh-huh."

6   Q.  Do you see that?

7   A.  I see the ending of that, yes.

8   Q.  And then if we go to page 126, lines 1 through 10 is the

9   next page --

10          THE COURT:  Could you pull up the mic, Mr. Pagliuca.

11  A.  We're on page 126.

12  Q.  Okay.  And then there is another question:

13  "Q.  That is another way of saying it is the first time you

14  went, is May of '02, and the last time was August of '03?

15  "A.  Yeah."

16          Do you see that?

17  A.  Yes, I do.

18  Q.  And that was your testimony under oath?

19  A.  Yes.

20  Q.  In 2009; correct?

21  A.  Yes.

22  Q.  And then you were then asked the question:

23  "Q.  Didn't know Mr. Epstein at all prior to May of '02 and had

24  no contact with him after August of '03?

25  "A.  Correct."

LC7Cmax4                          Carolyn - cross

1           Is that right?

2    A.  Yes, that's right.

3    Q.  So that was your deposition testimony under oath in 2009;

4    is that right?

5    A.  Yes, that's right.

6           MR. PAGLIUCA:  We can take that down.

7    Q.  You recall that Virginia Roberts was 18 when you first met

8    her; is that correct?

9    A.  Yes.

10   Q.  And you don't recall the exact date, but sometime in May or

11   June of '02 after this conversation is when you went to

12   Mr. Epstein's house; correct?

13   A.  I'm sorry.  Can you repeat the question.

14   Q.  Yes.  You don't recall the exact date, but sometime after

15   you had this conversation with Virginia Roberts in May or June

16   of '02 is when you went to Mr. Epstein's house; correct?

17   A.  Yes.

18   Q.  And you had never been to the house before; correct?

19   A.  Correct.

20   Q.  You never met Mr. Epstein before; correct?

21   A.  Correct.

22   Q.  You didn't even know the name of the person that you were

23   going to meet; correct?

24   A.  She told me when we got there.

25   Q.  Before you got there, you didn't even know the name of the

LC7Cmax4                          Carolyn - cross

1    person that you were going to meet; correct?

2    A.  Correct.

3    Q.  And it is Roberts who arranged this meeting with

4    Mr. Epstein; correct?

5    A.  I suppose.

6    Q.  Well, it was just you and her that went; correct?

7    A.  Yes.

8    Q.  And she drove; correct?

9    A.  Correct.

10   Q.  And she had a white car.  Do you recall that?

11   A.  Yes.

12   Q.  She picked you up at your house; right?

13   A.  Nope.

14   Q.  How did you get there?

15   A.  We were at her house for the first time, not a party, and

16   it was only me, Sean, Tony, and Virginia, and she dressed me

17   provocatively and that's when we went to Mr. Epstein's home.

18   Q.  Okay.  She knew where to go; right?

19   A.  Yes, she did.

20   Q.  And she drove the two of you there; is that right?

21   A.  Yes.

22   Q.  And it took about 30 minutes or so to get there; is that

23   fair?

24   A.  I have no idea, sir.

25   Q.  She parked the car; right?

LC7Cmax4                        Carolyn - cross

1   A.  Obviously.

2   Q.  And then you and she walked to the front door; is that

3   correct?

4   A.  No, we walked to the kitchen door.

5   Q.  You walked to a door; right?

6   A.  That led into the kitchen.

7   Q.  Okay.  You went inside; right?

8   A.  Yes.

9   Q.  Now, this is approximately 19 years ago is what we're

10  talking about here today; correct?

11  A.  Give or take.

12  Q.  And you had never been inside this house before; correct?

13  A.  Didn't you already ask me that question?

14  Q.  I don't think I did.

15  A.  That was the first time I went, was with Virginia.

16  Q.  And that's the first time you were inside; correct?

17  A.  Correct.

18  Q.  You had never met anyone who worked there before; correct?

19  A.  Correct.

20  Q.  And you went inside and you were taken upstairs by Virginia

21  Roberts; correct?

22  A.  Correct.

23          THE COURT:  Mr. Pagliuca, we're going to break here

24  for lunch.

25          MR. PAGLIUCA:  Thank you, your Honor.

LC7Cmax4                        Carolyn - cross

1           THE COURT:  Members of the jury, you have your lunch.

2    We'll resume in about an hour.  Thank you so much.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  The witness may step down and break for

3    lunch.

4          (Witness excused)

5          Everyone may be seated.  Okay, matters to take up

6    before the break?

7          MS. MOE:  Yes, your Honor.  During the morning break,

8    we had an opportunity to speak with the witness identified as

9    Brian.  I've provided a copy of the notes from that

10   conversation to defense counsel when we came back from the

11   break along with a text message that Brian provided us a copy

12   with.  I'm happy to -- we haven't had a chance to stamp them

13   yet with 3500 numbers, but I'm happy to provide a copy to the

14   Court.

15         THE COURT:  Okay.

16         MS. MOE:  Besides that, is there a particular time

17   when the Court would like to take up that particular issue and

18   the other issue that we addressed at sidebar?

19         THE COURT:  Let's discuss this now since that goes to

20   the defense's at least prior request was the exclusion of his

21   testimony.  So I'll hear from you on that, if you're prepared

22   to be heard from that now or we break and then I hear from you.

23         MS. MOE:  Your Honor, we'd be happy to take this up

24   after the break, perhaps in order to provide defense counsel an

25   opportunity to review those further and to confer on this

1    issue.  I just wanted to alert the Court that we had run this

2    issue down and disclosed that matter and wanted to promptly

3    alert the Court about that.

4            THE COURT:  So Ms. Menninger, the suggestion is we all

5    look at the copy of the notes, I think we resume in about 30

6    minutes to address the issue.

7            MS. MENNINGER:  Yes, your Honor.  I received it right

8    as testimony was beginning, so I have not studied them.  If

9    your Honor would like to take an additional 10 minutes, I can

10   try to do some research, but if your Honor is just wanting to

11   address the content of the note --

12           THE COURT:  My suggestion is we all look at the

13   contents of the notes, do some research, and resume in 30

14   minutes.  How is that?

15           MS. MENNINGER:  I will do my best, your Honor.

16           THE COURT:  It's all we all can do.

17           Do you want to give a 3500 stamp or --

18           MS. MOE:  Your Honor, I would suggest that we hand up

19   the printed copy now and, during the break, we can stamp it and

20   send an email copy to chambers.

21           THE COURT:  That's fine.

22           MS. MOE:  Thank you, your Honor.

23           THE COURT:  So it's 12:55.  We'll resume in 30 minutes

24   to discuss this.  Assuming we're going forward with this

25   witness's testimony, we'll take up, at sidebar, the issue

LC7Cmax4                        Carolyn – cross

1    regarding a question that the defense is interested in that

2    implicates some privacy issues.  Correct?

3              MS. MOE:  Thank you, your Honor.  Yes.

4              MS. MENNINGER:  Yes, your Honor.

5              THE COURT:  We'll meet in 30.  Thank you.

6              (Recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        A F T E R N O O N   S E S S I O N

2                    1:40 P.M.

3            THE COURT:  All right.  We'll take up the question of

4    the communication between the brother of Jane and Jane.

5            MR. ROHRBACH:  Yes, your Honor.

6            During the break, the government did find some cases.

7    But we also learned toward the end of the break that there are

8    a small number of additional text messages.

9            The government's view at this point is that it makes

10   sense for us to fully run down and make sure we have identified

11   the universe of text messages.  And we're willing to not call

12   Brian until tomorrow morning to give the parties an opportunity

13   to understand all the facts and provide an analysis of the law.

14           And so my understanding from talking to Ms. Menninger

15   is that the defense doesn't object to allowing us to brief this

16   issue tonight and call Brian and address it tomorrow morning.

17           THE COURT:  Okay.

18           MS. MENNINGER:  Yes, your Honor.  As long as the

19   factual record is still undeveloped, I don't think it makes

20   sense to start applying the law to those facts.  But I repeat

21   my request that there be an actual under-oath representation by

22   this witness about the communications rather than dribbling out

23   information.

24           THE COURT:  Well, I don't know if we'll need an under

25   oath prior to his testimony.  Certainly it can be fully

LC7VMAX5                    Carolyn - cross

explored in your cross-examination, which is under oath.  But I
do think in advance of that, we need a full understanding which
I think includes making sure you have every text and email
communication.  I would think you need to have an interview
with Jane, as well, to see if you're getting the same
information from her.  And I think you need to make sure that
there are no other conduits of information regarding Jane's
testimony to the brother.

          MR. ROHRBACH:  Yes, your Honor.

          THE COURT:  Okay.  And I've started to look at the law
too.  I think it's unlikely we're going to get to a breach of
the text of the rule.  I think my hypo about if somebody passed
the transcript would certainly go to a violation of the spirit
of the rule and not the text.  And there may be some further
version of full communication of her testimony, especially a
witness who's being put on solely to provide prior consistent
statements.

          I don't think the government did anything wrong.  I'm
a little shocked that this wasn't fully drilled into these
witnesses just as a matter of best practice.  I understand from
the notes that it was communicated to the witnesses not to
speak to other witnesses, but somehow this witness didn't
understand that to mean his sister.  But here we are.

          MR. ROHRBACH:  Your Honor, on that point, we would
just say that the notes from today reflect that the witness

LC7VMAX5                    Carolyn - cross

1    recalls having been instructed by the government not to discuss

2    his testimony with his sister.  Of course, it can be very

3    difficult not to talk about your life with your family.

4               THE COURT:  Right.  That would be the kind of thing, I

5    would think, best practices would say, Look, I know this is

6    difficult.  This is important.  I imagine that is a

7    conversation that many government lawyers have with witnesses.

8               MR. ROHRBACH:  Yes, your Honor.  And my understanding

9    is that we did have that conversation.

10              THE COURT:  Okay.

11              Then it may be a little hard to square that that

12   conversation was had with the statement that it was unclear

13   that this was a transgression.  There's some mismatch there.

14              So you need to run a full investigation.  We'll have

15   those facts produced to the defense by what time?

16              MR. ROHRBACH:  We'll be working on it through the

17   afternoon today.  We will do our best to have disclosed as much

18   as we know by the end of the court day.  Understanding the

19   breadth of the investigation the Court wants, it may take

20   longer to complete all of --

21              THE COURT:  Well, you should think about whether there

22   is anything else worth pursuing to make sure that the Court and

23   both sides have a full factual record.

24              MR. ROHRBACH:  We will certainly give that thought.

25              THE COURT:  And then, as I say, I think once we have

LC7VMAX5                    Carolyn - cross

1     that, my quick look at the case law is that I'm very unlikely

2     to exclude, unless there was some knowing and full violation of

3     the sequestration spirit, if details of -- significant details

4     of Jane's testimony.  But in the absence of that, I think what

5     we have is ripe grounds for cross-examination with an

6     opportunity for the defense to have at it.

7                MR. ROHRBACH:  Yes, your Honor.

8                MS. MENNINGER:  Your Honor I looked at some recent

9     case law, and I imagine your Honor has seen similar cases.  But

10    one was Judge Engelmayer's decision in *Teman*.  And there are

11    some significant reasons why this case is much different than

12    the decision he reached in that case, including the fact that

13    that was a conversation between the government and a witness

14    rather than -- he distinguished the other cases, which were a

15    witness speaking to another witness.

16                THE COURT:  There was no order in place for witnesses

17    not to speak.  It could have been requested, I suppose.  It

18    wasn't requested.  I didn't put one in place.  I never have.

19    And the reason is because if witnesses speak to each other,

20    that's going to come out on cross, and boy is that going to

21    look bad for the witnesses.

22                So I think that's probably where we are.  I have

23    looked at *Teman*.  I looked at the rule.  We'll keep looking at

24    cases once we have the full factual record.

25                But it seems to me we're likely to be at a point where

1   we have the factual record.  There's no additional record that

2   would lead to exclusion, and so we'll do what we need to do.  A

3   hearing, an order, only to prepare further for what's going to

4   happen is likely not necessarily.  I don't see any law that

5   supports that.  But we'll get the full factual record and

6   you'll brief it.

7         So I would like -- if this witness is going to testify

8   tomorrow, I think the government needs to provide the defense

9   the results of a full factual investigation by 6 p.m.  And

10  then, Ms. Menninger, when would you like to brief the issue?

11         MS. MENNINGER:  By 9 p.m., your Honor.

12         THE COURT:  Okay.  By 9 p.m.

13         And then let's say -- Mr. Rohrbach?

14         MR. ROHRBACH:  I apologize.  By 9 p.m.  By midnight.

15  I know that's late for the Court.  That would be three hours

16  for each side to write a brief.

17         THE COURT:  Okay.

18         MR. ROHRBACH:  Thank you, your Honor.

19         Just one other point on this witness, your Honor.

20         We understand that this witness is also a subject of a

21  defense subpoena.  And so the government would just like to

22  know whether, in light of the defense's motion to preclude his

23  testimony for this reason, he's still under defense subpoena.

24         THE COURT:  I suppose they might want to know the

25  result of that motion first.

1      MS. MENNINGER:  Yes, your Honor.

2      THE COURT:  Right?

3      MR. ROHRBACH:  Yes.

4      THE COURT:  Okay.  In other words, let's put it this

5  way:  If I grant your motion, do you intend to call the

6  brother?

7      MS. MENNINGER:  It seems highly unlikely, your Honor.

8      THE COURT:  Okay.

9      MS. MENNINGER:  But, your Honor, two very quick

10  factual issues.  One is you may recall that when we began at

11  the final pretrial conference on November 23rd, we specifically

12  requested permission to share Dr. Rocchio's testimony with our

13  two experts because we believed that this issue precluded

14  otherwise witnesses listening in or finding out about the

15  testimony of other witnesses, one.

16      The second point is --

17      THE COURT:  And I said talk it out, confer, and then

18  brief me if you have disagreement.  I received no briefing.

19      MS. MENNINGER:  I think there was no objection to that

20  process, your Honor.

21      MR. ROHRBACH:  There was no objection.

22      MS. MENNINGER:  And then the second point is when Jane

23  was released from the stand and the government asked for

24  permission to speak with her about logistical matters, I said

25  at that time, So long as she's admonished that she's not to

LC7VMAX5                    Carolyn - cross

1     speak to other witnesses; and they said, Of course.  That was a

2     brief sidebar conversation that was had.

3           So just to the extent your Honor has brought up the

4     fact that there wasn't an order specifically saying witnesses

5     aren't to speak to one another, I certainly thought it was

6     implied in the course and conduct of what had occurred and the

7     sequestration order generally.

8           THE COURT:  Okay.  You'll brief it.

9           MR. ROHRBACH:  Yes, we'll brief it, your Honor.

10          THE COURT:  All right.

11          So I suppose that we can deal then in the afternoon or

12    tomorrow with the related sub question of an area that the

13    defense seeks to cross the witness on.

14          MS. MENNINGER:  Yes, your Honor.

15          Ms. Moe and I spoke briefly.  We assumed, I think, as

16    your Honor said, that the question of gatekeeping would

17    logically come first before dealing with a side issue if he

18    does testify.  We didn't really have a chance over the break to

19    explore the facts of that further.

20          THE COURT:  Okay.  So you'll confer on that and we can

21    take it up.  I suppose we could take it up in the morning.

22    There's going to be a lot to do in the morning.  But I need to

23    hear from you on it before I resolve the question of whether

24    Brian will testify on the theory that I think it's likely that

25    he will testify.

1           MS. MENNINGER:  Understood, your Honor.

2           THE COURT:  Okay.  Thank you.

3           Is there anything else we can address now?

4           MS. STERNHEIM:  I can raise this now or --

5           THE COURT:  Microphone please.

6           MS. STERNHEIM:  I apologize.

7           THE COURT:  That's okay.

8           MS. STERNHEIM:  I could raise this now or we could

9    hold off, but the government has indicated that they may call

10   some witnesses out of order.  That's not the issue.

11          But with regard to one of the witnesses that they may

12   call, I have some objection to the relevance of some of the

13   testimony.  And I did not know if you wish to hear it now or

14   wait until such time as they actually intend to call.

15          THE COURT:  Okay.  So, let's see.  We have the current

16   witness.  How long do you anticipate for your cross,

17   Mr. Pagliuca?

18          MR. PAGLIUCA:  I'm going to guess an hour, hour and a

19   half, your Honor, something like that.

20          THE COURT:  Okay.

21          MR. PAGLIUCA:  Some of that may depend on some issues

22   that I think the government has opened the door on.  And I

23   don't know if you want to talk about those now or later.

24          THE COURT:  Well, I don't want the jury to be sitting

25   idly.  So if it is going to happen in your cross, we should

LC7VMAX5                    Carolyn - cross

1    talk about it now.

2              MR. PAGLIUCA:  Sure.  I don't know if you want to deal

3    with Ms. Sternheim's issue first.

4              MS. STERNHEIM:  Mine should go to the back of the bus

5    on this.

6              THE COURT:  Okay.

7              MR. PAGLIUCA:  So there was direct examination

8    testimony, your Honor, concerning psychiatric issues, ongoing

9    psychiatric issues, with this witness.  I think there was some

10   minimization of the ongoing psychiatric issues.  And the

11   records that I have reflect much more extensive psychiatric

12   issues.

13             I believe that I should be allowed to inquire about

14   her extensive psychiatric history.  There were questions on

15   direct examination about her ongoing drug abuse, and I think

16   that opens -- and I think it was minimized.  And I think that

17   that opens the door to my being able to examine on the full

18   extent of her ongoing drug abuse.

19             There was also testimony raised sort of in the vein

20   of, I'm schizophrenic and I am schizophrenic about my children

21   because they're important to me, essentially, and that's why I

22   have this schizophrenia and hear voices around my children.

23             This witness has a significant history of having her

24   children taken away from her and these children living with her

25   mother or other relatives.  And I think that the way that the

LC7VMAX5                    Carolyn - cross

1   government has framed this allows for inquiry about that.  And

2   had the government not asked those questions, it was not my

3   intent to get into any of the child issues.

4          But I think the jury is left with the impression that

5   because of what Epstein did to her, she's now schizophrenic and

6   has all these schizophrenic concerns about her children, when,

7   for the last 19 years, these children have been repeatedly put

8   in different places as a result of her problems.

9          MS. COMEY:  Your Honor, I think if Mr. Pagliuca is

10  going to go into detail, we should be having this at side bear

11  under seal, if we're going to be discussing the details of her

12  family.

13         THE COURT:  Yes.

14         MR. PAGLIUCA:  Okay.

15         THE COURT:  The court reporter requested, so she can

16  sit, that we do it in the robing room.

17         (Pages 1590 to 1601 SEALED)

18         (Continued on next page)

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  We'll bring in the jury.

 3              Can we have the witness come back please.

 4              MS. POMERANTZ:  I believe Ms. Comey just went to do

 5   that, your Honor.

 6              THE COURT:  Thank you.  Bring in the jury.

 7              (Jury present)

 8              THE COURT:  Please take your seats.  We're just

 9   waiting for the witness to return.

10              Good afternoon, Carolyn.  You may remove your mask.

11   And I remind you, you are under oath.

12              And Mr. Pagliuca, you may resume with your

13   cross-examination.

14              MR. PAGLIUCA:  Thank you, your Honor.

15              THE WITNESS:  One second.  I walked upstairs.

16              THE COURT:  Sorry about that.  Take your time.

17              THE WITNESS:  Okay.

18   CAROLYN, resumed.

19   BY MR. PAGLIUCA:

20   Q.  Are you ready?

21   A.  Yup.

22   Q.  Okay.  Carolyn, when we broke for lunch --

23              THE COURT:  Could you pull the mic up, Mr. Pagliuca?

24              MR. PAGLIUCA:  Yes, your Honor.

25              THE COURT:  Thank you.
```

1   Q.  -- we were talking about 2002, when you went to

2   Mr. Epstein's house with Virginia Roberts.  And I think where

3   we stopped was you were -- you went into the house and you were

4   taken upstairs by Ms. Roberts.  Do you recall that?

5   A.  Yes.

6   Q.  Now, the only person that you saw when you entered the

7   house, you identified as being an older lady with unknown hair

8   and an unknown accent.  Is that correct?

9   A.  No.  I said she had shoulder-length black hair with an

10  accent.

11  Q.  Do you recall again giving a statement to the FBI in August

12  of 2007?

13  A.  A what?  A testimony?

14  Q.  Do you recall being interviewed by the FBI in August of

15  2007, Special Agents Nesbitt and Kuyrkendall?

16  A.  Yes.

17  Q.  And they met with you at your house; is that right?

18  A.  Yes.

19  Q.  And they weren't there to be mean to you; they were trying

20  to ask you questions.  Correct?

21  A.  Yes.

22  Q.  And they introduced themselves to you, right?

23  A.  Yes.

24  Q.  And you certainly had no reason to lie to them; correct?

25  A.  Correct.

1   Q.   You told the FBI the truth at that meeting; correct?

2   A.   Some of the things I didn't mention because I was

3   embarrassed.

4   Q.   So let's talk about that.

5           Do you recall testifying at your deposition, this is

6   at 3505-043, page 27.

7           THE COURT:  And give us the line numbers while that's

8   being brought up on the screen.

9           MR. PAGLIUCA:  It's actually 3505-043, 9, at

10  deposition page 37, lines 21 through 23.

11          THE COURT:  I don't have anything on my screen yet.

12          MR. PAGLIUCA:  3505-043, page 9, page 27, deposition,

13  lines 21 through 23, continuing on to the next page, which is

14  28, lines 1 and 2.

15          May I, your Honor?

16          THE COURT:  Ms. Comey, any objection?

17          MS. COMEY:  No, your Honor.

18          THE COURT:  Go ahead.

19  BY MR. PAGLIUCA:

20  Q.   Isn't it true, Carolyn, that you testified under oath in

21  2009 to the following:

22  "Q.   Whether you were under oath or not, did you tell them the

23  truth at that meeting?

24  "A.   Yeah.

25  "Q.   Did you tell the FBI the truth when they came to your

1   house?

2   "A.  Yes.  I have absolute no -- absolutely no reason to lie

3   about this situation."

4           Do you recall that testimony under oath?

5   A.  I do not remember if I was under oath or not, but I do

6   remember the question.

7   Q.  Okay.  And you testified in your deposition that you told

8   the FBI the truth in 2007; correct?

9   A.  Yes.

10  Q.  Okay.  So let's go back to what you told the FBI.  And this

11  is at 3505-005, page 1, fourth paragraph, second sentence:

12          Carolyn noticed an older lady with short black hair

13  and an unknown accent at Epstein's residence.  Isn't that what

14  you told the FBI when you told them the truth in 2007?

15  A.  Yes.

16  Q.  And they didn't cut you off when you were talking to them;

17  correct?

18  A.  Well, that day was a bad day for me.  So it was like -- I

19  was not expecting the FBI to come to my home.

20  Q.  Okay.  They didn't cut you off though, they weren't rude to

21  you; correct?

22  A.  No, they weren't rude.

23  Q.  Okay.  And they gave you the opportunity to tell them

24  whatever you wanted to tell them; correct?

25  A.  Yes.

1  Q.  Okay.  What you told them, the only thing you told them is

2  that you saw an older lady with short black hair and an unknown

3  accent; correct?

4  A.  Yes.

5  Q.  Now, at that point in your life, you knew what a British

6  accent was; correct?

7  A.  Yes.

8  Q.  And you didn't tell them a British accent, you said an

9  unknown accent; correct?

10  A.  I didn't say an unknown accent, I said with an accent.

11  Q.  Are you denying telling the FBI in 2007 that you said an

12  unknown accent?

13  A.  The day that you're talking about --

14        MR. PAGLIUCA:  Your Honor, I'd ask that the Court --

15  A.  -- talking about --

16        MR. PAGLIUCA:  I'd ask that the Court direct the

17  witness to answer the question please.

18        THE COURT:  I will direct the witness to answer the

19  specific question and then you can explain.

20        Would you like --

21        THE WITNESS:  Yeah, can I --

22        THE COURT:  Repeat the question.

23        MR. PAGLIUCA:  Yes.

24  BY MR. PAGLIUCA:

25  Q.  You told the FBI that it was an unknown accent; correct?

1    A.  Yes.

2    Q.  Thank you.

3         Okay.  You didn't say anything else about the person

4    that you claim you saw at Epstein's house, correct, other than

5    what is right here?

6    A.  I guess, yeah.

7    Q.  Okay.

8    A.  I'm looking -- I don't know what I'm looking at and where

9    you're reading from.

10        THE COURT:  I think at this point you can close and

11   you can ask the question again just from her memory.  Go ahead.

12        MR. PAGLIUCA:  Thank you, your Honor.

13   Q.  What you told the FBI in 2007 was that you saw an older

14   lady with short black hair and an unknown accent, and that's

15   all you told them at the time; correct?

16   A.  Yes.

17   Q.  Thank you.

18        Now, you went in and Ms. Roberts led you upstairs;

19   correct?

20   A.  Yes.

21   Q.  She knew where to go; correct?

22   A.  Yes.

23   Q.  She instructed you to rub Mr. Epstein's legs; correct?

24   A.  Yes.

25   Q.  And she rubbed his back; correct?

LC7VMAX5                    Carolyn - cross

1    A.  Yes, but when we -- can you back up for a second?  Because

2    when we first --

3              THE COURT:  Could you talk into the mic.

4    A.  When we first walked in is when Maxwell introduced herself

5    to me.

6    Q.  You didn't tell that to the FBI in 2007, did you?

7    A.  No, I did not.

8    Q.  Thank you.

9              So you went upstairs and Ms. Roberts directed you to

10   rub Epstein's legs while she rubbed his back; correct?

11   A.  Yes.

12   Q.  Then Epstein told you to take off your shirt and your

13   pants; correct?

14   A.  Not at the first time, no.

15             MR. PAGLIUCA:  If we can show the witness again

16   3505-005, page 1, fourth paragraph -- no, fifth paragraph,

17   middle of the paragraph.

18             Isn't it true that you told the FBI, Epstein stated to

19   Carolyn, take off your shirt and take off your pants?

20   A.  Yes.

21   Q.  Okay.  And then you told the FBI, Virginia got naked and

22   Carolyn undressed to her bra and panties, right?

23   A.  Yes.

24   Q.  And it's after that that Virginia Roberts, who's 18 at this

25   time, has sex with Mr. Epstein in front of you; correct?

LC7VMAX5                         Carolyn - cross

1   A.  Yes.

2   Q.  Okay.  And that's while you sat on a couch; correct?

3   A.  Yes.

4   Q.  And they were looking at you while you were sitting on a

5   couch; correct?

6   A.  No, they were not looking at me.

7   Q.  Okay.  Epstein paid you $300 directly to you; correct?

8   A.  It was on the sink, but yes.

9   Q.  It was from Mr. Epstein to you; correct?

10  A.  I -- I don't know who it was from.  It was just laying

11  there.  Anybody could have put it there.

12          MR. PAGLIUCA:  Again, if we can show the witness

13  3505-005, page 2, paragraph 1.

14  Q.  The second to the last sentence:  Epstein paid Carolyn $300

15  at the end of the massage.  Do you see that?

16  A.  Yeah, I see that.

17          (Continued on next page)

18

19

20

21

22

23

24

25

LC7Cmax6                    Carolyn - cross

1  Q.  That's what you told the FBI in 2007; correct?

2  A.  Yes.

3  Q.  Okay.  You then left the house with Ms. Roberts after

4  Mr. Epstein paid you $300; is that correct?

5  A.  Yes, we left after.

6  Q.  And then after you left, isn't it true that you got

7  Mr. Epstein's phone number from the phonebook?

8  A.  No.

9          MR. PAGLIUCA:  We're going to show the witness,

10  please, 3505-005, page 2, third paragraph, first sentence.

11  Q.  Isn't it true that you told the FBI, in 2007, "Carolyn

12  obtained Epstein's phone number from a telephone book."  Do you

13  see that?

14  A.  Yeah, the telephone book that you're talking about was my

15  personal book.  It wasn't like a phonebook.

16  Q.  Well, what you told the FBI --

17  A.  It was a telephone book with my personal numbers of friends

18  and loved ones.

19  Q.  And you called to schedule a massage session by leaving a

20  message with Sarah.  Do you see that?

21  A.  Yes.

22  Q.  And then Epstein returned your call; correct?

23  A.  It was not Epstein who called me.

24  Q.  Well, isn't it true --

25  A.  It was someone in Epstein's house that called me.

1  Q.  Isn't it true that, in 2007, you told the FBI that Epstein

2  returned Carolyn's call?

3  A.  I see that it says that, yes, but I don't -- at the time,

4  the way that it's worded is not that Jeffrey Epstein himself

5  called me.

6  Q.  Well, there is not a different name, is there?  It says

7  Epstein returned Carolyn's call?

8        MS. COMEY:  Objection, your Honor.

9  A.  No.  Yes, that's what it says, but it wasn't Epstein

10  himself.

11        THE COURT:  Sustained.

12  Q.  Then there was a second visit that you had shortly after

13  you returning Mr. Epstein's call to schedule this second visit;

14  correct?

15  A.  I'm sorry.  Can you repeat the question.

16  Q.  Yes.  You scheduled a second visit with Mr. Epstein after

17  he returned your call; correct?

18  A.  I made an appointment to meet with Mr. Epstein again after

19  I got a phone call.

20  Q.  And then your boyfriend, Sean, drove you; correct?

21  A.  Yes.

22  Q.  And Sean waited in the car; is that right?

23  A.  Yes.

24  Q.  And this second visit, first you sat in the kitchen and

25  talked to the chef; correct?

LC7Cmax6                    Carolyn - cross

1    A.  I don't recall if it was the second visit or a couple into

2    going there.

3            MR. PAGLIUCA:  We can show the witness 005, page 2,

4    paragraph 4, please.

5    Q.  Isn't it true that, in 2007 --

6            MS. COMEY:  Objection, your Honor.  Isn't this

7    refreshing recollection at this point?

8            THE COURT:  Yes.  If you want to point her to the

9    paragraph and make it larger, that's fine.

10           MR. PAGLIUCA:  Sure.  Fourth paragraph, please enlarge

11   that.

12   BY MR. PAGLIUCA:

13   Q.  Have you had a chance to look at the fourth paragraph?

14   A.  I'm reading it right now, sir.

15   Q.  Okay.

16   A.  Okay.

17   Q.  Does reading that paragraph refresh your recollection that

18   you told the FBI that you sat in the kitchen and the chef asked

19   if you were hungry?

20   A.  You might be wrong on the paragraph you had me read.  It

21   mentioned nothing about a chef.  It mentioned about me taking

22   off my panties to get $400.

23   Q.  We should be at 005, page 2, paragraph 4.

24           THE COURT:  You mean the fourth full paragraph?

25           MR. PAGLIUCA:  Correct.

LC7Cmax6                    Carolyn - cross

1           THE COURT:  That's not what was said.

2           MR. PAGLIUCA:  I'm sorry.  The fourth line down

3      beginning with "She."

4           THE COURT:  That's not there.

5           MR. PAGLIUCA:  3505-005, page 2.

6           THE WITNESS:  You're wrong.

7           MR. PAGLIUCA:  I'm looking at a paper copy.

8           THE COURT:  Why don't you look at your paralegal's

9      screen and make sure you're directing to the right paragraph,

10     please.

11          I think you mean the third full paragraph.  Is that

12     what you're looking for?

13          MR. PAGLIUCA:  Yes, the third full paragraph.

14          THE COURT:  All right.  We have that now.

15          Question?

16          MR. PAGLIUCA:  Yes, your Honor.  I was waiting for the

17     witness to finish.

18     BY MR. PAGLIUCA:

19     Q.  Carolyn, does that refresh your memory that that's what you

20     told the FBI in 2007, that you sat in the kitchen and the chef

21     asked if you were hungry?

22     A.  Yes.

23     Q.  Isn't it also true that on that second visit, Sarah was

24     there and led you upstairs?

25     A.  I wasn't led upstairs by anybody.

LC7Cmax6                    Carolyn - cross

1  Q.  Sarah was there to greet you?

2  A.  The second time I had gone to Epstein's residence, Maxwell

3  greeted me.

4          MR. PAGLIUCA:  If we can direct the witness back to

5  the third paragraph, starting with the word "Sarah" after the

6  word "Hungry."

7          THE WITNESS:  I see what you're saying.

8  Q.  Does this refresh your recollection that, in 2007, you told

9  the FBI that Sarah was there and led her — meaning you —

10  upstairs?

11  A.  A lot of it runs together because I had gone there so many

12  times.  So I'm a little confused on the timing, because the

13  second time I went to his residence, I did not see Sarah.

14  Q.  So isn't it true, though, that that's what you told the FBI

15  in 2007?

16  A.  Obviously, because it's here.

17  Q.  And you also told them, in 2007, that Sarah placed towels

18  on the massage table; correct?

19  A.  Yes, that's what it states.

20  Q.  And at this second time, there is no one else there that

21  you have told the FBI about, other than Sarah and Mr. Epstein;

22  correct?

23  A.  Yes.  Maxwell was not brought up.

24  Q.  It's also true that Sarah was the person who would call you

25  from New York to schedule massages; correct?

LC7Cmax6                    Carolyn - cross

1    A.  It wasn't only Sarah, no.

2    Q.  If you can look at the next paragraph, 005, page 2, second

3    paragraph from the bottom.

4    A.  Question.

5    Q.  Does this refresh your memory that Sarah would call you

6    from New York to schedule a massage appointment for Epstein?

7    A.  On some occasions, yes.

8    Q.  Ms. Maxwell's name does not appear in that paragraph;

9    correct?

10   A.  We were not talking about Ms. Maxwell in 2007.

11   Q.  Okay.

12   A.  So this has nothing to do with --

13   Q.  Now, in this entire first discussion with the FBI in 2007,

14   it's true that you never said the name, Ghislaine Maxwell,

15   once; correct?

16   A.  Yes, because it's not who we were talking about.

17   Q.  So is it your testimony that the FBI limited your ability

18   to talk in some fashion?

19   A.  She was not the subject of the discussion.

20   Q.  You talked about Virginia Roberts, you talked about Sarah,

21   you talked about Sean, you talked about Epstein, you talked

22   about a cook, you talked about going there, and you never

23   mentioned Maxwell once; correct?

24   A.  Correct, because she was not topic of what they were asking

25   me.  It had nothing to do with her at the time.  But, yes,

several occasions, she was there, but I was not asked about

her.

Q.  You gave other information to the FBI about Sarah.  Do you

recall that?

A.  What kind -- what's the information?

Q.  Do you recall telling the FBI that Sarah called you from

New York to tell you about the Incubus tickets?

A.  I believe it was Epstein who called me about the Incubus

tickets.

         MR. PAGLIUCA:  If we can direct the witness to 005,

page 3, paragraph 5, the second to last sentence.

         THE WITNESS:  What about it?

Q.  Does this refresh your memory that you told the FBI, in

2007, that Sarah called Carolyn to inform her that Epstein left

the concert tickets for her?

A.  Yes.

Q.  And it was Sarah who called you to tell you that Epstein

wanted to take photographs of you; correct?

A.  What does that have to do with what I'm reading?

         MS. COMEY:  Your Honor, I think the document may still

be up for the witness.

         THE COURT:  Okay.  Shut the document.

         MS. COMEY:  Your Honor, I would ask that, at the end

of each question about a document, the document be brought

down.

LC7Cmax6                          Carolyn - cross

1               THE WITNESS:  I'm getting confused.

2               THE COURT:  Then do that.

3               MR. PAGLIUCA:  We'll do that, your Honor.

4               May I re-ask the question, your Honor?

5               THE COURT:  Yes.

6    BY MR. PAGLIUCA:

7    Q.   It was Sarah who called you to tell you --

8    A.   Yes.

9    Q.   -- that Epstein wanted to take photographs of you; correct?

10   A.   Yes.

11   Q.   And you left Florida in 2003 to go to Georgia; correct?

12   A.   Yes.

13   Q.   Now I want to talk about the lawsuit that you filed --

14   A.   What does that have to do with me going to Georgia?

15   Q.   I'm changing the question here.  Okay?

16          You filed a lawsuit against Epstein and Sarah Kellen

17   in 2008; correct?

18   A.   Yes.

19   Q.   You had lawyers.  One of your lawyers was a man named jack

20   Scarola; correct?

21   A.   Correct.

22   Q.   Mr. Scarola is still your lawyer; correct?

23   A.   I don't believe so.

24   Q.   Mr. Scarola represented you in your claim with the Epstein

25   Victim Compensation Fund; correct?

1    A.  Yes.

2    Q.  And you also had a lawyer in 2008 named Richard Willits.

3    Do you remember Mr. Willits?

4    A.  Yes, I do.

5    Q.  The lawsuits that were filed in 2008 were after your first

6    discussion with the FBI in 2007; correct?

7    A.  I'm not sure.

8    Q.  Well, you met with the FBI in 2007 and then there was a

9    lawsuit in 2008; right?

10   A.  Correct.

11   Q.  And before the lawsuits were filed, you had lawyers; right?

12   A.  Correct.

13   Q.  And you had meetings with lawyers about the lawsuits?

14   A.  Yes.

15   Q.  And based on those meetings, you filed not one, but two

16   civil complaints.  Do you recall that?

17   A.  I -- yeah.

18   Q.  I want to talk about the second civil complaint first.

19           First, you read that complaint before it was filed.

20   Do you recall that?

21   A.  I don't recall.

22           MR. PAGLIUCA:  If we can direct the witness to

23   3505-043, page 41, deposition page 157, lines 18 through 25.

24   If we can blow that up for the witness and the Court, please.

25           THE COURT:  Okay.

LC7Cmax6                        Carolyn - cross

1            MR. PAGLIUCA:  Thank you, your Honor.

2    Q.  Do you recall testifying in your deposition, under oath?

3    A.  Yes.

4            THE COURT:  You can leave it up for reading the

5    question.

6            MR. PAGLIUCA:  Thank you, your Honor.

7            THE COURT:  Go ahead.

8    Q.  You were asked:

9    "Q.  Did you read the complaint before it was filed?

10   "A.  Yeah, I read the complaint.

11   "Q.  Did you -- when you read the complaint, did you notice

12   there was anything missing from it?

13   "A.  No, I trust my attorneys.  That's why they're my

14   attorneys."

15           Correct?

16   A.  Right.

17   Q.  And moving on to the next question on the same page:

18   "Q.  Did you tell anyone, your lawyers or anybody --

19           THE COURT:  Just a second.

20           MR. PAGLIUCA:  That question was objected to, your

21   Honor, so I'm not going to read it.

22           THE COURT:  Okay.

23   Q.  The complaint that you filed in federal court was not

24   against Ms. Maxwell; correct?

25   A.  Correct.

LC7Cmax6                         Carolyn - cross

1   Q.  I'm sorry.  I didn't hear the answer.

2   A.  Correct.

3   Q.  The complaint didn't mention Ms. Maxwell's name; correct?

4   A.  Correct.

5   Q.  The complaint was 91 pages with 209 paragraphs.  Do you

6   remember that?

7   A.  Yes.

8   Q.  And not one paragraph had the word "Maxwell" in it;

9   correct?

10  A.  Correct.

11          MR. PAGLIUCA:  I would like to show the witness and

12  the Court first Exhibit C4.  I provided the government a copy

13  of this exhibit.

14          THE WITNESS:  Is it in the binder?

15          MR. PAGLIUCA:  It's in the smaller binder.  We can put

16  it on the screen, if that's easier.

17          THE WITNESS:  What's the number?

18          MR. PAGLIUCA:  C4.

19          THE WITNESS:  Okay.

20          THE COURT:  Question.

21          MR. PAGLIUCA:  Yes, your Honor.

22  BY MR. PAGLIUCA:

23  Q.  This complaint was filed by Mr. Willits on your behalf in

24  state court.  Do you recall that?  If you look at page 3,

25  Mr. Willits' signature is there.

LC7Cmax6                         Carolyn - cross

1    A.  I might be in the wrong --

2              THE COURT:  Could you pull up to the microphone,

3    please, Carolyn.

4    A.  I might be in the wrong binder.  Is it this one?

5    Q.  It should have -- yes, I think that's the one, and it

6    should be at C --

7              THE COURT:  Well, there is no C.  I think you mean tab

8    4?

9              MR. PAGLIUCA:  Yes, tab 4, which is going to be

10   Exhibit C4.

11   A.  That has to do with me being arrested --

12             THE COURT:  Just a moment.  Just a moment.  It's not

13   what I have in my binder.

14             MR. PAGLIUCA:  Can we pull up C4 electronically,

15   please.

16   Q.  ████████████, if you put that one down and we have the

17   exhibit on the screen in front of you.

18   A.  Yes.  It's also in the binder on the next page.

19             MS. COMEY:  Your Honor, can we approach?

20             (Continued on next page)

21             (Pages 1622 to 1624 SEALED)

22

23

24

25

LC7Cmax6                          Carolyn - cross

```
 1              (In open court)
 2              MR. PAGLIUCA:  May I resume your Honor?
 3              THE COURT:  You may.
 4    BY MR. PAGLIUCA:
 5    Q.  Carolyn, we were talking about the exhibit that was up on
 6    the screen which is the --
 7              THE COURT:  It's not up there.  Go ahead.
 8    Q.  The complaint filed by Mr. Willits in state court regarding
 9    Jeffrey Epstein and Sarah Kellen.  Do you see that?
10    A.  Yes, I do.  Yes.
11    Q.  And this was the complaint that was filed originally in
12    2008 on your behalf against those two individuals; correct?
13    A.  Yes.
14              MR. PAGLIUCA:  Did the witness say yes, your Honor?
15              THE COURT:  Yes.
16              THE WITNESS:  Thank you.
17              MR. PAGLIUCA:  I'm going to move for the admission of
18    C4, your Honor.
19              MS. COMEY:  I'm going to object, your Honor.  Not
20    inconsistent.
21              MR. PAGLIUCA:  I didn't hear the objection.
22              MS. COMEY:  I would object, your Honor.  It's not
23    inconsistent.
24              THE COURT:  I'll sustain.
25              MR. PAGLIUCA:  Can we have a sidebar, your Honor?
```

LC7Cmax6                      Carolyn - cross

1          THE COURT:  We'll take it at the break.

2          MR. PAGLIUCA:  Okay.

3   BY MR. PAGLIUCA:

4   Q.  Carolyn, I'd like to ask you some questions about Exhibit

5   C5, if we can display that for the witness, please.

6   A.  Go ahead.

7   Q.  Thank you.  Carolyn, I want to direct your attention first

8   to paragraph 21 of exhibit -- 11 of Exhibit C5.

9   A.  Okay.

10  Q.  This was the complaint that you reviewed with your lawyers

11  and testified under oath that it was complete and accurate;

12  correct?

13  A.  It wasn't accurate.

14  Q.  That's what you testified to under oath; correct?

15  A.  Yes, but they had it wrong.

16  Q.  Paragraph 11 is a factual claim that you made against

17  Mr. Epstein in that complaint; correct?

18  A.  Yes.

19  Q.  Paragraph 11 does not contain the name "Maxwell," correct?

20  A.  Correct.

21          MR. PAGLIUCA:  Your Honor, I'm going to move for the

22  admission of paragraph 11.

23          MS. COMEY:  Your Honor, same objection.

24          MR. PAGLIUCA:  Your Honor, I can respond --

25          THE COURT:  No, on this one, on paragraph 11, I will

LC7Cmax6                    Carolyn - cross

1   overrule.

2            MR. PAGLIUCA:  Thank you.

3   BY MR. PAGLIUCA:

4   Q.  Paragraph 11 reads:  "The plaintiff, Carolyn, was first

5   brought to the defendant, Jeffrey Epstein's mansion..."

6            THE COURT:  You skipped a word.

7   Q.  "...was the first brought to the defendant, Jeffrey

8   Epstein's mansion in late May or early June 2002 when she was

9   15 years old and in middle school."

10  A.  Correct.  I see that it says that, yes.

11  Q.  Okay.

12  A.  But it's inaccurate.

13           MR. PAGLIUCA:  I'd like to show the witness paragraph

14  21 of Exhibit C5.

15           THE WITNESS:  Okay.  Go ahead.

16  Q.  Again, this is a factual statement made by your lawyers in

17  this complaint against Jeffrey Epstein and Sarah Kellen;

18  correct?

19  A.  Correct.

20           MR. PAGLIUCA:  I move for the admission of paragraph

21  21, your Honor.

22           THE COURT:  Without objection, you may read it.

23           MR. PAGLIUCA:  Thank you, your Honor.

24  Q.  This paragraph reads:  "In late May or early June of 2002,

25  Carolyn was first introduced to defendant, Jeffrey Epstein.

1   Carolyn was brought to Jeffrey Epstein's residence by a female

2   friend of hers.  Carolyn sat on the couch while the female

3   friend took off her own clothes, mounted Jeffrey Epstein, who

4   was wearing only a towel and lying on a table, and performed a

5   sexual act upon Jeffrey Epstein in the presence of Carolyn in

6   exchange for her participation as an observer of Jeffrey

7   Epstein's lewd and insidious conduct.  Carolyn was paid $300 by

8   Jeffrey Epstein."

9            Correct?

10  A.   That's what it states.

11  Q.   Paragraph 27 is another factual paragraph filed by your

12  lawyers in federal court in this lawsuit; correct?

13  A.   Sorry?

14  Q.   Paragraph 27, could you look at that, please.

15  A.   Okay.  It's true.

16           MR. PAGLIUCA:  I move for the admission of paragraph

17  27, your Honor.

18           MS. COMEY:  No objection.

19           THE COURT:  Without objection, you may read 27.

20           MR. PAGLIUCA:  Thank you, your Honor.

21  Q.   Paragraph 27 says:  "Approximately one week after the first

22  incident, Carolyn received a telephone call from Jeffrey

23  Epstein requesting that she return to his residence.  On this

24  occasion, Jeffrey Epstein directed Carolyn to undress to her

25  brassier and underwear and to provide him with a massage.  At

LC7Cmax6                    Carolyn - cross

1   the conclusion of the massage, Jeffrey Epstein masturbated

2   himself in Carolyn's presence.  Jeffrey Epstein paid Carolyn

3   $300 for this encounter."

4           True?

5   A.   True.  But what does this have to do --

6           MR. PAGLIUCA:  I'd like to direct the witness's

7   attention to paragraph 33.  And this will be the last

8   exemplary, your Honor --

9           THE COURT:  Just ask the question.

10          MR. PAGLIUCA:  Yes.

11  BY MR. PAGLIUCA:

12  Q.   Do you see paragraph 33?

13  A.   Yes.

14  Q.   And that's another factual paragraph in the complaint

15  against Mr. Epstein, filed in federal court in 2009; correct?

16  A.   Yes.

17  Q.   And again, that's true?

18  A.   Yes.

19          MS. COMEY:  Your Honor, I would object.  It's not

20  inconsistent.

21          THE COURT:  Sustained.

22          MR. PAGLIUCA:  Your Honor, may I respond?

23          THE COURT:  I'm sustaining.  Move on.  We'll deal with

24  it at the break.

25          MR. PAGLIUCA:  Okay.  I'm going to move for the

LC7Cmax6                         Carolyn - cross

1    admission of paragraph 33, your Honor.

2              MS. COMEY:  Same objection.

3              THE COURT:  Sustained.  We'll take it up at the break.

4              MR. PAGLIUCA:  Okay.

5    BY MR. PAGLIUCA:

6    Q.  Carolyn, this complaint repeats these same paragraphs

7    against Mr. Epstein two times per month up to August 2003.  Do

8    you recall that?

9    A.  I do not recall.

10             MR. PAGLIUCA:  I'd like to show the witness paragraph

11   206.

12             THE WITNESS:  Okay.

13   Q.  Paragraph 206 is a factual complaint against Sarah Kellen.

14   Do you see that?

15   A.  Yes, I do.

16   Q.  And again, that was reviewed by you prior to it being filed

17   in federal court by your lawyers; correct?

18   A.  Um, what was the question, if it was correct?

19   Q.  You reviewed this prior to it being filed in federal court

20   by your lawyers, correct, and approved it?

21   A.  I did not.

22   Q.  Do you recall me asking you questions about your testimony

23   under oath earlier?

24   A.  I do.

25   Q.  And you agreed that you gave that testimony under oath in

LC7Cmax6                        Carolyn - cross

1    2009; correct?

2    A.   Yes.

3    Q.   Are you disagreeing with that now?

4    A.   Yes.

5          THE COURT:   I think the witness is looking at the

6    paragraph.  So clarify the question.

7          MR. PAGLIUCA:   Okay.

8    Q.   Isn't this paragraph 206 of the complaint that you agreed

9    you reviewed and agreed with; correct?

10   A.   Yes.

11   Q.   This paragraph does not contain the name Ghislaine Maxwell;

12   correct?

13   A.   Correct.

14         MR. PAGLIUCA:   I move for the admission of paragraph

15   206, your Honor.

16         MS. COMEY:   Same objection, your Honor.

17         THE COURT:   Sustained.

18   Q.   Paragraph 207, again, this paragraph deals with Sarah

19   Kellen; correct?

20   A.   I don't believe that it was to engage me in prostitution,

21   no.

22   Q.   My question is, is this a paragraph of the complaint that

23   was approved --

24   A.   Yes.

25         MR. PAGLIUCA:   Move for the admission of paragraph

LC7Cmax6                        Carolyn - cross

1   207, your Honor.

2           MS. COMEY:  Same objection, your Honor.

3           THE COURT:  I'll take it at the break.

4           MR. PAGLIUCA:  Your Honor, there are a number of these

5   that I will address with the Court at the break if that's all

6   right.

7           THE COURT:  Okay.

8   BY MR. PAGLIUCA:

9   Q.  Do you remember, Carolyn, talking to Dr. Hall in connection

10  with this lawsuit?

11  A.  Who?  I'm sorry.  Repeat the question.

12  Q.  Do you remember talking to --

13          THE COURT:  I'm sorry.  Stop.  You can close the

14  binder, Carolyn.  Thank you.

15          MR. PAGLIUCA:  May I, your Honor?

16          THE COURT:  You may.

17  Q.  Do you remember talking to Dr. Richard Hall for about six

18  and a half hours in connection with this lawsuit at your

19  lawyer's office on October 21st, 2009?

20  A.  I don't have any recollection of that.

21  Q.  You have no recollection of meeting with Dr. Hall for six

22  and a half hours on October 21st, 2009?

23  A.  No.

24  Q.  Do you recall telling Dr. Hall that you started seeing

25  Epstein in 2002?

1   A.  Yeah.

2   Q.  Yes, you do?

3   A.  Yes, I do.

4   Q.  There were also, in connection with this lawsuit, what are

5   called interrogatories that you answered under oath.  Do you

6   recall that?

7   A.  That what?

8   Q.  There were documents called interrogatories --

9   A.  I don't know what that -- what those are.

10  Q.  They were questions sent by lawyers --

11  A.  Okay.

12  Q.  -- to your lawyer for you to answer under oath.  Do you

13  recall that?

14  A.  I didn't -- I don't -- don't know anything about that.

15          MR. PAGLIUCA:  If we can show the witness 3505-043,

16  page 5, deposition page 12, lines 23 through 25.

17  Q.  Have you had an opportunity to review that, Carolyn?

18          THE COURT:  It just came up.

19  A.  Yeah.  Review -- which numbers am I?

20  Q.  Sure.

21  A.  The whole thing?

22  Q.  You should be looking at page 12, lines 19 through 25.

23          MS. COMEY:  Your Honor, is the question whether this

24  refreshes recollection?

25          THE COURT:  I think that is the question.

1            THE WITNESS:  I am confused.

2            MR. PAGLIUCA:  It is.

3            THE WITNESS:  Very confused right now.

4   BY MR. PAGLIUCA:

5   Q.  Well, reviewing those questions and answers, does that

6   refresh your recollection --

7   A.  You want me to read from 8 and 9 to 20 and 20-what?

8   Q.  Deposition page 12, on that page.

9   A.  Okay.

10  Q.  Lines 18 through 25.

11  A.  18 through 25.  Like I said, I'm so confused.

12          Okay.  I read it.

13  Q.  Does that refresh your recollection that you were shown

14  your answers to interrogatories, Mr. Scarola directed you to

15  them, and that you said to Mr. Scarola, this is what me and you

16  did, right, then it should be correct, unless somebody messed

17  with it?

18          MS. COMEY:  Objection, your Honor.  I didn't think

19  that was what -- the witness said she didn't recall.

20          THE COURT:  Sustained.

21  Q.  Isn't it true that's what you said under oath in 2009?

22          MS. COMEY:  A same objection.

23          THE COURT:  Sustained.

24  Q.  I'd like to show you, Carolyn, the answers to

25  interrogatories that you authored and swore to under oath in

1  connection with this lawsuit.  Okay?

2          MR. PAGLIUCA:  If we can show the witness C8, please.

3  It might be easier to look at C8 in the binder.

4          THE COURT:  Last time it wasn't the right exhibit.

5          MR. PAGLIUCA:  We can do it on the screen.

6          THE WITNESS:  Okay.  That's correct.

7          THE COURT:  Go ahead.

8  BY MR. PAGLIUCA:

9  Q.  Do you have C8?  And if you flip to the last page, 19 of 20

10  on C8.  Do you see that's the first part of your --

11  A.  I do.

12  Q.  And you signed that under oath; correct?

13  A.  Yes, I believe so.  That is -- that's my signature, my

14  first name, yes.

15          MR. PAGLIUCA:  Your Honor, I move for the admission of

16  C8.

17          MS. COMEY:  Same objection, your Honor.

18          THE COURT:  We'll take it up at the break.

19          MR. PAGLIUCA:  I'm going to have the same request,

20  your Honor, as to C9, which we'll take up at the break, I

21  assume?

22          THE COURT:  Yes.

23          MR. PAGLIUCA:  Would you like to take the break now?

24          THE COURT:  Do you have other matters?

25          MR. PAGLIUCA:  Yes, your Honor, I have further cross

LC7Cmax6                    Carolyn – cross

1    examination of this witness.

2              THE COURT:  We'll break.  Members of the jury, for the

3    afternoon break, we'll see you in about 15 minutes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax6                    Carolyn - cross

1          (Jury not present)

2          MR. PAGLIUCA:  Your Honor, should I sit or stand?

3          THE COURT:  I don't mind.  I just want to hear you.

4          MR. PAGLIUCA:  C4 was the state complaint, your Honor.

5    And I'm not sure what the objection was.

6          MS. COMEY:  The objection was that it is not

7    inconsistent with the witness's testimony, your Honor.  I

8    believe your Honor sustained that objection.

9          THE COURT:  That's what I'm hearing you on now.

10         Mr. Pagliuca, you're seeking the admission of the

11   whole document?

12         MR. PAGLIUCA:  I am, your Honor.  Alternatively, the

13   factual paragraphs.  This does not have a lot of legalese in

14   it.  It didn't seem to be too complicated to me.

15         THE COURT:  Okay.  So let's pick up the first factual

16   paragraph.

17         So just by way of background, you inquired about this

18   document and asked if Ms. Maxwell is mentioned anywhere in the

19   complaint; correct?

20         MR. PAGLIUCA:  Yes.

21         THE COURT:  And the answer to that was no?

22         MR. PAGLIUCA:  Correct.

23         THE COURT:  So what I think we then need is to take

24   individual statements to determine if there is some

25   inconsistency with the testimony.  So point me to the first

LC7Cmax6                     Carolyn - cross

1    factual inconsistency.

2           MR. PAGLIUCA:  Well, your Honor, there are two

3    principals at play here.

4           The first is this is what is commonly referred to as

5    impeachment by omission, which is a subset of impeachment by

6    contradiction.  Impeachment by omission typically occurs where

7    there is a document or a statement where the witness would

8    likely include whatever is omitted, and this is such a

9    document, and I am seeking to impeach by omission through this

10   document.  This is a complaint against two people that this

11   witness claims sexually abused her.  It's not only against

12   Epstein, it's against one of Epstein's employees who is

13   highlighted in this complaint.  The entire testimony by the

14   government here through this witness has downplayed the role of

15   Sarah Kellen and up-played the role of Ghislaine Maxwell, and

16   it is an impeachment by omission that, in 2008, shortly after

17   being interviewed by the FBI about the same subject matter with

18   counsel, there is no mention of Maxwell in this entire

19   complaint.  I think that is significant under the facts of this

20   case.  So, I think it is admissible under that theory and there

21   is ample federal law, First Circuit, this circuit, that

22   supports that theory of impeachment by omission.  And these

23   factual paragraphs, I believe, are also impeaching of the

24   witness's testimony because it is inconsistent with the things

25   that she has claimed happened to her in addition to these

1    things that are in the complaint.

2              THE COURT:  So that's a long way of getting to my --

3    responding to my first question.

4              MR. PAGLIUCA:  Yes.

5              THE COURT:  What paragraph is inconsistent?

6              MR. PAGLIUCA:  Well, the fact that Ms. Maxwell --

7              THE COURT:  Point me to a paragraph.

8              MR. PAGLIUCA:  All of the paragraphs, your Honor.

9              THE COURT:  On the same theory you just pronounced?

10             MR. PAGLIUCA:  Yes.

11             THE COURT:  So then on your second theory, can you

12   point to any inconsistency?

13             MR. PAGLIUCA:  Well, these are all omissions, your

14   Honor, factual.  So paragraph 8, for example, the witness has

15   testified now that she was the subject of penetration and

16   intercourse by Epstein.  Paragraph 8 does not include that.

17             Paragraph 9, I think, is an expansion.  We have only

18   Kellen, often calling -- excuse me.  11A is what I'm looking

19   at.

20             THE COURT:  So other than the omission theory, is

21   there an inconsistency you're pointing to?

22             MR. PAGLIUCA:  No.

23             THE COURT:  Is there any other?  I understand your

24   omission theory, I'll hear from Ms. Comey on that in a second,

25   I do have a question for you on it, and I need to read the

LC7Cmax6                    Carolyn - cross

whole thing.

        Let me just ask.  If there were, for example, a
paragraph that said these are some of the facts of what
occurred, but not all of them, would your omission theory work
to get everything in?

        MR. PAGLIUCA:  Yes.

        THE COURT:  If there is a few discrepancies?

        MR. PAGLIUCA:  Yes.

        THE COURT:  Do you have a case for that proposition?
I mean, it's really a factual question whether there is a
reasonable inference available from which the jury could
conclude that there is an inconsistency by testifying to one
thing to inclusion of facts now that were not included
previously.

        MR. PAGLIUCA:  I think that's true and it's under the
circumstances -- I mean the case law, I can -- I need to pull
up my computer to give you the cite here, your Honor, but I'll
do that now.

        THE COURT:  Okay.  Go ahead, Ms. Comey.

        MS. COMEY:  Thank you, your Honor.  I think the theory
of omission only works where one would expect that the specific
facts that are omitted would be included in the particular
statement.  This is a lawsuit brought against two defendants
and it is containing the core allegations against those two
defendants.  One would not expect that to include allegations

LC7Cmax6                        Carolyn - cross

1    against third parties.  I think that's borne out by the

2    substance of the document.  Count One only talks about Jeffrey

3    Epstein, the first defendant.  Count Two only talks about Sarah

4    Kellen, the second defendant.  I think that that makes sense

5    and it wouldn't be expected that Ghislaine Maxwell or anyone

6    else would be included in allegations in a complaint against

7    those two.

8            More broadly, I think defense counsel has already

9    gotten the point that he wants to make across to the jury.  He

10   has made very, very clear, repeatedly, that this witness sued

11   Jeffrey Epstein and Sarah Kellen and not Ghislaine Maxwell.

12   They have now heard that she has filed multiple court documents

13   that are lengthy in which the defendant's name is not

14   mentioned.  So he has everything he needs to make his

15   impeachment point.  At this point, it's cumulative and risks

16   403 prejudice and confusion of the issues, and a sideshow about

17   a 2009 lawsuit to put in the document itself.  He has

18   everything he needs.

19           THE COURT:  I think that he has everything he needs

20   goes to the relevance of the contention that the exclusion is

21   there.

22           MS. COMEY:  Your Honor, I think that the point is that

23   she wasn't included as a defendant.  I don't think that it

24   would be expected, especially in a document --

25           THE COURT:  I think it's a redirect point, frankly,

LC7Cmax6                       Carolyn - cross

 1   counsel.  And on a 401, 403, it is already in, it's a document.

 2   So it's really a cumulative argument.  The point that you want

 3   to make, I presume you'll make on redirect.  Since the point

 4   has already been made, I don't see that there is tremendous

 5   prejudice in including the document itself.

 6            MS. COMEY:  Your Honor, my concern would be that these

 7   are crafted by lawyers in order to satisfy the elements of

 8   particular causes of action.

 9            THE COURT:  Right.

10            MS. COMEY:  It will confuse the issues and it's not

11   written in a narrative form and it wasn't offered by this

12   witness, and I think it would confuse the issues to start

13   putting these words in that her attorneys wrote.  She did not

14   write this.

15            THE COURT:  I think those are fine redirect points.

16   We've already established the 401 of the omission, I don't

17   think it causes substantial 403 prejudice, and you're going to

18   make those redirect points in any event.  So at least with

19   respect to this document C4, I'm going to overrule the

20   objection.

21            C5, I think might be in a different position.  I mean,

22   206 says, expressly, Kellen is one of defendant Epstein's

23   employees, assistants referenced in paragraph 12.  Epstein,

24   Kellen, and others reached an agreement between themselves for

25   the purposes of allowing defendant Epstein to commit the

1   illegal acts.  And then if you turn back to 12, 12 says,

2   Epstein's a wealthy financier with a lavish home, wealth, a

3   network of assistants and employees used his resource and

4   influence over a vulnerable minor child to engage in a

5   systematic pattern of sexually exploited behavior.

6           I mean, on its terms, it references additional people.

7   And so, on its face, it's not exclusive and I think that puts

8   it in a different position.

9           MR. PAGLIUCA:  Your Honor, with regard to this

10  exhibit, I was simply offering discrete factual paragraphs.

11          THE COURT:  Right.  But 206 -- so 206 was the one that

12  we began with.  I don't think that paragraph is factually

13  inconsistent with the testimony for precisely the reason I've

14  just indicated.

15          MR. PAGLIUCA:  I think we left off with 206.

16          THE COURT:  So what's the next paragraph?

17          MR. PAGLIUCA:  I mean, I can go through it and tell

18  you all the paragraphs that I'm intending to introduce or

19  ask --

20          THE COURT:  So 206 is not inconsistent.  Therefore,

21  the objection is sustained.

22          What's the next paragraph?

23          MR. PAGLIUCA:  Well, let me look at 206 and hopefully

24  respond to that.

25          THE COURT:  That's fine.

LC7Cmax6                           Carolyn - cross

1          MR. PAGLIUCA:  I'm fine with not admitting that, your

2     Honor.  I think that's right.

3          THE COURT:  They might want to get that one in.

4          MR. PAGLIUCA:  I agree with you.

5          THE COURT:  What's next?

6          MR. PAGLIUCA:  Well, I guess the question -- I'm not

7     sure where we left off, your Honor, because I think we got to

8     about 33, and then we were going to take it up at sidebar.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Okay.  Should I look at 33?

2      MR. PAGLIUCA:  Yes, 33.  The first inconsistency with

3  the direct testimony is the date, July of 2002.

4      THE COURT:  I don't know -- so again, return to --

5  what's the inconsistency?

6      MR. PAGLIUCA:  Well, the indictment says 2001.  In her

7  direct testimony she said 2001, and on the cross-examination,

8  she admitted to 2002.

9      THE COURT:  So you have to use a full sentence so I

10  can track you.  She said the first incident was in 2001.

11      MR. PAGLIUCA:  Yes.

12      THE COURT:  She then talked about 100 additional

13  incidents --

14      MR. PAGLIUCA:  Right.

15      THE COURT:  -- over the course of at least a couple of

16  years.  So what's inconsistent in July of 2002, she again

17  returned to?

18      MR. PAGLIUCA:  This is chronological through this

19  complaint.  This complaint goes from -- 2002 is the beginning

20  spot, and goes through 2003.  So the entirety of the allegation

21  is that these events occurred between 2002 and 2003, not 2001

22  and 2004.  And so this is impeachment on the time frame that is

23  alleged in the indictment and testified to by the witness on

24  direct examination.

25      THE COURT:  Is there a paragraph that talks about the

1    first couple of incidents, which I think would be, as you're

2    suggesting, time frame inconsistent.

3              MR. PAGLIUCA:  I think you admitted those already,

4    your Honor.

5              THE COURT:  See?  I'm consistent.

6              MR. PAGLIUCA:  You are.  Yes, you are.  Yes, you are.

7              The Court admitted paragraph 21, I think, as the -- 21

8    and 27.

9              THE COURT:  Okay.

10             MR. PAGLIUCA:  And where we started getting --

11             THE COURT:  21 and 27.  27 is called incident two.

12             MR. PAGLIUCA:  Right.

13             THE COURT:  And then 33, I'm not saying an

14   inconsistency.  I'll sustain there.

15             MR. PAGLIUCA:  39 --

16             THE COURT:  And to the extent it is, because it could

17   somehow be read as part of a time frame that's off, it's

18   consistent with her -- it falls within the time frame she

19   testified to; it's not specific as to which incident this is.

20   To the extent there's 401 relevance, it's cumulative of the

21   point that you've already gotten in, which is that this -- that

22   the first incident described in this complaint took place in

23   2002, and her testimony is that it took place in 2001.

24             Next.

25             MR. PAGLIUCA:  But also to that point, your Honor,

LC7VMAX7                      Carolyn - cross

1    this is inconsistent because we're not -- we're not talking

2    about 2001, we're talking about 2002.

3              THE COURT:  Right.  But it doesn't specify -- she

4    testified to incidents like these in 2002, and so it's just

5    not -- tell me how it's inconsistent with that testimony.

6              MR. PAGLIUCA:  Well, you know, for the second time in

7    July of 2002 --

8              THE COURT:  No, it doesn't say that.

9              MR. PAGLIUCA:  Paragraph 39 is what I'm looking at.

10             THE COURT:  Oh, you told me 33.  I am a lot of things,

11   but I am not a mind reader.  I sustained on 33.

12             I will go to 39.  Go ahead.

13             MR. PAGLIUCA:  So for the second time in July of 2002.

14   This is --

15             THE COURT:  I mean, that reads like more than one

16   incident in July of 2002.

17             MR. PAGLIUCA:  The second, not a third, not a fourth.

18             THE COURT:  For the second time.  Okay.

19             MR. PAGLIUCA:  And when we get through all of this,

20   the other inconsistency that tracks all of these is there is no

21   allegation of sexual intrusion or penetration.  Every single

22   one of these allegations is fondling of breasts and buttocks,

23   every single one.  And so we have new testimony about the acts

24   that were allegedly performed.

25             THE COURT:  All right.  Ms. Comey, do you want to

1    respond to that for paragraph 39?

2              MS. COMEY:  So for 39, your Honor, first with respect

3    to the time frame, I think the first clause is for the second

4    time in that month of that year.  That's not inconsistent with

5    what the witness testified to.  She testified she was going

6    frequently, certainly at least twice a month, through 2002.  So

7    that's not inconsistent.

8              With respect to the sex acts, I think here is part of

9    the issue with taking a legal document and trying to suggest

10   that the witness should have included every single detail in

11   it.  It is not necessarily the case that in order to make out

12   the legal claims in this complaint, that a lawyer would have

13   needed to include anything other than fondling and

14   masturbation.  So it is not to be expected that if she had told

15   her attorneys about the other sex acts, that they would have

16   included it.  And so I don't think the theory of omissions

17   works with respect to the sex acts.

18             MR. PAGLIUCA:  I disagree, your Honor.

19             THE COURT:  Yes, I imagine.

20             MR. PAGLIUCA:  I mean, Ms. Comey doesn't do civil

21   work, but it is significant.  And it is significant for many

22   reasons.  And in particular --

23             THE COURT:  This one, there are details included.  The

24   one detail that was testified to is a significant detail.  So

25   with respect to 39, I'll overrule.  Sorry, I'll sustain.

1          MS. COMEY:  Your Honor, may I clarify on that?

2          I don't think the witness testified to a particular

3     time frame when the penetration actually took place.  And so I

4     don't know that we can say that any particular paragraph is

5     necessarily inconsistent, because I don't think she testified

6     to a time frame.  I don't know that she would remember a

7     particular time frame.  I think that this could be more readily

8     accomplished to the extent Mr. Pagliuca wants to point out that

9     this complaint does not contain a reference to that particular

10    sex act.  I think he can ask her the question.

11         MR. PAGLIUCA:  Your Honor, I think the document itself

12    has value --

13         THE COURT:  You're not moving the whole document.

14    We've established that.  So one paragraph at a time.

15         MR. PAGLIUCA:  Right.  The paragraphs have value --

16         THE COURT:  And you'll respond to Ms. Comey's point

17    that it's only inconsistent if the time frame matches up with

18    the time frame that she's testified as to penetration.

19         Do you have a response to that?

20         MR. PAGLIUCA:  Well, she testified here that it was

21    more frequent than what's alleged.  So that's one problem with

22    the argument from the government.  I think she testified here

23    that it was up to four times a week that she was going.  And

24    this complaint goes month by month, two times a month.  That's

25    what it talks about.  That's what this is.  So that's another

LC7VMAX7                    Carolyn - cross

 1    inconsistency.  I'm not sure where the disconnect is here on

 2    the factual inconsistency where there is specific claim of

 3    fondling breasts and buttocks.  At the conclusion of the

 4    massage, Jeffrey Epstein masturbated himself in C presence,

 5    paid C in excess of $200 for this encounter, which is also

 6    inconsistent with the testimony, which she's claiming 300, up

 7    to 600 an encounter.  So it's inconsistent.

 8             THE COURT:  All right.  I'm going to overrule on 39

 9    and I think Ms. Comey's points are fully available for cross --

10    sorry, for redirect on this one.

11             The time frame pace is a little difficult to match up

12    exactly given that there is some -- a little bit of a shift --

13    well, it's hard to know what time frame this is referring to,

14    but I think in light of the witness's testimony, there's an

15    inference available that paragraph 39 falls within the time

16    frame that she talked about, penetrative acts, and that's not

17    included.  So I'll allow 39.

18             Next.

19             MR. PAGLIUCA:  The same argument for 45, your Honor.

20             MS. COMEY:  Your Honor, I would just like to clarify

21    that the witness only described one penetrative act on one

22    occasion once.  So it cannot be that she's inconsistent if she

23    doesn't mention it in 50 different allegations on 50 different

24    dates.

25             THE COURT:  Was that the testimony, that there was

1    only a penetrative act once?

2              MS. COMEY:  Yes, your Honor.  It was the second

3    incident where Jeffrey Epstein brought another female into the

4    room.  She testified that he briefly penetrated her twice

5    during that incident.  So he inserted his penis into her two

6    times during that one incident and that was it.  So it's one

7    incident.

8              THE COURT:  Okay.  I'm re-persuaded.  I'm going to

9    sustain on 39.  But you can ask the question about are there

10   any allegations in the complaint regarding penetrative sex,

11   which is as she testified to.

12             Next paragraph.

13             MR. PAGLIUCA:  51.  And this is the same -- the same

14   issue.

15             MS. COMEY:  And the same objection, your Honor.

16             THE COURT:  All right.  So I'll sustain on 51.

17             Next.

18             MR. PAGLIUCA:  57.

19             THE COURT:  And again, you can ask the question, but

20   it's not, on its face, inconsistent.  And I don't think there's

21   an inference available.  And to the extent there is, it would

22   be cumulative of the question that you're asking.

23             57.

24             MS. COMEY:  Same objection, your Honor.

25             THE COURT:  All right.

1        I'll sustain on 57 for the same reason.

2        Next.

3        MR. PAGLIUCA:  I think I can -- I can just tell you

4   all of them, your Honor, which are going to be the same.

5        THE COURT:  If they are all on that same theory, then

6   you can make the record.  If there's any different theory of

7   inconsistency, either as to the specific time frame and

8   testimony or to some different inference available, I'll hear

9   it.  But otherwise just make the record with respect to the

10  numbered paragraphs.

11       MR. PAGLIUCA:  Sure.  And when I get to the place

12  where it's different, I'll stop and we'll address that.

13       THE COURT:  Okay.

14       MR. PAGLIUCA:  Is that fair?

15       THE COURT:  Fair.

16       MR. PAGLIUCA:  63.

17       THE COURT:  Okay.  Sustained.

18       MR. PAGLIUCA:  69, 75.

19       THE COURT:  Sustained on 69.  And sustained on 75.

20       MR. PAGLIUCA:  81.

21       THE COURT:  Sustained.

22       MR. PAGLIUCA:  87.

23       THE COURT:  Sustained.

24       MR. PAGLIUCA:  93.

25       THE COURT:  Sustained.

LC7VMAX7                      Carolyn – cross

1            MR. PAGLIUCA:  99.

2            THE COURT:  Sustained.

3            MR. PAGLIUCA:  105.

4            THE COURT:  Sustained.

5            MR. PAGLIUCA:  111.

6            THE COURT:  Sustained.

7            MR. PAGLIUCA:  117.

8            THE COURT:  Sustained.

9            MR. PAGLIUCA:  123.

10           THE COURT:  Sustained.

11           MR. PAGLIUCA:  129.

12           THE COURT:  Sustained.

13           MR. PAGLIUCA:  135.

14           THE COURT:  Sustained.

15           MR. PAGLIUCA:  141.

16           THE COURT:  Sustained.

17           MR. PAGLIUCA:  147.

18           THE COURT:  Sustained.

19           MR. PAGLIUCA:  153.

20           THE COURT:  Sustained.

21           MR. PAGLIUCA:  159.

22           THE COURT:  Sustained.

23           MR. PAGLIUCA:  165.

24           THE COURT:  Sustained.

25           MR. PAGLIUCA:  171.

1           THE COURT:  Sustained.

2           MR. PAGLIUCA:  177.

3           THE COURT:  Sustained.

4           MR. PAGLIUCA:  183.

5           THE COURT:  Sustained.

6           MR. PAGLIUCA:  There's a slightly different argument

7    on 189.

8           THE COURT:  Okay.

9           MR. PAGLIUCA:  And 195.

10          These are the end dates of the allegations, which

11   brackets it before 2004, which is inconsistent with the

12   testimony.  And so these are the last two dates alleged in this

13   complaint which does not go farther than August of 2003.

14          MS. COMEY:  Your Honor, I think the paragraphs

15   themselves are still consistent.  I think Mr. Pagliuca can make

16   the point by asking the question of the witness about whether

17   there were any allegations contained after August 2003 in the

18   complaint.

19          THE COURT:  Is there a line that says it's the final

20   contact?

21          MR. PAGLIUCA:  Well, it just says August 2003,

22   incident one and incident two.

23          THE COURT:  Right.

24          MR. PAGLIUCA:  And there are no further allegations in

25   the complaint.

1          THE COURT:  Okay.  Sustained.

2          I think if it said the last incident, then fine.  But

3   otherwise you can ask the question.  The paragraph itself is

4   not inconsistent.

5          What else?

6          MR. PAGLIUCA:  Well, I'm offering 207 and 208 with

7   regard to Sarah Kellen.

8          THE COURT:  207.

9          MR. PAGLIUCA:  207 and 208.

10         THE COURT:  What's the inconsistency in 207?

11         MR. PAGLIUCA:  Again, these are -- well, as to all of

12  these, I'll just make this argument as to all of the paragraphs

13  that the Court sustained.  I view these as impeachment by

14  omission because Ms. Maxwell's name does not appear in any of

15  these paragraphs.

16         THE COURT:  Right.  So this is why this one is

17  different than the last document, which is because of paragraph

18  206 and paragraph 12, which expressly reference other unnamed

19  individual employees and assistants.  So on that ground I'll

20  sustain on 207.

21         Is there something different in 208?

22         MR. PAGLIUCA:  No.

23         THE COURT:  Okay.  So sustained on that ground, too.

24         What else?

25         MR. PAGLIUCA:  The interrogatory responses, your

LC7VMAX7                          Carolyn - cross

1    Honor.

2              THE COURT:  Which one is that tab?

3              MR. PAGLIUCA:  Those are going to be C-8, I believe,

4    starting at --

5              THE COURT:  Okay.

6              MR. PAGLIUCA:  -- tab 8.

7              THE COURT:  Okay.  Is there a specific inconsistency

8    or is it the omission theory?

9              MR. PAGLIUCA:  Yes.  It's both.

10             THE COURT:  Objection.  Compound.  Sustained.

11             Go ahead.

12             MR. PAGLIUCA:  It's both.

13             This document, we need to read the question with the

14   answer.  And so question 16:  State in detail how you came to

15   be at Mr. Epstein's home on each occasion, i.e., did someone

16   bring you or ask you if you would or wanted to go.  If so,

17   state the name and address of that individual and what he/she

18   told you and the purpose of your visit.

19             THE COURT:  Okay.  It's an open-ended question.

20             MR. PAGLIUCA:  Right.  The answer is limited.

21             THE COURT:  Okay.  So I will allow -- Ms. Comey,

22   unless you want to be heard, my inclination is to allow the

23   question and answer in 16 in.

24             MR. PAGLIUCA:  The same is -- 17, your Honor, we have

25   the question:  The amount of monies or anything of value you

1   claim you were given or paid to you by Mr. Epstein or someone,

2   yaddah, yaddah.  And we have an expansive time frame here.  And

3   the question, 2000 to 2006.  And then the answer again is she's

4   only paid for May or June of 2002 to August of 2003.  So we've

5   excluded two whole years by this answer in terms of the time

6   frame the witness testified to.

7        THE COURT:  Okay.  On the time frame inconsistency,

8   I'll allow 17, question and answer.

9        What's next?

10       MR. PAGLIUCA:  19 is all males who had any sexual

11  contact with her.  It says sexual assault or battery since age

12  10.  And the answer is none.  And she's testified that there

13  were two males, I believe, that had sexual contact with her.

14       MS. COMEY:  Your Honor, I believe the testimony was

15  that they saw her naked in the massage room.  I don't believe

16  there was testimony about sexual contact.  I would want to

17  check the transcript, your Honor, but that is my recollection

18  of the testimony.

19       THE COURT:  It's mine as well, but you'll check the

20  transcript.  In the absence of that, I don't see any

21  inconsistency.

22       MR. PAGLIUCA:  Well, then 20 covers lewd or lascivious

23  conduct, which would be naked people in a massage looking at a

24  naked underage --

25       MS. COMEY:  Again, your Honor, the testimony was just

1    that they saw her naked.  There was no other color on it.

2    There was no suggestion that they were engaged in sex acts or

3    that they were naked.  I have the same objection.

4            THE COURT:  I'm going to overrule on that one, 20.

5    There's the inference available of inconsistency, so I'll allow

6    20.

7            Next.

8            MR. PAGLIUCA:  21 is a description --

9            THE COURT:  Just to spell that out, on the theory that

10   other males present in the room during conduct described could

11   be deemed lewd and lascivious conduct.

12           MS. COMEY:  I just want to be clear, your Honor, that

13   the description was that they saw her naked in the massage

14   room, not that they saw her during any of the conduct.  I think

15   there was testimony that she would be naked for a period before

16   Jeffrey Epstein would come in; and so it would just be them

17   seeing her nude in the room is what the testimony was, not lewd

18   and lascivious conduct.

19           THE COURT:  Well, I'm going to overrule on 20.

20           Go ahead.

21           MR. PAGLIUCA:  21 is simply asking a description of

22   the lewd and lascivious exhibition, the date, and whether you

23   received money or other consideration.  Answer, none.

24           THE COURT:  Okay.  Exhibition we did not get testimony

25   on, so I'll sustain.  There's no inconsistency on 21.  No

LC7VMAX7                          Carolyn - cross

1   inference available.

2            MR. PAGLIUCA:  Okay.

3            THE COURT:  Anything else?

4            MR. PAGLIUCA:  Yes.  C-9, question 16.  This is an

5   amendment to the prior question 16 by the witness.  And the

6   witness added in this amendment:  I was also transported via

7   private car provided by Jeffrey Epstein.

8            It's significant, your Honor, in that the witness had

9   the opportunity to think about, reflect, add information here,

10  and did not.  And it is important in the context of this case

11  where there's this changed memory over time.

12           THE COURT:  Okay.  I see the inconsistency.

13           MR. PAGLIUCA:  Thank you.

14           THE COURT:  16 I'll allow.

15           What else?

16           MR. PAGLIUCA:  I think that's it -- well, then

17  there's -- well, I think that's it.

18           THE COURT:  Okay.  We really need to get the jury

19  back.

20           MS. STERNHEIM:  Can we just have five minutes, Judge?

21           THE COURT:  You can take five.

22           MS. COMEY:  And, your Honor, can I ask how long we

23  have left on cross-examination?  I think it's been longer than

24  the direct at this point.

25           THE COURT:  I'm stepping down.  You can ask the

LC7VMAX7                      Carolyn - cross

1    question.

2              (Recess)

3              THE COURT:  We'll bring in the jury.

4              Ms. Comey is coming?

5              MS. POMERANTZ:  Yes, your Honor.

6              THE COURT:  Let's get the witness.

7              Mr. Pagliuca, if you can go to the podium.

8              MS. COMEY:  I apologize, your Honor.  The witness is

9    on her way.  I was looking for her.

10             THE COURT:  Okay.

11             Bring in the jury.

12             (Jury present)

13             THE COURT:  Everyone may be seated.  And we're getting

14   the witness, so it will just be a second.

15             Members of the jury, sorry for the extended break.  We

16   were working through issues to minimize the sidebars, so thank

17   you for your patience.

18             While we have a second, I'll use the time to remind

19   you of scheduling issues this week.  Same as it's been.

20             Next week, you'll recall, Monday, Tuesday, Wednesday

21   we won't sit.  That's because I have a scheduling conflict.  So

22   we'll be back Thursday, Friday.

23             And then the following week, Monday, Tuesday,

24   Wednesday, then we're off for the Christmas break.

25             And the following week, Monday, Tuesday, Wednesday,

LC7VMAX7                    Carolyn - cross

```
1    and then we're off for the New Year's break.
2              And I'll keep you updated beyond that as soon as I
3    have it.
4              Good afternoon, Carolyn.  You can take your seat.
5              And please remove your mask.  Thank you.
6              I remind Carolyn she's under oath.
7              Mr. Pagliuca, you may continue with your
8    cross-examination.
9              MR. PAGLIUCA:  Thank you, your Honor.
10             I'd like to direct the witness to 3505-43, page 10,
11   deposition page 31, lines 21 through 25.
12             THE COURT:  Can we get them called up please.
13             THE WITNESS:  I'm at page 10.
14             MR. PAGLIUCA:  It will come up on the screen.
15             THE COURT:  Page and lines?
16             MR. PAGLIUCA:  Excuse me?  Page and line, your Honor,
17   we're going to start --
18             MS. COMEY:  Your Honor, I would object to this.
19             MR. PAGLIUCA:  Start at page 32, line -- 31, line 18.
20   I'll have the witness to see if it refreshes --
21             THE COURT:  What are the lines?
22             MR. PAGLIUCA:  3505-043, page 10, deposition page --
23             THE COURT:  I can't hear you, Mr. Pagliuca.
24             MR. PAGLIUCA:  I'm trying to bend down, talk, and read
25   at the same time.
```

LC7VMAX7                          Carolyn - cross

1            THE COURT:  Right.

2            MR. PAGLIUCA:  3505-043, page 10, deposition page 31,

3     line 19.

4            THE WITNESS:  Is it in this binder?

5            MR. PAGLIUCA:  No, it will come up on your screen

6     there.

7            THE WITNESS:  Oh, okay.

8            THE COURT:  Sustained.

9            MR. PAGLIUCA:  Your Honor, I'd like the opportunity to

10    make a record on this after.

11           THE WITNESS:  There is nothing on my screen.

12           THE COURT:  It's okay.  Next question.

13           MR. PAGLIUCA:  Yes, your Honor.

14    BY MR. PAGLIUCA:

15    Q.  Carolyn, in the 2002 to 2003 time frame, you were abusing

16    multiple substances; correct?

17    A.  No.

18    Q.  Do you recall abusing alcohol and drugs at approximately

19    the age of 13?

20    A.  If you call smoking pot drugs, then I suppose so.

21           MR. PAGLIUCA:  If we can direct the witness to

22    3505-035.

23           THE WITNESS:  I was also on --

24           MR. PAGLIUCA:  47.

25           THE COURT:  Pause.  Go ahead.

LC7VMAX7                    Carolyn - cross

1      THE WITNESS:  I was also on my Xanax for anxiety.

2      MR. PAGLIUCA:  3505-035, 47.

3      THE COURT:  Lines please?

4      MR. PAGLIUCA:  Yes, your Honor.

5      THE COURT:  Thank you.

6      MR. PAGLIUCA:  23 through 24.

7      MS. COMEY:  No objection, your Honor.

8      THE COURT:  All right.  Go ahead.

9   BY MR. PAGLIUCA:

10  Q.  You indicated that you began drinking at the age 13, do you

11  see that?

12  A.  I don't.

13      THE COURT:  Carolyn, could you please move into the

14  mic.

15  A.  I do not see that on the page that's in front of me at all.

16      MR. PAGLIUCA:  Okay.  I will move on, your Honor.

17  Q.  You agree you were smoking marijuana at the age of 13;

18  correct?

19  A.  Yeah.

20      MR. PAGLIUCA:  I'd like to direct the witness to

21  3505-039, page 4, the lower right box.

22      THE WITNESS:  Yeah.

23  Q.  Do you recall that during the time frame 2002 through 2003,

24  you were using benzodiazepines three to six times a week;

25  correct?

LC7VMAX7                        Carolyn - cross

1   A.  Sir, this document that you're showing me was taken on

2   9/16/2005.  So what does that have to do with the time frame

3   you're asking me?

4   Q.  This was an intake interview, do you recall that?

5   A.  In 2005.

6   Q.  Right.  And if you turn to --

7          MR. PAGLIUCA:  The witness can be shown 039, page 6.

8   Q.  That's your signature in October of 2005; correct?

9   A.  Yes, but what does that have to do with the year 2002 and

10  2003?

11  Q.  You were telling the intake person about your drug use;

12  correct?

13  A.  In 2005.

14  Q.  And you were telling them about your history of drug use

15  prior to 2005 in this intake; correct?

16  A.  No.

17  Q.  No?  If we look at the intake form, the paragraph that I

18  showed you, do you recall telling --

19          THE COURT:  Can you turn to it and enlarge it.

20          MR. PAGLIUCA:  Yes, your Honor.

21          Page 4 of the exhibit.

22          THE COURT:  It's too small to read.

23  A.  Okay.  What's your question?

24  Q.  Do you recall telling the intake interviewer that you were

25  using benzodiazepines?

LC7VMAX7                         Carolyn - cross

1   A.  That's Xanax.

2   Q.  I understand.  Three to six times per week, right?

3   A.  Right.  At the age of 13.

4   Q.  Right.

5   A.  That was my anxiety medication.

6   Q.  You were using alcohol three to six times per week;

7   correct?

8   A.  And I used it in 2005.

9   Q.  Do you see that it says alcohol, three to six times a week,

10  beginning --

11              MS. COMEY:  Objection.  Reading from a document --

12              THE COURT:  Just a moment.  Just a moment.

13              You could direct her to it and ask if that refreshes.

14  Q.  Yes.  I'm looking at where it says alcohol.

15  A.  I see that.

16  Q.  Okay.  And you told them -- well, does this refresh your

17  memory that you told them that you were using alcohol three to

18  six times per week beginning in 2000?  Do you see that?

19  A.  Yes, I do see that.  But that's incorrect.

20  Q.  Okay.  So this interviewer -- well, you signed this form,

21  didn't you?

22  A.  I did.

23  Q.  It's also true that you were doing cocaine in 2002 and

24  2003; correct?

25  A.  Absolutely not.  I haven't done that.  I didn't use crack

1    until I was 18 years old.

2              MR. PAGLIUCA:  We can direct the witness to --

3    A.  And it dates in 2005.

4              MR. PAGLIUCA:  We can take down that document, your

5    Honor.

6              THE COURT:  It's down.

7              MR. PAGLIUCA:  If I can direct the witness to

8    3505-043, page 28, deposition page 105, lines 7 through 11.

9              THE COURT:  Just a moment.

10   A.  I'm sorry, what lines?

11   Q.  It will be enlarged for you.

12   A.  No, I see that.  I'm asking what lines of the paper you

13   would like me to look at.

14   Q.  Sure.  We're looking at lines 7 through 11.

15   A.  Yes, I see that.

16   Q.  Again, this is testimony under oath in 2009; correct?

17   A.  Right.

18             MS. COMEY:  Objection, your Honor.

19             THE COURT:  Sustained.

20             MR. PAGLIUCA:  The basis of the objection, your Honor?

21             THE COURT:  Not inconsistent.

22   Q.  You also ingested something called angel trumpets when you

23   were going to Mr. Epstein's house, do you recall that?

24   A.  That's a flower.  I don't think you should ingest those at

25   all.

LC7VMAX7                       Carolyn - cross

1      MR. PAGLIUCA:  If we can direct the witness to

2  3505-035, page 139.  That's the deposition page, I believe.

3      THE COURT:  I will direct the witness to answer,

4  because I don't think we got a direct answer to the question.

5      THE WITNESS:  I have never taken a hallucinogenic.

6      THE COURT:  Okay.  Go ahead.

7      MR. PAGLIUCA:  3505-035, page 139, line 10.

8      THE COURT:  All right.  Go ahead.

9      MS. COMEY:  Your Honor, may I confer with counsel --

10      THE COURT:  You may.

11      MS. COMEY:  -- please?

12      (Counsel conferred)

13      THE WITNESS:  I have never seen this document in my

14  life.

15      THE COURT:  Just one second, Carolyn.

16      MS. COMEY:  Thank you, your Honor.

17      MR. PAGLIUCA:  Thank you, your Honor.

18      THE COURT:  Can you orient the witness as to what

19  we're looking at.

20      MR. PAGLIUCA:  Page 138.

21      THE COURT:  But just the date that this is from.

22      MR. PAGLIUCA:  This is from 2009, your Honor.

23      THE COURT:  Okay.  Can you just show the first page,

24  because she said she didn't know what it was.

25      MR. PAGLIUCA:  Sure.  October 21st, 2009.

1          THE COURT:  Okay.  And then --

2          THE WITNESS:  Rough draft.  Who's it from?

3    BY MR. PAGLIUCA:

4    Q.  The question is did you make that statement?

5    A.  What statement?

6    Q.  That you used angel trumpets --

7    A.  No, I don't even see that as a question.  It was asking

8    about hallucinogenics.

9    Q.  You know what an angel trumpet is; correct?

10   A.  I do not.  I don't suggest anybody eats them.

11   Q.  Your drug use continued in the 2001 through 2003 time

12   frame; correct?

13   A.  No.

14   Q.  Isn't it true that you left the state of Florida in part

15   because you were abusing cocaine, and you and your boyfriend

16   wanted to go to Georgia so that you could detox?

17   A.  That is not true.  I went to Georgia to escape the

18   traumatic events that were happening in my life.

19   Q.  Well, and you went to Georgia and you were pregnant, right?

20   A.  I got pregnant in Georgia.

21   Q.  And you stayed there through 2003; correct?

22   A.  Yes.

23   Q.  I want to ask you some questions about your testimony

24   related to your claims about having sex with Mr. Epstein.

25          Do you remember testifying about that on direct

1    examination?

2    A.  When, earlier?

3    Q.  Yes.

4    A.  Yes.

5    Q.  And let me back up.

6    A.  Yeah.

7    Q.  Isn't it true that you used cocaine while you were at

8    Mr. Epstein's house?

9    A.  No.

10             MR. PAGLIUCA:  If I could direct the witness's

11   attention --

12   A.  I saw the paper.

13             THE COURT:  I will ask you to call it up.

14             MR. PAGLIUCA:  I am, your Honor.  I'm going to direct

15   the witness's attention to page 3505-043, 28, at page 105.

16   Let's start at page 103.

17             Does the witness have page 103?

18             THE COURT:  Yes.

19             MR. PAGLIUCA:  Let's go to line 10, start at line 11.

20             MS. COMEY:  Objection, your Honor.

21             THE WITNESS:  What does Mr. Epstein telling me not to

22   take drugs have to do with the question?

23             THE COURT:  Just a second.  When there's an objection,

24   you have to wait till I rule, please.

25             THE WITNESS:  Oh.

1           MR. PAGLIUCA:  It's foundational for the next

2      question.

3           THE COURT:  Well, then let's direct counsel and the

4      Court to the lines, and then you can expand for foundation, if

5      necessary.

6           MR. PAGLIUCA:  Sure.  Line 14:

7           Question:  And how did Mr. Epstein --

8           THE COURT:  No, no, no.  You need to tell the

9      government and me what lines to read.  The government can

10     indicate objection or no objection, and then I'll rule, and

11     then you can proceed or not proceed.

12          MR. PAGLIUCA:  Sure.  Page 103, line 14 through 25,

13     continuing on to 104, through page -- line 25, continuing on

14     through 105, page -- line 25.

15          THE COURT:  I'm still on 103 here.

16          MR. PAGLIUCA:  Excuse me?

17          THE COURT:  It was just on 103 so far.

18          MR. PAGLIUCA:  Okay.

19          THE COURT:  You need to communicate with each other

20     because it's just not working.

21          THE WITNESS:  I don't understand what this has to

22     do --

23          THE COURT:  Just a minute, please.

24          Can you repeat, I guess, the line.  Okay.

25          MR. PAGLIUCA:  And we do have paper copies, your

LC7VMAX7                    Carolyn - cross

1    Honor, if that's easier.

2                 THE COURT:  Okay.

3                 So what exact lines do you propose reading?

4                 MR. PAGLIUCA:  Well, I think we need to start at 14

5    and continue through that page, the next page, the next page,

6    and the next page.

7                 THE COURT:  Ms. Comey.

8                 MS. COMEY:  Your Honor, I think the only potentially

9    admissible portion of this might be on pages 105 through 106.

10                THE COURT:  Thank you.  Let's go there.

11                That seems to get what you're getting at.

12                MR. PAGLIUCA:  Sure.  I was just trying to give the

13   context, your Honor.  So that's fine.  I'll go there.

14   BY MR. PAGLIUCA:

15   Q.  Looking at line 7 on page 105, does it refresh your memory

16   that you answered the question:  Yes, but I have done cocaine

17   at Mr. Epstein's house also?

18                MS. COMEY:  Your Honor, I think we need the question

19   and then its answer, and then it needs to continue through to

20   page 106.

21                THE WITNESS:  I need to know what line --

22                THE COURT:  So at this point you may read on that page

23   those indicated lines.  Go ahead.

24                MR. PAGLIUCA:  Fine, your Honor.

25                Starting at line 4, is that fine, Ms. Comey?

LC7VMAX7                        Carolyn - cross

1              MS. COMEY:  Yes.  But I would ask that counsel be

2       cautioned not to say a last name.

3              MR. PAGLIUCA:  Absolutely.

4              MS. COMEY:  And then continuing into page 106, line 9.

5              MR. PAGLIUCA:  That will be fine.

6              Does it refresh your recollection --

7              THE COURT:  You can just read.  Just read it all the

8       way through and then move on.

9              MR. PAGLIUCA:  Okay.

10             THE WITNESS:  Thank you.

11             MR. PAGLIUCA:  (Reading)

12      "Q.  And you were and he doing cocaine away from Mr. Epstein,

13      that is what you did when you weren't at Mr. Epstein's house?

14      "A.  Yes.  But I have done cocaine at Mr. Epstein's house also.

15      "Q.  When did you do cocaine at Mr. Epstein's house?

16      "A.  On some occasions when I was there.

17      "Q.  What occasions were those?

18      "A.  I don't recall the dates and times.

19      "Q.  What, where at his house were you doing cocaine?

20      "A.  I would excuse myself and go to the bathroom.

21      "Q.  And who was in the bathroom when you were doing cocaine?

22      "A.  Myself.

23      "Q.  And what form of cocaine were you doing?

24      "A.  Powder.

25      "Q.  And did you tell anyone you were taking cocaine?

LC7VMAX7                    Carolyn - cross

1    "A.  Mr. Epstein knew I was high.

2    "Q.  Did you tell Mr. Epstein that you had gone in the bathroom

3    in his house and snorted cocaine?

4    "A.  Not per se in that form.

5    "Q.  Did you tell him that you were using drugs in his house?

6    "A.  No.

7    "Q.  So -- no.  He never told you to do drugs in his house, did

8    he?

9    "A.  No, he never told me to."

10   A.  He says he never told you to use drugs.  You missed a word.

11   Q.  Okay.  And then the answer was:

12   "A.  No, he never told me to."

13        Correct?

14   A.  That's what it says.

15   Q.  And those are the answers that you gave under oath in 2009;

16   correct?

17   A.  Yes.

18   Q.  Now, I want to ask you some questions about your testimony

19   here today about your claim that you had intercourse with

20   Mr. Epstein.

21        MR. PAGLIUCA:  Directing the witness's attention to

22   the same page, 106, line 13.

23        THE COURT:  Not up yet.

24        MS. COMEY:  Your Honor, I would just ask that the

25   witness be asked to explain what she defines as "sexual

LC7VMAX7                     Carolyn - cross

```
 1   intercourse."
 2              MR. PAGLIUCA:  I think that's --
 3              THE COURT:  That's not an objection.  Let me look at
 4   what we're talking about.  Let's do this the same way every
 5   time, okay?
 6              MS. COMEY:  Yes, your Honor.
 7              THE COURT:  Page and line?
 8              MR. PAGLIUCA:  106, 13, your Honor.
 9              THE COURT:  All right.  Go ahead.
10   BY MR. PAGLIUCA:
11   Q.  (Reading)
12   "Q.  Did you ever have sexual intercourse with Mr. Epstein?
13   "A.  No."
14              Do you see that question and answer?
15   A.  Yeah, I do.
16              MR. PAGLIUCA:  Then, your Honor, I'm going to
17   continue, with the Court's permission, to the next series of
18   questions and answers.
19              THE WITNESS:  Can I finish my answer?
20              THE COURT:  You may.
21              THE WITNESS:  You asked me the question, did you ever
22   have sexual intercourse with Mr. Epstein.  And the answer says
23   that I replied no.  I replied no because I was not a willing
24   participant.  He had intercourse with me and I stopped it.  I
25   didn't ask to have sex with him.
```

LC7VMAX7                          Carolyn – cross

1              MR. PAGLIUCA:  And, your Honor, may I continue

2       reading?

3              THE COURT:  What lines?

4              MR. PAGLIUCA:  Sixteen through 107, 14.

5              THE COURT:  Need to see 107.

6              Through what line?

7              MR. PAGLIUCA:  Five, your Honor.

8              THE COURT:  Okay.  Go ahead.

9              MS. COMEY:  I would object, your Honor.

10             THE COURT:  I'm sorry?

11             MS. COMEY:  Same objection, your Honor.

12             THE COURT:  Go ahead.

13      BY MR. PAGLIUCA:

14      Q.  (Reading)

15      "Q.  Do you know what I mean by sexual intercourse or do I need

16      to go through the various acts?

17      "A.  Oh, I am pretty sure I know what sexual intercourse is

18      being I have two children.

19      "Q.  Well, I just want to make sure we're clear about some

20      things.  Did Mr. Epstein ever insert his penis into any part of

21      your body at all?

22      "A.  I just said that I've never had any sexual intercourse

23      with Mr. Epstein, and that I knew what -- "

24             THE COURT:  You misread.

25      BY MR. PAGLIUCA:

LC7VMAX7                    Carolyn - cross

1   Q.  (Reading)

2   A.  "I just said that I've never had sexual intercourse with

3   Mr. Epstein, and that I knew what sexual intercourse was and I

4   said no.  So for you to explain to me what it was, unnecessary.

5   "Q.  Okay.  Do you just want to answer my question now, ma'am?

6   "A.  I did four times.  I said no."

7            Continuing on, your Honor, to --

8            THE WITNESS:  For a spelling of that answer should

9   have been he did four times, I said no.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC7Cmax8                         Carolyn - cross

1           MR. PAGLIUCA:  Continuing on, your Honor, to page 106,

2     please.

3           THE COURT:  Lines?

4           MR. PAGLIUCA:  24, 25 -- excuse me.  108, 24, 25, 109,

5     16.

6           THE COURT:  Ms. Comey?

7           MS. COMEY:  Same objection.

8           MR. PAGLIUCA:  I need a basis.  I'm going to respond.

9           THE COURT:  I'm going to overrule.

10    BY MR. PAGLIUCA:

11    "Q.  Did you ever masturbate Mr. Epstein?

12    "A.  No.

13    "Q.  Did you ever touch Mr. Epstein's penis?

14    "A.  No.

15    "Q.  In any way?

16    "A.  No.  No.

17    "Q.  Did you ever penetrate with any part of your body, any

18    part of Mr. Epstein's body?

19    "A.  Besides touching his nipples, no.

20    "Q.  Did you ever do anything physically to Mr. Epstein, other

21    than give him a nipple massage?

22    "A.  Squeezed his nipples.

23           THE WITNESS:  That says, "Simple massage."

24    "Q.  Simple massage?

25    "A.  Squeezed his nipples."

1              Correct?

2      A.  Correct.

3      "Q.  Was that part of the massage?

4      "A.  No.

5      "Q.  Okay.  So other than squeeze his nipples and give him a

6      massage, did you do anything else physically to Mr. Epstein?

7      "A.  No."

8              Correct?

9      A.  Yes.  But what does this have to do with what I'm here for

10     today?

11             THE COURT:  Mr. Pagliuca, next question.

12             MR. PAGLIUCA:  Yes, your Honor.

13     Q.  When you spoke to the agents in 2007, you did not say

14     anything about Ghislaine Maxwell; correct?

15     A.  Ms. Maxwell was not the topic of discussion at that time.

16     Q.  Is the answer to my question yes?

17     A.  The only thing Ms. Maxwell was involved in was fondling and

18     touching my breasts and my buttocks, and for that, my soul is

19     broken and so is my heart.

20             THE COURT:  Counsel.

21             MR. PAGLIUCA:  Your Honor, I move to strike the answer

22     and ask the Court to direct the witness to answer the question

23     asked.

24             THE COURT:  Carolyn, you have to follow my rules here,

25     you have to.

1           Jury will disregard.  I do direct the witness to

2    respond to the questions.  I'll give you an opportunity to

3    explain and Ms. Comey will have an opportunity to redirect.

4           Go ahead.

5    BY MR. PAGLIUCA:

6    Q.  The question was, in 2007, you never said anything to the

7    FBI agents about Ms. Maxwell; correct?

8    A.  Correct.

9    Q.  Your two lawsuits involving Jeffrey Epstein and Sarah

10   Kellen say nothing about Ms. Maxwell; correct?

11   A.  Correct.

12   Q.  Your deposition testimony in 2009 says nothing about

13   Ms. Maxwell, other than the two words that Ms. Comey read;

14   correct?

15   A.  Correct.

16   Q.  Now, you also met with Ms.Villaflana (ph.) in Florida in

17   2007 with the government.  Do you recall meeting with her?

18   A.  I'm sorry, who?

19   Q.  Ms. Villaflana?

20   A.  I'm not -- I don't recall the name.

21   Q.  Do you recall that there was a second meeting with the

22   government in 2007 in Florida which Ms.Villaflana attended?  Do

23   you remember that?

24   A.  I'm not sure exactly who that is.

25   Q.  You never said anything to Ms.Villaflana or anyone else in

LC7Cmax8                          Carolyn - cross

1  the second meeting about Ms. Maxwell; correct?

2  A.  I don't recall.

3  Q.  Between 2002 and 2003, you were in mental health

4  counseling.  Do you recall that?

5  A.  No.

6  Q.  Do you remember Dr. Susan Pope?

7  A.  That was my therapist.

8  Q.  All right.

9  A.  I wasn't in a mental facility.

10  Q.  I said counseling.  So I will use your word, your

11  therapist.  Do you recall being in therapy with Dr. Pope?

12  A.  Yes.

13  Q.  You never mentioned Ms. Maxwell in therapy with Dr. Pope;

14  correct?

15  A.  Correct.

16  Q.  Now, you also met with Dr. Serge Thys?

17  A.  Dr. Thys.

18  Q.  Never mentioned Ms. Maxwell to him either; correct?

19  A.  Correct.

20  Q.  It's true, isn't it, Carolyn, that your story has changed

21  significantly since 2007, 2008, and 2009; correct?

22  A.  No.

23  Q.  And isn't it true -- well, first of all, you had no contact

24  with the government between 2007 and 2019; correct?

25  A.  I'm not sure.  I don't remember the dates.

1  Q.  Do you recall that after you met with the agents in 2007,

2  the next time you spoke with anyone from the FBI was March

3  19th, 2019?  Do you recall that?

4  A.  Yes.

5  Q.  And the agents contacted you and you told them that you

6  wanted to talk to your lawyers before talking to them; correct?

7  A.  Yes.

8  Q.  And you got a hold of Mr. Scarola, who was your lawyer from

9  before; correct?

10 A.  Yes.

11 Q.  And you spoke with Mr. Scarola?  The government continued

12 to try to contact you in 2019; correct?

13 A.  Correct.

14 Q.  And you didn't get back to them at all in 2019, did you?

15 A.  I don't recall.

16 Q.  Well, do you recall that Mr. Scarola forwarded a number of

17 emails from the government to you in 2019 and you never

18 responded to them?

19 A.  I -- I don't recall any of that.

20 Q.  You don't recall getting any emails from your lawyer --

21 A.  I'm not sure.  My phone number has been changed numerous

22 times.

23 Q.  My question is, do you recall getting any forwarded emails

24 from the government from your lawyer?

25 A.  Yes.

LC7Cmax8                          Carolyn – cross

1   Q.  And you didn't respond to those in 2019; correct?

2   A.  Correct.

3   Q.  Mr. Scarola also left you multiple --

4             THE COURT:  Just a second.  Go ahead.

5   A.  I'm not sure -- the dates and everything have been run

6   together right now.

7   Q.  Mr. Scarola also left multiple voice messages for you with

8   regard to the government, correct, in 2020?

9             MS. COMEY:  Objection, your Honor.

10            THE COURT:  Sustained.

11            MR. PAGLIUCA:  If I can direct the witness to 3505 --

12            THE COURT:  No, question.  What's your question?

13            MR. PAGLIUCA:  I understand.

14  BY MR. PAGLIUCA:

15  Q.  The question is, you were aware that Mr. Scarola was

16  leaving messages for you about contacting the government?

17  A.  I -- to Mr. Scarola --

18            THE COURT:  Just a minute.

19            MS. COMEY:  Objection.

20            THE COURT:  I sustained the objection.  That's why I

21  said go to the next question.

22            MR. PAGLIUCA:  I don't understand the basis for the

23  objection, your Honor.

24            MS. COMEY:  Privilege, your Honor.

25            THE COURT:  Sustained.  Sustained.  Next question.

LC7Cmax8                    Carolyn - cross

1   BY MR. PAGLIUCA:

2   Q.  You never responded to the government in 2020, based on any

3   messages that were left on your phone; correct?

4   A.  I did speak with Mr. Scarola in 2020.

5            MS. COMEY:  Your Honor --

6            THE COURT:  I'll allow that answer and now you'll move

7   on.

8            MR. PAGLIUCA:  I am, your Honor.

9   Q.  You first responded to the government in July of 2020

10  through Mr. Danchuk; correct?

11  A.  That was my attorney.

12  Q.  Right.  You first responded to them through Mr. Danchuk;

13  correct?

14  A.  Yes.

15  Q.  And July 1, 2020, is one month after applications to the

16  Epstein Victim Compensation Fund were opened; correct?

17           MS. COMEY:  Objection.  Foundation.

18           THE COURT:  Sustained.

19  Q.  You knew that in June, one month earlier, applications were

20  opened to the Epstein Victim Compensation Fund; correct?

21  A.  No.

22  Q.  In July 2020, your lawyer, Mr. Scarola, sent an email with

23  a number of bullet points for the government to interview

24  about; correct?

25           MS. COMEY:  Objection.  Foundation.

1    THE COURT:  Just a moment.  Overruled.

2        The question is, in July 2020, did Mr. Scarola send an

3    email with a number of bullet points for the government to

4    interview about.

5    A.  Anytime I talked to the government, he was present with me.

6    Q.  I understand that.  And those interviews with the

7    government were a followup to the email that Mr. Scarola sent

8    on your behalf as your agent on July 16th, 2020; correct?

9        MS. COMEY:  Objection, your Honor.

10        THE COURT:  Sustained on foundation.

11    Q.  You were aware that Mr. Scarola sent the email with the

12    bullet points to the government in advance of you meeting with

13    the government; correct?

14    A.  Correct.

15    Q.  And there are materials shown to you in advance of your

16    meeting with the government; correct?

17        MS. COMEY:  Objection, your Honor.  We're veering into

18    privileged territory.

19        THE COURT:  You need to clarify the question so I can

20    respond to that objection.

21        MR. PAGLIUCA:  I'm not asking for any communications,

22    your Honor.  I'm just talking about materials shown to her --

23        THE COURT:  By her attorney, you're asking her what

24    materials her attorney showed her?

25        MR. PAGLIUCA:  In advance of meeting with the

LC7Cmax8                        Carolyn - cross

1   government, yes.

2               THE COURT:  Sustained.

3   A.  I have no --

4               THE COURT:  I sustained it.

5   BY MR. PAGLIUCA:

6   Q.  You were present with Mr. Scarola and other lawyers on

7   multiple occasions meeting with the government; correct?

8   A.  Yes.

9   Q.  And this was at the same time that you were submitting your

10  Epstein Victim Compensation Fund request; correct?

11  A.  No, it's not correct.

12  Q.  Well, do you recall meeting with the government in July of

13  2020?

14              THE COURT:  Do you recall meeting with the government

15  in July 2020.

16  A.  No.  I'm not sure.  I can't recall.

17              THE COURT:  Okay.  You can say you can't recall if you

18  can't recall.

19  A.  I can't recall.

20  Q.  Do you recall meeting with the government -- let me ask the

21  question.  How many times do you recall meeting with the

22  government in 2020?

23  A.  I'm not sure.

24  Q.  Multiple times; correct?

25  A.  I don't recall.

LC7Cmax8                      Carolyn – cross

1   Q.  And do you recall submitting your application to the

2   Epstein Victim Compensation Fund in October of 2020?

3   A.  I'm not sure when it was admitted.

4            MR. PAGLIUCA:  Can we show the witness Exhibit C6,

5   electronically, please, and let's go to the last page of the

6   exhibit.

7            THE WITNESS:  Yes, that's my signature.

8   Q.  And there is a date on there, which is October 14th, 2020.

9   Does that refresh your recollection as to when you submitted

10  it?

11  A.  Yes, that's when it was submitted.

12  Q.  And that's during the time that you were meeting with the

13  government; correct?

14           THE COURT:  You could put the exhibit down?

15           MR. PAGLIUCA:  Yes, please.

16  A.  Yes.

17  Q.  And your Epstein Victim Compensation Fund submission is

18  different from your two lawsuits against Epstein and Kellen;

19  correct?

20  A.  Yes.

21  Q.  Your Epstein Victim Compensation Fund has the date, May

22  1st, 2020, as the start date, not -- I'm sorry.  2001 as the

23  start date; correct?

24  A.  I do not recall.

25           MR. PAGLIUCA:  If we can show the witness that --

LC7Cmax8                         Carolyn - cross

1    A.  Can you repeat the question.

2              MR. PAGLIUCA:  Sure.  If we can show the witness page

3    3 of C6, please.

4              THE WITNESS:  What is your question now?

5    Q.  I'm looking in the middle of the page, would that refresh

6    your memory as to what the date was you were claiming the

7    beginning date in the Epstein Victim Compensation Fund to get

8    compensation?

9    A.  Yes.

10   Q.  And that's May 1st, 2001; correct?

11   A.  Wait.  Can you ask me the question again, because --

12   Q.  In your Epstein victim fund compensation submission, you

13   were claiming Epstein abused you beginning May 1, 2001;

14   correct?

15   A.  Yes.

16   Q.  And that's different from the two lawsuits that you

17   filed --

18   A.  Yes.  I've already answered that question for you.

19   Q.  Okay.  This Epstein Victim Compensation Fund submission is

20   also different because you added claims of vaginal penetration

21   with fingers, sex toys, oral sex, and forged intercourse?

22   A.  Absolutely not.  That's a lie.

23             MR. PAGLIUCA:  If we can show the witness page 4 of 11

24   in that same exhibit.

25   Q.  Does that refresh your recollection that, with the Epstein

LC7Cmax8                    Carolyn - cross

1    Victim Compensation Fund, you added claims of vaginal

2    penetration with fingers and sex toys, oral sex, forged

3    intercourse; true?

4    A.  I suppose.  That's what it states.

5    Q.  And that's different from your lawsuits against Epstein --

6    A.  Yes.

7    Q.  Kellen --

8            THE COURT:  Carolyn.  Carolyn.  You have to wait for

9    the question to finish and then you may give your answer.  Go

10   ahead.

11   Q.  That's different from your lawsuits filed against Epstein

12   and Kellen in 2008 and 2009; correct?  Correct?

13   A.  I already answered.  Yes.

14   Q.  The other difference between your 2008 and 2009 lawsuits

15   and your Epstein Victim Compensation Fund request is that you

16   included Ms. Maxwell in this Epstein victim fund request;

17   correct?

18   A.  No, that's not correct.  I did not add her.

19   Q.  As part of the Epstein Victim Fund request, you were

20   awarded $3.25 million; correct?

21   A.  I'm not exactly sure.

22           MR. PAGLIUCA:  If we can show the witness C7, and the

23   bottom of the page, the number there.

24   Q.  Does that refresh your recollection --

25   A.  That does not say $3.9 million.  It's $2,804,000.

LC7Cmax8                         Carolyn - cross

1            MR. PAGLIUCA:  Thank you.  We can take the exhibit

2      down.

3      Q.  You received $2,804,000; correct?

4      A.  Yes.  But what does that have to do with anything?

5      Q.  They subtracted $446,000 which had been previously paid for

6      your claims against Mr. Epstein and Ms. Kellen; correct?

7      A.  Yes, but no money will ever fix what's happened to me.  So

8      why is that --

9            MR. PAGLIUCA:  Move to strike the answer, your Honor.

10            THE COURT:  Carolyn, you have to wait for my ruling

11      when there is an objection.

12            THE WITNESS:  Oh, okay.

13            THE COURT:  Objection sustained.  Jury will disregard.

14      I will direct the witness to answer the questions of

15      Mr. Pagliuca.

16            Ms. Comey will have an opportunity to come back and

17      ask you additional questions.

18            Go ahead.

19            MR. PAGLIUCA:  Thank you, your Honor.

20      BY MR. PAGLIUCA:

21      Q.  As part of this compensation fund, you know that if any of

22      the information you've submitted is false, you can lose the

23      money; correct?

24      A.  Yes.

25      Q.  And you know if any of the information you've submitted is

1   false, you can be in criminal trouble; correct?

2   A.  Yes.

3   Q.  So there is an incentive for you to stick to your story;

4   correct?

5          MS. COMEY:  Objection, your Honor.

6          THE COURT:  Sustained.

7   Q.  Ms. Comey asked you some questions about your schizophrenia

8   and issues related to your children.  Do you recall that?

9   A.  Yes, I do.

10  Q.  Isn't it true that you're worried about your children being

11  taken away from you because you've lost custody in the past

12  because of substance abuse issues?

13  A.  No, that is not what I said.  You are wrong.

14  Q.  Isn't it true -- I'm not asking what you said --

15  A.  It is not true, no.

16         THE COURT:  Hang on a second.  I'll direct the witness

17  to answer the question and then Ms. Comey will have an

18  opportunity to redirect.  You may ask the question.

19  Q.  Isn't it true that you're worried about your kids being

20  taken away because you lost custody of the children --

21  A.  No.

22  Q.  -- in the past --

23         THE COURT:  You have to wait for the question.

24  Q.  -- because of substance abuse issues?

25  A.  No.

LC7Cmax8                    Carolyn - cross

1            THE COURT:  Okay.  Next question.

2            MR. PAGLIUCA:  No further questions, your Honor.

3            THE COURT:  Ms. Comey.

4            MS. COMEY:  Briefly, your Honor.  Thank you.

5            MR. PAGLIUCA:  I need to confer, your Honor.

6            THE WITNESS:  I didn't lose my kids.

7            THE COURT:  Let's go, counsel, because it's close to

8    the end of the day.

9            MS. COMEY:  Your Honor, I'm going to be very brief.

10            THE COURT:  Okay.  Mr. Pagliuca, now is your time?

11            MR. PAGLIUCA:  Yes, your Honor.  Got it.  Your Honor,

12    as I understand it, the prior testimony that's been read into

13    the record is admitted; is that correct?

14            MS. COMEY:  Your Honor, it's been read into the

15    transcript.

16            THE COURT:  Correct.

17    BY MR. PAGLIUCA:

18    Q.  When you were talking to the government, you recall seeing

19    a photograph of Ms. Maxwell pregnant; is that correct?

20    A.  Excuse me?

21    Q.  One of your memories about Ms. Maxwell is you claim that

22    you saw a photograph of her in Epstein's house, pregnant;

23    correct?

24    A.  Nude and pregnant laying on the --

25    Q.  And pregnant.

LC7Cmax8                        Carolyn – redirect

1   A.  -- yes.  There was multiple pictures, nude photos.

2           MR. PAGLIUCA:  May I approach the witness, your Honor?

3           THE COURT:  Yes, but Mr. Pagliuca, you got to --

4           MR. PAGLIUCA:  Yes, your Honor.

5           Your Honor, I've handed the witness Defendant's

6   Exhibit C10.  The government has a copy.

7           THE WITNESS:  That is not the photo.

8           MR. PAGLIUCA:  Your Honor, I think I understand the

9   Court's ruling that the interrogatories that we discussed are

10  admitted; is that correct?

11          THE COURT:  Yes.

12          MR. PAGLIUCA:  No further questions.

13          MS. COMEY:  Three minutes, your Honor.

14          THE COURT:  Okay.

15          MS. COMEY:  May I inquire?

16          THE COURT:  You may.

17  REDIRECT EXAMINATION

18  BY MS. COMEY:

19  Q.  Carolyn, did you write your civil complaint?

20  A.  No.

21  Q.  Did you write your application to the Epstein Victim

22  Compensation Fund yourself?

23  A.  No.

24  Q.  Carolyn, when you were shown a report of an FBI interview,

25  had you ever seen that report before today?

1     A.  No.

2     Q.  Did you write it yourself?

3     A.  No.

4     Q.  Did anyone ever ask you if it was accurate?

5     A.  No.

6     Q.  Do you know how old you were when you first saw Ghislaine

7  Maxwell?

8     A.  I was 13.

9     Q.  Do you know how old you were when you first went to Jeffrey

10  Epstein's house?

11     A.  I was 13.

12     Q.  Do you know what year it was?

13     A.  Not off the top of my head right now.

14     Q.  Do you know what year it was when you were 14 years old,

15  Carolyn?

16     A.  I can't remember right now.

17     Q.  Are you able to tell us what year it was when you were 15

18  years old?

19     A.  No.

20     Q.  Can you tell us what year it was when you were 13?

21     A.  If I do the math, yes.

22     Q.  Did anyone tell you what to say here today on the stand?

23     A.  No.

24     Q.  Carolyn, are you trying to get money out of testifying here

25  today?

LC7Cmax8                        Carolyn - redirect

1   A.  No.  Money will not ever fix what that woman has done to

2   me.

3   Q.  Carolyn, why are you here today?

4   A.  Because what she did was wrong and she takes vulnerable

5   young girls and --

6           MR. PAGLIUCA:  Your Honor, I object.

7   A.  I'm so petrified that my daughters are --

8           THE COURT:  Carolyn, just a second.  Just a second.  I

9   have to rule on an objection.  Grounds.

10          MR. PAGLIUCA:  Your Honor, it's a narrative and

11  it's --

12          MS. COMEY:  Your Honor, an answer he doesn't like is

13  not a narrative.

14          THE COURT:  Counsel, both of you need to behave.

15          MR. PAGLIUCA:  I'm behaving, your Honor.  It's a

16  narrative --

17          THE COURT:  I understand.  Just one word objection.

18          MR. PAGLIUCA:  404(b).

19          THE COURT:  All right.  I'll let the answer in as it

20  is.  Next question.

21  BY MS. COMEY:

22  Q.  Carolyn, what have you been told by the government to do

23  here today?

24  A.  Just tell the truth.

25          MS. COMEY:  No further questions.

LC7Cmax8

```
1              THE COURT:  Mr. Pagliuca.

2    RECROSS EXAMINATION

3    BY MR. PAGLIUCA:

4    Q.  The $446,000 that you received in 2009, that was gone by

5    2012; correct?

6    A.  I don't know, sir.  I have children that I take care of.

7    Q.  The $446,000 was gone by 2012; correct?

8              MS. COMEY:  Beyond the scope, your Honor.

9              THE COURT:  Overruled.

10   A.  I do not recall the dates.

11   Q.  You don't recall when you ran out of $446,000?

12   A.  I bought a house, a car, food.  I don't recall.

13   Q.  And you lost all of it; correct?

14   A.  Absolutely not.

15             MR. PAGLIUCA:  No further questions, your Honor.

16             MS. COMEY:  Nothing, your Honor.

17             THE COURT:  All right.  Carolyn, you may step down,

18   you are excused.  Thank you.

19             THE WITNESS:  Thank you.

20             (Witness excused)

21             THE COURT:  Members of the jury, we're about two

22   minutes over.  Thank you for your attention and diligence.

23   We'll resume same time tomorrow.  Thank you so much.

24             (Continued on next page)

25
```