# EXHIBIT A

L3P8GIUC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VIRGINIA L. GIUFFRE,

4                   Plaintiff,                19 Cv. 3377 (LAP)

5           v.

6   ALAN DERSHOWITZ,                          Remote Conference

7                   Defendant

8   ------------------------------x
                                              March 25, 2021
9                                             2:30 p.m.

10  Before:

11                      HON. LORETTA A. PRESKA,

12                                            District Judge

13                      APPEARANCES

14  COOPER & KIRK, PLLC
         Attorneys for Plaintiff
15  BY:  CHARLES J. COOPER
         NICOLE J. MOSS
16
    AIDALA BERTUNA & KAMINS PC
17       Attorneys for Defendant
    BY:  ARTHUR L. AIDALA
18       IMRAN H. ANSARI
         BARRY KAMINS
19       JOHN M. LEVENTHAL
              -and-
20  TODD & WELD LLP
    BY:  HOWARD M. COOPER
21       CHRISTIAN KIELY
         KRISTINE C. OREN
22

23

24

25

L3P8GIUC

1              (Pages 1-42 sealed)

2              (The following proceedings are open to the public)

3              THE COURT:  Hey, Mr. Kiely.

4              MR. KIELY:  Good afternoon, your Honor.

5              THE DEPUTY CLERK:  You should be good to go.

6              THE COURT:  Thank you.

7         For those who are just joining us, counsel and the

8    Court have had discussions in a sealed transcript with respect

9    to certain sealed motions that are before the Court.

10             The next item we have on the agenda is plaintiff's

11   motion to require Professor Dershowitz to produce certain

12   documents on his Harvard e-mail.

13             Would someone like to bring me up-to-date on where we

14   are?  It seemed that you folks had been making some good

15   progress in your discussions.

16             MS. MOSS:  Your Honor, if I may, since it is our

17   motion, I would appreciate the opportunity to address that.

18             THE COURT:  Ms. Moss.

19             MS. MOSS:  Simply, we were seeking leave to file a

20   motion to compel for, frankly, the simple and at this point

21   really undisputable fact that we now sit over a year since

22   serving our document request, and we still do not have the

23   first production of documents from that Harvard account.

24             Now, it is true that from when we were last in front

25   of you, which I believe was four months to the day, there has

L3P8GIUC

1     been some progress made, but in our estimation, certainly not

2     nearly enough progress.  And there have been significant

3     roadblocks put up to beginning production from that Harvard

4     account by the defendant, primarily his absolute dead-fast

5     refusal to acknowledge that it is his obligation to cover the

6     cost of the production of e-mail from that account up to and

7     including Harvard's review of those e-mails before they will

8     release them to defendant's counsel for review for

9     responsiveness to discovery in this case.

10            We spoke about this briefly at our last status

11    conference, but the defendant well knew, with his involvement

12    in the *Edwards v. Dershowitz* matter, that Harvard's policy was

13    that before it would release documents from that e-mail account

14    for discovery in litigation, that it would need to conduct a

15    review for FERPA and other confidentiality concerns.  We have

16    worked to try to reduce the volume of documents that would be

17    subject to that review.  And shortly after we filed our

18    February letter, Harvard did an about-face and agreed that

19    there were some number of e-mails that it would in fact

20    voluntarily allow the defendant to have without Harvard

21    conducting its FERPA review.  But as to all --

22            THE COURT:  May I interrupt for one minute, Ms. Moss?

23            Ms. Reporter, F-E-R-P-A, all caps.

24            Go ahead, ma'am.

25            MS. MOSS:  But as to all of the other documents,

L3P8GIUC

1    Harvard maintains, as it has under its access use policy, that

2    it has the right and the obligation to review those documents.

3    And the defendant has steadfastly refused to acknowledge his

4    responsibility to pay for Harvard's review in order for those

5    documents to be produced in discovery.

6            THE COURT:  So the first item on the agenda is cost.

7            MS. MOSS:  Yes, ma'am.

8            Your Honor, that is the first issue.  And until that

9    really can be resolved, we may at some point start to get some

10   documents from the Harvard account.  But until that issue is

11   resolved, we certainly will not get all of the documents that

12   are relevant and responsive from that account.  So that is

13   really the first and most important issue in our view.

14           THE COURT:  Why don't we go to Mr. Kiely on this

15   issue.

16           Mr. Kiely, would you like to be heard on this?

17           MR. KIELY:  Yes, your Honor.

18           Your Honor, this is a production that Harvard is

19   making in response to a subpoena that plaintiff served.  To the

20   extent Harvard is unwilling to bear the cost associated with

21   the review, which, as Ms. Moss just indicated, have been

22   drastically reduced since the filing of our letters to

23   eliminating up to 75 percent of the volume of documents from

24   Harvard's internal review, if they are unwilling to bear that

25   cost, the rules provide that plaintiff as the subpoenaing party

L3P8GIUC

1    here must work with Harvard to ease the burden on them,

2    including by assuming some or all of that cost.

3        THE COURT:  Refresh my recollection, Mr. Kiely.  I

4    believe the reason that plaintiffs say they served that

5    subpoena was because even after defendant acknowledged that

6    those e-mails were discoverable, he hadn't taken the steps

7    necessary to produce them.  So I am not sure --

8        MR. KIELY:  Your Honor, that's not correct.

9        I'm sorry, I didn't mean to cut you off.

10       THE COURT:  I am not sure we should be looking at this

11   as merely a naked subpoena.

12       MR. KIELY:  Your Honor, at the outset of discovery, we

13   assumed that we would be able to make a production of Professor

14   Dershowitz's Harvard e-mail with cooperation from Harvard.

15   That cooperation over many months was not forthcoming,

16   resulting in the issuance of plaintiff's subpoena.  It is the

17   issuance of plaintiff's subpoena that caused Harvard finally to

18   perform a collection and produce search term reports to the

19   parties which could be the basis for the negotiation that has

20   been ongoing and since that time, which has taken many months,

21   not through any fault of the parties; the parties have been

22   very diligent in always responding promptly to new information

23   from Harvard, but they are a third party, this is not perhaps

24   top priority for them, and so it takes time and is an

25   incremental process, and here we are.

L3P8GIUC

1          THE COURT:  Let me just ask you this.  You don't deny

2     that those e-mails are discoverable information from the party,

3     from Mr. Dershowitz, right?

4          MR. KIELY:  Well, your Honor, we haven't seen any of

5     these e-mails.

6          THE COURT:  I'm sorry.  You really aren't sitting here

7     telling me you deny that, are you, really?

8          MR. KIELY:  I am not denying that there is

9     presumptively discoverable material within that e-mail account.

10    But the question of whether it's discoverable in this case and

11    the question of whether it's something that Professor

12    Dershowitz has within his control to produce are two separate

13    questions.  These are e-mails, at least the forensic --

14    Professor Dershowitz's access to his Harvard e-mail account is

15    limited to his mail app on his iPhone.  The forensic collection

16    review and production of that e-mail is a process that Harvard

17    is the gatekeeper of.  So if they have to perform this FERPA

18    review with respect to a subset of e-mails, and now, as Ms.

19    Moss just indicated -- you know, we had been told for months

20    that it had to be every single e-mail and there was going to be

21    a very substantial cost associated with that, and now we are

22    told that it is only going to be a small fraction of those

23    e-mails.

24         THE COURT:  But this is not news to Professor

25    Dershowitz.  He has done this before, right?  At least that is

L3P8GIUC

1    what it says in these letters.

2              MR. KIELY:  Your Honor, there was a much narrower

3    collection of documents in 2015, all of which have already been

4    produced to plaintiff in this case, that was done through a

5    cooperative process by an agreement.  The production that

6    plaintiff is seeking in this case is many magnitudes larger

7    than what was done in connection with the 2015 Florida

8    litigation.  We attempted to reach that same agreement with

9    Harvard.  It didn't happen.  They would not agree to those

10   terms.

11             THE COURT:  Regardless of volume, Professor Dershowitz

12   is well aware of Harvard's requirements.

13             Here is my question.  Professor Dershowitz decided

14   that he would use his Harvard account for all of these

15   communications.  Why should it be on plaintiff's head to pay

16   for this?

17             MR. KIELY:  Well, your Honor, again, as between

18   plaintiff and defendant, there is an argument to be made

19   certainly that Harvard should bear the cost of a review for

20   FERPA and Harvard confidential information.

21             THE COURT:  Unfortunately, I can't beat them on the

22   head and make them agree to that.

23             MR. KIELY:  Your Honor, this is information that is

24   only discoverable via this subpoena process.  Harvard has made

25   that clear.  They would not do this on a voluntary basis.

L3P8GIUC

1    Therefore, the rules provide that any cost-shifting is

2    plaintiff's responsibility.

3              THE COURT:  What were all of those negotiations

4    between defendant and plaintiff where defendant said, I'm

5    working on it, I'm working on it?  Subpoena is not the only way

6    to do it.

7              MR. KIELY:  Your Honor, we for months tried to get

8    very basic information from Harvard concerning the e-mail

9    account:  The volume of e-mails, the date range available, and

10   applying an initial set of search terms, what was the volume

11   that was returned?

12             THE COURT:  Let's assume that's true.  And let's

13   assume that the service of the subpoena shook that process

14   loose a little bit.  Tell me again why it should be on

15   plaintiff's head and not on defendant's head to pay the costs

16   that Harvard is incurring on this?

17             MR. KIELY:  This is discovery that plaintiff is

18   seeking from a third party that has a cost associated with

19   review by a third party to protect the third party's interests.

20   If it were up to Professor Dershowitz, he would forgo the

21   production of those subset of e-mails that require this FERPA

22   review.

23             THE COURT:  Of course he would.  That's not the point

24   either, right?

25             MR. KIELY:  Your Honor, if I could just add one point.

L3P8GIUC

1   Professor Dershowitz's obligation to provide discovery under

2   Rule 34 is limited to, at least as it concerns electronic

3   discovery and forensic collection, things that he has the power

4   to accomplish on his own.  And we have certainly done that in

5   spades with respect to the Gmail and other e-mail accounts.

6   That's not the case for the Harvard e-mail.

7           THE COURT:  Thank you.

8           Ms. Moss.

9           MS. MOSS:  Yes, your Honor.  Several of the things

10  that came out are very important and are absolutely going to

11  touch on another issue that we raised in our letter, which is

12  the question of whether the defendant can assert privilege over

13  these e-mails.

14          It goes back to, he knew, he knew absolutely, from at

15  least early 2015, what Harvard's policy was, and he made the

16  deliberate and conscious choice to continue to use that Harvard

17  account.  He cannot now use the fact that he chose to use the

18  Harvard account, knowing that when these e-mails would be

19  subject to discovery in litigation, that it would go through

20  this process and that Harvard would demand that that be paid

21  for, as a reason to excuse not having to either produce these

22  e-mails or to somehow shift the cost to the plaintiff, because

23  we were forced to issue a subpoena because of the amount of

24  time that had gone by without a single production from this

25  account.

L3P8GIUC

1       That is where we stand, and we have been trying for

2   months to come up with ways to at least shake loose some

3   production.  Two months ago we requested that at a minimum the

4   defendant agree that Harvard could begin review for a very

5   modest number of search terms that were directly on their face

6   going to return responsive documents to our discovery requests.

7   These were communications that the defendant had with Jeffrey

8   Epstein and Ghislaine Maxwell.

9       MR. KIELY:  Your Honor, just very quickly --

10      MS. MOSS:  Conceptually, the defendant agreed to that,

11  but when push came to shove, which was Harvard saying, well, we

12  are not going to start this review until there is an agreement

13  on cost, the defendant refused.  So now two months have gone by

14  with not even having this small subset of documents with the

15  review being done.

16      So that is where we find ourselves, and we just

17  genuinely believe that if there is not an order from this Court

18  making clear that it is the defendant's obligation, that we are

19  going to be many, many more months down the road, and we are

20  likely going to be right back in front of you because this cost

21  issue isn't going to go away.

22      MR. KIELY:  Harvard has agreed to forgo a review of

23  those documents that Ms. Moss suggested that we pay to have

24  them review.  So the notion that we somehow held up the process

25  by refusing to pay for a review that they have now agreed they

L3P8GIUC

1    don't even need to conduct is wide of the mark.

2                THE COURT:  So where are those documents now?

3                MR. KIELY:  They are in Harvard's possession, and we

4    essentially, after the filing of plaintiff's letter on this

5    issue, we finally got a final set of search term results back,

6    which produced a reasonable number of results, which we were

7    prepared to compromise on, it was a 2,000 document gap, and

8    essentially conclude this agreement.  And then, as I am sure

9    Ms. Moss will get to, it has been a moving target because in

10   the last couple of days we have now learned of an additional

11   cache of documents that Harvard has located.  We have very

12   little information about them, what the date range is, whether

13   they are duplicative of the e-mail already collected.

14               THE COURT:  Where are the earlier documents, why have

15   they not been produced, the ones that we have identified, that

16   Harvard said it's going to forgo --

17               MR. KIELY:  Your Honor, because --

18               THE COURT:  Can I finish?

19               That Harvard has said it will forgo its review of,

20   where are they?

21               MR. KIELY:  That agreement by Harvard has occurred in

22   the past week.  So I expect that shortly those will be produced

23   to us to review for privilege and then produce responsive

24   documents to the plaintiff.

25               THE COURT:  So is there any cost associated with

L3P8GIUC

1    those, any cost for Harvard to review or anything like that?

2              MR. KIELY:  Of the roughly 16,000 documents that have

3    been agreed upon, Harvard is able to bypass review for

4    approximately 11,000.  So there are 5,000 documents that

5    Harvard still needs to review.  They estimate their cost to

6    review at a dollar a document, which puts that at about 5,000

7    documents.  But I expect that in relatively short order -- and

8    again, we don't control this, Harvard controls it -- that those

9    roughly 11,000 e-mails can be produced to us to begin review

10   for responsiveness and privilege.

11             THE COURT:  All right.

12             Now, with respect to the recently located pack of

13   documents, what is the status of that set?

14             MR. KIELY:  Your Honor, I have made multiple requests

15   for information about that.  We have very little information as

16   to what those documents consist of.  So it is, frankly,

17   premature for us to even take a position as to the burden

18   associated with reviewing those documents, and it is premature

19   for your Honor to make any ruling with respect to these newly

20   discovered documents.  We just don't have any information.  We

21   have requested it from Harvard and are awaiting it.

22             THE COURT:  What is the basis of our belief that these

23   are responsive documents?

24             MR. KIELY:  Your Honor, they hit on search terms that

25   were agreed upon for the other body of documents.  But again,

L3P8GIUC

1    we haven't seen a search term report so we don't know whether

2    there might be a couple search terms that are resulting in a

3    large number of false positives.  Relative to the total number

4    of documents, they have a very high, quote unquote, response

5    rate of hitting on the search terms.  So there is some need for

6    further investigation before we start doubling the review that

7    we agreed to essentially.

8          THE COURT:  Ms. Moss, anything else on the cost issue

9    with respect to the already identified documents?

10         MS. MOSS:  Your Honor, only to reiterate that

11   defendant continues to take the position that he is not

12   responsible for the documents Harvard is going to review, and

13   our position is that he is.

14         THE COURT:  Anything new?

15         Mr. Kiely, anything additional you haven't said before

16   on the cost issue relating to the already identified documents?

17         MR. KIELY:  Well, your Honor, this relates to another

18   of the issue, which is the scope of the review, the scope of

19   the search protocol generally.  And what I understood was an

20   alternative request to file a motion in limine.  It is a

21   broader point about the scope of discovery and the broad nature

22   of the request that plaintiff has made.  While they oppose our

23   very targeted efforts to take testimony from individuals who

24   are at the center of this case, they are seeking very broad

25   document discovery from Professor Dershowitz into all manner of

L3P8GIUC

1    tangential issues.

2              This discovery has been very lopsided in this case

3    already.  We have had about 4,000 documents produced by the

4    plaintiff, a large percentage of which, including the bulk of

5    plaintiff's e-mail, was already reviewed, collected, and

6    produced as part of the Maxwell case.  Professor Dershowitz has

7    already produced 10,000 documents, stands to produce many more

8    thousands of documents.

9              THE COURT:  Counsel, you know that's all irrelevant.

10   So stop, please.

11             MR. KIELY:  Respectfully, I don't think it's

12   irrelevant.  I think it goes to burden and proportionality

13   here.  Discovery is a two-way street, it's an exchange, and

14   this has been one-sided, and that is something that the Court

15   needs to take into account when evaluating Professor

16   Dershowitz's burden objections here.

17             THE COURT:  So your position is, if you produced X

18   number of documents and lots more than the other side has

19   produced, then you don't have to produce any more.  That's your

20   position?

21             MR. KIELY:  I haven't said we don't have to produce

22   any more.  I say it's a factor to take into account when

23   considering the burden.

24             Your Honor, I would give one example.  At the last

25   status conference, you may recall that plaintiff made much of

L3P8GIUC

1    our objection on burden grounds to producing Professor

2    Dershowitz's text messages.  While we agreed to an exchange of

3    text messages, we collected, reviewed, and produced text

4    messages from Professor Dershowitz going back to 2012, only to

5    learn that, for some reason, although she was under

6    preservation obligations in connection with other litigation,

7    plaintiff only had text messages going back to November 2018.

8    So we get this paltry production of text messages for the past

9    two years.  We made a voluminous production on behalf of

10   Professor Dershowitz.  And this has characterized the exchange

11   of discovery in this case, and it's not reasonable, it's not

12   proportional, and it's not fair.

13            MS. MOSS:  Your Honor, may I respond?

14            THE COURT:  I am not sure what topic we are talking

15   about.  I think, Mr. Kiely, you went away from cost.  And my

16   question to you was, Do you have anything else to say about

17   cost you haven't said before?  And then you went to search

18   terms.

19            MR. KIELY:  Your Honor, I was making a broader point

20   about the asymmetry of discovery here that I think infuses all

21   of these disputes that we have addressed, your Honor, today.

22            THE COURT:  Anything else on cost?

23            All right.  Search terms.

24            On the one hand, it seemed that there was a great

25   volume relating to search terms of individuals other than

L3P8GIUC

1    defendant who plaintiff identified as Epstein associates.  But

2    on the other hand, plaintiff I guess offered to eliminate the

3    search terms associated with the other Epstein associates if

4    Professor Dershowitz would say that he would not use

5    information about them to impeach plaintiff.

6              Where are we on that, Mr. Kiely?

7              MR. KIELY:  Well, your Honor, I believe this dispute

8    is mooted because, at least with respect to the original

9    collection of Harvard e-mail that we reduced down to 16,000, we

10   have agreed to defendant's search terms including search terms

11   relating to other individuals who Ms. Giuffre has accused of

12   being sexually trafficked to.  So it moots that.

13             Just on that point, your Honor, we have never refused

14   to provide discovery into these individuals.  We have simply

15   tried to negotiate reasonable search terms that are targeted to

16   actually relevant information, and exclude what is likely to be

17   irrelevant information about public figures whose names may

18   appear in Professor Dershowitz's e-mail, many times in context

19   having nothing whatsoever to do with this case.  And that is a

20   routine dispute about search terms.  We have never refused to

21   provide discovery.

22             THE COURT:  So we are finished with that?

23             MR. KIELY:  I think that's the point that Ms. Moss is

24   making, that somehow we have refused to provide discovery of

25   Professor Dershowitz's e-mail about these individuals, and

L3P8GIUC

1    therefore --

2              THE COURT:  You're wasting time.  If we have agreed to

3    what the search terms are, and I don't need to read that

4    portion of the letter again, I don't need a rehash.

5              MR. KIELY:  I apologize, your Honor.

6              THE COURT:  Are we finished with search terms so far?

7    We have no outstanding search term disputes as we sit here?

8              MR. KIELY:  Not that are ripe.  With regard to the

9    very recently discovered e-mails, there may be.  I just want to

10   be clear about that.

11             THE COURT:  All right.

12             I confess to not understanding the privilege issue.

13             Ms. Moss, I took from your letters that you respect,

14   if that's a decent word, Professor Dershowitz's attorney-client

15   communications with his other clients over his Harvard e-mail.

16   But yet you take the position, and I am asking this as a

17   question, do you take the position that his communications over

18   his Harvard e-mail with his current attorneys on this case are

19   not privileged?  Is that your position?

20             MS. MOSS:  No.  It's actually in between those two, if

21   I may, your Honor.

22             You are correct, we are not suggesting that Mr.

23   Dershowitz's clients don't have a claim of privilege.

24   Privilege, of course, is something that the client has.  So we

25   have no basis at this point to believe that his clients had any

L3P8GIUC

understanding about Harvard's access policies and that his

clients didn't have an expectation of confidentiality.

        But as to Mr. Dershowitz himself, we believe that

there is strong circumstantial evidence, and that the case law

suggests that this needs to be looked at on a case-by-case

basis, and that on the facts of this case, that Mr. Dershowitz,

the defendant, knew that the communications that he was

engaging in, his personal communications, with his counsel --

and let me exempt for a moment litigation counsel since the

complaint was filed.  While we may have an argument about that,

the parties have agreed that, as the point in time that the

complaint in this case was filed, that neither party is seeking

or is going to be logging communications with litigation

counsel.  But what we have is from April 1, 2015 through April

16, 2019, that several-year span, in which the defendant

engaged in personal communications over his Harvard e-mail

account knowing that these e-mails were not subject to a

reasonable expectation of confidentiality, because he knew, he

knew from his experience in the *Edwards v. Dershowitz* case,

that when and if these e-mails became subject to discovery, or

any other litigation or legal process, that Harvard would have

the right, and reserve to themselves the right, to review those

e-mails.  We have seen that in this case.  Mr. Kiely has in

fact acknowledged that Harvard is the, quote unquote,

gatekeeper of those e-mail.

L3P8GIUC

1          And we know, not just that the defendant was aware of

2     this policy, we know that he was out courting the very

3     litigation that would make it subject to this third-party

4     review.  He publicly encouraged the plaintiff to sue him on

5     multiple occasions.  He approached multiple investigative units

6     of the government, the U.S. Attorney's Office, and sought and

7     invited them to investigate.  He filed complaints with four

8     different state bar associations.

9          THE COURT:  How does that waive the privilege?

10          Maybe I should go to Mr. Kiely and ask him, what is

11     the basis of the claim of privilege with respect to the

12     pre-complaint documents on Harvard e-mail?

13          MR. KIELY:  Your Honor, it's simple.  This is not a

14     run-of-the-mill case of an employer provided e-mail.  Professor

15     Dershowitz is a tenured, now emeritus professor of Harvard Law

16     School.  The policy applicable to Harvard faculty e-mail in

17     fact provides robust protections and creates a strong

18     expectation of privacy, and we have cited that.

19          THE COURT:  Mr. Kiely, I did read the letter.  I

20     really did.  My question is, what is the basis of a claim of

21     privilege on the pre-complaint e-mails?  And I think counsel

22     said April of '15 to April of '19, or something like that.

23          MR. KIELY:  Your Honor, perhaps I am not understanding

24     the Court's question.  We are referring to attorney-client

25     communications that are privileged, and Ms. Moss is making an

L3P8GIUC

1    argument that somehow there was a waiver because there was a

2    lack of expectation of privacy.  The basis for there being

3    privilege is that they are attorney-client communications, or

4    whatever other privilege might arguably apply, and there has

5    been no waiver because Professor Dershowitz has a strong

6    expectation of privacy in his e-mail.  And the fact that

7    Harvard, pursuant to an agreement in which Harvard expressly

8    recognized Professor Dershowitz's attorney-client privilege

9    over his Harvard e-mails, conducted a FERPA review of some

10   subset of those e-mails for production in another litigation,

11   that does not constitute a broad waiver of Professor

12   Dershowitz's attorney-client privilege over his Harvard e-mail

13   account.

14          Also, the ramifications of a ruling here that somehow

15   Professor Dershowitz's Harvard e-mail account is not

16   sufficiently private for there to be privilege are really

17   far-reaching in terms of Professor Dershowitz's clients, in

18   terms of his own case, because I would note that one of Ms.

19   Giuffre's lawyers, Professor Cassell, is a law professor at --

20          THE COURT:  I read the letter.  I know.  He is at the

21   University of Utah.  I know.

22          MR. KIELY:  So let's get his e-mails then.  I am not

23   seriously suggesting that, but there is an expectation of

24   privacy here, and the policy confirms that.

25          THE COURT:  Ms. Moss.

L3P8GIUC

1          MS. MOSS:  Certainly.  Your Honor, the policy confirms

2     in black and white, and as the defendant realized and lived

3     through in the *Edwards v. Dershowitz* litigation, that the

4     university may access electronic information in connection with

5     threatened or pending litigation, and to respond to lawful

6     demands for information in law enforcement investigations,

7     other government investigations, and legal processes.  It put

8     him on notice that, when he was engaging in those

9     communications, they were not confidential.

10          We are not suggesting that there is waiver.  This is

11     not a question of waiver, which would apply to perhaps these

12     other clients of the professor.  What we are saying is that in

13     order for an otherwise privileged communication, for that

14     privilege to lie, it has to be made in confidence, it has to be

15     a reasonable expectation of confidentiality.  It would be akin

16     to him sitting in a crowded restaurant and talking to his

17     attorney but asking the people next to him, please don't listen

18     in.  That was not reasonable.  He knew when he was engaged in

19     these communications that if they were subject to legal

20     process, Harvard would be reviewing them.  And that was my

21     point about why it is so relevant that he was out courting the

22     very legal process and going to government investigators and

23     seeking investigation of the very issues that are the subject

24     matter of the e-mails that we are seeking in this litigation.

25          THE COURT:  I am not understanding that point.  He was

1   out all over the media.  He went to the U.S. Attorney's Office.

2   What has that got to do with the confidentiality of the Harvard

3   e-mails?

4   　　　　MS. MOSS:  Because he did it knowing that, if his

5   invitation to the plaintiff to sue him happened, that those

6   communications would become subject to legal process, and that

7   under those circumstances Harvard would have the right to

8   review those e-mails.  It's in black and white.

9   　　　　THE COURT:  Are those communications with the U.S.

10  Attorney's Office, media outlets, or are those communications

11  with lawyers advising him?

12  　　　　MS. MOSS:  Whatever communications he was engaging in

13  on his Harvard e-mail account that are relevant to the subject

14  matters of the claims in this case, which are the same subject

15  matters of the claims and the defenses that were going on in

16  the *Edwards v. Dershowitz* case, which, as you know, also

17  involved this extortion claim; they were substantially

18  overlapped with all of the allegations that he made in the bar

19  complaints to the state bar agencies.

20  　　　　MR. KIELY:  Your Honor, if I may, first of all, I

21  would direct you to page 4 of our opening letter.  We cite

22  about ten cases there that deal with this issue.  The fact that

23  Harvard may under certain enumerated limited circumstances

24  access Professor Dershowitz's e-mail account does not mean that

25  there is not a sufficient expectation of privacy or

L3P8GIUC

1    confidentiality in the e-mail.  The question is whether they

2    have -- the cases talk in terms of monitoring for no reason at

3    all time.  Harvard's policy is very different.

4            Second of all, the fact that Harvard reserves to

5    itself the right to access e-mail in connection with responding

6    to legal process, that gets us nowhere.  Google responds to

7    subpoenas.  They notify the user.  There is an ability to

8    assert the privilege, which is what we are doing here.  So that

9    gets plaintiff nowhere.

10           THE COURT:  Anything else on this issue?

11           MS. MOSS:  Simply, your Honor, I would just reiterate

12   that we believe that, because it's such a fact-intensive

13   inquiry, we would renew our request to be able to fully brief

14   this.

15           THE COURT:  I will consider that.

16           May I inquire then, Ms. Moss, is it the fact that you

17   are not proposing the motion in limine with respect to other

18   Epstein associated people?

19           MS. MOSS:  Your Honor, we certainly believe that

20   discovery could be substantially aided and sort of the

21   limitation and sort of how we proceed in this case would

22   benefit substantially from a ruling on that, as we have seen

23   today throughout, in terms of what the defendant is seeking and

24   what this could very quickly devolve into if their position is

25   correct.  We think that limiting it in that way -- and I am not

L3P8GIUC

1    going to reiterate the arguments that my partner Chuck Cooper

2    made, but we think for those reasons such a motion, if the

3    Court was willing to entertain it, could substantially aid

4    discovery in this case.

5                MR. HOWARD COOPER:  If I may respond to that briefly?

6                THE COURT:  Who wants to speak?

7                MR. HOWARD COOPER:  The other side, Mr. Cooper.

8                THE COURT:  Let me have Mr. Howard Cooper first.

9                MR. HOWARD COOPER:  Your Honor, obviously, given what

10   is in the complaint, there are very differing views of what is

11   fair game for discovery.  A motion in limine, as we all know,

12   is something that gets filed prior to trial, and based upon the

13   Federal Rules of Evidence, seeks to exclude evidence.  We are

14   not there yet, and in order to get there, one is entitled to

15   try to develop a full record on discovery with regard to the

16   admissibility of the evidence that they have gathered.  What is

17   at issue right now is Rule 26(c), which is whether something is

18   reasonably calculated to lead to the discovery of admissible

19   evidence, even if it takes multiple stages to get there.  And

20   your Honor knows the law and forgive me for even saying it out

21   loud since we are all so familiar with it.

22                We can't do a motion in limine right now.

23   Effectively, what the plaintiff is asking is she has filed a

24   40-page complaint; she has included multiple names; she has

25   included multiple allegations.  And now she wants to prevent

L3P8GIUC

1    discovery from happening into her own allegations.  She

2    included affidavits from Ms. Ransomme and from Ms. Farmer.  She

3    attached them.  She made them part of this case.  She literally

4    quotes them in her complaint, etc.

5        With all due respect, while everybody would like to

6    have the hot knife through butter as to what is in and what is

7    out, this case needs to proceed on a topic-by-topic and

8    issue-by-issue basis with the rules of discovery applying and

9    with your Honor being the referee about them, or having a

10   magistrate do it understanding how burdensome this is on the

11   Court.  But the idea that we are going to try this case and try

12   issues of admissibility before Professor Dershowitz even has

13   the opportunity to take discovery into what Ms. Giuffre is

14   relying upon to demonstrate falsity, it frankly would result in

15   a very unfair, one-sided process.

16       THE COURT:  Thank you.

17       Mr. Charles Cooper.

18       MR. CHARLES COOPER:  Thank you, Judge Preska.

19       As the Court has acknowledged, we are planning to file

20   a motion in limine, and we have telegraphed that very clearly.

21   We have been debating within ourselves, to be frank, your

22   Honor, what the best timing would be to bring that forward.  We

23   completely believe that this case should not, either in

24   discovery and certainly not at trial, become nine or so trials

25   instead of one.  It is not the case that our complaint includes

L3P8GIUC

1    names of other individuals.  It does not.  Yes, we have

2    attached some affidavits, and the other side is certainly

3    welcome and we anticipate they are going to take discovery into

4    that, but this case is about the plaintiff, Virginia Giuffre,

5    and the defendant cross-claimant, Professor Dershowitz.  It's

6    not about anything else.

7          MR. HOWARD COOPER:  If I may, your Honor, just very

8    briefly.

9          THE COURT:  What do you think about counsel's

10   suggestion that this motion is really premature at this time,

11   that we probably should wait until we have a better sense of

12   what is going on here?

13         MR. CHARLES COOPER:  Well, I think we shouldn't wait

14   to have this resolved if the cost of that is going to be

15   discovery as though this is a trial on nine different claims of

16   sexual abuse.

17         THE COURT:  Let me ask you this question.  Earlier on

18   today Mr. Howard Cooper I think said, plaintiff is the master

19   of her complaint.  She put all of this stuff in here.  He

20   mentioned the perjuries, serial perjurer, obviously the

21   extortion scheme and the like.  What about that?  Doesn't that

22   change things somewhat?

23         MR. CHARLES COOPER:  No, your Honor.  I come back to

24   our earlier discussion, which of course was under seal, but our

25   point is that that is not the foundation in any way of the

L3P8GIUC

1    defamation claims that are at issue in this case.  Those

2    vagrant phrases in some of the subparagraphs of paragraph 17,

3    as I walked through, were, as counsel himself suggested, simply

4    included because they were parts of a sentence or a series of

5    sentences that contain the clearly defamatory material.  They

6    were not themselves in any way separate subject matters of a

7    defamation claim.  And as you point out, yes, we are masters of

8    our complaint.  To the extent there is any legitimate

9    reasonable basis for confusion on that, we have suggested to

10   the Court that we did not intend that confusion, and we

11   disclaim any such meaning of our complaint or foundation for

12   any defamation action.

13            So, your Honor, again, I believe that our complaint

14   can't be reasonably interpreted otherwise, and I would say that

15   once again the counterclaim that has been filed in this case

16   also correctly understands the one plaintiff versus one

17   defendant nature of the defamation claims at least that the

18   plaintiff has alleged.

19            THE COURT:  Do you want an opportunity to clean up the

20   complaint?

21            MR. HOWARD COOPER:  Before we do that, your Honor, may

22   I?

23            THE COURT:  Can I ask counsel a question?

24            MR. HOWARD COOPER:  I thought you were talking to me.

25            THE COURT:  I was asking Mr. Charles Cooper if he

L3P8GIUC

1    wants an opportunity to clean up the complaint.

2            MR. CHARLES COOPER:  If the Court is tempted,

3    notwithstanding my arguments concerning the intendment of the

4    complaint and our disclaimer of any intendment or meaning in

5    the passages of the complaint, as ascribed by counsel for

6    Professor Dershowitz, then yes.  If the Court is tempted to

7    interpret it as he has suggested, then I would like an

8    opportunity to reframe the complaint in order to eliminate any

9    confusion.  I have attempted to do that in my presentation to

10   the Court, but yes, we would appreciate that opportunity before

11   it is used as the basis to go down this path vis-a-vis Mr.

12   Wexner or certainly vis-a-vis anyone else.

13           THE COURT:  Mr. Howard Cooper.

14           MR. HOWARD COOPER:  Your Honor, both in the private

15   session and now we are focused on the defamation claim, it's

16   very important that I remind the Court and my brother Mr.

17   Cooper that the complaint is not just a defamation claim.  In

18   the complaint, Professor Dershowitz is sued over and is accused

19   of being a co-conspirator in a sex trafficking ring that

20   involved multiple girls.  I believe that it says at least 40

21   girls and then later says over 100.  There is a map that is

22   drawn in the complaint in which it is depicted about where all

23   of this sex trafficking happened.  Mr. Cooper is trying to

24   unring a bell that cannot be unrung here.  They framed the

25   complaint.  They accused Professor Dershowitz falsely of being

L3P8GIUC

1    a rapist and a co-conspirator with Jeffrey Epstein and

2    Ghislaine Maxwell in a sex trafficking ring.  And by doing

3    that, they have opened the door for us to ask all of this

4    discovery in terms of other people.  And they don't like the

5    fact that they are now reaping what they sowed.

6           Further, your Honor, even with regards just to Ms.

7    Giuffre, both the complaint and the amended complaint are

8    judicial admissions on her behalf, and it will not cure the

9    problem to excise the complaint because I will insist,

10   respectfully, that your Honor allow me at trial to

11   cross-examine her against all of these things that she now

12   wants to withdraw.  Not to mention the fact, your Honor, that

13   my client has been put to an unbelievable burden and expense

14   here in responding to the complaint as framed.

15          I would ask, your Honor, with regard to two things.

16   Number one, if there is an intention to file a motion in

17   limine, I think we should all follow the rules.  Mr. Cooper

18   should call me and tell me that he wants to do that so we can

19   conference the issue, and he ought to be compelled to go along

20   with your Honor's local rules, as we have done, to seek leave

21   to file a motion, and we will oppose in due course, rather than

22   trying to debate something that I don't even fully understand

23   its contours in a hearing that has nothing to do with it.  If

24   he wants to amend the complaint, I would respectfully ask that

25   we go through the same process.  And there will be consequences

L3P8GIUC

1   for the withdrawing by Ms. Giuffre of numerous judicial

2   admissions in changing of her theories, etc.  This doesn't

3   happen just because they decided it's a bad idea because now we

4   are looking for discovery into everything she alleged.

5           Thank you, your Honor.

6           THE COURT:  Mr. Charles Cooper, anything else on this?

7           MR. CHARLES COOPER:  Your Honor, certainly, before we

8   file a motion in limine, we will meet and confer with our

9   friends on the other side of this case.  There is no doubt

10  about that.  As I say, we are discussing internally the

11  appropriate path forward on that.  We won't bring it to the

12  Court without meeting and conferring.  I really have nothing to

13  add to the points that I have already made about the nature of

14  our complaint and its proper interpretation.

15          THE COURT:  Fair enough.

16          I will ask you folks to meet and confer on the motion

17  in limine, amending the complaint or the counterclaim, so that

18  perhaps we can get this case ready to go to trial sooner rather

19  than later.

20          MR. CHARLES COOPER:  Very well, your Honor.

21          THE COURT:  Any stipulations you can come to as to

22  various effects would, of course, make the path smoother.

23          The only thing that I will rule on is with respect to

24  cost.  With respect to the already identified cache of

25  documents identified in Professor Dershowitz's Harvard e-mail,

L3P8GIUC

1    it shall be on Professor Dershowitz to pay whatever costs

2    Harvard insists upon being paid.  The material is clearly

3    discoverable material which he should have produced, and the

4    fact that plaintiff was required -- maybe not required, but in

5    fact served the subpoena to move the process along is of no

6    moment.

7            As to everything else, decision reserved.

8            MR. CHARLES COOPER:  Thank you, your Honor.

9            MR. HOWARD COOPER:  Thank you, your Honor.

10           THE COURT:  Have we exhausted ourselves, counsel?

11           MR. HOWARD COOPER:  I am ready to go for another hour,

12   but I am sure everyone else is tired.  So we will let Charles

13   get back to the slopes.

14           MR. KIELY:  Your Honor, very quickly.  We filed a

15   letter request seeking leave to file a promotion letter under

16   seal, docket 266, about two weeks ago.  Just hoping that your

17   Honor could act on that so we can tee up the next discovery

18   dispute.

19           THE COURT:  We will look for it and do it on paper.

20           MR. CHARLES COOPER:  Thank you, your Honor.

21           THE COURT:  Thank you, counsel.  Thank you for being

22   present.

23           (Adjourned)

24

25