# Cooper & Kirk

Lawyers
A Professional Limited Liability Company

Nicole J. Moss  nmoss@cooperkirk.com

1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036

(202) 220-9636
Fax (202) 220-9601

April 4, 2022

**Via ECF**
Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

    Re:    ***Giuffre v. Dershowitz*, Case No.: 19-cv-03377-LAP**
                **Plaintiff's Designation of Documents for *In Camera* Review**

Dear Judge Preska:

    I write on Plaintiff's behalf to inform the Court which emails Plaintiff has chosen for the Court's *in camera* review from the allegedly privileged communications that Defendant has withheld from production. The Court directed Plaintiff to designate five communications in each of three categories—common interest, attorney associates, and work product—for the Court to review *in camera*. Doc. 401 at 3, 6 (Feb. 14, 2022); Tr. at 40:2-4 (Feb. 22, 2022). Below are those designations, along with an analysis of the applicable legal standards and factual background.

        **I.**    **Common Interest with Epstein**

    The common-interest rule protects the confidentiality of attorney-client communications that are disclosed to a third party *if* that third party "is engaged in a 'common legal enterprise' with the holder of the privilege." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015). Parties share a common interest only where "their legal interests are sufficiently aligned that the counsel of each is in effect the counsel of all." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 57 N.E.3d 30, 38 (N.Y. 2016) (internal citation omitted). "The common interest rule does not apply merely because … one party has an interest in a litigation involving another party"; rather, the privilege-invoking party must show "the need for a common *defense* as opposed to the mere existence of a common problem." *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 434 (S.D.N.Y. 2013) (emphasis added, quotation marks omitted).

    The common legal interest must also be connected to ongoing or reasonably anticipated litigation. *Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, 252 F.R.D. 163, 170 (S.D.N.Y. 2008); *see also United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). New York courts have "uniformly rejected efforts to expand the common interest doctrine to communications that do not concern pending or reasonably anticipated litigation," and have refused to apply the doctrine

Hon. Loretta A. Preska
April 4, 2022
Page 2

to "shared communications in furtherance of any common legal interest" outside of the narrow circumstances just described. *Ambac Assur. Corp.*, 57 N.E.3d at 37.

If a common legal interest exists, then the privilege-holder and the third party must further possess "a joint defense effort or strategy [that] has been decided upon and undertaken." *Schaeffler*, 806 F.3d at 40. This requires at least a "meeting of the minds" as to the joint defense effort. *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 416 (S.D.N.Y. 2004)

Finally, once such a joint-defense agreement has been reached, not all communications between the privilege-holder and the third party are protected; rather, "only those communications made in the course of an ongoing common enterprise *and intended to further the enterprise* are protected." *Schaeffler*, 806 F.3d at 40 (emphasis added).

In short, Defendant's communications are properly protected by the common-interest rule only if the communications are (1) themselves attorney-client privileged communications, (2) with someone with whom Defendant shares a common *legal* interest connected to litigation; (3) where a joint-defense agreement has been reached with that individual; and (4) where the communication in question is intended to further the joint defense. Plaintiff respectfully asks the Court to determine *in camera* whether the following five emails satisfy that standard:

1. "Ranch. Confidential," Doc. ID 111602, withheld as a joint defense/common interest communication concerning *Jane Doe #1, et al. v. United States*, Case No. 08-80736 (S.D. Fla.) ("CVRA Action"), dated February 6, 2015.
2. "REDACTED," Doc. ID 114762, withheld as a joint defense/common interest communication concerning *Edwards v. Dershowitz*, dated April 19, 2015.
3. "Dershowitz Claims Alleged Sex Victim Tried to Extort $1 Billion | Daily Business Review," Doc. ID 493068, withheld as a joint defense/common-interest communication concerning *Edwards v. Dershowitz*, dated October 16, 2015.
4. "Please csll me." Doc. ID 90433, withheld as a joint defense/common interest communication concerning Giuffre accusations v. Dershowitz, dated May 19, 2019.
5. "Villafonte email of sept 2007," Doc. ID 509849, withheld as a joint defense/common interest communication concerning this action and Giuffre accusations v. Dershowitz, dated September 16, 2019.

*Attorney-Client Privilege*. It is doubtful that these communications are privileged to begin with. For the first four of these emails, Defendant contends that he is conveying, or Epstein is soliciting, legal advice in the context of an attorney-client relationship between Defendant and Epstein.[1] For example, the second example provided above (the email with the redacted subject line, identified with Doc. ID 114762) was sent by Ghislaine Maxwell to Jeffrey Epstein, Epstein's lawyer Darren Indyke, and Defendant. Although Defendant initially argued that he had a joint-defense agreement with Maxwell, he has since admitted that that was not the case. He has

---

[1] In response to a general inquiry, Defendant's counsel represented that Defendant is acting in his capacity as an attorney to Epstein and as a party to a joint-defense agreement in emails designated "Attorney-Client—J. Epstein is privilege holder; Joint Defense." We requested specific confirmation for the emails identified above but have not yet received a response.

nevertheless withheld this communication as a joint-defense communication between Epstein and Maxwell, to which he may be privy as Epstein's attorney. As already discussed at length, Doc. 384, at 2, that Dershowitz was acting as Epstein's attorney in connection with the matters covered by their purported joint-defense agreement is implausible when one considers (1) the absence of evidence of an attorney-client relationship, and (2) the patent conflict of interest created by Defendant representing Epstein in connection with matters in which Defendant has a personal legal interest. The proceeding to which the Maxwell communication purportedly relates—*Edwards v. Dershowitz*—is one in which *Defendant* was a party, and in which Epstein and Maxwell had no legal interest. The third example, the email conversation with the subject line "Dershowitz Claims Alleged Sex Victim Tried to Extort $1 Billion | Daily Business Review," took place *during* the second day of Defendant's deposition in *Edwards v. Dershowitz* and apparently related to testimony he gave in that deposition. The fourth example, the email with the subject line "Please csll me," relates to the present suit against *Defendant*, in which Epstein also had no legal interest. It is apparent that Defendant is pursuing his own interests instead of Epstein's in many of the purported joint-defense communications.

*Common Legal Interest*. To the extent that Defendant is not acting as Epstein's attorney, he can preserve any privilege covering shared communications *only* if he and Epstein were acting in pursuit of a common *legal* interest in anticipated or pending litigation. We have already explained how Defendant has failed to carry his burden to establish that he and Epstein ever shared such an interest. *See* Doc. 373, at 2–4; Doc. 384, at 3–4. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, *e.g.*, Exhibit 1, and any interest they shared was not legal in nature. The question whether Defendant's and Epstein's respective interests satisfy the common interest doctrine is not likely to be illuminated by the content of the designated emails. It would not be surprising if some of the emails we seek reflect a shared interest in, for example, discrediting Plaintiff and/or her attorneys. But a shared interest is insufficient to protect the privilege when it is disconnected from legal stakes in ongoing or anticipated litigation. Unless these emails reveal legal stakes that Defendant has yet to articulate, they will not alter the conclusion that Defendant cannot protect his communications under the common-interest doctrine.

We will elaborate on our prior arguments only to observe that the email with the subject line "Villafonte email of sept 2007" cannot possibly be a common-interest communication. Any legal interest of Epstein's that would have supported extending Defendant's attorney-client privilege to cover communications with Epstein's attorneys terminated with Epstein's death a month before this email exchange occurred. While it is conceivable that Epstein's *estate* could have shared an ongoing common interest with Defendant, Defendant has identified none.

*Existence of Agreement*. As the Court is aware, Defendant and Epstein negotiated a joint defense agreement that covered their communications "in connection with the matters styled as *Jane Doe #1, et al. v. United States*, Case No. 08-80736 (S.D. Fla.) and *Edwards, et al., v. Dershowitz*, Case No. CACE 15000072, in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida and in connection with any other proceeding and/or

investigation relating to or arising from this matter."² Doc. 373-4. According to Defendant's privilege descriptions, two of the communications that Plaintiff has selected for review relate to matters outside the scope of that written agreement. Defendant has asserted a joint-defense privilege over hundreds of similar communications relating to *Giuffre v. Maxwell*, Case No. 15-7433 (S.D.N.Y.), this action, and "related matters." He defends these designations on two grounds: that no written agreement is needed to sustain a joint-defense privilege, and that the communications fall under the umbrella of "any other proceeding and/or investigation relating to or arising from" the CVRA Action and *Edwards v. Dershowitz*.

Although the common interest doctrine does not require a written agreement, the existence of a contemporaneous written agreement that covers some but not all matters in which Defendant asserts that he and Epstein had a common legal interest suggests that no meeting of the minds occurred as to the excluded matters. And the written joint defense agreement is best read not to extend beyond the CVRA Action and *Edwards v. Dershowitz*. The catch-all provision on which Defendant relies captures such additional proceedings as appeals or collateral actions (e.g., enforcement of a settlement agreement) and government investigations of the allegations in these actions. It is not so broad as to capture distinct cases, else the decision to exclude then-existing litigation about the same subject matter—such as ongoing litigation between Mr. Edwards and Epstein—would be meaningless. Reinforcing a narrower reading of the catch-all is the fact that the agreement specifies that it covers "proceeding[s]" and "investigation[s]," in contradistinction to the broad word "matters," which it uses to refer to litigation.

Finally,  *See, e.g.*, Ex. 1.

*Communications in Furtherance of Common Legal Interest.* Finally, even if the two men shared a common legal interest, Defendant is not entitled to withhold every communication he had with Epstein during the relevant period. Rather, the doctrine protects only those communications made for the purpose of obtaining or conveying legal advice about a matter in which the parties shared a common legal interest. Defendant has produced only a small handful of communications with Epstein that occurred after their common interest supposedly arose, and it appears from available information that his privilege designations, which number in the thousands, extend well beyond communications in furtherance of a common legal strategy.

For example, Defendant sent the first email we have selected for review, with the subject "Ranch," to Epstein during a time when Defendant was trying to construct an alibi for the locations where Plaintiff accused him of abusing her, *see, e.g.*, Exhibit 2, including Epstein's ranch in New Mexico. Defendant has withheld this email based on a privilege *belonging to Epstein*. This privilege designation is invalid if Defendant was gathering factual information from Epstein to layer into his own alibi, instead of providing legal advice to Epstein or asking Epstein to share

---

² At a February 22, 2022, hearing, counsel for Defendant represented that Mr. Weinberg executed the agreement on Mr. Epstein's behalf in 2015. It is our understanding that counsel will produce email evidence to support this representation.

with him legal advice Epstein obtained from Epstein's attorneys.[3] The subject lines of other emails from Defendant that supposedly contain Epstein's privileged information—for example, "Where was this taken and by whom?"—suggest a similar fact-gathering rather than advice-giving or -soliciting function.

The privilege log is rife with other examples of emails that appear not to further a common *legal* strategy. For example, Defendant has withheld dozens of emails that we have reason to believe relate to Defendant's public statements about Plaintiff's accusations outside the context of litigation. These emails may well advance a common *media* strategy, but not a common legal one.

## II. Attorney Associates

Defendant has claimed attorney-client privilege over communications with more than thirty attorneys or law firms for whom Plaintiff has been unable to confirm the existence of an attorney-client relationship. Defendant is a noted attorney and law professor, and many of his associates and even family members are attorneys. Defendant is not entitled to withhold every conversation he had with these associates and family members. "When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged." *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 596 (S.D.N.Y. 2015); *see United States v. Salyer*, 853 F. Supp. 2d 1014, 1022-23 (E.D. Cal. 2012) (holding that conversations with lawyer friend not protected by attorney-client privilege where attorney "was acting as a supportive friend," not offering legal advice); *United States v. Evans*, 113 F.3d 1457, 1462-63 (7th Cir. 1997) (affirming that attorney-client privilege was waived by presence of third party because although third party was an attorney, he was attending meeting in his capacity as a friend).

This remains true even when the conversation relates to ongoing or anticipated litigation or other legal matters. Attorney-client privileged communications are only those made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." *Gulf Islands Leasing, Inc. v. Nonardier Cap., Inc.*, 215 F.R.D. 466, 470 (quotation marks omitted). One-sided communications in which a party is "informing his friend, [an attorney], of what is occurring, who the various actors are, what roles they play, and how the case is proceeding," May touch on legal issues but are not attorney-client privileged communications. *Salyer*, 853 F. Supp. 2d at 1022-23; *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (Attorney's "advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege.").

---

[3] It appears from the privilege log that Defendant initiated this conversation with a one-on-one email to Epstein. Epstein then responded, copying his attorneys. Defendant replied to Epstein alone, before forwarding all or part of the exchange to Mr. Weinberg. To provide the complete context, we have selected Mr. Weinberg's response to Defendant's forward, but we respectfully request that defendant be compelled to produce the entire chain if the document we have identified does not include it, as it is always possible that some but not all parts of the chain are privileged. Note that, while Mr. Weinberg was Epstein's attorney, Defendant has also claimed an attorney-client relationship with Mr. Weinberg.

It is evident that Defendant has been too liberal in asserting privilege over his communications with lawyer associates. He has asserted and subsequently withdrawn assertions of privilege over communications with lawyers at Blackfords LLP, Ken Feinberg, Mitch Webber, Jeannie Suk Gersen, Richard Pildes, and Marshall Sonenshine. Plaintiff respectfully requests that the Court view the following documents *in camera* to determine if Defendant has properly designated them as attorney-client privileged, as well:

1. Rory Millson, Doc. ID 516400, dated June 2, 2015.
2. Jesse Diner, Doc. ID 518250, dated November 10, 2015.
3. Lawrence Marshall, Doc. ID 175727, dated May 19, 2016.
4. Stephen Trachtenberg, Doc. ID 56835, dated April 8, 2019.
5. Michael and Marc Mukasey, Doc. ID 508261, dated April 16, 2019.

*Rory Millson*. Defendant has withheld eight communications with Mr. Millson that are all part of the same email exchange.[4] He has produced no evidence to support his claim that these communications are privileged, such as an engagement agreement with Mr. Millson or his law firm, Cravath, Swaine & Moore LLP. To our knowledge, Mr. Millson has not appeared on Defendant's behalf in any proceeding, and indeed, his relevant communications with Defendant appear to have been quite limited. We emailed Mr. Millson to inquire about the nature of his relationship with Defendant and have received no response. Exhibit 3, at 1. In addition, in a deposition in another action, Defendant identified Mr. Millson, not as an attorney, but instead as a faintly remembered source of information about David Boies. Exhibit 4, at 1272–85, 1339; *see also* Exhibit 5, at 24:21–40:25 (in a deposition that occurred a few months after the withheld communications with Mr. Millson, not identifying Mr. Millson as one of his attorneys).

*Jesse Diner*. In his deposition in *Edwards v. Dershowitz*, Defendant testified that he had had confidential attorney-client communications with "a lawyer in Broward named Diner" who "offered to represent" him. Ex. 5, at 26:20–21. Defendant has withheld five communications with Mr. Diner: one in which Defendant's attorney sends Mr. Diner pleadings from *Edwards v. Dershowitz*, and four emails that occurred after the *Edwards* deposition, in which Mr. Diner and Defendant appear to discuss correspondence from Mr. Edwards' attorney seeking to confirm the existence of an attorney-client relationship. Regardless of whether the email with the pleadings is privileged because it concerns a potential representation, it appears that Defendant did not retain Mr. Diner, and their subsequent exchanges about Mr. Edward's attorney's inquiry would not be privileged.

*Lawrence Marshall*. Defendant has represented that he had an attorney-client relationship with Professor Marshall, and he has withheld one communication with Professor Marshall based on a privilege belonging to Defendant. Quite apart from the fact that Defendant has not produced any evidence to substantiate the privilege, there are three reasons to doubt the assertion. First, Professor Marshall did not respond to our email asking him to confirm that he had privileged communications with Defendant. Ex. 3, at 3. Second, Defendant withheld three other

---

[4] Again, to the extent that the email we selected does not reflect the entire exchange, we respectfully request that Defendant be required to produce enough documents to capture the full exchange.

communications with Professor Marshall on the basis of a privilege belonging to Epstein, not himself. Finally, Defendant recently testified that Professor Marshall in fact represented Ghislaine Maxwell. Ex. 4, at 1521:13–1522:11; *see also* Exhibit 6 (email chain among Defendant, Professor Marshall, and Maxwell's attorney, in which Professor Marshall expresses an understanding that his communications with Defendant are not privileged). As noted, Defendant has acknowledged that he had no common interest agreement with Maxwell. Based on these contradictory representations, Defendant should produce all of his communications with Professor Marshall.

*Stephen Trachtenberg*. Defendant has withheld five communications with President Trachtenberg on the ground that they contain "advice and representation . . . concerning possible defamation claims against The New Yorker." Based on their subject line, the communications appear to relate to an article Defendant wrote about *The New Yorker's* coverage of Plaintiff's accusations against him. Given the absence of evidence that Defendant engaged President Trachtenberg, *See* Ex. 3, at 4, it appears that this communication may have been one of many in which Defendant sought to disseminate his account of the events at issue in this litigation, instead of a genuine request for legal advice.

*The Mukaseys*. The Mukaseys are friends and supporters of Mr. Dershowitz. Defendant contends that he also had an attorney-client relationship with both of them, but he has produced no evidence of those relationships. When we contacted Marc Mukasey to investigate Defendant's claim, Mr. Mukasey expressed surprise because he did not recall that he or his father had represented Defendant. Exhibit 3, at 9.

### III. Work Product

Defendant has logged thousands of documents as protected work product. The legal protection for work product "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *Granite Partners v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 52 (S.D.N.Y. 1999). To receive work-product protection, Defendant must bear the "burden of proving that the document was prepared in anticipation of litigation and that it would not have been prepared in substantially similar form but for the prospect of litigation." *United States v. Stewart*, 287 F. Supp. 2d 461, 467 (S.D.N.Y. 2003). For example, if "the underlying and transparent intent [i]s to use the contents of the [alleged work product] to" shape public perceptions of the parties, then the work product protection is *not* available. *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 142 (N.D.N.Y 2007).

Furthermore, work-product protection is waived "when documents are used in a manner contrary to the doctrine's purpose, when disclosure 'substantially *increases* the opportunity for potential adversaries to obtain the information.' " *Schanfield v. Sojitz Corp. of Am.*, 258 F.R.D. 211, 214 (S.D.N.Y. 2009) (emphasis added). Thus, "where the third party to whom the disclosure is made is not allied in interest with the disclosing party or does not have litigation objectives in common, the protection of the doctrine will be waived." *Tilberg v. Next Management Co.*, No. 04CIV7373RJHRLE, 2005 WL 3543701, at *1 (S.D.N.Y. Dec. 28, 2005).

Importantly, work-product protection is also waived "when a party to a lawsuit uses it in an unfair way that is inconsistent with the principles underlying the doctrine of privilege." *Stewart*, 287 F. Supp. 2d at 469 (S.D.N.Y. 2003); *see also Tribune Co. v. Purcigliotti*, 1997 WL 10924, at *5 (S.D.N.Y. Jan. 10, 1997). For example, where a broker-dealer published and disseminated a report selectively quoting from internal investigation documents, any work product protection over those documents was deemed to have been waived. *Granite Partners*, 184 F.R.D. at 54-56.

Finally, work product protection is not absolute. It can be overcome if the party seeking it "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3)(A)(ii). This is particularly true of "fact work product, which "consists of factual material, including the results of a factual investigation" prepared by an attorney in anticipation of litigation. *Robinson v. De Niro*, No. 19-CV-9156, 2022 WL 704922, at *5 (S.D.N.Y. March 9, 2022). Courts will conduct an *in camera* review and find any work product protection overcome where the documents "carr[y] great probative value on [a] contested issue," and cannot be otherwise obtained. *Brook v. Simon & Partners, LLP*, No. 17CIV6435 (GBD) (SLC), 2021 WL 5919207, at *6 (S.D.N.Y. Dec. 15, 2021) (finding any work product protection overcome where emails directly concerned the terms of the contract in dispute); *ICM Controls Corp. v. Honeywell Int'l, Inc.*, No.5:12-CV-1766, 2020 WL 1819658, at *6 (N.D.N.Y. April 10, 2020) (finding work product protection overcome where plaintiffs demonstrated "substantial need for them in order to make their own assessment of the propriety of counsel's contacts" with former employee and "would not have other means of obtaining this information").

Plaintiff respectfully requests that the Court review the following five documents *in camera* to determine if Defendant has appropriately invoked work product protection over them.

1. "Investigation Quotation," Doc. ID 114598, dated May 4, 2015.
2. "South Florida Dates," Doc. ID. 517279, dated July 8, 2015.
3. "Boies Memos for NYT Reporter," Doc. ID 511868, dated November 18, 2015.
4. "memo to U.S. Attorneys," Doc. ID 514586, dated November 4, 2016.
5. "11/9/15," Doc. ID 73894, dated February 2, 2019.

Since Plaintiff's accusations against Defendant became public in late 2014, Defendant has waged a two-front war—one in the courts and one in the media—with the ultimate objective of convincing the world that Plaintiff's accusations against him are false. The purpose of much of his litigation conduct has been to supply his public campaign. He intervened in the CVRA action not to further some concrete interest in the outcome of that litigation, but to have Plaintiff's accusations stricken from the record. Doc. 127-1, at 6. And he intervened in *Giuffre v. Maxwell* not because he had a legal stake in that case but in order to have unsealed documents that he believed would convince the public to disbelieve Plaintiff. Mot. to Intervene, Doc. 362, in *Giuffre v. Maxwell*, No. 15-7433 (S.D.N.Y. Aug. 11, 2016). Moreover, the two lawsuits to which he has been party—*Edwards v. Dershowitz* and this case—were occasioned by his vociferous and vocal public attacks on Plaintiff and anyone associated with her. These circumstances make it difficult for Defendant to establish that much of the work he has done to build his case "would not have been prepared in substantially similar form but for the prospect of litigation." *Stewart*, 287 F. Supp. 3d at 467.

Hon. Loretta A. Preska
April 4, 2022
Page 9

Defendant's media campaign has been the "but for" cause of his litigation, not the other way around.

The most prominent example of work that would have happened even without litigation is the construction of Defendant's calendar defense. After Plaintiff's accusations became public, Defendant began to compile "travel records" that he claimed would show that he could not have been in the locations where Plaintiff claims he abused her when she claimed the abuse happened. It appears that the animating purpose of this exercise was to present the records to Plaintiff's lawyers at Boies Schiller Flexner LLP, in an effort to convince them that Plaintiff's accusations were false. Amend. Counterclaim ¶ 34, Doc. 127 (June 3, 2020); Decl. of Alan Dershowitz ¶¶ 47–58, Doc. 10 (June 7, 2019). Defendant has taken the position ███████████████████████████████████████████████████ Exhibit 7, at 5-6, which means that the work he did to prepare for them is not work product. In any event, even if it began as work product, Defendant readily shared his records with Plaintiff's counsel, with members of the media, and with law enforcement, before he finally published a chart depicting them as an exhibit to his book. *See* ALAN DERSHOWITZ, GUILT BY ACCUSATION: THE CHALLENGE OF PROVING INNOCENCE IN THE ACT OF #METOO 153 (1st ed. 2019); *see, e.g.*, Exhibit 8. In these and other contexts, Defendant has routinely bolstered his defamatory statements about Plaintiff by referring to his travel records and what they purportedly show.[5]

Despite the non-litigation purposes for which he prepared the travel records, and the way he has used that defense as a sword against Plaintiff in litigation and public alike, Defendant seeks to use the work-product doctrine to shield scores of communications about the reconstruction of his calendar. These communications are not work product to begin with, and even if they were,

---

[5] *See, e.g.*, Alan M. Dershowitz, *Letter to the Editor: Article Misrepresented Dershowitz*, THE HARVARD CRIMSON (Dec. 5, 2018), https://bit.ly/2S8ISe5; Ben Ashford & Cheyenne Roundtree, *EXCLUSIVE: Defiant Alan Dershowitz brands Virginia Roberts a 'fake MeToo victim' as she files defamation suit claiming the lawyer who defended pedophile Jeffrey Epstein had underage sex with her and repeatedly called her a liar*, DAILYMAIL.COM (Apr. 16, 2019), https://dailym.ai/2ScPyrF; Transcript: Alan Dershowitz Denies Epstein Rape Accusations And Defends Role In Sweetheart Deal, NPR (July 15, 2019), https://n.pr/2PYsv0U; Transcript from Life, Liberty & Levin, *Alan Dershowitz says it would be unconstitutional for President Trump to be impeached by current inquiry*, FOXNEWS (Dec. 8, 2019), https://fxn.ws/3xgi6me; Alan Dershowitz, *The Ghislaine Maxwell I know*, SPECTATOR USA (July 3, 2020), https://bit.ly/2QkSWT0; TOI Staff, *Dershowitz says he's suing Netflix over sexual allegations in Epstein series*, THE TIMES OF ISRAEL (June 25, 2020), https://bit.ly/3xhr1nr; Solange Reyner, *Alan Dershowitz to Newsmax TV: Challenging Legal Issues in Case Against Ghislaine Maxwell*, NEWSMAX at 6:02–6:10 (July 6, 2020), https://bit.ly/3epikyJ; i24NEWS English, *Alan Dershowitz: False Accusations Damage My Advocacy for Israel*, YOUTUBE at 2:13–2:28 (July 16, 2020), https://bit.ly/32HJ4W0; Naama Lanski, *Dershowitz's war for the truth*, ISRAEL HAYOM (Oct. 12, 2020), https://bit.ly/3tYwvlb; The Megyn Kelly Show, *Alan Dershowitz on SCOTUS, Epstein, and OJ. Ep. 10*, GOOGLE PODCASTS at 54:28–54:56 (Oct. 14, 2020), https://bit.ly/3JlOYit.

their protection has been waived by Defendant's repeated, offensive disclosures. Finally, whatever work-product protection remains can be overcome by Plaintiff's substantial need. These communications may show whether Defendant was aware of the serious gaps, shortcomings, and inconsistencies in his travel records. Because Defendant bolstered the statements for which Plaintiff sues him by making representations about the completeness of his records, these communications provide essential evidence of his state of mind when he made these statements.

The same arguments require the disclosure of Defendant's unprivileged (but purportedly work-product) communications concerning various investigations Defendant commissioned and Defendant's records of his meetings with David Boies, as well as his communications disseminating supposedly protected information to the media, law enforcement, or other third parties.

Defendant has withheld three communications we have designated for *in camera* review as attorney-client privileged, as well.[6] All are unilateral communications between Defendant and Nicholas Maisel, his research assistant. Defendant's attorneys do not participate. The communications are therefore privileged only if the communication is an essential part of seeking or receiving legal advice by other means. Defendant's contention that nearly all his unilateral communications with Mr. Maisel meet this standard is implausible. When we have challenged the privilege designations in meet and confers, Defendant's counsel have fallen back on the work-product doctrine, but they have refused to withdraw the attorney-client privilege designation from any. We have made our best effort to select entries that we believe are unlikely to be privileged based on their context. "South Florida Dates," for example, was likely occasioned by a request by Mr. Boies, not Defendant's counsel. *See* Ex. 2 (transmitting a requested memorandum concerning Defendant's South Florida trips during the years when Plaintiff accuses Defendant of abusing here). The emails concerning memos for a *New York Times* reporter and U.S. Attorneys, too, seem to have been sent based on requests from third parties.

\* \* \*

Plaintiff recognizes with gratitude the additional labor required of the Court to perform an *in camera* review. We stand ready to assist that Court in its review with any additional information or analysis that the Court requires.

Respectfully,

s/ Nicole J. Moss
Nicole J. Moss

CC: Counsel of Record (via ECF)

---

[6] Defendant initially designated as privileged the "Investigation Quotation" chain, but his counsel have since acknowledged that a third party who was neither Defendant's attorney nor his agent (Zvi Boyarski) participated in the communication, as well, thereby waiving any privilege.