# Exhibit B
# (Filed Under Seal)

# 16-3945-cv-(L),

## 17-1625 (CON), 17-1722 (CON)

## United States Court of Appeals
## for the
## Second Circuit

VIRGINIA L. GIUFFRE,

*Plaintiff-Appellee,*

– v. –

GHISLAINE MAXWELL,

*Defendant,*

– v. –

SHARON CHURCHER, JEFFREY EPSTEIN,

*Respondents,*

ALAN M. DERSHOWITZ, MICHAEL CERNOVICH, dba CERNOVICH MEDIA,

*Intervenors-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE
## [REDACTED]

SIGRID S. MCCAWLEY
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
(954)356-0011

PAUL CASSELL
UNIVERSITY OF UTAH, S.J. QUINNEY
COLLEGE OF LAW
332 South 1400 East, Room 101
Salt Lake City, Utah 84112
(801) 585-5202
*Attorneys for Plaintiff-Appellee*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................. iv

PRELIMINARY STATEMENT ............................................................................1

ISSUES PRESENTED FOR REVIEW ..................................................................3

STATEMENT OF THE CASE ..............................................................................4

I.     MS. GIUFFRE IS SEXUALLY TRAFFICKED BY JEFFREY EPSTEIN
       TO HIS POWERFUL FRIENDS. .............................................................4

II.    DURING THE CRIME VICTIMS RIGHTS ACT CASE, MS. GIUFFRE
       IDENTIFIES DERSHOWITZ AS ONE PERSON TO WHOM EPSTEIN
       TRAFFICKED HER ..................................................................................6

III.   DERSHOWITZ SETTLES A DEFAMATION CASE AFTER
       ATTACKING MS. GIUFFRE'S LAWYERS. ...........................................10

IV.    MS. GIUFFRE FILES HER DEFAMATION LAWSUIT ALLEGING HER
       VICTIMIZATION BY EPSTEIN SEX TRAFFICKING ORGANIZATION
       ...................................................................................................................12

       A.    The District Court Enters a Protective Order for Sensitive Documents
             Related to Sex Trafficking of a Minor. .................................................12

       B.    Dershowitz Agrees to Be Bound by the Protective Order. .................13

       ██    ████████████████████████████████████████████████
             ████████████████████ ........................13

       ██    ████████████████████████████████████
             ██████████████████████████████████
             ████████████████████████ ............................18

VII.   THE DISTRICT COURT REFUSES TO MODIFY THE  PROTECTIVE
       ORDER ...................................................................................................21

       A.    The Dershowitz Intervention ..................................................21

B.      The Cernovich Intervention. ...............................................................23

SUMMARY OF ARGUMENT ........................................................................28

ARGUMENT ....................................................................................................29

I.      APPLICABLE STANDARDS OF REVIEW. ............................................29

        A.      Standards of Review Applicable to the Issue of Whether Dershowitz
                Was Bound by the Protective Order...................................................29

        B.      Standards of Review Applicable to the Issue of Whether Cernovich
                Demonstrated that the Protective Order Should Be Modified. ...........29

        C.      Standards of Review Applicable to the Issue of a District Court's
                Decision to Seal or Unseal Documents. .............................................30

II.     THE DISTRICT COURT PROPERLY FOUND THAT, BECAUSE
        DERSHOWITZ AGREED TO BE BOUND BY THE CONFIDENTIALITY
        PROVISIONS OF THE PROTECTIVE ORDER AS A PRECONDITION
        TO RECEIVING ANY CONFIDENTIAL MATERIALS, HE
        REMAINED BOUND BY THE PROTECTIVE ORDER. ..........................30

III.    THE DISTRICT COURT PROPERLY DENIED CERNOVICH'S
        MOTION SEEKING MODIFICATION OF THE PROTECTIVE
        ORDER..................................................................................................33

        A.      The District Court Correctly Analyzed Cernovich's Motion as One
                Seeking Modification of a Protective Order. .....................................33

        B.      The District Court Did Not Abuse Its Discretion In Limiting
                Cernovich's Permissive Intervention to the Purpose of Seeking
                Modification of the Protective Order. ................................................36

        C.      The District Court Properly Rejected Cernovich's Attempts to
                Modify the  Protective Order. ...........................................................38

        D.      The District Court Had Before It Other Sound Reasons for Denying
                Cernovich's Motion to Modify the Protective Order, Specifically
                Evidence that Cernovich Intended to Use Any Confidential Materials
                that He Obtained as a Proxy for Dershowitz to "Attack"
                Ms. Giuffre. ......................................................................................44

IV.   IF THIS COURT CONCLUDES THAT CERNOVICH HAS PROPERLY
      RAISED A RIGHT OF ACCESS CLAIM APART FROM THE
      PROTECTIVE ORDER, THEN THIS COURT SHOULD REMAND TO
      THE DISTRICT COURT FOR FURTHER FINDINGS. ............................49

      A.   On Any Remand, the District Court Can Make Appropriate Findings
           about Sealing or Unsealing Documents Under Settled Second Circuit
           Law. ....................................................................................................49

           1.   The Existence of a "Judicial Document." ..................................50

           2.   The Weight to Be Extended to Any Presumption of Access. ....53

           3.   The Balancing of Interests. ........................................................54

           4.   The First Amendment Right of Access. ......................................55

      B.   A Remand Is Needed to Allow Judge Sweet to Weigh the
           Competing  Factors. ...........................................................................57

CONCLUSION .....................................................................................................62

CERTIFICATE OF COMPLIANCE WITH F.R.A.P RULE 32(a) .......................64

CERTIFICATE OF SERVICE ..............................................................................65

iii

# TABLE OF AUTHORITIES

Page

## Cases

*Anderson v. Cryovac, Inc.*,
  805 F.2d 1 (1st Cir. 1986) ............................................................................... 52, 54

*Bernstein v. Bernstein Litowitzerger & Grossmann LLP*,
  814 F.3d 132 (2d Cir. 2016) ................................................................................31

*Bond v. Utreras*,
  585 F.3d 1061 (7th Cir. 2009)..............................................................................52

*Catanzano by Catanzano v. Wing*,
  103 F.3d 223 (2d Cir. 1996) ........................................................................... 30, 37

*Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*,
  263 F.3d 1304 (11th Cir. 2001)....................................................................... 52, 53

*United States v. Corbitt*,
  879 F.2d 224 (7th Cir. 1989).................................................................................53

*Does v. United States*,
  817 F. Supp. 2d 1337 (S.D. Fla. 2011)......................................................... *passim*

*Dorsett v. County of Nassau*,
  289 F.R.D. 54 (E.D.N.Y. 2012)............................................................................48

*Drax v. Reno*,
  338 F.3d 98 (2d Cir. 2003) ...................................................................................45

*In re EPDM  Antitrust Litig.*,
  255 F.R.D. 308 (D. Conn. 2009)...........................................................................42

*In re Tiligent, Inc.*,
  640 F.3d 53 (2d Cir. 2011) ............................................................................ 28, 39

*Joy v. North*,
  692 F.2d 880 (2d Cir.1982) ..................................................................................53

*Kamakana v. City and County of Honolulu*,
  447 F.3d 1172 (9th Cir. 2006)...............................................................................52

iv

*Kirkland v. New York State Dep't of Corr. Servs.*,
    711 F.2d 1117 (2d Cir. 1983) ...............................................................38

*Krizek v. Cigna Grp. Ins.*,
    345 F.3d 91 (2d Cir. 2003) ............................................................ 30, 31

*Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*,
    998 F.2d 157 (3d Cir. 1993) ..............................................................52

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
    156 F. Supp. 3d 425 (S.D.N.Y. 2016) ......................................... 56, 62

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006) ..................................................... *passim*

*Moll v. Telesector Res. Grp., Inc.*,
    760 F.3d 198 (2d Cir. 2014) ..............................................................35

*Nixon v. Warner Communications, Inc.*,
    435 U.S. 589 (1978) ...................................................................... 48, 49

*Omari v. Ras Al Khaimah Free Trade Zone Auth.*,
    No. 16 CIV. 3895 (NRB), 2017 WL 3896399 (S.D.N.Y. Aug. 18, 2017) ..........55

*Phillips v. G.M. Corp.*,
    307 F.3d 1206 (9th Cir. 2002) ...........................................................53

*S.E.C. v. TheStreet.Com*,
    273 F.3d 222 (2d Cir. 2001) ..................................................... *passim*

*Seattle Times Co. v. Rhinehart*,
    467 U.S. 20 (1984) ............................................................................53

*U.S. v. Amodeo*,
    71 F.3d (2d Cir. 1995) ("*Amodeo II*") ...................................... *passim*

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ..............................................................39

## <u>Statutes</u>

18 U.S.C. § 3771 ................................................................................8

18 U.S.C. § 3771(a)(8)........................................................................9

v

## Rules

Fed. R. App. P. 32(a)(5)................................................................65

Fed. R. App. P. 32(a)(6)................................................................65

Fed. R. App. P. 32(a)(7)(B) ..........................................................65

Fed. R. App. P. 32(f)......................................................................65

Fed. R. Civ. P. 5.2 .........................................................................35

Fed. R. Civ. P. 24(b)(2)..................................................................37

Fed. R. Civ. P. 24(b)(3)..................................................................38

Fed. R. Civ. P. 26 ..........................................................................35

Fed. R. Civ. P. 26(c).......................................................................37

Fed. R. Evid. 415 ...........................................................................19

## Other Authorities

UMAR News, Jan. 5, 2015,
    https://www.youtube.com/watch?v=KXzcxsiQv7Q)............................6

*Vanity Fair Reminds Us When Jeffrey Epstein Wasn't a Creep*,
    by Ray Gustini, *The Wire* (June 21, 2011) .............................6

## PRELIMINARY STATEMENT

Ms. Giuffre is a victim of Jeffrey Epstein's sex trafficking organization. When she bravely came forward to explain what happened to her at the hands of Epstein and his powerful friends, Epstein's "Madame" and girlfriend, Ghislaine Maxwell, told the world that Ms. Giuffre was a liar.  Ms. Giuffre filed a defamation action. After the Court fully denied Maxwell's motions to dismiss and for summary judgment, Ms. Giuffre prepared to prove the truth of her allegations of being sexually abused as a minor at trial.

Evidence produced in this case concerned sexual trafficking and child sex abuse. Both parties asked the District Court to place sensitive documents under seal.  The Court entered an agreed protective order, allowing for certain discovery to be handled confidentially.  The order, however, allowed the materials to be shared with prospective witnesses – provided that the witness agreed to be bound by the protective order, and make no use of the documents except for trial preparation purposes.  One of Jeffrey Epstein's closest friends – appellant Alan Dershowitz – entered into such an agreement.  However, shortly after reviewing confidential materials in this case, he speciously claimed that several documents would prove that he was "innocent" of any involvement in Epstein's trafficking. Notably, the documents prove no such thing.  Though he has neither been a plaintiff nor a defendant in any action against Ms. Giuffre, he moved to intervene

in the District Court below for purposes of modifying the protective order to release self-selected, sealed discovery materials to the media, as Dershowitz had previously appeared on news networks to disparage Ms. Giuffre.

The District Court denied Dershowitz's motion, finding that he was bound by his agreement to abide by the terms of the protective order.  Thereafter, Maxwell (with whom Dershowitz was working as a witness) filed a motion for summary judgment, attaching the main documents that Dershowitz wanted to publish.  And then, as if on cue, ten days later, an "investigative journalist" – appellant Michael Cernovich – appeared on the scene seeking the same materials. While claiming to be independent from Dershowitz, Cernovich has close ties to Dershowitz.  And, as a self-proclaimed "slut shamer," Cernovich had a common interest with Dershowitz in attacking Ms. Giuffre.

Cernovich sought, in his words, to "intervene to modify the protective order."   The District Court granted his motion to intervene, but denied his request to modify the protective order, finding that Cernovich failed to make a showing for modification.

Now Dershowitz and Cernovich ask this Court to reverse the District Court's orders.  Dershowitz claims that the documents he seeks somehow show his innocence.  But numerous documents in the record confirm Ms. Giuffre's sworn testimony that she was abused by Dershowitz when he visited his close friend (and

2

sex trafficker) Jeffrey Epstein.  The Court should note that, rather than expose the whole truth, Dershowitz wants to keep the evidence against him under seal. Indeed, as the case proceeded below, ████████████████████████████████ ████████████████████████████.  In light of these facts, this Court should affirm the District Court's decision enforcing the protective order against Dershowitz, because allowing him to publicize selected documents would destroy the "reciprocity" of the protective order and violate his agreement to be bound by the protective order.  Dershowitz has no claim to make, to this Court or any other, whereby he can demand to publish these documents.

Cernovich, meanwhile, contends that the District Court committed "fundamental error" when it treated his motion as a "motion to modify a protective order." Yet he told the District Court in his motion that he was "seek[ing] intervention *to modify a protective order*."  This Court should reject Cernovich's efforts to recast the proceedings below.  The District Court properly evaluated his motion as one to modify a protective order and properly denied it.

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court commit clear error in finding that appellant Dershowitz had agreed to be bound by the provisions of the protective order?

2. Did the District Court properly treat appellant Cernovich's motion to intervene as one requesting modification of the protective order where in his

3

motion to intervene Cernovich specifically stated that he was "seek[ing]

intervention *to modify a protective order*"?

3.  Did the District Court abuse its discretion when it found no

"extraordinary circumstance or compelling need" justifying modification of a

protective order?

## <u>STATEMENT OF THE CASE</u>

**I.    MS. GIUFFRE IS SEXUALLY TRAFFICKED BY JEFFREY EPSTEIN TO HIS POWERFUL FRIENDS.**

Dershowitz uses much of his brief to attack Ms. Giuffre. Dershowitz Br. at

1-2.  But Dershowitz's selective presentation of facts ignores the mountain of

evidence supporting Ms. Giuffre's sworn testimony of being sexually trafficked by

Jeffrey Epstein to his powerful friends – including Alan Dershowitz.

Dershowitz initially refers to Ms. Giuffre's "alleged relationship" with

Jeffrey Epstein, but never denies the pivotal background fact that Ms. Giuffre was

repeatedly sexually abused – and sexually trafficked – by convicted sex offender

Jeffrey Epstein.  J.A.-455-60.  Although not mentioned in Dershowitz's brief,

Epstein pled guilty to state sex charges, while entering into a non-prosecution

agreement with the federal government for his federal sex offenses involving more

than thirty girls (including Ms. Giuffre).  J.A.-471.

Dershowitz claims that he never saw "Epstein in the presence of underage

girls." DE 363 at 3. J.A.-654.  This lack of observation is remarkable given that

Epstein brazenly and repeatedly abused numerous underage girls in his Florida and

New York mansions and several other locations that Dershowitz apparently admits

he visited on multiple occasions.  Indeed, in 2009, ███████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████

        ███████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████

        While ignoring Epstein's widely-known sex trafficking network,

Dershowitz's ineptly attempts to build a circumstantial case that he could not have

---

[1] ████████████████████████████████

███████████████████████████████

██████████████████████████

abused Ms. Giuffre. Dershowitz now claims, for example, that at the time of the

abuse, he was merely "acquainted with Mr. Epstein through academic events . . . ."

Dershowitz Br. at 9.[2]  But in 2005 (before Epstein's criminal prosecution),

Dershowitz said "I'm on my 20th book … The only person outside of my

immediate family that I send drafts to is Jeffrey."  DE 364 at 3. J.A.-197. (citing

*The Talented Mr. Epstein*, by Vicky Ward, in *Vanity Fair* (Jan. 2005)).  Vanity

Fair quoted Dershowitz saying that, even if Epstein went bankrupt, "I would be as

interested in him as a friend if we had hamburgers on the boardwalk in Coney

Island and talked about his ideas."  *Id.* (citing *Vanity Fair Reminds Us When*

*Jeffrey Epstein Wasn't a Creep*, by Ray Gustini, *The Wire* (June 21, 2011)).

## II. DURING THE CRIME VICTIMS RIGHTS ACT CASE, MS. GIUFFRE IDENTIFIES DERSHOWITZ AS ONE PERSON TO WHOM EPSTEIN TRAFFICKED HER.

Ms. Giuffre revealed Dershowitz's involvement in Epstein's sex trafficking

when she bravely came forward in the Crime Victims' Rights Act (CVRA)

litigation in the Southern District of Florida.  The case involved billionaire Jeffrey

Epstein's sexual abuse of more than 30 minor girls, including Ms. Giuffre.  *See*

*Does v. United States*, No. 9:08-CV-80736-KAM, DE 361 at 8 & n.15 (Mot. for

---

[2] In earlier media statements, Dershowitz took an even more extreme position, stating that "I have never been alone with . . . Jeffrey Epstein." *See* DE 364 at 3 n.4. J.A.-197. (*citing* UMAR News, Jan. 5, 2015, https://www.youtube.com/watch?v=KXzcxsiQv7Q).  And yet ████████████ ████████████████████████████████████████████ ████████████████████████████████

6

Part. SJ) (S.D. Fla. Feb. 10, 2016) (collecting supporting evidence for this assertion); J.A.-471 (Justice Department "victim" notification to Ms. Giuffre).  The U.S. Attorney's Office entered into contentious plea negotiations with Epstein, with prosecutors initially requiring that Epstein plead to a felony sex offense.  *Id.* at 10-13.  After pressure from Epstein, the U.S. Attorney agreed to a non-prosecution agreement under which neither Epstein nor any of his "potential co-conspirators" were prosecuted for sexually abusing more than thirty girls. Epstein, instead, pled guilty to state felonies for soliciting prostitution with a minor.  *Id.* at 17. No federal charges were ever filed and Epstein spent much of the jail term on "work release" in his luxurious office.

In clear violation of the CVRA, the U.S. Attorney's Office failed to tell Epstein's victims about the non-prosecution agreement until well after it had taken effect.  *Id.* at 18-24.  Worse, after the agreement was signed, the Office continued to tell the victims that the case was "still under investigation" and that they should be "patient."  *Id.* at 24-35.  When the victims eventually learned of the agreement, two victims ("Jane Doe 1" and "Jane Doe 2") filed suit in federal court under the CVRA, arguing that the prosecutors violated their right to confer and be treated fairly.  *Does v. United States*, No. 9:08-CV-80736-KAM, DE 1 (Compl.) (S.D. Fla. Jan.16, 2015).  Litigation in the case continues to this day.  *See, e.g., Does v. United States,* 817 F. Supp. 2d 1337 (S.D. Fla. 2011).

7

In January 2015, Ms. Giuffre filed a motion to join the CVRA lawsuit.  *See Does v. United States*, No. 9:08-CV-80736-KAM, DE 341-1 (Mot. for Joinder in Action) (S.D. Fla. Jan. 2, 2015).  She alleged that, though identified as a "victim" by the Government, the Government concealed its non-prosecution agreement from her to protect Epstein and other "powerful individuals."  *See Does v. United States*, No. 9:08-CV-80736-KAM, DE 341-1 at 6-7.  Ms. Giuffre identified Dershowitz, Epstein's friend and defense attorney, as one of the individuals protected by the deal and to whom she was trafficked on multiple occasions.

Significantly, Ms. Giuffre did not name the individuals to whom she was trafficked for fame or for money. To the contrary, Ms. Giuffre identified herself as "Jane Doe 3" in an action wherein the main relief being sought was (and is) invalidation of the non-prosecution agreement.  Ms. Giuffre's lawyers specifically listed nine separate reasons why Jane Doe 3's allegations that Dershowitz had sexually abused her were relevant to the case:

> 1. To establish that Jane Doe 3 had been sexually abused by Jeffrey Epstein and his co-conspirators (including co-conspirator Alan Dershowitz), which would make her a "victim" of a broad sex trafficking conspiracy covered by the federal Crime Victims' Rights Act, 18 U.S.C. § 3771, and therefore entitled to participate in the case;
> 2. To support then-pending discovery requests that asked specifically for information related to contacts by Dershowitz with the Government on behalf of Jeffrey Epstein;
> 3. To support the victims' allegation that the Government had a motive for failing to afford victims with their rights in the criminal process … ;

8

4.  To establish the breadth of the NPA's provision extending immunity to "any potential co-conspirators of Epstein" and the scope of the remedy that the victims (including not only Jane Doe 3 but also other similarly-situated minor victims who had been sexually abused by Dershowitz) might be able to obtain for violations of their rights;

5. To provide part of the factual context for the scope of the "interface" between the victims, the Government, and Epstein's defense team … ;

6. To prove the applicability of the "crime/fraud/misconduct" exception to the attorney-client privilege that was being raised by the Government in opposition to the victims' motion for production of numerous documents;

7. To bolster the victims' argument that their right "to be treated with fairness," 18 U.S.C. § 3771(a)(8), had been violated through the Government's secret negotiations with one of their abusers;

8.  To provide notice and lay out the parameters of potential witness testimony for any subsequent proceedings or trial . . . ; and

9.  To support Jane Doe 3's argument for equitable estoppel to toll the six-year statute of limitations being raised by the Government in opposition to her motion to join . . . .

*Does v. United States*, No. 9:08-CV-80736-KAM, DE 291 at 18-26 & n.17 (Pl.'s.

Resp. to Mot. for Ltd. Intervention) (S.D. Fla. Jan. 21, 2015).

Ultimately, the District Court denied Ms. Giuffre's motion, concluding, "at this juncture in the proceedings," details about the individuals who had abused was unnecessary to a determination of whether she should be permitted to join the lawsuit.  DE 324. J.A.-228-238. The Court did not address the other eight specific reasons that Ms. Giuffre's counsel had identified for providing such details. Perhaps the reason the Court did not address these issues was that it also ruled that Ms. Giuffre "is free to reassert these factual details through proper evidentiary

9

proof, should [Jane Doe 1 and Jane Doe 2] demonstrate a good faith basis for believing that such details are pertinent to a matter presented for the Court's consideration." DE 324 at 6. J.A.- 234. The Court also *denied* Dershowitz's motion for sanctions against Ms. Giuffre's attorneys. *Id.* at 6-7. Litigation is ongoing, so whether Ms. Giuffre's testimony regarding the various grounds listed above will be necessary remains to be determined.

## III.   DERSHOWITZ SETTLES A DEFAMATION CASE AFTER ATTACKING MS. GIUFFRE'S LAWYERS.

Following Ms. Giuffre's filing in the CVRA case, Dershowitz repeatedly attacked Ms. Giuffre and her attorneys in every form of media he could find. Rather than respond in kind, Ms. Giuffre's attorneys (Paul G. Cassell and Bradley J. Edwards) filed a defamation action against Dershowitz in Florida state court. Ultimately, Dershowitz chose to settle the defamation case, and the settlement included both a public statement and confidential monetary payments. J.A.-1265.

As part of the settlement, Cassell and Edwards withdrew their allegations against Dershowitz in the defamation case (including their then-pending summary judgment motion) and Dershowitz withdrew his allegations of unethical conduct against Cassell and Edwards. J.A.-1265. In their notice of withdrawal of the summary judgment motion, Cassell and Edwards stated: "The withdrawal of the referenced filing is not intended to be, and should not be construed as being, an acknowledgment by Edwards and Cassell that the allegation[s] made by Ms.

10

Giuffre were mistaken.  Edwards and Cassell do acknowledge that the public filing in the Crime Victims' Rights Act case of their client's allegation against Defendant Dershowitz became a major distraction from the merits of the well-founded Crime Victims' Rights Act [case] by causing delay and, as a consequence, turned out to be a tactical mistake."  J.A.-1265.

Dershowitz also refers to an "investigation" he paid for by Louis Freeh in an effort to proclaim his innocence. Dershowitz Br. at 11.  Interestingly, while Dershowitz has provided a one-paragraph summary of the investigation to the press, he has not made the specifics of the investigation public, including what Freeh learned about Defendant Maxwell's involvement in Jeffrey Epstein's sex trafficking organization.

Dershowitz also claims in a footnote that, in the defamation action, he "provided indisputable contemporaneous documentary evidence – including cell phone and credit card records and dates of court and television appearances – that proved he could not have been, and was not, in locations where Giuffre claimed to have met him during the relevant period." Dershowitz Br. at 11 n.4.  The Court will notice that there is no citation of authority for this assertion.  And an inspection of the Florida court records shows that, rather than leave those documents available for public inspection, Dershowitz immediately placed them under a protective order in Florida.  *Id.*  We assume that in his reply brief

11

Dershowitz will either provide all of that those documents or concede that, in fact, these documents prove that (among other things) he was in New York and Florida at exactly the same time Ms. Giuffre was there.

## IV.  MS. GIUFFRE FILES HER DEFAMATION LAWSUIT ALLEGING HER VICTIMIZATION BY EPSTEIN SEX TRAFFICKING ORGANIZATION

On September 21, 2015, Ms. Giuffre filed the underlying defamation action against Ghislaine Maxwell.  J.A.-6.  In her complaint, Ms. Giuffre recounted having been sexually trafficked while she was a minor by Epstein and Maxwell. The complaint did not mention Dershowitz; he is extraneous to this action.

Ms. Maxwell answered the complaint, and contentious litigation proceeded.

### A.  The District Court Enters a Protective Order for Sensitive Documents Related to Sex Trafficking of a Minor.

Because the case involved the sexual abuse of minor girls (including Ms. Giuffre), at the joint request of the parties, the District Court entered a protective order covering confidential materials.  The protective order allowed the parties to protect against the discovery and dissemination of confidential information "which will improperly annoy, embarrass, or oppress any party, witness, or person providing discovery in this case . . . ."  J.A.-124.  Unsurprisingly, in a case involving sexual assault, both parties designated certain documents as confidential. After granting 28 motions to seal (and denying none), and gaining familiarity of the nature of the evidence, on August 9, 2016, the District Court modified the

protective order "to reduce unnecessary filings and delay" by allowing sealing without the need for filing a separate letter motion.  J.A.-196.

### B.  Dershowitz Agrees to Be Bound by the Protective Order.

███████████████████████████████████████████████████

███████████████████████████████████████ After the filing of the lawsuit, Maxwell's defense counsel informed Dershowitz of the terms of the protective order, which allowed disclosure of confidential information in the case to a potential witness but only if the witness agreed to be bound by the terms of the protective order.  J.A.-665; J.A.-126.  In turn, the terms of the protective order required that any disclosed confidential information "shall not be disclosed or used for any purpose except the preparation and trial of this case."  J.A.-125.  To ensure compliance with this provision, the protective order required that any witness who received confidential information to provide a written acknowledgment that he had read the protective order and that he agreed to be bound by the its provisions.  J.A.-126. The protective order also required that any materials produced to witnesses had to be returned at the conclusion of the case.  J.A.-128.  Dershowitz reviewed the protective order and, in writing, agreed to be bound by its terms.   J.A.-665.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



14



Dershowitz Br. at

19.  But the basis for Dershowitz's assertion is his carefully-worded claim that

"Dershowitz had no business dealings with Mr. Epstein and was not his lawyer at

the time in question" (*id.*), failing to acknowledge that, business aside, he

indisputably had a close *personal* friendship with Epstein, sending his book drafts

to Epstein and repeatedly visiting him overnight at his mansions.

15

Dershowitz also apparently believes that ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

Dershowitz then offers an inaccurate and distorted summary of the record in bullet points.  Dershowitz Br. at 20-21.  But the support for these bullet points turns out to be, on close examination, simply another unsupported statement by Dershowitz – ██████████████████████████████

████████   For example, ██████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

16

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██

      Stepping back to look at the big picture, a more complete summary of the

record would show the following significant information ████████████████

█████████████████████████████████████

   ██████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████

   ██████████████████████████████████████
████████████████████████████████████████
█████████████████████████

   ███████████████████████████████████████
███████████████████████████████████████
██████████████████████████

   ██████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████████
███████████████████

   ██████████████████████████████████████
█████████████████████████████████



Tellingly, Dershowitz does not seek to disturb the

protective order shielding those documents.



19



## VII.   THE DISTRICT COURT REFUSES TO MODIFY THE PROTECTIVE ORDER.

### A.   The Dershowitz Intervention.

On August 11, 2016, Dershowitz sought permission to intervene in the case

for purposes of obtaining an order unsealing certain documents previously filed

with the district or, in the alternative, for an order modifying the protective order

previously entered by the District Court.  J.A.-197.  On November 2, 2016, the

District Court entered an order granting intervention but denying substantive relief.

Sp.A.-16-26.





**B.     The Cernovich Intervention.**

After the District Court denied Dershowitz's motion, the underlying case between Ms. Giuffre and Ms. Maxwell moved forward.  On January 9, 2017, Maxwell (with whom Dershowitz was working as witness) filed a motion for summary judgment, attaching many of the documents Dershowitz sought, including the so-called memoir document.  C.M.A.- 117.  Then, as if on cue, ten days later, an "investigative journalist" (C.M.A.-096) appeared on the scene claiming a right to access to these materials.  Cernovich's motion sought essentially the same relief Dershowitz requested.  This remarkable concidence becomes less remarkable, given the strong ties between Dershowitz and Cernovich.

Cernovich is the executive producer of a film starring none other than Alan Dershowitz.  C.M.A.-118.

Indeed, a promotional website features a clip of Dershowitz's starring role.

C.M.A.-118.



"Silenced. Our War on Free Speech."



Cernovich is not shy about broadcasting his relationship with, and influence by,

Alan Dershowitz, and tweeted in the summer of 2016:

> "Spent the morning talking free speech, Twitter censorship, and the ADL with Alan Dershowtiz for Silenced."

C.M.A-1119.



Cernovich attributes his inspriation to attend law school to Dershowitz:

> "Meeting Deshowitz was a personal joy of mine,
> as his book "The Best Defense: The Courtroom
> Confrontations of America's Most Outspoken
> Lawyer of Last Resort" inspired me to go to law
> school."

C.M.A-1119.

Cernovich told the District Court that he was an investigative journalist whose motivation for seeking to intervene "is grounded solely in the public interest." C.M.A.-96, 105. But in fact, Cernovich appears to have a personal interest in (to use his words) "slut sham[ing]" women. C.M.A.-121. Multiple websites, including Wikipedia.com, captured various tweets issued by Cernovich. C.M.A.-120. Cernovich's tweets showed that his interest in sexual assault was not simply journalistic, as he claims, but instead betrays a purient interest to fetishize rape:

> "The hotter the sex, the more closely it resembles
> rape."

Another tweet he issued expressed an opinion that "[d]ate rape does not exist":

> "Have you ever tried "raping" a girl without using
> force? Try it. It's basically impossible. Date rape
> does not exist."

C.M.A.-121. Indeed, it appeared that Cernovich harbors a special antipathy for victims of sexual assault, saying "why should I care when women are raped?"

25

> "A whore will let her friend ruin your life with a
> false rape case. So why should I care when women
> are raped?"

C.M.A.-121.  Ceronovich does not only tweet his support for sexual assault.

According to *The New Yorker*, Cernovich, himself, "was accused of raping a

woman he knew; the charge was later dropped, but a judge ordered him to do

community service for midemeanor battery."  C.M.A.-121.

Cernovich publishes his ideas on the importance of victim-shaming women,

particularly racial minorities:

> "Not being a slut is the only proven way to avoid
> AIDS. If you love black women, slut shame them."

C.M.A.-121.  AIDS is not the only deadly disease he has used to attack women in

relation to sexual activity and rape. He has also tweeted, "Who cares about breast

cancer and rape?  Not me."  C.M.A.-122.  In short, Cernovich simply uses

electronic media to engage in his own personal vendetta:

> "Fat/ugly women seek out dominant men to abuse
> them. Then they seek sympathy from others. "He's
> so mean." Hence why women troll Twitter."

C.M.A.-122.

On May 3, 2017, the District Court granted the motion as Cernovich had

presented it – i.e., the District Court granted Cernovich's motion "to intervene to

modify the protective order."  Sp.A.-30. The District Court, however denied the

substantive relief Cernovich (and Dershowitz[6]) were requesting.  The District

Court began by noting that, under this Court's previous rulings, "there is a strong

presumption against modification of a protective order, and orders should not be

modified absent a showing of improvidence in the grant of the order or some

extraordinary circumstance or compelling need.'"  Sp.A.-31 (*citing In re Tiligent,*

*Inc.*, 640 F.3d 53, 59 (2d Cir. 2011)).  The District Court further explained that

"[i]n this case, the parties and multiple deponents have reasonably relied on the

Protective Order in giving testimony and producing document including evidence

of assault, medical records, and emails."  Sp.A.-31-32. The District Court further

found that Ms. Giuffre "has provided in opposition sufficient basis to deny the

motion, including the case's status as ongoing and near trial, and the nature of the

documents requests as sensitive, regarding sexual assault of a minor at issue."

Sp.A.-34.  The District Court concluded that "[b]ecause of the sensitive nature of

the materials designated as confidential, involving allegations of sexual abuse and

trafficking of minors, and because we are mere weeks from assembling a jury for

trial, the importance of leaving these materials protected by the Protective Order

outweighs and public interest in their publication at this time."  Sp.A.-35.

---

[6] On February 10, 2017, Dershowitz joined in Cernovich's motion.  J.A.-580.

## SUMMARY OF ARGUMENT

This Court should reject Dershowitz's appeals because he agreed, in writing, to be bound by the terms of the protective order as a condition to receiving and reviewing any documents covered by the order.  The protective order, in turn, permitted him to use any documents he received only for purposes of preparing the case for trial and required him to return any documents at the end of trial.  The District Court properly held that, having agreed to be bound by the protective order, Dershowitz could not use and release confidential documents he received under the protective order.

This Court should reject Cernovich's appeal because he presented his request for permissive intervention as seeking "*to modify a protective order*." Proceeding to analyze the case the way Cernovich had presented it, the District Court properly noted that this Court has instructed that "a District Court should not modify a protective order . . . absent a showing of improvidence in the grant of the order or some extraordinary circumstance or compelling need." *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001) (internal quotations omitted). The District Court properly concluded that Cernovich had failed to make the required extraordinary showing, and Cernovich does not even attempt to show otherwise.

If for any reason this Court should conclude that the District Court did not

enter appropriate findings sufficient to reject Dershowitz's or Cernovich's motions,

this Court should remand to the District Court for further findings on the subject.

**ARGUMENT**

**I.     APPLICABLE STANDARDS OF REVIEW.**

**A.     Standards of Review Applicable to the Issue of Whether Dershowitz Was Bound by the Protective Order.**

The District Court found that



This a factual finding based on documentary and other evidence,

which this Court reviews only for "clear error."  *See Krizek v. Cigna Grp. Ins.,* 345

F.3d 91, 99 (2d Cir. 2003) ("A court's factual findings, including those based on

documentary evidence, are reviewed for clear error.").

**B.     Standards of Review Applicable to the Issue of Whether Cernovich Demonstrated that the Protective Order Should Be Modified.**

The District Court treated Cernovich's motion for permissive intervention as

a motion for modification of a protective order and limited his intervention to that

ground.  Sp.A.- 30.  The District Court had "broad discretion" to grant, deny, or

restrict a motion for permissive intervention, *Catanzano by Catanzano v. Wing*,

103 F.3d 223, 234 (2d Cir. 1996), and the issue of how to characterize Cernovich's

motion is simply a question of fact about what was presented to the District Court,

which this Court reviews for clear error. *Krizek*, 345 F.3d at 99. A District Court's

decision to ultimately deny modification of a protective order is reviewed for abuse

of discretion. *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 228 (2d Cir. 2001).

> ### C.   Standards of Review Applicable to the Issue of a District Court's Decision to Seal or Unseal Documents.

Regarding sealed documents, this Court reviews the District Court's "factual

findings for clear error, its legal determinations de novo, and its ultimate decision

to seal or unseal for abuse of discretion." *Bernstein v. Bernstein Litowitzerger &*

*Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016).

## II.   THE DISTRICT COURT PROPERLY FOUND THAT, BECAUSE DERSHOWITZ AGREED TO BE BOUND BY THE CONFIDENTIALITY PROVISIONS OF THE PROTECTIVE ORDER AS A PRECONDITION TO RECEIVING ANY CONFIDENTIAL MATERIALS, HE REMAINED BOUND BY THE PROTECTIVE ORDER.

Turning first to the two interlocutory appeals taken by Dershowitz (Nos. 16-

3945 and 17-1625), the Court should affirm the District Court's decision, because

Dershowitz agreed to be bound by the confidentiality provisions of the protective

order before receiving any confidential materials.  Accordingly, after receiving the

materials, he remained bound by the confidentiality provisions of the protective

edit

order to which he had agreed.  Indeed, affirming the District Court is required

because ████████████████████████████████████████████

Throughout his brief, Dershowitz castigates the District Court for treating

the issues before it as involving modification of a protective order.  Indeed,

Dershowitz goes so far as to argue that "neither Cernovich's motion, *nor*

*Dershowitz's memorandum joining it, requested modification of the protective*

*order*."  Dershowitz Br. at 31 (emphasis added).  As Dershowitz frames the case,

"In fact, *no such 'motion to modify' [the protective order] had been made, either*

*by Cernovich or Dershowitz*."  *Id.* at 5 (emphasis added).

In light of these concessions, the Court should reject Dershowitz's appeals.

Dershowitz fails to acknowledge that, after he was identified as a potential witness

for defendant Maxwell, Maxwell's legal counsel informed Dershowitz of the terms

of the protective order.  J.A.-125.  Dershowitz does not dispute that the protective

order allowed defense counsel to disclose the information in the case to a potential

witness in the case (such as Dershowitz) only if he agreed to be bound by the terms

of the protective order.  J.A.-125.  In turn, the terms of the protective order

required that any disclosed confidential information "shall not be disclosed or used

for any purpose except the preparation and trial of this case."  J.A.-125.  To ensure

compliance with this provision, the protective order required that any witness who

received confidential information had to provide a written acknowledgment that he

had read the protective order and that he agreed to be bound by its provisions.

J.A.-126.  The protective order also required that any materials produced to a

witness had to be returned at the conclusion of the case.  J.A.-128.  The protective

order allowed challenges to confidentiality designations, but only by the parties to

the case – not witnesses.  J.A.-127.

Most important, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

In light of these undisputed facts, Dershowitz is not entitled to any relief

before this Court.  To the contrary, the terms of the protective order to which he

agreed to be bound – and did not challenge below – now require him to return all

copies of the discovery materials that he received.  Moreover, because the

underlying case has been settled, under the terms of the protective order, he is not

permitted to "disclose" or "use" the confidential materials he received for any

reason.

The District Court ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

32

████████████████████████████████████████

████████████

Remarkably, while finding room in his brief for numerous attacks on the District Court for its "misapprehension" that a modification of the protective order was at stake in this case (Dershowitz Br. at 31), Dershowitz never quotes (or even acknowledges) this dipositive language from the District Court's ruling below – much less provide any argument as to why the District Court's ruling should be disturbed on his appeal.[7]   Accordingly, this Court should affirm the District Court's rulings as to Dershowitz on this basis and reject his two appeals.

## III.   THE DISTRICT COURT PROPERLY DENIED CERNOVICH'S MOTION SEEKING MODIFICATION OF THE PROTECTIVE ORDER.

### A.   The District Court Correctly Analyzed Cernovich's Motion as One Seeking Modification of a Protective Order.

As with Dershowitz, Cernovich criticizes the District Court for treating his motion as one involving modification of a protective order rather than some sort of motion to unseal, despite the fact that he explicitly styled his motion as a request to modify the protective order.  Indeed, Cernovich argues that the District Court committed "fundamental error" when it treated his motion as a "motion to modify

---

[7] Of course, Dershowitz should not be permitted to develop such an attack for the first time in his reply brief, as this would deprive Ms. Giuffre of any opportunity to defend the District Court's ruling.

33

a protective order under Fed. R. Civ. P. 26" rather than "a motion to unseal under

Fed. R. Civ. P. 5.2."  Cernovich Br. at 8.

But Cernovich's argument founders from the fundamental defect that he

*never even cited Rule 5.2* to the District Court, either in his opening written brief,

his reply brief, or during his oral argument.  *See* C.M.A.-95 (table of authorities for

memorandum in support of Cernovich's motion to intervene for federal rules cited,

and Rule 5.2 not cited); C.M.A.-136-45 (reply memorandum in support of

Cernovich's motion to intervene, in which Rule 5.2 is not cited); J.A.- 590-91 &

595-97 (oral argument by Cernovich, in which Rule 5.2 is not cited).  Of course,

"[i]t is a well-established general rule that an appellate court will not consider an

issue raised for the first time on appeal."  *Moll v. Telesector Res. Grp., Inc.*, 760

F.3d 198, 204 (2d Cir. 2014) (internal quotation marks omitted).  If Cernovich

intended to rely on Rule 5.2 standards, he should have at least cited Rule 5.2 in the

District Court.

Cernovich's failure to even cite Rule 5.2 is not some technical glitch that the

District Court should have been expected to overlook.  To the contrary, Cernovich

explicitly told the District Court in his intervention papers - not that he was seeking

intervention to unseal documents – but, rather that he was "seek[ing] intervention

*to modify a protective order* and inspect court documents."  C.M.A.-97 (emphasis

added).  Indeed, he requested that "the August 8 Order [concerning procedures for

confidential designation under the protective order] should be vacated." C.M.A.-97.

Having told the District Court in his opening memorandum that he was seeking "to modify a protective order," Cernovich used a different, but complementary description, in his reply memorandum. This time, Cernovich used rhetorical flourish, stating that he was not "seeking to modify the protective order. He seeks to restore it." C.M.A.-139 (internal citation omitted). Cernovich went on to characterize his argument in terms of altering the protective order. In the very next sentence in his reply, Cernovich began a new section entitled "The Protective Order Contemplates Confidential Materials Not Being Sealed." C.M.A.-139. Cernovich then noted that the protective order in the case had originally required motions to be filed to designate materials as confidential, but that the Court had chosen to modify that requirement in the interests of judicial economy. *Id.*

Cernovich then explained that his motion linked directly into the terms of the protective order, i.e., returning the protective order to its original form:

> Mr. Cernovich's motion addresses the Order of June 24, 2016 (Docket No. 250) setting forth how the parties are to file unredacted documents under seal, and the Standing Order of August 9, 2016 (Docket No. 348). These orders abrogated the requirements of Section 6.2 of the Electronic Case Filing Rules & Instructions for the Southern District of New York. The August 9, 2016, Standing Order notably stated that "[a] party wishing to challenge the sealing of any particular submission may do so by motion." (Docket No. 348). Thus, Mr. Cernovich is doing precisely what this Court requires. His challenge would not modify any order, rendering irrelevant Plaintiff's

35

arguments related to the standard for modifying a Rule 26(c) protective order. *To the extent the motion is construed as one seeking to modify the June 24 and August 9, 2016 order, there is good cause to do so.*

C.M.A.-140 (emphasis added).

In sum, Cernovich plainly presented his motion in terms of modifying (or "restoring") the existing protective order.

### B. The District Court Did Not Abuse Its Discretion In Limiting Cernovich's Permissive Intervention to the Purpose of Seeking Modification of the Protective Order.

It is important to recall that all of these arguments were being raised in the context of Cernovich's motion to permissively intervene. *See* C.M.A.-97 (motion citing Fed. R. Civ. P. 24(b)(2) regarding permissive intervention). Cernovich told the District Court in his moving papers that he was "seek[ing] intervention *to modify a protective order*" CMA-097 (emphasis added), and having further argued in his reply brief that "*[t]o the extent the motion is construed as one seeking to modify the June 24 and August 9, 2016 order, there is good cause to do so.*" Ultimately the District Court allowed Cernovich permissive intervention for purposes of seeking to modify the protective order, ruling that "the motion of Cernovich to intervene *to modify the Protective Order* is granted." Sp.A.-30.

The District Court had broad discretion in reviewing Cernovich's motion for permissive intervention. *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 234 (2d Cir. 1996). Indeed, this Court has noted that "a denial of permissive intervention

has virtually never been reversed."  *Id*.  Here, the District Court took a less extreme step than denying intervention, but instead simply granted intervention under the narrow terms that Cernovich had first proposed – allowing intervention to seek to "modify the protective order."  Sp.A.-30.  Of course, just as the District Court has discretion to deny intervention entirely, it likewise has discretion to impose conditions on the granting of intervention.  *See Kirkland v. New York State Dep't of Corr. Servs.*, 711 F.2d 1117, 1128 (2d Cir. 1983) (affirming district court decision to allow intervention on limited terms).  The District Court's approach of granting intervention on limited terms was a fair and logical reading of Cernovich's pleadings, and was responsive to the District Court's obligation to consider whether the intervention would "prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).

If Cernovich was unhappy with the scope of the District Court's order, he was free to challenge it on appeal.  But Cernovich presents no such challenge here.  To the contrary, Cernovich claims not that he is appealing from the intervention ruling, but rather from District Court's substantive ruling.  *See* Cernovich Br. at 7 ("Appellant appeals from the denial of his motion to unseal and the overruling of his objection to the redaction of the summary judgment decision").  Of course, because he has failed to present *any* arguments against the District Court's intervention ruling, Cernovich has obviously failed to make the demanding

showing that the District Court abused its discretion in allowing limited

intervention.  Accordingly, this Court should review Cernovich's appeal (No. 17-

1722) as involving intervention limited to challenging an existing protective order.

### C.   The District Court Properly Rejected Cernovich's Attempts to Modify the  Protective Order.

Cernovich labors hard to avoid the obvious conclusion that he sought a

modification of the protective order.[8]  Perhaps the reason for his labors is that the

standard for reviewing a District Court's ruling on modification of protective

orders is extremely deferential.  This Court has instructed District Courts that, as a

general matter, a "strong presumption [exists] against the modification of a

protective order, and orders should not be modified absent a showing of

improvidence in the grant of the order or some extraordinary circumstance or

compelling need." *In re Teligent, Inc.*, 640 F.3d 53, 59 (2d Cir. 2011) (affirming

denial of motion to lift confidentiality provisions of the protective order).  Of

course, once a District Court reviews – and denies – a request to modify a

---

[8]  The amicus in this case, the Reporters Committee for Freedom of the Press et al.,
also attempts to recharacterize the way this case was presented to the district court.
*See* Amicus Br. at 14-15.  But, of course, an amicus can only present arguments on
issues presented by the parties/intervenors in the District Court, not inject new ones
in the case.  *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir.
2001) ("Although an *amicus* brief can be helpful in elaborating issues properly
presented by the parties, it is normally not a method for injecting new issues into
an appeal.").  Accordingly, the vast bulk of the amicus brief is irrelevant to proper
resolution of the appeals, which turn on whether the District Court properly denied
a motion to modify a protective order.

protective order, review in this Court would be only be for abuse of discretion.  *See*

*S.E.C. v. TheStreet.Com*, 273 F.3d 222, 228 (2d Cir. 2001).  Combining these two

standards, a reversal of the District Court here would only be appropriate if the

District Court abused its discretion in concluding, consistent with a "strong

presumption against modification," that there was not some extraordinary

circumstance or compelling need for modification.

Perhaps recognizing the futility of even attempting to meet these demanding

standards before this Court, Cernovich commendably declines to even advance

such an argument.  As the Court is aware from reading Cernovich's brief, it was an

extremely abbreviated pleading that essentially adopted many of the arguments

from Dershowitz's brief.  But while Cernovich adopts Dershowitz's arguments

concerning unsealing of the documents in question, Cernovich did *not* adopt the

section of Dershowitz's brief dealing with the District Court's alleged failure in

refusing to modify the protective order.  *Compare* Dershowitz's Br. at 49-55

(arguing that the protective order should have been modified) *with* Cernovich's Br.

at 10 (adopting pages 31-32 of the Dershowitz brief); *id.* at 11 (adopting pages 26-

29, 30-32, 32-33, and 42-49 of the Dershowitz brief, but not 49-55).  Indeed, it

would not have been possible for Cernovich to simply adopt this portion of the

Dershowitz brief, because it ultimately hinges on Dershowitz's special

circumstances, which (according to Dershowitz) give him a personal need to

disseminate self-selected sealed documents.  *See* Dershowitz Br. 53-55 (arguing that Dershowitz can meet the compelling need test).  In light of these facts, Cernovich's appeal (No. 17-1722) provides (quite literally) no basis whatsoever for overturning the District Court's denial of his motion to modify the protective order.

Moreover, even if Cernovich had adopted Dershowitz's arguments challenging the District Court's refusal to modify the protective order, those arguments fail to show that the District Court abused its discretion in denying the motion for modification.  Dershowitz begins his attack on the District Court's ruling by noting that a party must show reasonable reliance on the protective order. But Dershowitz never comes to grips with the fact that the District Court specifically made a factual finding on this issue.  ██████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████  This is a factual finding that may only be overturned on a showing clear error.  Because Dershowitz fails to discuss this factual finding (*see* Dershowitz Br. at 51-53), he has obviously not shown that it is clearly erroneous.

Instead of discussing the specifics of the reasonable reliance in this particular case, Dershowitz makes generalized arguments.  First, Dershowitz points to the self-designation feature of the protective order as somehow undercutting

reliance.  Dershowitz Br. at 52.  But the District Court added that feature to the

protective order only after it had gained extensive experience with the case,

showing the large number of confidential documents involved in the case.

Moreover, the self-designation feature was not a "blanket" protective order, *cf. In*

*re EPDM  Antitrust Litig.*, 255 F.R.D. 308 (D. Conn. 2009) (an inapposite case

cited by Dershowitz that involved a blanket order), but rather an order requiring

good faith representation by the parties about the sensitivity of particular

documents or materials.  Even a casual perusal of the record in this case reveals

that the parties did not simply designate every single document as confidential. To

the contrary, many documents are public, and many are only partially redacted.

Second, Dershowitz points to the "challenge" feature of the protective order

as somehow undercutting reasonable reliance.  But that feature simply meant that

either party could obtain court review of materials at issues to determine whether

they were truly of a confidential nature.  That hardly undercuts reasonably reliance

on the protective order in connection with the documents in this case where the

District Court has specifically concluded that the documents at issue should remain

confidential.

Third, Dershowitz asserts that the District Court simply ordered all

documents kept confidential when so designated in the protective order.

Dershowitz Br. at 52.  But, again, that argument has no force in the context of this

case, where the District Court specifically revisited the confidentiality of the documents in question in ruling on the Dershowitz and Cernovich challenges.

Finally, Dershowitz argues that there is "no indication that the [parties] relied on the Order to produce documents that they would not have otherwise disclosed." Dershowitz Br. at 53 (quoting *Tradewinds Airlines*, *Inc. v. Soros*, 2016 WL 3951181, at *2 (S.D.N.Y. 2016)). But whatever may have been the situation in the case cited by Dershowitz, here there is more than an "indication" that the parties might have behaved differently – there is a factual finding to that effect from the District Court. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Having failed to make a showing to overturning the District Court's finding of reasonable reliance, Dershowitz then tries to make a showing of "compelling" (yet, extrajudicial) need. Dershowitz Br. at 53-55. But, once again, Dershowitz fails to acknowledge a factual finding made by the District Court on this very point. After receiving briefing on Dershowitz's alleged need for the documents, the District Court specifically rejected his claims, ████████████████

████████████████████████████████████████████

█████████████████████████████ Dershowitz again fails to discuss

this factual finding, much less explain how it is clearly erroneous.[9]

The District Court's finding is well-supported in the record.  Dershowitz

states that the documents he seeks are somehow "exculpatory" (Dershowitz Br. at

54).  But as explained at length in the fact section above, a mountain of evidence

corroborates Ms. Giuffre's credible accounts of Dershowitz's sexual abuse –

evidence Dershowitz ignores.  Indeed, in the litigation below███████████████

████████████████████████████      ████████████████████████████

███████████████████████████████████████████████████████, so

Dershowitz cannot credibly claim that he will be able to exonerate himself from

involvement in the sex trafficking of his close friend Epstein.  And to the extent

that Cernovich has somehow adopted these arguments, he likewise lacks any

compelling need for access to the documents.

The District Court's refusal to modify the protective order should be

affirmed for the reasons given by the District Court.

---

[9] While Dershowitz asks this Court to remedy an alleged "wrong" committed against him, he has neither alleged a cognizable claim, nor brought a claim in any forum related to this alleged "wrong," from which he could seek discovery as a plaintiff.  The District Court was correct to deny Dershowitz, as a non-party intervener, to modify the District Court's orders and obtain unfettered use of party-discovery for a personal vendetta.

**D.** **The District Court Had Before It Other Sound Reasons for Denying Cernovich's Motion to Modify the Protective Order, Specifically Evidence that Cernovich Intended to Use Any Confidential Materials that He Obtained as a Proxy for Dershowitz to "Attack" Ms. Giuffre.**

For the reasons above, the District Court properly denied Cernovich's motion for modifying the protective order. Additional grounds exist in the record, however, for sustaining the District Court's decision – specifically, clear evidence that Cernovich intended to use any confidential materials he obtained as a proxy for Dershowitz to victim-shame Ms. Giuffre. It is well settled that "the judgment of a lower court may be affirmed without cross-appeal on the basis of any argument that is supported by the record, whether it was ignored by the court below or flatly rejected." *Drax v. Reno*, 338 F.3d 98, 106 (2d Cir. 2003). Accordingly, Ms. Giuffre presents these additional reasons for affirming the decision below.

As recounted at greater length above, about nine weeks after the District Court denied Dershowitz's motion, defendant Maxwell (with whom Dershowitz was working as witness) filed a motion for summary judgment – attaching many of the same documents Dershowitz had sought as well as others of a similar nature. And then, as if on cue a self-declared "investigative journalist" (CMA-096) blogger appeared on the scene claiming a right to access many of the same materials. "Journalist" Cernovich's motion sought essentially the same relief – to

44

selectively publish certain documents that Dershowitz thought would be helpful to him in his media attacks on Ms. Giuffre. As detailed above, Dershowitz and Cernovich have close ties, with Dershowitz starring in Cernovich's film and inspiring him to go to law school. (CMA-118; CMA-119).

Cernovich was no doubt aware that the case in which he sought to intervene was a case involving the sexual abuse and trafficking of Ms. Giuffre while she was a minor child. Cernovich tells this Court that he is a "political journalist" who wants to "inform[] the public about the issues at [stake] in this case" (Cernovich Br. at 4-5), but his self-published statements on sexual assault point to a different purpose – a personal vendetta wholly divorced from anything related to the public right of access to the Courts.

Cernovich, an accused rapist, appears to have a personal victim-shaming women who come forward about sexual abuse. Cernovich blames victims and fetishizes rape, as multiple websites, including Wikipedia.com, reveal from his captured tweets:

- "The hotter the sex, the more closely it resembles rape";

- "Have you guys ever tried 'raping' a girl without using force? Try it. It's basically impossible.  Date rape does not exist";

- "A whore will let her friend ruin your life with a false rape case.  So why should I care when women are raped?";

- "Not being a slut is the only proven way to avoid AIDS.  If ou love black women, slut shame them";

45

- "Fat/ugly women seek out dominant men to abuse them.  Then they seek sympathy from others.  'He's so mean.'.  Hence why women troll Twitter"; and

- "Who cares about breast cancer and rape? Not me."

CMA-120-21.  The interest is not merely academic (or journalistic); according to *The New Yorker*, Cernovich "was accused of raping a woman he knew."  C.M.A.-121.

These facts were presented to the District Court in response to Cernovich's motion to intervene.  CMA-122-130.  Cernovich did not deny any of the attributions.  CMA-136-45.  And with respect to the argument that he was simply a stalking horse for Dershowitz, Cernovich wrote that Ms. Giuffre "provides nothing more than shameful and unprofessional table-pounding for [her] argument that Mr. Cernovich and Prof. Dershowitz are in cahoots and the Court should not give this theory any credence."  C.M.A.-138. But tellingly, despite submitting an affidavit on other subjects, *see* C.M.A.-137 n.1, Cernovich chose not to submit any affidavit (or other evidence) of a lack of connection to, and coordination with, Dershowitz. Indeed, when the District Court later held oral argument on Cernovich's intervention motion, Cernovich's counsel was forced to concede "my client's relationship with Professor Dershowitz."  J.A.-595.

In light of these essentially uncontested facts, the District Court's denial of modification of a protective order at Cernovich's request was entirely correct, and

46

certainly not an abuse of discretion.  "A litigant's purpose in seeking modification of an existing protective order is also relevant for determining whether to grant a modification." *Dorsett v. County of Nassau*, 289 F.R.D. 54, 65 (E.D.N.Y. 2012). Indeed, Dershowitz's purpose was to maintain his extrajudicial attacks on Ms. Giuffre in the media, in which he falsely called her a "prostitute" and a "bad mother" to her three minor children. CMA-124.  Indeed, in over 50 statements to the press, Dershowitz has attacked Ms. Giuffre, arguing that "she should go to jail . . . [and] the lawyers should be disbarred." C.M.A.-124.  By his own words, Dershowitz wants to intimidate and harass Ms. Giuffre with the specter of his sending her (an FBI-confirmed victim of sexual abuse) "to jail."

When the District Court denied him documents to continue that vendetta – because he willingly signed an agreement forbidding him to disclose those documents – Maxwell then attached these documents to her motion for summary judgment.  And ten days after that filing, Cernovich sought to intervene to modify the protective order to obtain them.  Quite conveniently for Dershowitz, his acquaintance Cernovich is a "rape apologist" who advocates sexual assault victim-shaming." C.M.A.-124.

*Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598 (1978), explained that "[i]t is uncontested that the right to . . . copy judicial records is not absolute . . . access has been denied where court files might have become a vehicle for improper

purposes."  *Nixon* instructed that lower courts should "exercise an informed discretion as to the release" of materials, because, "[o]therwise, there would exhibit a danger that the court could become a partner in the use of the subpoenaed material to gratify private spite or promote public scandal, with no corresponding assurance of public benefit."  435 U.S. at 603 (internal citations and quotations omitted).  Building on such concerns, this Court has also noted the courts need not unseal private and otherwise-protected material to enable a non-party to conduct a public smear campaign.  *U.S. v. Amodeo*, 71 F.3d at 1044, 1051 (2d Cir. 1995) ("*Amodeo II*") ("The nature and degree of injury must also be weighed. This will entail consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information ….  *Personal vendettas…need not be aided*" (emphasis added)).

    In light of the facts and the relevant case law, this Court should affirm the District Court's decision to refuse to modify the protective order because, under *Nixon* and *Amodeo II*, the documents would go to Cernovich to gratify his "private spite" for Ms. Giuffre as a victim of sexual assault, which would in turn simply serve the purpose that Dershowitz was attempting to achieve when he sought to be relieved from the non-disclosure provisions of the protective order.  Dershowitz should not be able to achieve by proxy what he himself is forbidden from doing directly. The District Court's decision should be affirmed for these reasons as well.

48

## IV.   IF THIS COURT CONCLUDES THAT CERNOVICH HAS PROPERLY RAISED A RIGHT OF ACCESS CLAIM APART FROM THE PROTECTIVE ORDER, THEN THIS COURT SHOULD REMAND TO THE DISTRICT COURT FOR FURTHER FINDINGS.

For the reasons explained in the previous sections, neither Dershowitz (as explained in Part II) nor Cernovich (as explained in Part III) raised a valid reason for any modification of the protective order sealing documents in this case.  To the contrary, the District Court properly held that Dershowitz was bound by the terms of the protective order (terms to which he agreed), and Cernovich's argument to, as he put it, "modify a protective order" (C.M.A.-97) was unavailing.  Accordingly, the District Court's decision should be affirmed without reaching any of the complicated right of access issues that Dershowitz and Cernovich present in their appeals.

If, however, this Court concludes that either Dershowitz or Cernovich is entitled to entirely reframe the case from the way they chose to present it below and to newly mint a right of access claim, then the proper course for this Court is to simply remand the matter back to the District Court for further findings.  In this section, we first discuss the appropriate standards that would govern the issue on remand and, second, explain why the resulting factual issues would require a remand.

### A.   On Any Remand, the District Court Can Make Appropriate Findings about Sealing or Unsealing Documents Under Settled Second Circuit Law.

49

The standards pertaining to access to documents are well-known, and on any remand, the District Court would have little difficulty in making the appropriate findings.  This Court has laid out the process to be followed in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006).  The process involves multiple steps, each of which is briefly discussed in turn.

### 1.    The Existence of a "Judicial Document."

In *Lugosch*, this Court explained that there is a common law right of public access to judicial documents.  *Id.* at 119.  But "before any such common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.' . . . [T]he mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. In order to be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process."  *Id.* (internal citation omitted).

It is also clear from this Court's decision in *Lugosch* that some of the documents at issue in this case are judicial documents.  Specifically, *Lugosch* holds that "there exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion."  *Id.* at 124.  On the other hand, with regard to documents submitted in connection with non-dispositive motions, such as discovery motions, it does not appear that this

50

Court has spoken.  A review of the case law reveals, however, that *every circuit* to have directly addressed this point has found that documents filed as exhibits to non-dispositive discovery motions *do not qualify* as judicial documents.  *See, e.g., Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *Bond v. Utreras*, 585 F.3d 1061, 1075 n.8 (7th Cir. 2009); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc*., 263 F.3d 1304, 1312–13 (11th Cir. 2001); *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 10 (1st Cir. 1986); *Leucadia, Inc. v. Applied Extrusion Technologies, Inc*., 998 F.2d 157, 164 (3d Cir. 1993).

Dershowitz acknowledges that the District Court properly looked to these authorities in reaching its decision.  *See* Dershowitz Br. at 36 (citing Sp.A.-20-21).  But he claims that these other Courts of Appeal relied "on legal propositions [the Second Circuit] has already rejected."  *Id.*  But, to the contrary, this Court has previously rejected any argument that would "transform every document that a court reviews into a 'judicial document' presumptively open to the public, despite well-settled law to the contrary."  *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 233 (2d Cir. 2001).  And with regard to discovery in particular, this Court has explained that "[d]iscovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public."  *Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982).

51

Moreover, Dershowitz is apparently unable to distinguish the Third Circuit precedent, and with regard to the Seventh and Ninth Circuit rulings, Dershowitz describes their rationale as rejecting any sort of a presumption of public access. Dershowitz Br. at 36.  That is incorrect. Those cases rely on the fact that the "usual presumption of the public's right of access is rebutted" by a sealing order, *Phillips*, or that a document was of a type that has historically been treated as confidential, *Corbitt*.  *Phillips v. G.M. Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002); *United States v. Corbitt,* 879 F.2d 224, 228 (7th Cir. 1989).  Similarly, Dershowitz misstates the Eleventh Circuit's approach, which relied on a ruling from this Court. *See Chicago Tribune*, 263 F.3d at 1312 & n.11 (citing its approach as the "better rule" that followed from *United States v. Amodeo*, 71 F.3d 1044, 1048-49 (2d Cir. 1995)).  Similarly, the First Circuit's approach relied on the fact that

> [m]aterials submitted to a court for its consideration of a discovery motion are actually one step further removed in public concern from the trial process than the discovery materials themselves, materials that the Supreme Court has said are not subject to the public's right of access.  *See Seattle Times Co.,* 467 U.S. 36–37. It would be an odd procedure if a trial court were forced to scrutinize strictly for first amendment implications materials it considers in support of or in opposition to a discovery motion, but it did not have to do so for the information the parties seek to uncover.

*Anderson*, 805 F.2d at 13.  This Court should follow the clear weight of well-reasoned authority in every other circuit that has considered this issue and conclude that there is no presumption of access to discovery-related documents.

## 2.     The Weight to Be Extended to Any Presumption of Access.

For documents determined to be "judicial documents" for which a presumption of access attaches, *Lugosch* holds that the next step in the process is to determine the weight of that presumption. 435 F.3d at 119.  The determination of weight "must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id.*  Little additional needs to be said about this point, because the District Court can presumably make any necessary findings related to it.

In his brief, however, Dershowitz claims that Judge Sweet "misapprehended the law" governing sealing of summary judgment motions when he made a brief reference to dicta in *Amodeo II* regarding situations in which a right of access "is not as pressing," dicta which has since been clarified by this Court's ruling in *Lugosch*.  *See* Dershowitz Br. at 31-32 (citing *Lugosch*, 435 F.3d at 120-21).  But Judge Sweet's brief reference was simply making the point that, when he ruled, he was "mere weeks from assembling a jury for trial" and thus the need to keep materials under seal "outweigh[ed] any public interest in their publication *at this time*."  Sp.A.-35 (emphasis added).

53

Cernovich takes a different tack on this language, arguing that because the case below later settled without need for a jury trial, "the very basis the District Court utilized to restrict public access no longer exists." Cernovich Br. at 12. But the three appeals before this Court all involve orders issued by the District Court when the case was progressing towards trial and the Court had to be concerned about (among other things) prejudice to any jury pool. The parties' appeal must accordingly be decided based on the facts that the District Court faced at the time it ruled.

### 3.   The Balancing of Interests.

*Lugosch* also instructed that "[f]inally, after determining the weight of the presumption of access, the court must balance competing considerations against it. Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." 435 F.3d at 120. Here again, little needs to be said about the legal standards, which are well-settled in this Circuit. Courts in this Circuit have routinely applied the *Lugosch* standards, and when good cause is shown, have kept sensitive materials under seal. *See, e.g.*, *Omari v. Ras Al Khaimah Free Trade Zone Auth.*, No. 16 CIV. 3895 (NRB), 2017 WL 3896399, at *14 (S.D.N.Y. Aug. 18, 2017); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 445 n.7 (S.D.N.Y. 2016) ("As for competing considerations that counsel in

favor of allowing the parties to file their [summary judgment] briefs under seal, the privacy interests of the parties in preventing the public disclosure of private business figures and communications are not insignificant. The Court therefore concludes that the balance of interests is in favor of allowing the parties' [summary judgment] briefs to be filed under seal.").

### 4.    The First Amendment Right of Access.

Finally, *Lugosch* notes that apart from a common law right of access, in some more limited situations, a qualified First Amendment right of access to certain documents may develop.  *Lugosh* noted that this Court has "articulated two different approaches for determining whether the public and the press should receive First Amendment protection in their attempts to access certain judicial documents. The so-called 'experience and logic' approach requires the court to consider both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question.  The courts that have undertaken this type of inquiry have generally invoked the common law right of access to judicial documents in support of finding a history of openness. The second approach considers the extent to which the judicial documents are derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings." *Lugosch*, 435 F.3d at 120.

The Court need not spend any time discussing this issue, because Cernovich did not develop an argument based on either of the two approaches in the Court below.  *See* C.M.A.-91-106 ("experience and logic" test not cited, much less developed).[10]  Accordingly, Cernovich has waived his right to present such a claim for the first time on appeal.

And, in any event, such a claim would lack any merit.  No one can plausibly argue that access to the documents at issue here are a "necessary corollary" of any right to attend court proceedings.  And with respect to the "experience and logic" approach, on the facts of this case this approach would not create any additional right to access documents beyond that stemming from the common right of access (which covers the summary judgment materials, as noted above).  With regard to discovery materials, the fact that five courts of appeals have found, for example, that there is no common law right of access to discovery documents surely undercuts the argument that such documents have "historically been open" to public examination.  More broadly, there is no "historical openness" to the press of a party's raw discovery materials.  Indeed, quite the opposite is the case.  As this Court has explained, there is no public right of access to material exchanged in

---

[10] Dershowitz did develop such an argument in his motion below, but Cernovich never adopted that argument below.  As explained in Part I, above, Dershowitz cannot properly raise this issue here because (as the District Court ruled) he has agreed in writing not to disclose or use any confidential materials covered by the protective order.

discovery. *Amodeo II*, 71 F.3d at 1050 (documents "passed between the parties in discovery, lie entirely beyond the presumption's reach…"). Finally, public access would not "play a significant positive role in the functioning of the particular process" in question, as the parties have settled the case.

Of course, even if a First Amendment right of access does exist to the documents in question, that does "not end the inquiry. [D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (internal citation omitted). So even if the Court concludes that a First Amendment right of access is in play, a further balancing of the competing concerns is required before concluding that the documents should be released.

**B.  A Remand Is Needed to Allow Judge Sweet to Weigh the Competing Factors.**

It hardly should come as a surprise that the District Court handled this case as Cernovich, for example, had framed it in his opening pleading – i.e., as an issue of whether to "modify a protective order." C.M.A.-97. If the case is now going to be framed in a different way, then the District Court must make appropriate factual findings in light of different standards. The District Court is thoroughly familiar with the documents in question and other factual issues surrounding unsealing, such as the reliance interests of the parties in designating materials as confidential

and other matters that would have to be considered in balancing the competing

considerations.

The District Court has not yet had the opportunity to make findings on these

issues, a point that appellants appear to concede.  *See* Dershowitz Br. at 43

(describing First Amendment standards and then explaining "no such findings have

ever been made").  Accordingly, it would be premature for the Court to adjudicate

what those findings might entail.  Dershowitz, however, has sketched out his

position what those findings might look like.  While it would be mere dicta for this

Court to comment on this hypothetical section of Dershowitz's brief, a few points

in response may be appropriate.

First, Dershowitz asserts that the District Court "should not have even

considered Dershowitz's motivation in seeking access to the documents …."

Dershowitz Br. at 43.  As authority for this proposition, Dershowitz cites this

Court's decision in *Amodeo II*, which did indeed hold "motive generally to be

irrelevant to defining the weight accorded the presumption of access."  *United*

*States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("*Amodeo II*").  However, far

from holding that District Courts should not *ever* consider motivation, as just a few

sentences later this Court differentiated between journalists "interested in

monitoring courts" from others, explaining that *"[d]ifferent considerations apply*

*where personal motives, such as an individual vendetta or a quest for competitive*

*economic advantage, are involved*. However, we believe these considerations are best weighed as part of an assertion by a person or firm of a right of privacy based on an anticipated injury as a result of disclosure." *Id.* at 1050 (emphasis added). Thus, if this Court were to remand for further fact-finding, the District Court would be required to address (among other things) Ms. Giuffre's argument that Dershowitz and Cernovich worked in concert with each other and Defendant's attorneys, to attach these documents to an ill-founded summary judgment motion, all in order to obtain release of those documents to one individual with a personal vendetta and another who is a rape apologist, both who want to victim-shame Ms. Giuffre,[11] with the former already having falsely called her a "prostitute." CMA-124.

Second, Dershowitz claims that the privacy issues at stake in this case are insufficient to support sealing because he "seeks to reveal (unflattering and false) statements *about himself*." Dershowitz Br. at 45 (emphasis in original). This is a disingenuous description of the materials at issue. Indeed, Dershowitz himself describes ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

---

[11] Ms. Giuffre has certainly not waived factual arguments such as this one, since she presented them at length in the district court. CMA-117-30. She is accordingly entitled to have the district court rule on them in the first instance.

███████████████████████████████████

███████████████████████████████████

████████████████████████

Dershowitz also argues that weighed against privacy should be the fact that Ms. Giuffre "has spent the last several years smearing him publicly in every available forum." Dershowitz Br. at 45. The Court will notice that no citations accompany that assertion. And unlike Dershowitz, who has penchant for the cameras, Ms. Giuffre's "smears" turn out, on close examination, to be a single court motion (and a related affidavit) seeking to be declared a victim in the Florida Crime Victims' Rights Act case, a deposition *taken under seal by Dershowitz's* attorneys in the Florida defamation case, and a deposition *taken under seal this case at the request of Ms. Maxwell*, with whom Dershowitz is friendly with and aligned in interest. Indeed, the complaint that Ms. Giuffre filed in this case does not even mention Dershowitz. Thus, other than providing appropriate court testimony and pleadings, Ms. Giuffre has not made public statements about Dershowitz – much less spending "the last several years smearing him publicly in every available forum."

█████████████████████████████████

███████████████████████████████████

███████████████ Courts routinely seal materials in support of filings when they

60

contain proprietary or similarly-protected content.  *See, e.g, Louis Vuitton Malletier, S.A. v. My Other Bag, Inc*., 156 F. Supp. 3d 425, 445 n.7 (S.D.N.Y. 2016) (allowing sealing of summary judgment findings to protect propriety interests).[12]

The larger problem with Dershowitz's claim is that he seeks to *selectively* release information about himself from the case below.  Dershowitz is not seeking, for example, to release sworn testimony from ███████████████████ ████████████████████████████████████████████████ ████████████████  Dershowitz clearly has little interest in having the public weigh *all* of the evidence contained in the record below.  The case below involves more than 900 docket entries, many of which contain strong documentary and testimonial support of Ms. Giuffre's account of victimization at the hands of Epstein and his powerful friends.  The District Court was alluding to this fact when it noted that to allow Dershowitz to cherry-pick several documents that he wants to have unsealed would mean ███████████████████████████████████ ███████████████████████████████████

---

[12] ██████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████  Indeed, this Court expressly recognizes such privacy rights as a legitimate basis to overcome the presumption of access.  *Amodeo II*, 71 F.3d at 1051 ("Such interests, while not always fitting comfortably under the rubric 'privacy,' are a venerable common law exception to the presumption of access.").

61

Dershowitz also advances the argument that Ms. Giuffre has somehow "waived" her right to confidentiality.  Dershowitz Br. at 45.  But with respect to allegations against him, Dershowitz shows nothing other than that Ms. Giuffre has appropriately participated in court proceedings.  But in any event, if the Court concludes that such factual questions need to be considered, the proper forum for doing so is the District Court.

## CONCLUSION

Ms. Giuffre was sexually abused by Alan Dershowitz.  He and his victim-shaming proxy should not be permitted to compound the abuse through selective unsealing of confidential documents from the court below.

So that the record is completely clear, Ms. Giuffre is not opposed to general unsealing of the *entire* factual record in the district court – a record that validates her word over Dershowitz's, including the ███████████████████████████████████ ███████████████████████████.  But disclosure of the entire factual record is not the relief Dershowitz and his proxy are seeking.  Through their appeals, Dershowitz and his proxy seek to present a distorted picture of what happened below by releasing just a handful of documents that they find useful.  The decisions of the District Court declining to allow such a one-sided modification of the protective order should be affirmed.

62

December 13, 2017

Respectfully Submitted,

*/s/ Paul G. Cassell*
PAUL G. CASSELL
S.J. Quinney College of Law
University of Utah
383 S. University St.
Salt Lake City, UT 84112
(801) 585-5202[13]
BOIES SCHILLER FLEXNER LLP

Sigrid McCawley
Boies Schiller & Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

---

[13] This daytime business address is provided for contact purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

## <u>CERTIFICATE OF COMPLIANCE WITH F.R.A.P RULE 32(A)</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's Local Rule 32.1 [and the Court's order allowing a brief not to exceed 15,000 words].  The brief contains <u>14,911</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the Microsoft Word computer software used by counsel.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: December 13, 2017.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 13, 2017, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served to all parties of record via transmission of the Electronic Court Filing System generated by CM/ECF.

/s/ Paul G. Cassell
Paul G. Cassell

65